# IN THE MATTER OF 2000 MINNESOTA SUGAR BEET CROP INSURANCE COVERAGE ARBITRATION

This document relates to all cases except:

*Anderson Farms, et al. v. Fireman's Fund Ins. Co.*,
D. Minn. Court File No. 01-CV-1637

**FINDINGS OF FACT**

File Nos. 01-CV-1629
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
02-CV-0985
65-C0-01-648

## TABLE OF CONTENTS


I. INTRODUCTION

II. SUMMARY FINDINGS

III. THE PARTIES

IV. SIGNIFICANT NON-PARTY

V. THE FEDERAL CROP INSURANCE PROGRAM

VI. FACTS REGARDING AND GENERAL DESCRIPTION OF THE SOUTHERN MINNESOTA SUGARBEET CROP IN A TYPICAL YEAR (AS OPPOSED TO CROP YEAR 2000).

VII. FACTS REGARDING CROP YEAR 2000 AND THE EARLY FREEZE EVENT OF OCTOBER 6 THROUGH OCTOBER 9, 2000.

A. THE FREEZE

B. THE GROWERS' LOSSES

C. THE GROWERS' LOSSES WERE CAUSED BY ADVERSE WEATHER CONDITIONS.

D. ALL GROWER SUGAR BEETS HARVESTED AFTER THE FREEZE DID NOT MEET THE MINIMUM ACCEPTABLE STANDARDS OF THE GROWER AGREEMENT EXCEPT AS QUALIFIED IN THE BALANCE OF THESE FINDINGS.

VIII. THE GROWERS' INDEMNITY DAMAGES ARE ACCURATELY ADJUSTED AND PAYABLE UNDER 13(E) OF THE POLICY.

IX. THE GROWERS FOLLOWED GOOD FARMING PRACTICES IN HARVESTING AND STORING OF THEIR 2000 SUGAR BEET CROP.

X. THE GROWERS' LOSSES WERE NOT CAUSED BY SMBSC MISMANAGEMENT.

A. THE SMBSC EXERCISED SOUND, RECOGNIZED PRACTICES IN HARVESTING AND STORING THE 2000 SUGAR BEET CROP.

1. SMBSC And The Growers Responded Reasonably And Prudently To The Freeze Event.

2. SMBSC Acted Reasonably and Prudently in the Piling of the Sugar Beets.

3. SMBSC Acted Reasonably and Prudently in Monitoring and Managing the Piles.

B. SMBSC'S SCALPING DID NOT CAUSE THE GROWERS' LOSSES.

C. SMBSC'S DECISION TO CONTINUE FULL HARVEST DURING POST-FREEZE WARM TEMPERATURES AFTER OCTOBER 10, 2000 WAS NOT A CAUSE OF THE GROWERS' LOSSES.

D. SMBSC'S PRACTICES IN SAMPLING AND MONITORING THE SUGAR BEETS DID NOT CAUSE THE GROWERS' LOSSES.

E. SMBSC'S VENTILATION PRACTICES DID NOT CAUSE THE GROWERS' LOSSES.

F. SMBSC'S BELIEF THAT THE SUGAR BEETS WOULD HEAL FOLLOWING A FREEZE EVENT WAS REASONABLE AND DID NOT CAUSE THE GROWERS' LOSSES.

G. THE EXPERIENCE OF THE SIDNEY, MONTANA SUGAR BEET GROWERS IS DISTINGUISHABLE AND LACKS PROBATIVE VALUE FOR THE PROPOSITION THAT THE LOSSES SUFFERED IN THE SMBSC GROWER REGION WERE AVOIDABLE OR CAUSED BY NEGLIGENCE, MISMANAGEMENT, OR OTHER WRONGDOING.

H. OTHER CLAIMS OF ALLEGED SOURCES OF LOSS.

XI. NOTICE

A. NEITHER SMBSC NOR THE GROWERS KNEW, NOR REASONABLY COULD HAVE KNOWN, THAT A LOSS OF THE CROP WAS PROBABLE BEFORE MID-DECEMBER 2000.

1. Problems In Harvesting And Processing The Crop After The Freeze Did Not Alert The Growers That A Loss Was Probable.

2. Post-Freeze Communications Between The SMBSC Management And The Growers Do Not Demonstrate That Either Knew, Or Had Reason To Know, That A Loss Of The Crop Was Probable Before Mid-December 2000.

3. The SMBSC Did Not Conceal Information From The Growers Or The Insurers.

B. SPECIFIC FACTS REGARDING THE GIVING OF NOTICE BY THE GROWERS TO THE INSURERS: THE SMBSC NOTICE OF DECEMBER 15, 2000, FACTS BEARING UPON WIDESPREAD KNOWLEDGE OF A SIGNIFICANT FREEZE EVENT, AND SPECIFIC FACTS WITH RESPECT TO INDIVIDUAL GROWERS.

1. <u>The December 15, 2000 Notice by the SMBSC.</u>

2. <u>General Notice Due To Common Knowledge Within The Growing Area And The Crop Insurance Industry Of A Significant Freeze Event.</u>

3. <u>Facts Regarding the Giving of Notice by Individual Growers To The Insurers</u>

*(a) Facts with respect to individual growers who provided no notice to any insurer prior to the notice transmitted by the SMBSC on December 15, 2000.*

*(b) Facts with respect to individual growers who were informed that an insurance agent provided notice to an insurer, but have no personal knowledge regarding the circumstances of the notice.*

*(c) Facts with respect to individual growers who were informed that a PIK adjuster was in one or more of their fields appraising a portion of their 2000 sugar beet crop after the freeze and that this constitutes notice.*

*(d) Facts with respect to individual growers who rely on their conduct as described in proffered discovery responses as notice.*

*(e) Facts with respect to individual growers who agreed to be bound by the deposition testimony of a family member or farming partner regarding the issue of notice.*

*(f) Facts with respect to growers who provided live or deposition testimony, and/or documentary evidence, on the issue of notice at the arbitration hearing.*

C. PROVIDING MEANINGFUL NOTICE BEFORE MID-DECEMBER 2000 WAS NOT POSSIBLE.

XII. THE INSURERS WERE NOT PREJUDICED BY THE ALLEGED LACK OF TIMELY NOTICE.

A. LATE NOTICE DID NOT PREVENT AN ACCURATE ADJUSTMENT OF THE GROWERS' LOSSES.

B. DEFENDANT INSURERS DID NOT FOLLOW THE DELAYED NOTICE LOSS ADJUSTMENT PROCEDURES SET OUT IN THE LOSS ADJUSTMENT MANUAL (LAM).

C. DEFENDANT INSURERS MADE NO REQUEST OF ANY GROWER, NOR TOOK ANY ACTION TO INVESTIGATE ANY CLAIM, BEFORE ISSUING A GENERAL DENIAL TO EACH GROWER.

XIII. CONCLUSION.

## I. INTRODUCTION.

This is a dispute between 402 sugarbeet growers and their multi-peril crop insurers over the existence and scope of indemnity obligations following an early, deep, and hard freeze in early October 2000 and the ensuing failure of the sugarbeet crop. The plaintiff-growers have made claims for insurance indemnity payments under the policies. The defendant insurance companies have denied the claims.

Upon Order of the United States District Court, the resolution of the factual disputes has been referred to arbitration for adjudication and a decision regarding all disputed issues of fact. The parties have selected the undersigned arbitrators, and have engaged the arbitrators to adjudicate and decide all issues of fact pursuant to the Engagement Letter dated March 20, 2003, effective as of January 29, 2003.

The Arbitration proceeding commenced on September 8, 2003 and ended on October 1, 2003. It was preceded by a complex and difficult discovery and pre-hearing proceedings, inclusive of periodic status conferences with the Arbitration Panel and motion practice, most of which is memorialized in Panel Arbitration Orders 1 through 10. During the course of these pre-hearing events, the Parties worked diligently and frequently were able to arrive at agreed upon solution of their differences. On those issues that could not be resolved, the Panel exercised its discretion inclusive of limiting the number of oral depositions of 402 named plaintiff-growers to those growers who claimed that they had provided notice of damage or loss to the insurers above, beyond, and different than the notice transmitted on their behalf by the Southern Minnesota Beet Sugar Cooperative by letter dated December 15, 2000. See Panel Arbitration Order No. 4 and Panel Order No. 5[1]. The insurer-defendants at all pertinent times preserved their objection to this procedure and memorialized their demand to take depositions of each grower-plaintiff on a full range of issues they believed were invoked by this dispute. Once the Panel's decision to limit the number of depositions was made, both the Insurers and Growers

---

1 The insurer-defendants asserted a contractual right to depose all 402 grower-plaintiffs. The plaintiffs moved for an order providing that no depositions of grower-plaintiffs be permitted on the ground of time expiration or waiver by defendants. The Panel ordered a limited number of depositions of plaintiffs. These were to be "undifferentiated" plaintiffs – selected randomly so as to be a reasonable sample of the 402 growers. They were to be subjected to broad questioning by the defendants. The Panel reserved the issue of whether additional depositions would be permitted until after these were completed and transcripts provided to the Panel along with supplemental argument by the parties.

The Panel reviewed the transcripts and concluded that the only subject matter where lack of commonality in the representative depositions required further depositions was on the issue of notice. The Panel ordered that all plaintiffs could be deposed on the notice issue and urged the parties to consider stipulations that would reduce the number of those that need be taken. Cooperative efforts by the parties greatly reduced the number of depositions that were required for the purpose of completing the evidentiary picture on the notice issue.

While the insurance contract governs the obligation of plaintiffs to submit to examination, it does not modify the normal rules of conduct of the arbitration. In this respect, an inquiry submitted by the defendants to the RMA for a ruling on the right to and scope of depositions did not focus on the issue confronting the parties and the Panel. That issue is: Can the Panel in an arbitration proceedings involving over 400 plaintiffs limit the number of depositions of plaintiffs if the Panel determines, after a fully informed hearing, that taking the deposition of roughly 350 plaintiffs is unnecessary, repetitious, and needlessly costly and time-consuming? In the Panel's view, the issue is not contractual breach, but the propriety of the Panel's order limiting depositions. The Panel notes that plaintiffs did not refuse to have their depositions taken and both sets of parties have fully complied with the Panel's orders on depositions.

worked diligently to complete the deposition process and related discovery, inclusive of the stipulation scheme set out in the Order, and were faithful to its letter and spirit.

Before the Hearing, the parties submitted voluminous written materials including trial briefs, motions, and proposed findings of fact. A lengthy, complex, and complete evidentiary Hearing commenced on September 8, 2003 and concluded on October 1. Thereafter, the Panel was provided with extensive post-Hearing submissions including proposed findings of fact, exhibit books comprising all arbitration exhibits used at the hearing, deposition testimony designations, transcripts of arbitration hearing testimony, all of which the Panel considered along with the testimony and documentary evidence and briefing tendered during the course of the Hearing.

Based upon the complete record of the Arbitration hearing and related proceedings, the written and oral submissions, and after extensive consideration and deliberation, we, the undersigned arbitrators, make the Following Summary Findings of Fact and Specific Findings of Fact.

## II. SUMMARY FINDINGS.

1. All grower-plaintiffs suffered an adverse weather event in the form of significant widespread freezing temperatures that occurred during a four day period commencing Friday, October 6, 2000 and ending on Monday, October 9, 2000.

2. The adverse weather event was a direct cause of the losses sustained by all of the grower-plaintiffs.

3. Except as provided in Paragraph 68 of these Findings, all grower-plaintiffs' sugar beets unharvested as of the onset of the freezing temperatures were damaged and no longer suitable for processing into sugar as a result of the freezing temperatures.

4. All grower-plaintiffs and the Southern Minnesota Beet Sugar Cooperative reasonably and in good faith believed at all times prior to mid-December 2000 that the sugar beets unharvested as of the freeze had not been permanently damaged and, in fact, had healed and would process sufficiently well that no probable loss would occur.

5. Notice of probable loss was provided by the growers as set forth in Findings 140 through 217, and 242.

6. No insurance company was prejudiced by late notice, nor by any non-compliance with policy provisions.

7. Except as provided in Finding 68, all of the unharvested sugar beets sustained freeze-damage that, in turn, caused them to be non-storable and fall short of the minimal acceptable standards of the growers processing contracts.

8. The grower-plaintiffs, the Southern Minnesota Beet Sugar Cooperative, and its professional employees at all pertinent times planned and executed the harvest campaign in a reasonable and professional manner. They did so in the good faith belief that their decisions regarding the freeze, the handling of the harvest, the timing of the commencement, suspension, and resumption of harvest, storage decisions, piling decisions, and decisions with respect to the processing of the sugar beets that were freeze-damaged were reasonable and necessary.

9. There was no negligence, mismanagement, wrongdoing, or failure to follow good farming practices on the part of the growers or the SMBSC and, even if there were, the losses sustained by the grower-plaintiffs were not caused by any such conduct or any other uninsured cause.

10. Except for those harvested and reasonably processable within 7 days following the freeze, the gross dollar value of the sugar beets unharvested as of October 9, 2000 was zero.

11. Deloitte & Touche LLP compiled a joint database ("Database") for use by the Panel and the parties in calculating indemnities and furnishing other information for use by the panel and parties. The Database contains, for each and every plaintiff, all information set forth in the attached Exhibit 1. Select information from the Database for each and every plaintiff is set forth in Attachments A and B, and is incorporated herein as Findings of Fact. Except as provided in Finding 68, each of the grower-plaintiffs (save for any specific exceptions in the Findings concerning disputed Database cases) satisfies the factual pre-requisites of Paragraph 13(e) of the crop provisions of the multi-peril crop insurance policy (MPCI policy) and qualifies for an insurance indemnity payment under their policy in the amount as calculated (after considering all information included in the Database as set forth in Exhibit 1) as set forth herein as Attachment A. Attachment A also sets forth amounts previously paid in indemnities by RCIC to its insureds as reflected in Attachment A and lists the amounts still owing to each plaintiff.

## III. THE PARTIES.

1. Plaintiffs (also hereinafter referred to as "growers" and or "plaintiff-growers") are insured sugar beet growers from southern and western Minnesota and members of the Southern Minnesota Beet Sugar Cooperative (SMBSC).

   a. Each grower-plaintiff entered into a Growing Agreement with SMBSC for the 2000 sugar beet crop year. An exemplar of the contract is attached as Exhibit 2.

b. Each plaintiff planted, grew, and harvested sugar beets for the 2000 sugar beet crop year as set forth in Attachment B.

c. Each and every plaintiff was insured under an MPCI policy as set forth in 7 C.R.F. §§ 457.8 and 457.109, in the manner set forth in Attachment B.

d. Each plaintiff purchased one or more MPCI policies from one of the private insurance company defendants for the 2000 sugar beet crop year as set forth in Attachment B.

e. The price election and coverage levels for each plaintiff's 2000 sugar beet crop as set forth in the insurance contracts for each plaintiff are set forth in Attachment B.

f. The plaintiffs paid in aggregate over $4,250,000 in premiums to the defendants to purchase this MPCI coverage for the crop year 2000.

g. Additionally, the contractual acreage for each plaintiff is set forth in Attachment B.

2. Defendants are eight private insurance companies[2] and certain affiliates that sold MPCI policies to the plaintiffs for the 2000 crop year. They are as follows:

a. NAU County Insurance Company.

b. Rural Community Insurance Company ("RCIC").

c. IGF/CNA Insurance Company ("IGF").

d. Farm Bureau Mutual Insurance Company.

e. Acceptance Insurance Company.

f. Farmers Alliance Mutual Insurance Company.

g. Rain and Hail LLC.

h. Great American Insurance Company.

## IV. SIGNIFICANT NON-PARTY (THE SMSBC ORGINIZATION).

3. The SMBSC is a farmers cooperative, wholly owned by approximately 550 growers in 18 Minnesota counties farming approximately 120,000 acres. It was formed in 1973 by 300 growers. The first crop processed by the

[2] In addition, a ninth insurer, Hartford Insurance Company of the Midwest ("Hartford") was originally a defendant in these proceedings. Subsequent to the evidentiary hearing in these proceedings, Hartford and those insured with claims against Hartford settled their claims.

SMBSC's factory was planted in 1975. 402 of these 550 growers are named plaintiffs in these cases.

a. The SMBSC's business function is to receive sugar beets grown by the growers and process those sugar beets into sugar and by-products for sale. Toward that end, SMBSC maintains a factory that processes sugar beets and a professional staff that operates the factory and oversees the growing of sugar beets and receipt of sugar beets at piling or receiving stations.

b. The SMBSC is a grower-owned cooperative. Its only crop is sugar beets and its only function is to produce sugar and sugar beet-related by-products from sugar beets.

c. The SMBSC has a zero profit at the end of the year. All money that the SMBSC earned through processing the crop is ultimately returned to the growers after expenses are deducted.

d. The SMBSC was a successful enterprise and had never lost an entire crop, nor the majority of a crop, to a freeze except for the 2000 crop.

e. The SMBSC processing plant in Renville was a state-of-the-art, recently up-graded facility.

f. The SMBSC factory had, in 2000, an estimated slice rate of 11,000 tons per day. The slice rate is the rate at which large volumes of raw beets can be sliced and introduced into the factory extraction process.

g. The SMBSC had a laboratory that is used during harvest to analyze samples taken from grower truckloads. It employs industry standard polarimetric procedures.

## V. THE FEDERAL CROP INSURANCE PROGRAM.

4. Each defendant is an insurance company or an affiliate of such a company approved by the Federal Crop Insurance Corporation ("FCIC") to sell and service, and which sold, crop insurance in 2000 under the comprehensive congressionally-mandated federal crop insurance program established pursuant to the Federal Crop Insurance Act ("FCIA").

5. The FCIC, an agency and instrumentality of the United States Department of Agriculture ("USDA"), was created to provide and administer the federal crop insurance program for America's agricultural producers.

6. The Risk Management Agency ("RMA") is a USDA agency which provides operational, managerial, and personnel support for the FCIC.

7. The provisions of the MPCI policy at issue in this case were promulgated by the FCIC as part of regulations issued pursuant to the FCIA, as

amended. The relevant regulations are codified at 7 C.F.R. §§ 457.8 ("Basic Provisions") and 457.109 ("Crop Provisions"). In addition to the Basic Provisions, which are applicable to all crops (as designated by the Manager of the FCIC and approved by its Board of Directors), and the Crop Provisions, which are specific to a given crop (such as sugar beets), the MPCI policy has a component called the Special Provisions, which are developed, issued, and published by the FCIC. The Special Provisions establish coverage terms on a county-by-county basis for each type of crop eligible to be insured. We incorporate the full text of the cited regulations in these Findings.

8. In 1980, the FCIA was amended to restructure the federal crop insurance program to capture the private sector's marketing and product innovation capabilities and increase participation in the program. Before 1980, the private sector was not involved in the sale or servicing of federal crop insurance, and the FCIC was the direct insurer under the program. After the 1980 amendments, the private sector became the marketers and direct insurers of MPCI coverage. At the time of these suits, all MPCI coverage was sold under the names of private sector participants, including each of the defendants.

9. The basic relationship between the FCIC and each of the defendants is established in the FCIA, federal regulations, and the Standard Reinsurance Agreement ("SRA"). Each defendant executed a separate SRA with the FCIC, all of which contain identical terms and conditions.

## VI. FACTS REGARDING AND GENERAL DESCRIPTION OF THE SOUTHWESTERN MINNESOTA SUGAR BEET CROP HARVEST IN A TYPICAL YEAR (AS OPPOSED TO THE CROP YEAR 2000).

10. The harvest of sugar beets is a multi-step process. Growers first "top" or "defoliate" their sugar beets with a topper, i.e., they remove the leafy foliage (also called "the canopy"). Within minutes, a second machine, the lifter, passes down the topped rows, "lifting" the sugar beets and depositing the now-topped sugar beets in a truck. The truck carries and delivers the grower's beets to the receiving station. Every load is ticketed and weighed and from approximately every third load, beet samples are taken and sampled in a laboratory called a "tare lab."

11. The "tare lab" uses a specific test, called a "polarimetric test," to measure the amount of sugar (and other related molecules) in the sugar beets. The test involves several steps, including cutting the sugar beet samples, grinding them, putting them into solution, and shining a special, polarized light through the sample. Such tests are used to determine the level of extractable, marketable sugar – called sucrose – in the sugar beets.

12. Harvest is commenced and completed in two phases: a "pre-pile" phase, and a "full-harvest" phase. "Pre-pile" refers to the early portion of harvest

where growers deliver only a limited number of tons of sugar beets to the receiving station at a rate and in a manner in which the factory can be continuously fed, but not in a rate or manner in which "pre-pile" sugar beets will be left for long term storage. "Full harvest" refers to remainder of the harvest where sugar beets are delivered to the piling stations in a manner designed to pile all of the sugar beets into massive piles. During full harvest, hundreds of growers and their workers drive thousands of toppers, lifters and trucks, in some cases non-stop 24 hours per day, to pile sugar beets at the 12 piling stations. In a typical year, more than 80,000 beet truck loads of sugar beets will be delivered in full harvest, creating multi-thousand-ton sugar beet piles.

13. Upon delivery to the piling stations, an individual grower's beets are commingled with those of other growers whereupon they loose their separate identity and can no longer be identified as having been grown by a specific grower. As a result, the grower has a pro-rata interest in commingled beets as opposed to an interest in specific beets.

14. Because the processing of sugar beets is limited by the "slice rate" of the factory – the rate at which sugar beets can be put into the process and "sliced" and processed into sugar – piles are designed to facilitate the storage of sugar beets for up to six months while awaiting processing. Piling of sugarbeets is a widely practiced storage procedure in northern climates. At a "slice rate" of approximately 11,000 tons per day, it takes SMBSC from September until approximately March to process all of a crop year's sugar beets.

15. The sugar beets are piled from back-to-front in enormous piles, using piling techniques to create a trapezoidal shaped pile many hundreds of feet long and approximately 180 feet wide. They are more wide at the bottom than they are at the top. Their length varies from pile to pile but usually extends as far the prepared ground surface permits. The exact height of the pile is a function of the length of a given receiving strip and the amount of sugar beets that must be piled there. A piling height of approximately 18 feet is widely accepted for the purpose of balancing the objective of keeping the pile cool with the objective of limiting the number of surface beets on the outer layers that are exposed to the elements.

16. Each load of sugar beets delivered by any grower to SMBSC's receiving stations follows exactly the same process for delivery. As the truck leaves the field, the truck has a card with bar code information regarding the growers name, the location of the field, and the receiving station to which that grower is delivering that load of beets. As the grower's delivery truck drives onto the scale, that information and the gross weight of the load is recorded by the scale operator. The driver then unloads the sugar beets into the piler and drives back to the scale where the empty truck is weighed. In roughly one out of every three trucks, a tare sample is also taken. A tare is

a sample of the beets that is washed, cleaned, and weighed. It then is subjected to a polarimetric test.

17. SMBSC and its growers have complete and accurate records of every delivery that was made by every grower to the SMBSC including, but not limited to, the date on which the delivery was made, the amount of the delivery, and the field from which the delivery was made. The delivery records for plaintiffs are reflected in the Database.

18. SMBSC determines when to begin harvest of sugar beets based upon several factors including the size of the crop, the expected weather conditions, the speed at which the crop can be harvested, the developing sugar content of the sugar beets, and the processing capacity of the factory in light of the size of the crop.

19. It was reasonable and prudent for the SMBSC to select a date like October 25 as the anticipated date of completion of full harvest and calculate backward to select October 9, 2000 as the date to commence full harvest. This period permitted reasonably sufficient time in which to harvest and pile 1.8 million tons of sugar beets and avoid the risk of a ground-freezing, harvest-ending late-fall/early winter freeze or early heavy snow that had occurred in the recent past.

## VII. FACTS REGARDING CROP YEAR 2000 AND THE EARLY FREEZE EVENT OF OCTOBER 6 THROUGH OCTOBER 9, 2000.

20. In the crop year 2000, the pre-pile phase began on August 23. All growers delivered 462,214 tons of sugar beets to the SMBSC factory before the first day of the freeze on October 6. These sugar beets were, like every year, not intended, nor piled, for long term storage. Rather, they were processed promptly upon delivery. Thus, there were few if any pre-freeze sugar beets available to process after the freeze that occurred in early October of 2000.

21. In 2000, full harvest had originally been scheduled to begin on or about Wednesday, October 4, 2000, but was rescheduled to begin on Monday, October 9, 2000. However, in the early morning hours of Friday, October 6, 2000, the first of four overnight freezes hit the SMBSC grower region.

22. SMBSC and its growers responded to the freeze in the same manner that it and its growers had successfully responded to previous freezes. Harvest, which would have begun on Monday, October 9, 2000, was suspended through 2:00 p.m. on Wednesday, October 11, 2000 at all piling stations other than Renville and Redwood Falls where the suspension extended through 2:00 p.m. on Thursday, October 12. Dr. Widner, SMBSC Vice President of Agriculture in 2000, and his staff, at his direction, began inspecting sugar beets. Growers and agricultural staff cut open beets immediately following the freezing temperatures. A frozen sugar beet may

show – and growers and agricultural staff observed – discoloration in the frozen portion of the sugar beet. As had happened in the past, after the frozen tissue thawed, the discoloration dissipated, and, within a couple days of the freeze, the sugar beets appeared normal, "healed," and ready for harvest. Freeze events were not uncommon in the northern growing regions, occurring on average once in every three seasons. These growers and the SMBSC had at all times in seasons before Crop Year 2000 been able to successfully process the beets by delaying harvest until the beets showed visible signs of healing in this manner. They followed the same practice and procedure in Crop Year 2000.

23. With a freeze, the green leafy portion of a sugar beet – the "top," becomes raggy and difficult to remove. Growers and SMBSC experienced, as they had expected, some initial difficulty processing sugar beets with raggy tops. Over time, this problem lessened, as the ropy or raggy tops became more brittle, and topping became easier.

24. SMBSC expected that after the initial difficulties, processing results would improve. But that did not occur. Rather, SMBSC agricultural staff noticed the development of "hot spots" and deterioration. "Hot spots" and "sink holes" are descriptive terms for the manifestation of deterioration in and amongst piled beets that are hotter than surrounding beets. These areas are comparatively warmer than cooler sections of the pile and appear to be sinking as a result of deterioration. SMBSC staff estimated that there would be approximately 20-30 days of deterioration to address and salvage early in processing with a small amount of sugar beets being discarded. Moreover, SMBSC expected, with the onset of winter and progressively cooler ambient temperatures, deterioration would slow, and had, at that point, good reason to believe that it was diligently and successfully addressing the situation, as it had in others years, by removing trouble spots.

25. Approximately 10 days into the process of working through the visible deterioration, the plan appeared to be proceeding as expected. Workers had already addressed deterioration at four of the twelve sites, and only minor deterioration issues were apparent at a fifth site, with discard estimates of less than a total of 45,000 tons out of the 1.8 million tons harvested after the freeze. Near the end of November, about the time when SMBSC had first planned to be through the areas of deterioration, SMBSC was forced to discard more of the sugar beets, attempting to improve still-sagging sugar extraction results. When even discarding visibly deteriorating sugar beets did not materially improve factory results, the problem crystallized: Even the best-looking sugar beets were not acceptable for processing.

26. On December 15, 2000, at about 2:00 in the afternoon, SMBSC Chief Financial Officer Jeff Plathe sent a fax to all of the defendants, except Farm Bureau Insurance Company, informing them that "the frost damage will

result in a significant loss." Within approximately one month, most of the defendant insurers had responded with a short, unqualified, complete denial. The denials recounted lack of notice and failure to leave representative samples.

27. The growers, despite a good-faith effort, suffered a complete, total, and unprecedented loss of their entire sugar beet crop harvested after the freeze except for the beets that were harvested and processed within 7 days of Wednesday, October 12, 2000.

28. The harvested sugar beet crop for all growers at SMBSC in 2000 was 2,333,031 tons. Of that amount, approximately 462,214 tons (20 %) of the crop) were harvested on and after August 23, 2000 but before the onset of the October 6–9, 2000 freeze. The remaining 1,870,817 tons (80 % of the crop) were harvested after the freeze. The post-freeze harvest commenced on a limited basis on October 9, 2000 and on an unlimited basis on Wednesday, October 12, 2000. The last day of harvest was Sunday, October 29, 2000.

29. The harvest campaign is a very large project. The 2,333,031 tons harvested from 120,000 acres yielded an average of roughly 20 tons per acre. Each truck delivered roughly 20 tons of beets to an SMBCS piling station. The campaign resulted in roughly 115,000 truck loads and deliveries.

30. There were no discards from the pre-pile phase. As of December 15, 2000, SMBCS discarded 45,000 tons (2.5% of the 1,870,817 post freeze crop harvested between October 9, 2000 and October 29, 2000.

31. After December 15, 2000, SMBSC discarded significantly more beets – 438,000 tons (about 19% of the entire crop, and about 23% of the post-freeze harvest).

32. The total discards for the total crop were 483,000 tons (about 21.0 % of the entire crop, and about 26% of the post-freeze harvest).

33. Over the course of the 2000-2001 winter, all of the beets remaining would be transported to the SMBSC plant for processing into sugar. The plant could process 11,000 tons of beets per 24 hour day. Assuming normal processing, a full harvest would have yielded 6,000,000 CTW bags of sugar (i.e., 6 million 100 pound bags). Thus, a normal harvest would have produced 600 million pounds of sugar. Instead, however, the production was only 59% of the expected yield.

**A. THE FREEZE.**

34. During and between the period beginning in the early morning night-time hours of Friday, October 6 and ending on Monday, October 9, 2000, the

SMBSC growing region was struck with an early, wide spread, hard, and deep freeze.

35. The widespread, sub-freezing air mass that caused the freezing temperatures and ultimately lead to the growers' losses was unique and noteworthy because of both the large geographic scale and the earliness of the freeze.

36. The National Weather Service data is the most reliable data with respect to ambient air temperatures for the relevant time frames and locations.

37. Every national weather service recording station for the grower region recorded freezing temperatures during some portion of the night time hours of October 6, 8 and 9.

38. Every national weather service station in the grower region reported temperatures below –3 degrees Celsius (26.6 degrees Fahrenheit) for significant amounts of time on at least October 6, 8 and 9.

39. The Morris, Minnesota National Weather Service Station reported 5+ hours of temperatures below 26.6 degrees Fahrenheit the night of October 5 and the morning of October 6, 10 hours of temperatures below 26.6 degrees Fahrenheit from October 7 to 8, 3.75 hours below 26.6 degrees Fahrenheit from the 8th to the 9th, for a total of 18 hours and 45 minutes of temperatures below 26.6 degrees Fahrenheit.

40. National Weather Service data for the Glenwood station indicates that from October 5 to 6 there were 2 hours and 40 minutes below 26.6 degrees Fahrenheit, from the 7th to the 8th there were 9 hours and 30 minutes below 26.6 degrees Fahrenheit, from the 8th to the 9th there were 5 hours and 30 minutes below 26.6 degrees Fahrenheit for a total of 17 hours and 40 minutes below 26.6 degrees Fahrenheit.

41. National Weather Service data for the Benson station indicates that from October 5 to 6 there were 5 hours and 40 minutes below 26.6 degrees Fahrenheit, from the 7th to the 8th there were 13 hours below 26.6 degrees Fahrenheit, from the 8th to the 9th there were 8 hours and 45 minutes below 26.6 degrees Fahrenheit for a total of 27 hours and 15 minutes below 26.6 degrees Fahrenheit.

42. National Weather Service data for the Montevideo station indicates that temperatures fell below 26.6 degrees Fahrenheit for 2 hours and 36 minutes from the 5th to the 6th of October, 8 hours and 45 minutes from the 7th to the 8th of October, 1 hour and 48 minutes on the 8th to the 9th of October for a total of 13 hours below 26.6 degrees Fahrenheit.

43. National Weather Service data for the Willmar station indicates there were 6 hours 15 minutes below 26.6 degrees Fahrenheit from the 5th to the 6th of

October, 9 and one half hours below 26.6 degrees Fahrenheit from the 7th to the 8th of October, 20 minutes below 26.6 degrees Fahrenheit on the 8th to the 9th of October for a total of 16 hours below 26.6 degrees Fahrenheit.

44. National Weather Service data for the Hutchinson station indicates there were 2 hours 45 minutes below 26.6 degrees Fahrenheit from the 5th to the 6th of October, more than 8 hours below 26.6 degrees Fahrenheit from the 7th to the 8th of October, 10 hours from the 9th to the 10th of October for a total of greater than 20 hours and 45 minutes below 26.6 degrees Fahrenheit.

45. National Weather Service data for the Redwood Falls station indicates there were 6 hours below 26.6 degrees Fahrenheit from the 5th to the 6th of October, 1 hour below 26.6 degrees Fahrenheit from the 6th to the 7th of October, 11 hours below 26.6 degrees Fahrenheit from the 7th to the 8th of October, 6 hours below 26.6 degrees Fahrenheit from the 8th to the 9th of October, and 2 hours below 26.6 degrees Fahrenheit from the 9th to the 10th of October for a total of 26 hours below 26.6 degrees Fahrenheit.

46. The National Weather Service data is recorded at 1.5 meters off the ground and understates the severity of the cold suffered by the beets because cold air sinks and hot air rises.

47. Growers in the SMBSC growing area reported seeing frost on the leaves and in the crowns of their sugar beets. All fields were affected by the low temperatures experienced between the early morning hours of Friday, October 6 through the early morning hours of Monday, October 9, 2000.

48. The National Weather Service data demonstrated that the temperatures at every National Weather Service station in the grower region were sufficiently cold to cause, and in fact did cause, mortal, but undetectable by commercially reasonable means, cellular damage to all growers' sugar beets between the 6th and 9th of October 2000. This was a phenomenon never before encountered by the SMBSC or its growers, nor since – even though there have been freeze events causing the same or similar visible signs of damage as those observed by the SMBSC and its growers after the 2000 freeze event.

49. Drought is also an adverse weather condition. During the late summer of 2000, the SMBSC growing region experienced a drought. Drier than normal conditions experienced by the SMBSC grower region in the late summer could and did exacerbate the damage caused by the freeze event.

## B. THE GROWERS' LOSSES.

50. The annual estimates for the growers' per ton beet payments were established by reasonable estimates based upon historical data such as crop size, sugar content, extraction rates, revenues and expenses.

51. August projections of the 2000 sugar beet crop payment to the growers were $30.08 per ton, adjusted by sugar content.

52. SMBSC's factory results reflecting the processing of sugar beets that were harvested before the freeze substantiated that the processing of sugar beets harvested before the freeze met the projections and expectations of the SMBSC. Sugar beets harvested before the freeze processed normally and sugar production was normal and in line with historic and expected values.

53. Extraction rates from sugar beets harvested before the freeze demonstrated that before the freeze, the 2000 crop was normal and healthy and suitable for processing into sugar.

54. Except for those harvested and processed within 7 days following Thursday, October 12, 2000, the gross dollar value of the sugar beets harvested after the freeze was zero (0).

## C. THE GROWERS' LOSSES WERE CAUSED BY ADVERSE WEATHER CONDITIONS.

55. The growers offered testimony of Susan Martin, Ph.D., a specialist in plant biochemistry, plant ecology and plant physiology whose career spanned 28 years with the Agriculture Research Service, a branch of the United States Department of Agriculture, and whose work all related to sugar beets. Defendants' offered testimony of Prof. Keith William Jaggard, Ph.D., an agronomist and sugar beet researcher at Brooms Barn Research Station in the UK. Both were competent witness and each testified candidly. The panel, however, finds that to the extent their respective opinions and conclusions conflict, Dr. Martin was more persuasive.

56. The type of crop damage that occurred manifests over time after harvest and delivery (during storage) the extent of which cannot be precisely determined until the time of processing.

57. Dr. Martin testified about the biochemical and physiological changes that occurred. Cell damage and sucrose loss in sugar beet occurs when root temperature fall below 28° F. Alternate freezing and thawing such as experienced during the October 6 – 9 period was the worst possible situation and lead to the breakdown of cell walls and disruption of increasing volumes of tissue. Respiration (the normal biochemical process of sucrose breakdown to provide energy for cell and tissue maintenance) increases in an attempt to heal the wounded tissue. Sucrose breakdown occurs immediately as a result of respiration. Moreover, the tissue damaged by the freeze/thaw cycles is attacked by microorganisms that greatly increase the decomposition of sucrose, forming polysaccharide "gums" or "slimes" and invert sugar (glucose and fructose, resulting from the splitting of sucrose). Both gums and invert sugar cause significant problems in processing and render the beets extremely difficult to process; most

factories would reject such beet *if they could be detected.* If such beets can be processed promptly (within a few days, or a week or two when held under good storage conditions) they can be processed essentially normally. Gradually as a result of the accumulation of inverts and "gums", they become very difficult or impossible to process economically.

58. With the first serious freeze that occurred on the morning hours of October 6, the green plant material above the ground, that is the leaves and petioles, were destroyed and wilted to the ground leaving the sugar beet itself exposed to freezing temperatures and ambient air of subsequent freezing days.

59. The successive freezing temperatures had a cumulative effect on the sugar beets; not just the one freeze, but several over 4 to 5 days exacerbated the freeze damage that occurred to all the beets.

60. The freeze damaged beets that appeared normal in appearance were still unsuitable for storage and processing.

61. There was no correlation between the physical appearance of the beets that were being processed and the amount of extracted marketable sugar from those sugar beets. Beets in poor condition, and healthy appearing beets, yielded the same results.

62. There was no correlation between the polarimetric test results for sugar content and the purity and ability of the processor to extract sugar from those beets.

63. There was very little, if any, correlation between the piling station from which the sugar beets came (be they stations with poor, good, or mixed beets) and the ultimate ability to process those beets; as the SMBSC moved from one piling station to the next, there was no improvement in extraction rates.

64. The poor processing results were caused by inverts, slimes and gums which were a direct result of the freezing temperatures from October 6 through 9.

65. The SMBSC continued to make thoughtful and disciplined attempts to process the beets in an effort to minimize as much as possible the losses to the grower members. Despite all reasonable efforts, the realized extraction rates for post-freeze sugar beets remained so low that they could not be economically processed into sugar and had no value for any other purpose.

**D. ALL GROWER SUGAR BEETS HARVESTED AFTER THE FREEZE DID NOT MEET THE MINIMUM ACCEPTABLE STANDARDS OF THE GROWER AGREEMENT EXCEPT AS QUALIFIED IN THE BALANCE OF THESE FINDINGS.**

66. The Growers Agreement provided that the SMBSC had the option of rejecting sugar beets which, in the SMBSC's opinion, were not suitable for the manufacture of sugar.

67. Except for those described in Finding 68, none of the post-freeze sugar beets were suitable for the manufacture of sugar and did not meet the minimal acceptable standard of the Growing Agreement.

68. Based on the high temperatures experienced in the immediate post-freeze period, 7 days from and after the freeze is the appropriate period during which harvested and reasonably processable beets met the minimal acceptable standard. In light of all the circumstances surrounding the freeze event, this yields a total of 77,000 tons of post-freeze harvested beets that met the minimal acceptable standard. These beets are allocable among the grower units proportionately to the total delivered beets post-freeze as all parties recognized that co-mingling would occur. The calculations set forth in Attachment A have been adjusted to reflect this finding.

69. Polarimetric testing conducted by the SMBSC after delivery of the post-freeze sugar beets to the piling stations was sufficient, under normal circumstances, to assess the sugar content and purity of the beets. It was, however, insufficient to detect the cellular damage sustained by the beets in Crop Year 2000, and, therefore, its results were inaccurate and misled the SMBCS with respect the whether the beets met the minimal acceptable standards of the Grower Agreement.

70. In freeze damaged beets, sucrose breaks down into glucose and fructose. Only sucrose is processable into marketable sugar. The Polarimetric test incorrectly identifies the fructose and glucose as sucrose, thus overstating the sugar content and purity level of the beet.

71. Polarimetric tests do not reveal whether dextran (an impurity that affects the processability of a beet) levels in freeze damaged beets will develop in the future.

72. Polarimetric testing is not predictive of the storability of the beet or its ability to recover from freeze damage and maintain sugar content.

73. The processing results experienced with regards to the sugar beets harvested after the freeze is the best evidence under the circumstances that the sugar beets were not suitable for processing.

74. The determination by the SMBSC that none of the post-freeze beets were suitable for the manufacture of sugar was a bona fide reason for rejection of the beets by the SMBSC. This determination could not have been made by polarimetric tests upon delivery of the beets to the piling stations.

75. Section 13 of the MPCI policies provides for alternative means of appraising harvested or unharvested production depending upon whether the beets meet the "minimal acceptable standards contained in the sugar beet processor contract" (Section 13(d)) or if, on the other hand, "the processor accepts harvested production and that does not meet the minimum acceptable standards contained in the sugar beet processor contact" (Section 13(e)).

76. The growers proffered the testimony of Kenneth Ackerman who was the Chief Executive Officer of the Federal Crop Insurance Corporation ("FCIC") and Administrator of the Risk Management Agency ("RMA") during the relevant period of time as to the custom and practice of the responsible administrative agency at the time.

77. The panel accepts the proffered testimony concerning the relevant practices of the administrative agency during such times.

78. Commingling of growers beets at the piling station was mandated by the terms of the Growing Agreement and contemplated by the providers of the MPCI policies at such time as such policies were issued.

79. Acceptance of the beets by the SMBSC at the piling stations did not render the beets susceptible of processing under the circumstances presented.

80. The Risk Management Agency ("RMA") was the unit of the Federal Crop Insurance Corporation ("FCIC") responsible for the administration of the federal crop insurance.

81. The RMA from time to time issued management bulletins when the need arose to communicate new information or a new interpretation of the MPCI policy or the regulations.

82. The RMA issued Bulletin No. MGR-01-010 on March 2, 2001 on the subject of the insurability of sugar beets affected by adverse weather conditions in the 16 Southern Minnesota Counties constituting the grower region of the SMBSC in Crop Year 2000.

83. Three administrative policy issues were covered by the bulletin: (1) Did the loss result from a cause that occurred during the insurance period; (2) were the beets damaged; and (3) was an appraisal at the time of delivery a requirement.

84. The referenced Bulletin provided as follows:

"We understand that when the producer (grower) delivered the sugar beets, the tonnage and sugar content exceeded the minimum standards of the processor contract. However, section 13(e) of the Sugar Beet Provisions states, 'Harvested production or unharvested production that is appraised after the

earliest delivery date that the processor accepts production and that does not meet the minimum acceptable standards contained on the sugar beet processor contract due to an insured peril will be converted to standardized tons * * *. ' There is nothing in this provision that states when the appraisal must occur to determine whether the sugar beets meet the standards, as long as it is after the first date that the processor accepts delivery. A reasonable interpretation of this provision is that the appraisal by the processor at the time of processing should apply, not the appraisal at the time of delivery, because freeze and thaw damage that occurred before harvest can manifest itself after delivery according to a USDA sugar beet expert. Therefore, *producers whose sugar beets fail to meet the minimum standards in the processing contract at the time of processing may be eligible for an adjustment in accordance with section 13(e).*

* * *"

85. The central facts in dispute in this arbitration mirror and are consistent with the facts described and italicized in Finding 84. Except for those described in Finding 68, none of the SMBCS growers' sugar beets met the minimum standards of the growing agreement at the time of processing.

## VIII. THE GROWERS' INDEMNITY DAMAGES ARE ACCURATELY ADJUSTED AND PAYABLE UNDER 13(E) OF THE POLICY.

86. The appropriate calculation for the indemnity payments for each and every plaintiff is as set forth in Attachment A incorporated herein by reference.

87. In light of the evidence as a whole, and only as a finding of fact and not of law, no plaintiff will receive a double recovery, nor a payment in excess of the anticipated value of his crop (which the Panel finds to be $40 per ton for purpose of this finding) had there not been a freeze, as a result of federal disaster relief benefit payments from the Farm Services Agency and/or Commodity Credit Corporation payments relating to the 2000 freeze. The amounts of FSA and CCC payments received by each plaintiff are listed in Attachment C, which is incorporated in these findings. Considering the evidence as a whole, including the payments made to the growers, no grower will receive a double recovery even considering the amount of FSA and CCC payments as set forth in Attachment C.

## IX. THE GROWERS FOLLOWED GOOD FARMING PRACTICES IN HARVESTING AND STORING OF THEIR 2000 SUGAR BEET CROP.

88. Defendants allege that the growers' losses were a result of causes not covered under the MPCI policies including premature harvesting before the beets had sufficiently healed, failing to adequately scalp the beets for storage, and in otherwise failing to follow good farming practices. These are all affirmative defenses for which defendants carried the burden of

proof. The panel finds that defendants did not meet that burden for reasons set forth in the following findings.

89. Confronted on October 11, 2000 with the task of harvesting the remaining 1.8 million tons of beets, it was reasonable for the SMSBC to decide that the harvest could not practically be delayed beyond October 11th or 12th. Fields in the SMBSC growing region can and do freeze in late October and/or early November. Moreover, the number of harvest days may be reduced by rain. The substantial remaining harvest, therefore, had to be completed with dispatch and before the end of October. The alternative was to run the risk of additional freezing temperatures, frozen ground and/or snow which could result in the loss of the remaining unharvested crop.

90. The growers followed the same practice they had successfully followed after freezes they had suffered over the years. They delayed harvest to allow the beets to heal. Beets in the field were examined by both growers and the agriculturists. Harvest was resumed only after the beets, upon visual inspection, appeared to have recovered and only as directed by SMBSC.

91. The Growing Agreement provided that all sugar beets delivered to the piling stations were to be properly topped *at the base of the bottom leaf.* The MPCI policy further defined good farming practices as the agricultural practices in use in the county for the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance and are those recognized by the Cooperative State Research and Extension Service as compatible with agronomic and weather conditions in the county.

92. The growers complied with the good farming practice requirements of the policy. The scalping provisions of the Growing Agreement and growers' compliance with the same were consistent with the policy requirements.

93. Scalping deeper than the normal practice presented its own risks given the extended period the beets were required to be in storage. Excessive scalping adds to the rate of beet respiration by creating a wound that permits an increase in microbial action. Increased microbial action can render the beet unsuited for long-term storage and lead to contamination of the piles and unacceptable reduction in sugar extraction.

## X. THE GROWERS' LOSSES WERE NOT CAUSED BY SMBSC MISMANAGEMENT.

### A. THE SMBSC EXERCISED SOUND, RECOGNIZED PRACTICES IN HARVESTING AND STORING THE 2000 SUGAR BEET CROP.

#### 1. <u>SMBSC And The Growers Responded Reasonably And Prudently To The Freeze Event.</u>

94. SMBSC made every reasonable and good faith effort to attempt to preserve and process the sugar beets in good condition. We find that there was nothing in the SMBSC's handling of the sugar beets from the first day of the freeze through the last day of the efforts to process the beets that in any way constituted negligence, mismanagement or wrongdoing or a failure to follow good farming practices by SMBSC or any of its growers.

95. Dr. Widner and members of his agricultural staff, in response to the freeze, visited fields and cut sugar beets across the top and root in order to inspect for evidence of frozen tissue. Frozen tissue in the sugar beet appears as a watery or glassy or discolored portion of the sugar beet compared to the bright white color of non-frozen sugar beet tissue.

96. Full harvest was to have begun on Monday, October 9th. In response to the freeze, SMBSC reasonably and prudently delayed the harvest. It decided to begin only after the beets appeared upon visual inspection to be healed and ready for long-term storage.

97. The incoming truck loads of beets were inspected at the piling stations by SMBSC agricultural staff who mounted ladders and platforms at the scale houses for the purpose of examining the beets while still in the trucks and being weighed. Meanwhile, other SMBSC staff continued to monitor the condition of the beets in the fields.

98. SMBSC agriculturalists (under the direction of Dr. Widner) checked on as many fields as possible by going to the fields and checking beets of various sizes at various positions in the field, high areas and low areas, on field edges and interior portions of the fields, in thin stands and thick stands in order to get a complete profile of the condition of the sugar beets.

99. All areas were examined in a manner designed to detect frost damage in the beets and, if present, whether the beets appeared to have healed and were ready for harvest.

100. The insurers principle witness, Dr. Jaggard, confirmed that the tare results from deliveries to SMBSC piling stations indicated that SMBSC did an excellent job of assuring that clean beets went into the piles.

101. The excellent tare percentages of the growers deliveries demonstrates the level of care that the growers used in caring for their beets before they got to the piles and the care used by SMBSC professionals in making sure that clean beets were put into piles.

102. The practices of other sugar beet processors support SMBSC's decision to harvest beets after checking to make sure that the beets had healed by visual inspection.

2. **<u>SMBSC Acted Reasonably And Prudently In The Piling Of The Sugar Beets.</u>**

103. SMBSC's practice regarding piling heights did not constitute negligence, mismanagement, or wrongdoing by the SMBSC. Moreover, the piling heights did not cause the losses suffered by the growers.

3. **SMBSC Acted Reasonably And Prudently In Monitoring And Managing The Piles.**

104. The agricultural staff inspected piles for signs of hot spots on a daily basis by walking up the sides and across the surface of the piles looking for areas showing signs of excessive ventilation.

105. In 2000, as in every year, SMBSC "staked" each day's deliveries in each pile. An agriculturalist drove a stake or flag at the edge of the pile. That stake marked the beginning of each 24 hour period of deliveries. This facilitated later inspections the pile for the purpose of determining whether difficulties in the pile were attributable to any particular day's deliveries.

106. The staking or flagging of piles also served the purpose of permitting agricultural staff members to inspect all piles for a particular day's deliveries if problems arose at one pile relating to a particular day's delivery.

107. Thermal imagery records procured through pass-over aircraft revealed that SMBSC was employing reasonable and prudent practices to assess conditions and address pile conditions as they became apparent.

108. On November 7, 2000, SMBSC informed its growers of beet piles showing concerns in the form of sink holes and some deterioration, including informing the growers that deteriorated areas were being blended and in some cases set aside for discard.

109. SMBSC engaged in reasonable efforts to address areas of deterioration including building a new road to reach the back side of one of the piling stations.

110. The only method of disposal of deteriorating beets is land application. Land application means spreading the deteriorated sugar beets on farmers' fields at a rates roughly equivalent to agronomic rates for accumulation of nitrogen.

111. The losses suffered by the growers were not the result of the manner in which the SMBSC monitored and addressed pile deterioration.

**B. SMBSC'S SCALPING DID NOT CAUSE THE GROWERS' LOSSES.**

112. Scalping refers to the practice of removing some portion of crown material from a sugar beet when it is harvested.

113. The scalping practices recommended by SMBSC and employed by the growers did not cause the growers' losses. The practice of removing only a limited amount of crown material – an inch or inch and one-half – was well-tested and a proven, effective, and prudent practice for harvesting and storing sugar beets in Minnesota. SMBSC's recommendations and the growers' practices in topping and scalping their sugar beets did not constitute negligence, mismanagement, or wrongdoing.

114. The amount of crown material that is removed by scalping varies from processor to processor.

115. There are no uniform standards governing scalping in the United States.

116. Excessive crown removal results in two or three times more decay and an increase in respiration.

117. As was SMBSC's recommendation and common practice, its growers removed all of the green material plus about an inch or inch and one-half of the center of the sugar beet.

118. The scalping procedure – removing all of the green material plus an inch or inch and one-half of the center of the beet – is a reasonable and prudent practice.

119. Three highly qualified experts – Dr's. Susan Martin, Keith Jaggard, and J. Widner confirm that excessive scalping adds to the rate of respiration by creating a wound in the sugar beet. This wound results in increased microbial action in the sugar beet. The SMBSC agricultural staff made a reasonable, informed, and professional decision to limit the size and depth of the scalping cut, thereby limiting the amount of damage at the crown, for the purpose of limiting the amount of excess respiration.

120. The evidence does not substantiate that more aggressive scalping, and the creation of a larger wound, would have eliminated, or even reduced, the growers' losses.

## C. SMBSC'S DECISION TO CONTINUE FULL HARVEST DURING POST-FREEZE WARM TEMPERATURES AFTER OCTOBER 10, 2000 WAS NOT A CAUSE OF THE GROWERS' LOSSES.

121. Defendants' contention that SMBSC should have delayed the harvest until cooler weather prevailed is unsupported by the evidence. A further delay would have exposed the crop to the unacceptable risk of prolonged rain, snowfall, and/or or frozen ground and the loss of beets not yet harvested. Because of this concern, the SMBSC reasonably concluded that harvest had to be completed before November 1.

122. Moreover, the evidence taken as a whole demonstrates that even had SMBSC delayed the harvest during the warm temperatures, the growers' losses could not have been avoided.

### D. SMBSC'S PRACTICES IN SAMPLING AND MONITORING THE SUGAR BEETS DID NOT CAUSE THE GROWERS' LOSSES.

123. SMBSC conducted inspections to look for freeze damage in the fields and at the receiving stations. The inspection and sampling of beets in the field and at the piling stations, and the monitoring of the piling stations by the SMBSC agriculturists, was reasonable and not the cause of the losses suffered by growers.

### E. SMBSC'S VENTILATION PRACTICE DID NOT CAUSE THE GROWERS' LOSSES.

124. The amount and use of ventilation by SMBSC in the crop year 2000 did not cause the losses suffered by the growers, nor did it constitute negligence, mismanagement or wrongdoing by SMBSC.

### F. SMBSC'S BELIEF THAT THE SUGAR BEETS WOULD HEAL FOLLOWING A FREEZE EVENT WAS REASONABLE AND DID NOT CAUSE THE GROWERS' LOSSES.

125. The SMBSC and the growers provided for a reasonable interval between the freeze event and the resumption of harvest for the beets to heal.

126. The evidence taken as a whole demonstrates that it was reasonable for SMBSC to conclude, based in part on 19 years of experience, that the post-freeze beets could be successfully processed into sugar.

### G. THE EXPERIENCE OF THE SIDNEY, MONTANA SUGAR BEET GROWERS IS DISTINGUISHABLE AND LACKS PROBATIVE VALUE FOR THE PROPOSITION THAT THE LOSSES SUFFERED IN THE SMBSC GROWER REGION WERE AVOIDABLE OR CAUSED BY NEGLIGENCE, MISMANAGEMENT, OR OTHER WRONGDOING.

127. The experience of the growers and processors in Sidney, Montana does not establish that the losses experienced in the SMBSC were avoidable, nor the result of negligence, mismanagement, or other wrongdoing. While there are similarities between the Sidney experience and the SMBSC experience, the testimony of Russell Fullmer, the agricultural manager in Sidney, does not provide a persuasive basis for concluding that the SMBSC grower losses were caused by negligence, mismanagement, or other wrongdoing by SMBSC or the plaintiffs.

### H. OTHER CLAIMS OF ALLEGED SOURCES OF LOSS.

128. Full harvest was originally scheduled to begin on Friday, October 6, 2000. Later, SMBSC decided to change the commencement to Monday, October 9, 2000. The 2000 freeze event began on October 6, 2000. This freeze would have caused a delay of full harvest in any event. As it turns

out, the freeze caused a delay in full harvest until 2:00 pm on Wednesday, October 12. Thus, whether full harvest was scheduled to commence on October 6, 2000 or October 9, 2000 is of no consequence. Because of an act of nature, full harvest could not have commenced any earlier than October 12.

129. The insurers contend that such things as respiration, ordinary wounding at harvest, handling by pilers, and weather conditions experienced after the sugar beets were harvested were a cause of the losses sustained by these growers. These factors were unavoidable and, in and of themselves, did not cause the losses sustained by the growers. SMBSC's and its growers' twenty seven year history of successful crops, during which it conducted its harvest in the same manner as in 2000, substantiates that the growers losses in the crop year 2000 were not caused by these normal and unavoidable factors. Rather, it was the freeze/thaw in October that caused the damage to this crop.

## XI. NOTICE.

### A. NEITHER SMBSC NOR THE GROWERS KNEW, NOR REASONABLY COULD HAVE KNOWN, THAT A LOSS OF THE CROP WAS PROBABLE BEFORE MID-DECEMBER 2000.

#### 1. Problems In Harvesting And Processing The Crop After The Freeze Did Not Alert The Growers That A Loss Was Probable.

130. Hot spots and beet degradation were, and are, not uncommon in sugar beet piles. SMBSC's staff and factory were trained and equipped to deal with these circumstances by processing the degrading sugar beets in advance of, and blending them with, healthier appearing beets.

131. Hot spots would generally appear in January, February or March, but SMBSC's experience had been that hot spots could occur at any time after harvest and new hot spots are a normal part of sugar beet storage and processing. SMBSC and the growers did not know, nor could have reasonably known before mid-December 2000, of a probable loss of the crop attributable to the presence of what appeared to be manageable hot spots and sink holes in November 2000, particularly in light of the fact that they were identified and attended to promptly in the normal course of business.

132. SMBSC initially experienced some problems with processing the frozen sugar beets due to anticipated difficulty in removing the green material from frozen sugar beets immediately after the freeze period.

133. The difficulties initially experienced were "raggy tops" that were reasonably addressed by blending sugar beets without raggy tops with sugar beets that had raggy tops.

134. The visible deterioration that SMBCS addressed in early November did not provide notice to any grower that a loss was probable or that any grower had a probable insurance claim.

135. Prior to December 2000, SMBSC reasonably and in good faith believed that its efforts to blend hot spots and address visible deterioration would stabilize the piles and eventually result in SMBSC being able to process the entire crop profitably.

2. **Post-Freeze Communications Between The SMBSC Management And The Growers Do Not Demonstrate That Either Knew, Or Had Reason To Know, That A Loss Of The Crop Was Probable Before Mid-December 2000.**

136. Factory information conveyed as of November 7, 2000 to the growers indicated that extraction and granulation rates were down to about half of expected levels. The reduced extraction and granulation rates as of early November did not put growers on notice of a probable loss. SMBSC reasonably believed that the reduced extraction and granulation rates of November were the result of the identification, culling, and expedited processing of isolated pockets of deteriorating beets and reasonably believed that processing results would improve once isolated pockets of deterioration were processed.

137. The experiences of other processors support the growers' testimony that electronic messages to them from the SMBSC regarding freezing temperatures did not cause them to know, or have reason to know, that a loss of an individual grower's crop was probable before mid-December 2000.

3. **The SMBSC Did Not Conceal Information From The Growers Or The Insurers.**

138. SMBSC reasonably believed that as of mid-November 2000 that it would have less than 45,000 tons of discards out of a post-freeze crop of 1.8 million tons (i.e., a loss of about 2.5%).

139. The harvest concluded with the last of the beets being delivered to the piling stations by October 29, 2000. With the exception of a few fields of PIK beets that remained in the fields of a few growers, there were no beets in fields for any adjuster to inspect before the last day for giving notice of a probable loss in accordance with the requirements of section 14 (Duties in the Event of Damage or Loss) of the Basis Provisions or section 12 of the Sugar Beet Crop Provisions of the MPCI policies, even if any grower had reason to believe that a loss was probable during the interim.

**B. SPECIFIC FACTS REGARDING THE GIVING OF NOTICE BY THE GROWERS TO THE INSURERS: THE SMBSC NOTICE OF DECEMBER 15, 2000, FACTS BEARING UPON WIDESPREAD KNOWLEDGE OF A SIGNIFICANT FREEZE EVENT, AND SPECIFIC FACTS WITH RESPECT TO INDIVIDUAL GROWERS.**

1. **The December 15, 2000 Notice By The SMBSC.**

140. On December 15, 2000, all defendant insurers except Farm Bureau Mutual Insurance Company received a fax from SMBSC placing them on actual notice of probable losses of SMBSC grower sugar beet crops in the year 2000.

141. Farm Bureau received actual notice of claims regarding the October 2000 freeze no later than December 26, 2000.

142. Letters of denial were sent by the insurers mostly within a few weeks, but some substantially later. The denials, in general, raise late notice in violation of the MPCI General and Special Policy Provisions. The following are representative examples:

a. Farmers Alliance issued a denial letter to at least one grower on December 22, 2000.

b. RCIS issued a denial letter on December 26, 2000.

c. Acceptance issued a denial letter to at least one grower on December 27, 2000.

d. Rain & Hail issued a denial letter on December 27, 2000.

e. Great American issued a denial letter on December 29, 2000.

f. Hartford issued a denial letter on January 17, 2001.

g. IGF issued a denial letter on January 26, 2001.

h. Ag Force, as general agent for Mountain States and NAU, issued a denial letter to at least one grower on February 21, 2001.

i. Farm Bureau's adjuster, without performing any quality adjustments, informed at least one plaintiff that Farm Bureau was denying the claim. Farm Bureau also sent a denial letter to at least one insured on May 15, 2001.

2. **General Notice Due To Common Knowledge Within The Growing Area And The Crop Insurance Industry Of A Significant Freeze Event.**

143. All parties, directly or by and through their agents and representatives, were aware of the freeze in the SMBSC growing region by not later than October 20, 2000.

3. **Facts Regarding The Giving Of Notice By Individual Growers To The Insurers.**

144. 108 growers (out of a universe of 402) in three separate categories were deposed in this case in the following sequence:

a. twenty-five (25) "undifferentiated" growers, chosen by defendants, were deposed in April of 2003 ("undifferentiated" meant that these growers were selected in relatively random manner and the insurers were free to pursue a full range of questions (e.g., farming history and practices, prior claims experience, etc.) and were not limited to facts concerning the notice issue).

b. twenty-six (26) members of the SMBSC's Board of Directors and the Shareholder Litigation Committee were deposed in April and May 2003.

c. fifty-seven (57) growers were deposed in July and August of 2003 pursuant to Arbitration Panel Orders 4 and 6 regarding the issue of Notice.

***(a) Facts with respect to individual growers who provided no notice to any insurer prior to the notice transmitted by the SMBSC on December 15, 2000.***

145. The growers identified on Exhibit 3 have agreed to be bound by the terms of ¶ 2, Stipulation No. 1 of Arbitration Panel Order No. 6 and thereby admit that neither they, nor anyone on their behalf, provided notice to any insurer at any time or in any manner prior to the notice transmitted by the SMBSC on December 15, 2000.

***(b) Facts with respect to individual growers who were informed that an insurance agent provided notice to an insurer, but have no personal knowledge regarding the circumstances of the notice.***

146. The growers identified on Exhibit 4 have agreed to be bound by the terms of ¶ 2, Stipulation No. 2 of Arbitration Panel Order No. 6 and thereby admit that they were informed that an insurance agent (or agency) provided notice of potential, possible, or probable freeze damage to an insurance company, but they had no personal knowledge regarding the fact that notice was given, the circumstances involved in the agent's (or agency's) decision to provide notice, nor that they communicated directly or indirectly with agents, adjusters or any insurance company employees or representatives prior to December 15, 2000.

***(c) Facts with respect to individual growers who were informed that a PIK adjuster was in one or more of their fields appraising a portion of their 2000 sugar beet crop after the freeze and that this constitutes notice.***

147. The growers identified on Exhibit 5 have agreed to be bound by the terms of ¶ 2, Stipulation No. 3 of Arbitration Panel Order No. 6 and thereby admit that they recalled, or were informed that, a PIK adjuster was in one or more of their respective fields appraising a portion of their 2000 sugar

beet crop after the freeze, but none recalled any communications with any PIK adjuster, and that neither they, nor anyone on their behalf, provided notice to any insurer at any time or in any manner prior to December 15, 2000.

***(d) Facts with respect to individual growers who rely on their conduct as described in proffered discovery responses as notice.***

148. The growers identified on Exhibit 6 have agreed to be bound by the terms of ¶ 2, Stipulation No. 4 of Arbitration Panel Order No. 6 and thereby stipulate and admit that they provided discovery responses indicating they contacted their insurance agent before November 30, 2000 and that they would not testify to any conversations or discussions with their insurance agents beyond that already disclosed in their discovery responses.

149. With respect to growers identified on Exhibit 6 who have agreed to Stipulation No. 4 of Arbitration Panel Order No. 6 and rely upon their proffered discovery responses describing their communications with their respective insurance agents before November 30, 2000, the Panel finds the facts set out in Findings 150 through 169.

150. Terry Ahlbrecht called his agent Keith Scott before Mr. Scott appraised the PIK acres. Mr. Ahlbrecht spoke to Mr. Scott sometime later and confirmed that Mr. Scott had appraised the PIK acres.

151. BNV Farms, William VanderVoort discussed the sugar beet harvest with his agent, Keith Scott, when he delivered his green sheets (a shorthand reference to production history records).

152. Herman Brouwer talked about the hard freeze and sugar beets with his insurance agent, Chip Goeman, during the second week of October 2000.

153. Gerry Busiahn's insurance agent was informed of the freeze in October 2000.

154. Roger Busiahn discussed the cold October temperatures with his insurance agent, Wayne Reiten, throughout November and December 2000.

155. A PIK appraiser came out to Robert Dirksen's fields some time after the freeze and after full harvest was completed.

156. Merle Gerdes's fields were appraised by a PIK appraiser after the freeze. In response to Interrogatory No. 2, Eric Jon Hendrickson stated as follows:

a. I received the e-mail from SMBSC on or about October 8, 2000, stating there was a heavy freeze. On Sunday morning one or two days later I called my insurance agent Duane Jindra and told him the SMBSC had halted harvest. He said I needed to talk with the insurance adjuster for

RCIS who is John Larson and I did. I told John we had a hard freeze and I was waiting to hear again from the beet plant and the insurance company on what to do. I was unsure what I should do because this had never happened to me before. John said it was up to me when I wanted to begin lifting again. He did not say whether or not he would be coming out to inspect damage on my beets. Several days later, about 5, SMBSC said growers delivering to Renville could begin lifting again. I saw no point in waiting anymore for John to come out because he never said in a definite way that he was. When it was my turn I lifted again.

157. Bernie Herickhoff contacted his agent after the freeze and told his agent about the rubbery foliage on his sugar beets.

158. Charles Hinderks's PIK appraiser Bob Dahlke was in Mr. Hinderk's fields appraising PIK acres between October 13 and October 20, 2000.

159. Wade Hoekstra's insurance agent, Terry Hochsprung, sent a letter informing IGF of the freeze on or about October 17, 2000.

160. Marvin Kiecker had several conversations with his insurance agent throughout October and November 2000 regarding an incorrect yield guarantee on beets grown in Redwood county. Mr. Kiecker also delivered APH records to his agent in November of 2000.

161. Mike Kopel's agent Keith Scott was in Mr. Kopel's fields to appraise PIK acres on or about November 2, 2000.

162. Jeff Kramer discussed his PIK acres and the drought conditions with his agent Keith Scott in early November 2000. Mr Kramer's fields were also appraised by a PIK appraiser after the freeze. Jason Lund discussed the freeze with his insurance agent in the middle of October 2000.

163. Mike McNamara of McNamara Farms, Inc. informed his insurance agent of the freeze and the "potential for freeze damage" in November 2000.

164. Dennis Preuss talked to his insurance agent throughout the October 2000 harvest about the problems he was having topping and defoliating sugar beets.

165. John Gass of Triple G Farms contacted his agent Keith Scott sometime after the October 2000 freeze to request a PIK appraisal.

166. Edward Sachariason talked to his agent Stan Knudson about the freeze sometime in November of 2000.

167. Jason Sachariason talked to his agent Stan Knudson about the freeze sometime in November of 2000.

168. Scott Sachariason talked to his agent Stan Knudson about the freeze sometime in November of 2000.

169. Dennis Sjogren contacted his agent Dwight DeBoer within a few days of the freeze and notified his agent that freeze had occurred.

***(e) Facts with respect to individual growers who agreed to be bound by the deposition testimony of a family member or farming partner regarding the issue of notice.***

170. The Panel finds that pursuant to Arbitration Panel Order No. 6, ¶ 3, the growers identified in Exhibit 7 have agreed to be bound by the deposition testimony of a family member or farming partner regarding the issue of Notice.

***(f) Facts with respect to growers who provided live or deposition testimony, and/or documentary evidence, on the issue of notice at the arbitration hearing.***

171. With respect to all growers who do not fall within the embrace of the stipulations set out in Panel Order No. 6 and who have provided oral and/or documentary evidence at the arbitration hearing or by proffered deposition testimony, the Panel finds the facts set out in Findings 172 through 212.

172. Kenneth Abbas contacted his insurance agent, Terry Hochsprung, on or around October 6, 7, or 8, 2000, and reported that it had been cold.

173. Jeffrey Agre discussed the freeze with insurance agent, Duane Jindra, during the second week of October. Later, Jindra came to his fields to conduct an inspection of his PIK fields, but he did not think he had a probable loss and did not ask Jindra to place his MPCI carrier on notice of a probable loss.

174. Randall Ashburn's agent was told of the freeze in October 2000, but even after the DTNs of early November advising of "hot spots" in some of the piles, he did not think Ashburn had a probable loss.

175. Joel Bakker contacted his insurance agent, Jonathan Ammermann, approximately three days after the freeze and discussed his concern that it had been cold.

176. David Brouwer contacted his insurance agent, Chip Goeman, during the freeze and notified the agent of the freeze.

177. Jeffrey Brouwer contacted his insurance agent during the October 2000 harvest and talked about the freeze.

178. Todd Cole discussed the freeze with his insurance agent in October 2000.

179. Howard Dahlager spoke with his insurance agent, Sandy Scheffer, in October 2000, shortly after the freeze. He notified her of the freeze. She told him that she would file a notice with his MPCI carrier. Later, on November 11, 2000, Dahlager told her to withdraw the claim because he did not think at that time there was a probability of a loss. He did so because he thought his sugar beets were processable. Dahlager spoke with her again in December 2000 and asked her to file a claim.

180. Roger Duncan of R. Duncan Farms contacted his insurance agent within a week of the frost. He told the agent to turn in a claim because he did not know what damage there may be to his beets. Duncan's agent did not file a claim. Pursuant to Arbitration Panel Order No. 6, ¶ 3, this finding of fact is also applicable to Brett Duncan.

181. Dean Enestvedt's brother, Steven, contacted the Enestvedts' insurance agent in mid- to late-October 2000 and informed the agent of the freeze. Although Dean testified that he did this in December, the testimony of his brother, Steven, supports the proposition that he did so in October, not December.

182. Steven Enestvedt called his insurance agent, Terry Hochsprung, in October 2000 and expressed concern about the freeze. Hochsprung told Steven that the claim had been filed. Hochsprung followed up with Steven within days of receiving the December 15, 2000 notice from the SMBSC. Pursuant to Arbitration Panel Order No. 6, this finding of fact is also applicable to Alan Enestvedt.

183. Chad Gunter spoke with his insurance agent, Jason Noble of the Noble Agency, the week after the freeze and told him that the temperature had dropped below freezing. He asked Noble if he should file a claim. Noble does not recall what he was told.

184. Thomas Hagen talked about the freeze with his insurance agent, Keith Scott, on or about October 11, 2000.

185. Donald Hartung called his insurance agent Terry Hochsprung during the freeze and told the agent the freeze might have damage to his sugar beets.

186. During the October 2000 harvest, Roger Heller spoke with his insurance agent and banker, with whom he shares an office space. They discussed defoliation problems caused by the freeze. Heller did not instruct his agent to file a claim at that time. He did not know that he had a claim or a loss. Pursuant to Arbitration Panel Order No. 6, ¶ 3, this finding of fact is also applicable to Blake Schroeder.

187. James Hinrichs discussed the freeze with his insurance agent, Mr. Goeman, the day after the freeze. Pursuant to Arbitration Panel Order No. 6, ¶ 3, this finding of fact is also applicable to David Hinrichs.

188. Lyle Jaenisch talked about the freeze with his insurance agent, Jason Noble, in October 2000. Pursuant to Arbitration Panel Order No. 6, ¶ 3, this finding of fact is also applicable to the following plaintiffs: Chris Jaenisch, Molly Jaenisch and Tony Jaenisch.

189. Randall Janssen had casual conversation about the freeze with his insurance agent at various times in October and November 2000.

190. Larry Johnson contacted his insurance agent, Terry Peterson, sometime between October 8 and 12, 2000, and informed the agent that it had been cold. Pursuant to Arbitration Panel Order No. 6, this finding of fact is also applicable to Brian Johnson and Deron Johnson.

191. Larry Kidrowski discussed the difficulties in topping the beets caused by the freeze with his insurance agent before mid-December 2000. He also spoke with him after the December 15, 2000 SMBSC notice.

192. Robert Kiecker discussed the freeze with his insurance agent, Don Clauson, on a regular basis throughout October and November 2000. Pursuant to Arbitration Panel Order No. 6, this finding of fact is also applicable to the following plaintiffs: Edward Fahey, Scott Kiecker, Stephen Kiecker and Warren Kiecker.

193. George Kleven's agent, Stanley Knudson, called Mr. Kleven within a day or two of the 2000 freeze. They discussed the freeze and Mr. Kleven told his agent that there was a hard freeze, but that he did not know if there was any damage to the crop at that time.

194. Rick Knapper had contact with an insurance agent Clarence Klinke every day throughout the October 2000 harvest because they worked the beet harvest together.

195. Keith Knudson discussed the freeze with his insurance agent and uncle, Stan Knudson, during the October 2000 harvest.

196. Scott Kohler contacted his insurance agent on or about October 10, 2000, and told the agent about the freeze and that he had raggy tops on his sugar beets.

197. Mike Kramer or Tim Kramer on behalf of Kramer Farms discussed the freeze with their insurance agent, Keith Scott, at the end of October or early November 2000.

198. Bradley Kubesh informed his insurance agent, Deb Rath, of the freezing temperatures in early October 2000.

199. David Kubesh informed his insurance agent of the freeze sometime in November 2000.

200. James Long discussed the freeze and its effect on his crop with his insurance agent, Wayne Reiten, before November 30, 2000. Pursuant to Arbitration Panel Order No. 6, this finding of fact is also applicable to Casey Long and Chris Long.

201. Gary Maczïewski contacted his insurance agent, Ron Augeson, during the October 2000 harvest and informed the agent of the freeze and possible crop damage.

202. Terry Noble discussed the freeze with his insurance agent, Jason Noble, before December 15, 2000.

203. Kyle Petersen contacted his insurance agent, Terry Hochsprung, on or around October 12-15, 2000, and told the agent to file a claim. Mr. Petersen did not know if had an insurance claim at that time; he contacted his agent because of the possibility that he might have a claim. By the end of October 2000, Mr. Petersen did not believe he had a claim because he believed that he delivered storable, processable beets.

204. Neal Prokosch contacted his insurance agent, Rick Nordin, before December 15, 2000, informed the agent of the freeze, and told the agent he was having difficulty defoliating his sugar beets.

205. Harlan Ruiter's insurance agent, Clarence Klenke, ran Mr. Ruiter's defoliator during the 2000 harvest. Mr. Klenke knew from his experience working in Mr. Ruiter's fields during October 2000, that the freeze occurred and that the freeze caused defoliation problems during harvest.

206. Scott Ruiter discussed the freeze with his insurance agent, Clarence Klenke, during the October 2000 harvest when Mr. Klenke was working in Mr. Ruiter's fields.

207. Steven Ruschen contacted his insurance agent during the October 2000 harvest and informed the agent that he had suffered a probable loss because of the freeze. The agent told Ruschen that he had submitted a blanket claim on behalf of all the growers he insured. This was before December 15, 2000, but the record does not reflect the specific date.

208. Within five to seven days after the freeze, Robert Schemel contacted his insurance agent's office and discussed the freeze with his insurance agent's son, Jon Ammerman, because the agent, Will Ammerman, was out of the country. Schemel told Ammerman that there had been a freeze and expressed concerns that there may be a probable loss. When he delivered his beets to SMBSC, Schemel believed that he was delivering a good beet crop.

209. David Schwerin discussed the freeze with his insurance agent in October or November 2000.

210. Within two days of the October freeze event, Jeffrey Stamer's agent, Rain and Hail's Mr. Domeier, was in Stamer's sugar beet fields and commented on the hard freeze. He saw Stamer's beets and observed the frost. Domeier asked what the frost would do to the beets. Stamer stated that if left to heal, the beets should be fine. Domeier stated that if a problem arose in the future, that they could deal with the problem. Stamer didn't think he would have a loss at that point and did not request that a claim be filed.

211. Donavon Vandervoort contacted his insurance agent, Keith Scott, on or about October 11, 2000, informed the agent of the freeze, and told the agent that there could be a probable loss.

212. Curtis Watson contacted his insurance agent, Jonathan Ammermann, before November 30, 2000, and discussed the harvesting difficulties caused by the freeze.

### C. PROVIDING MEANINGFUL NOTICE BEFORE MID-DECEMBER 2000 WAS NOT POSSIBLE.

213. The purpose of notice obligations imposed by the multi-peril crop insurance policy is to provide defendants' adjusters with an opportunity to make a fair assessment of and properly adjust a loss. It is not an end in and of itself.

214. The express provisions of the policy state that an insured is only required to file a written notice with an agent when the insured initially discovers that the insured crop has been damaged *to the extent that a loss is probable.*

215. The practice of the defendant insurers was to require the giving of notice only when the grower-insured had knowledge of a probable loss. At least one insurer was critical of some of its growers for giving notice of a possible loss after the freeze in October 2000 and did not open a claims file when that occurred.

216. A reasonable insured would not give notice of a probable loss until such time as he knows that it was probable that the loss would be greater than his deductible or coverage level.

217. No grower knew, nor could have known, that he had suffered damage to the extent that a loss was probable prior to mid-December 2000.

## XII. DEFENDANTS WERE NOT PREJUDICED BY THE ALLEGED LACK OF TIMELY NOTICE.

### A. LATE NOTICE DID NOT PREVENT AN ACCURATE ADJUSTMENT OF THE GROWERS' LOSSES.

218. On May 9, 2003, defendants requested a Final Agency Determination from the Risk Management Agency regarding the interpretation of a portion of § 457.7 of the Common Crop Insurance Policy Basic Provisions (Basic

Provisions), published in the Code of Federal Regulations ( C.F.R.) at 7 C.F.R. § 457.7.

219. The relevant part of § 457.7 about which inquiry was made stated then, and still states, that "no indemnity shall be paid unless the insured complies with all terms and conditions of the contract".

220. FAD-018 was issued in response to defendants request and stated in relevant part:

> "failure to comply with the policy requirements constitutes a breach of the insurance contract and could jeopardize receipt of any indemnity if such beach is determined to be substantive. For example, if the breach results in the inability to accurately determine the amount of loss or whether a loss occurred, then no indemnity could be paid."

221. The determination of the RMA was that "when failure to comply with a provision is determined not to affect the amount or existence of a loss in any way . . . then an indemnity may still be paid."

222. The growers' alleged noncompliance, if any, with any of the provisions of ¶ 14 of the MPCI policy did not, given the circumstances of this loss, affect the ability of an insurer to accurately adjust and determine the existence and amount of any plaintiffs' loss.

223. There was no commercially reasonable test that any insurer could have performed that would have revealed the cellular damage that, in turn, rendered all of the post-freeze beets un-storable and all but 77,000 tons economically un-processable even if the growers had left representative samples of their sugar beet crop in the field.

224. After about 72 hours of the freeze, all beets would have appeared to have healed and no visual inspection would have disclosed the latent injury to the crop had the insurers sent adjusters to any grower's fields.

225. There were in fact some adjusters in some growers' fields after the freeze inspecting sugar beets assigned to the PIK (Payment-In-Kind) fields and none reported any damage or loss.

226. Notice within 15 days of the completion of harvest by any grower would have been in compliance with the MPCI policy terms, but would not have afforded an insurer the opportunity to inspect sugar beets in the field as they had already been delivered to piling stations and commingled, a circumstance that was contemplated by all the parties.

227. IGF received a written notice from an insurance agent for multiple insureds on October 17, 2000 informing IGF of a "possible" loss. Telephone calls

by the agent, Terry Hochsprung, and by an IGF adjuster contemporaneous with the October 17, 2000 notice confirmed and clarified that the written notice related to the freeze event of October 6-10.

228. IGF did not open claims files based upon this written notice.

229. IGF did not fail to open claim files because of the lack of grower-specific notice forms associated with this October 17, 2000 notice. In response to a nearly identical written notice by the agent on behalf of multiple growers in December 2000, claims files were opened.

230. Approximately one month after receiving the December notice, IGF denied plaintiffs claims. Plaintiffs received the same substantive denial letter whether they had been included in the October 17, 2000 written notice or not.

231. IGF made no attempt to adjust accurately the loss for any grower, including the growers included in Terry Hochsprung's notices, before denying the claims. To the contrary, the IGF adjuster who received the "loss packets" when the files were opened testified that the loss packets were eventually thrown away in his own garbage.

232. The notice received on October 17, 2000 was adequate actual notice of a "possible loss" for growers whose agent was Terry Hochsprung, or T&A Agency. Neither IGF nor any other insurance company took any action to adjust any grower's claim based upon notice of a "possible loss."

233. Insurer actions in Crop Year 2001 when notice was given to number of defendant insurers as precautionary measures by a number of growers after a Fall freeze support the proposition that the insurers could not and would not have been able to do anything to adjust the crop differently had timely notice been given.

## B. DEFENDANT INSURERS DID NOT FOLLOW THE DELAYED NOTICE LOSS ADJUSTMENT PROCEDURES SET OUT IN THE LOSS ADJUSTMENT MANUAL (LAM).

234. The FCIC issued a Loss Adjustment Manual (LAM) as a guide to assist in the adjustment of losses.

235. The LAM in effect for the crop year 2000 contains a delayed notice of loss provision that describes a procedure by which an insurer may adjust a loss notwithstanding untimely notice.

236. The delayed notice of loss provision in the LAM states: "The approving official will: (a) approve claims for which the amount of loss can be accurately determined."

237. The amount of each grower's loss could be, and is, accurately determined as set out in these Findings of Fact.

238. No defendant insurer followed the optional procedures set forth in the LAM with respect to a delayed notice.

### C. DEFENDANT INSURERS MADE NO REQUEST OF ANY GROWER, NOR TOOK ANY ACTION TO INVESTIGATE ANY CLAIM, BEFORE ISSUING A GENERAL DENIAL TO EACH GROWER.

239. Each grower had the duty under Section 14 of the MPCI policy to provide complete harvesting and marketing records of each insured crop by unit and other records, and to submit to examination under oath, upon request.

240. No request was made of any grower for any records or examination under oath of any grower by any insurer prior to issuance of denial.

241. No defendant insurer issued any reservation of rights in denying these claims.

242. Defendants admit that plaintiffs had no further obligations to provide additional information or documents once the denial letter was issued.

243. No defendant insurer requested an examination under oath of any insured.

244. Defendants did not request copies of the growing agreements before issuing the denial letters.

245. Commingling of the sugar beets did not prevent accurate adjustment of the grower losses under ¶ 13(e) of the policy.

## XIII. MARVIN KIECKER RELEASE.

246. Considering all of the evidence and particularly the limited settlement amount, we find that the intention of the parties was to limit the Marvin Kiecker Release to losses other than the freeze loss and does not preclude Marvin Kiecker's recovery for the freeze loss. The Panel finds that Marvin Kiecker's coverage level on units 101 and 102 is 75%.

## XIV. LANE AND GREG SCHWITTERS ISSUE.

247. Lane and Greg Schwitters submitted a notice of probable loss on unit 205 for damage due to flooding that occurred in crop year 2000 prior to the freeze event of October 2000. The Schwitters' insurer, Great American, performed an appraisal and an adjustment of the loss on this unit unrelated to the freeze on September 1, 2000 and November 13, 2000, respectively. Great American remitted indemnity payments to Greg Schwitters in the amount of $15,584.00 on or about November 27, 2000, and to Lane

Schwitters in the amount of $15,584.00 on or about November 28, 2000. These indemnity payments are reflected in Attachment A to these Findings of Fact. This finding is not intended to preclude any legal defenses defendants may have regarding unit 205. The Panel finds that the November 13, 2000 adjustment did not constitute a final adjustment and does not preclude Lane and Greg Schwitters' recovery for the freeze.

## XV. CONCLUSION.

Without displacing or diminishing the foregoing Findings of Fact, and inasmuch as the Panel's authority does not extend to Conclusions of Law, the Panel makes the following central Finding of Facts.

248. All of the beets harvested on or after the freeze were unsuitable for storage and did not meet the minimal acceptable standards of the Growing Agreement except those beets that were reasonably processable within a period of one to two weeks immediately following October 12, 2000. Based on the high temperatures experienced in the immediate post-freeze period, 7 days is the appropriate period.

249. 77,000 tons of beets met the minimal acceptable standards and were reasonably processable within a period of one to two weeks immediately following the freeze. These beets are allocable among the grower units proportionately to the total delivered beets post-freeze as all parties recognized that co-mingling would occur. The appropriate calculation for indemnity payments for each and every plaintiff is as set forth in Attachment A incorporated herein by reference.

250. Except for those that were reasonably processable within 7 days following the freeze, the gross dollar value of the sugar beets unharvested as of October 12, 2000 was zero.

______________________________ Dated: 19 August, 2004
David F. Fitzgerald

______________________________
Robert W. Kettering

______________________________
John W. Mooty