UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| *In re 2000 Sugar Beet Crop Insurance Litigation* | Civil File Nos.: 01-CV-1629<br>01-CV-1630<br>01-CV-1632<br>01-CV-1633<br>01-CV-1634<br>01-CV-1635<br>01-CV-1636<br>02-CV-0985 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS' COMPLAINTS**

Defendants American Growers Insurance Company, et al.[1] (collectively "defendants") are entitled to summary judgment as a matter of law on Count I of plaintiffs' Complaints. On August 20, 2004, plaintiffs and defendants jointly filed the Final Findings of Fact issued the day before by an Arbitration Panel ("Panel")[2] established as a result of this Court's order docketed September 27, 2002, and reported at 228 F. Supp.2d 992 (D. Minn. 2002). Pursuant to the insurance policy and the federal regulation under which the arbitration took place, this Court must apply the policy's terms and conditions as well as controlling law. Once it does so, judgment in favor of defendants on Count I is mandated.

A defense judgment should be entered notwithstanding the Panel's conclusion that $16,496,736 in insurance indemnity payments are due plaintiffs. Reaching this result flows

---

[1] Defendants and the actions in which they are named as parties are: American Growers (in 01-CV-1633); The Alliance Ins. Co. and Farmers Alliance Mut. Ins. Co. (in 01-CV-1636); Farm Bureau Mut. Ins. Co. (in 01-CV-1635); Great American Ins. Co. (in 01-CV-1634); IGF Ins. Co. (in 01-CV-1630); NAU Country Ins. Co. (in 02-CV-0985); and Rain and Hail L.L.C. (in 01-CV-1629).

[2] See Docket No. 81. The Panel was composed of David F. Fitzgerald, Robert W. Kettering, and John W. Mooty.

directly from application of the policy's terms and controlling law. Reaching this result, moreover, involves neither wholesale second-guessing of the Panel's findings nor embracing any novel standard of review.[3] Defendants explain the applicable standards of review in Part II.

All plaintiffs are members of Southern Minnesota Beet Sugar Cooperative ("SMBSC"), a cooperatively owned processor of its members' sugar beets. (Findings of Fact at ¶¶ 1 and 3.a.) The Panel treated SMBSC as a significant non-party organization. (Id. at Part IV.) Defendants are insurance companies or certain affiliates which sold federal crop insurance policies to plaintiffs for the 2000 crop year. (Id. at ¶ 2.)

## SUMMARY OF ARGUMENT

Plaintiffs' claims in Count I arise under their Sugar Beet Crop Insurance Policies issued under the federal crop insurance program. Federal crop insurance is fundamentally different from private insurance coverage governed by state law. It is funded through the federal Treasury, and it is completely and thoroughly subject to regulations promulgated by the federal government. The regulations strictly dictate the rights and obligations of the insureds and insurers, the manner in which claims are to be processed, and the method for resolving any disputes that may arise with respect to the payment of insurance indemnities.

Key portions of plaintiffs' sugar beet insurance policies—and the only portions implicated by this motion—are set forth in two federal regulations: 7 C.F.R. § 457.8 (setting forth the "Basic Provisions" common to every federal crop insurance policy) and 7 C.F.R. § 457.109 (containing the "Sugar Beet Crop Provisions" applicable to the specific crop at issue). The regulatory structure requires all insureds, like these plaintiffs, to comply with all policy

[3] Defendants believe the Panel made numerous factual errors. They recognize, however, the practical and legal impediments to pursuing even a well founded attack on multiple factual findings. Defendants also believe that such an attack is unnecessary because the points pursued by defendants provide complete, independent, and alternative bases for entry of judgment.

provisions as a condition for receiving an indemnity payment. 7 C.F.R. § 457.7. Defendants explain the legal structure of this federal program in Part I.

Two independent bases exist for entry of judgment in favor of defendants.

First, plaintiffs breached inescapable legal obligations under their sugar beet insurance policies. The Panel either avoided or excused these breaches:

1. Plaintiffs failed to provide timely notice under their policies.
2. Plaintiffs did not permit defendants to inspect representative samples of their 2000 sugar beet crops.
3. Plaintiffs did not submit claims for indemnity, let alone timely ones.
4. Plaintiffs refused to submit to examinations under oath.

This set of grounds for judgment in favor of defendants involves no attack on the Panel's factual findings. In fact, defendants' approach accepts as accurate all but one of these findings, and the sole exception (finding 222) must be vacated because it is wholly incompatible with established law and, therefore, immaterial. Defendants establish this ground for judgment in Part III.

Second, even if plaintiffs had not breached multiple threshold legal obligations under the policy, indemnity awards to them must be vacated because:

1. The Panel computed plaintiffs' losses under the wrong provision of the policy.
2. The Panel computed plaintiffs' losses in plain contravention of controlling Eighth Circuit authority.
3. The Panel's computations are impermissible under the policy.
4. The Panel made material computational errors.
5. The Panel's indemnity findings are internally inconsistent as well as unsupportable by the record.

The first three of this set of points do not require the Court to confront any factual issues. Instead, they accept the relevant findings by the Panel, which, however, are legally deficient.

The other two points involve factual issues, but they are the sort of matters that are reviewable and may be vacated under established standards of review. Defendants document this ground for judgment in Part IV.

## I. THE FEDERAL CROP INSURANCE PROGRAM REQUIRES STRICT CONSTRUCTION AND FULL COMPLIANCE BY ALL PARTICIPANTS.

Congress enacted the Federal Crop Insurance Act ("FCIA") "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance." 7 U.S.C. § 1502(a). Congress created the Federal Crop Insurance Corporation ("FCIC"), as an agency and instrumentality of the United States Department of Agriculture ("USDA"), to administer the federal crop insurance program for the nation's agricultural producers. 7 U.S.C. § 1503. Acting under its statutory authority in 7 U.S.C. § 1506(r), FCIC, in turn, has promulgated extensive and comprehensive regulations that control every aspect of the federal crop insurance program. 7 C.F.R. §§ 400-457.165.

Congress has "established an insurance fund" at the United States Treasury which holds funds appropriated annually and premium income. 7 U.S.C. § 1516(c)(1). This Treasury account funds indemnities paid to insureds, premium subsidiaries paid on their behalf, agents' sales commissions, and expense reimbursements under reinsurance agreements with defendants and other approved insurance providers. 7 U.S.C. § 1516(b)(1). Appropriations also cover other expenses of the federal crop insurance program. 7 U.S.C. § 1516(a).

Because federal crop insurance is a congressionally enacted program that subsidizes the cost of insurance coverage and pays claims using federal funds, participants in the federal crop insurance program "must turn square corners" in strictly observing the terms and conditions defined by Congress and promulgated by the FCIC for charging the public treasury. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 385 (1947). This approach "does not reflect a callous

outlook," but instead "merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury." Id. "[N]ot even the temptations of a hard case can elude the clear meaning of the regulation[]" promulgated by the agency acting under the authority of Congress. Id. at 386.

The exacting federal regulations governing the federal crop insurance program embody the well established and overarching policy that the public fisc shall only be disbursed in strict accordance with the explicit terms and conditions established by Congress. This policy emanates directly from the Constitution, where the Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law." Art. I, § 9, Cl. 7. The objective of the Appropriations Clause "is to secure regularity, punctuality, and fidelity, in the disbursement of the public money," 2 Commentaries on the Constitutions of the United States § 1348 (3d ed. 1858), and "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or individual pleas of litigants." Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 428 (1990). Protecting the public fisc is embodied in multiple provisions of the FCIA. Leading the list is Congress' mandate that the federal crop insurance program should be actuarially sound. 7 U.S.C. §§ 1506(o) and 1508(i).

Notwithstanding the "temptations of a hard case," neither the Panel nor the Court has the authority either to rewrite the regulations promulgated for the operation of the federal crop insurance program or to dispense federal monies in a manner that has not been authorized by Congress. The specific language of 7 C.F.R. § 457.7 explicitly established these limitations on fact finders' and courts' powers. Quite simply, by its terms, this regulation forbids the payment

of any indemnity under a policy to any insured who has failed to comply fully with the policy's terms and conditions.

## II. THE PANEL'S FINDINGS OF FACT SHALL NOT APPLY TO THE EXTENT THEY DEVIATE FROM THE STRICT TERMS AND CONDITIONS, OR VIOLATE THE UNDERLYING PUBLIC POLICY, OF THE FEDERAL CROP INSURANCE PROGRAM.

The arbitration took place after the Court directed arbitration of factual disputes. Its order, in turn, was based on the applicable federal regulations which comprise the terms of the FCIC-mandated insurance policy. The Court's order limited the Panel's authority, consistent with these applicable regulations, to make "factual determinations" concerning the parties' "factual disputes." In re 2000 Sugar Beet Crop Ins. Litig., 228 F. Supp. 2d 992, 995 & 999 (D. Minn. 2002). The strictly circumscribed scope of the Panel's authority was confirmed in the Engagement Letter executed by all parties and the Panel's members. It provided that the Panel would be "responsible for rendering findings of fact, but no conclusions of law or determinations of ultimately liability, consistent with the Basic Provisions as ordered by the Court in In re 2000 Sugar Beet Crop Insurance Litigation, 228 F.Supp.2d 992 (D. Minn. 2002)."

Notwithstanding its limited mandate, the Panel issued Findings of Fact that contain legal determinations that are reserved for the Court, exceed the authority allowed by the applicable regulations and policy terms, conflict with the limited engagement accepted by the Panel to resolve disputed facts, and cannot be reconciled with the applicable law and public policy that underlies the federal crop insurance program. Indeed, the Panel has exceeded even the authority of this Court by purporting to eliminate plaintiffs' clearly enunciated duties and obligations as insureds under the policy; to provide plaintiffs with awards that exceed the amount of liability established or which could have been established under the insurance policy; and to render

"factual" determinations incompatible with an actuarially sound crop insurance program and otherwise undermine the integrity of this federal program.

Defendants are aware of the deferential standard of review often applied to arbitration awards. Nonetheless, "although the arbitrator's authority is broad, it is not unlimited." Boise Cascade Corp. v. Paper Allied-Indus. Chem. & Energy Workers, Local 7-0159, 309 F.3d 1075, 1080 (8th Cir. 2002) (citations omitted). Arbitrators are not free to enter awards that "so directly contradict[] the plain meaning of the parties' agreement that it effectively rewrites it." Id.[4]

Moreover, the Court has the authority to disallow or vacate any arbitration award that "would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" United Paper Workers Int'l Union v. Misco, Inc., 484 U.S. 29, 42-43 (1987) (quoting W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983); Muschany v. United States, 324 U.S. 49, 66 (1945)).[5] While it has typically applied this public policy exception to overturn arbitration awards that conflict with well established policies that promote public safety, see, e.g., Iowa Electric Light & Power Co. v. Local Union 204, 834 F.2d 1424, 1427-28 (8th Cir. 1987), the Eighth Circuit has not limited the application of the public policy exception exclusively to cases involving public safety:

> . . . we cannot limit our policy inquiry to areas of public safety or any particular substantive area of the law. The extent of our inquiry is properly delineated by the "well-defined and dominant" policy framework laid down by the Supreme

---

[4] See also Amalgamated Transit Union, Local No. 1498 v. Jefferson Partners, 229 F.3d 1198, 1200-01 (8th Cir. 2000); Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688, 959 F.2d 1438, 1440 (8th Cir.), cert. denied, 506 U.S. 1013 (1992).

[5] This public policy exception is essential to protecting the public's interest when implicated in private arbitrations; those public interests "will go unrepresented unless the judiciary takes account of [them] when it considers whether to enforce such agreements." Misco, 484 U.S. at 42 (citing McMullen v. Hoffman, 174 U.S. 639, 654-55 (1899); Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356-58 (1931)).

> Court in Misco and W.R. Grace, not by the underlying conduct leading to the arbitration.

Painewebber, Inc. v. Agron, 49 F.3d 347, 350 (8th Cir. 1995).

The federal crop insurance program embodies well defined and dominant public policy that requires strict adherence to the federal regulations at issue. "From its origin, the stated purpose of the federal crop insurance program has been 'to promote the national welfare by improving the economic stability of agriculture *through a sound system of crop insurance*.'" Wiley v. Glickman, 1999 WL 33283312, at *1 (D.N.D. 1999) (emphasis added & quoting 7 U.S.C. § 1502(a)). This mandate has been implemented through a comprehensive federal legislative scheme along with a detailed and exhaustive regulatory approach promulgated and overseen by the congressionally authorized agency. See, e.g., 7 C.F.R. §§ 400-457.165. These regulations, and the terms of the mandated insurance policy, expressly provide that "[n]o indemnity shall be paid unless the insured complies with all terms and conditions of the contract," and that "[n]o award determined by arbitration . . . can exceed the amount of liability established or which should have been established under the policy." 7 C.F.R. § 457.7.

The Panel has issued Findings of Fact that ignore the public policy requiring strict compliance with an exacting scheme of federal regulation. Specifically, the Panel has excused plaintiffs' failure to adhere to explicit regulatory requirements, and ignored the legal directive that no indemnity may be paid without complying with all of those requirements. In short, the Panel has contravened "the public policy of this nation concerning the strict compliance with [the] regulations." Iowa Electric, 834 F.2d at 1426.

Accordingly, the Court need not, and should not, defer to the Panel as to any legal questions such as the application of the law to the facts or any legal conclusions adopted by the Panel. See Basic Provisions ¶ 20(a), codified at 7 C.F.R. § 457.8. Further, the Court need not,

and should not, defer to the Panel with respect to any findings which would lead to payment of an indemnity in excess of the policy limitations, including applicable coverage levels because "[n]o award determined by arbitration . . . can exceed the amount of liability established or which should have been established under the policy." See Basic Provisions ¶ 20(d), also codified at 7 C.F.R. § 457.7. Finally, the Court need not, and should not, defer to the Panel with respect to any factual findings which contravene public policy.

## III. PLAINTIFFS' FAILURE TO COMPLY WITH THE TERMS AND CONDITIONS OF THEIR POLICIES BARS COVERAGE.

Implementing the congressional mandate of "a sound system of crop insurance" and the Constitutional requirement of strict control over the dispensing of federal monies, the hallmark regulatory provision of the federal crop insurance program provides that "[n]o indemnity shall be paid unless the insured complies with all terms and conditions of the contract." 7 C.F.R. § 457.7.[6] The Panel simply ignored this clear and unequivocal principle, as well as the well-defined and explicit underlying public policies, by countenancing plaintiffs' wholesale failure to comply with their clearly defined and expressly itemized contractual obligations.

Defendants first discuss in Part III.A. controlling federal law as it relates to plaintiffs' contractual obligations under their policies. The thrust of these obligations is to provide insurers timely, complete information so that companies can dispatch loss adjusters to perform their duties. Part III.B. then delineates plaintiffs' most egregious breaches of their obligations. Finally, Part III.C. explains that these breaches cannot be excused.

---

[6] Plaintiffs, as insureds under the standard insurance policy mandated by the federal government, have a number of obligations and duties that they must perform in order to qualify for any indemnity payments, and plaintiffs are deemed to be fully knowledgeable as to all of these terms. See Nobles v. Rural Cmty. Ins. Servs., 303 F. Supp. 2d 1292, 1304 (M.D. Ala.), aff'd, --- F.3d ---, Table No. 04-11313 (11th Cir. 2004) (citing FCIC v. Merrill, 332 U.S. 380, 384-86 (1947)).

**A. Plaintiffs Are Required To Establish Compliance With All Policy Terms And Conditions.**

The unrebutted evidence and the uncontested facts of this case establish that plaintiffs failed to provide timely notice and did not comply with numerous other duties which they had as insureds in the federal crop insurance program. However, the Panel simply ignored these fundamental breaches, finding that "[n]o insurance company was prejudiced by late notice, nor by any non-compliance with policy provisions." (Findings of Fact at p. 5 and ¶ 222.) The Panel's finding in this regard is wholly at odds with the undisputed evidence in the record. More importantly, the Panel's finding is irrelevant as a matter of law. It is well established that the federal crop insurance program requires strict compliance, and failure to comply strictly shall not be excused based on arguments of prejudice, waiver, hardship, or substantial compliance. See FCIC v. Merrill, 332 U.S. at 385 (insured "must turn square corners when they deal with the Government"); Scaife v. Federal Crop Ins. Corp., 167 F.2d 152, 154 (8th Cir. 1948) (affirming requirement that "satisfactory proofs of loss shall be furnished"); Byrne v. Federal Crop Ins. Corp., 289 F. Supp. 873, 874-75 (D. Minn. 1968) (insured denied recovery due to submission of untimely claim for indemnity notwithstanding timely notice of loss).[7]

The Eighth Circuit recently reaffirmed the strict requirement that, in order to receive indemnity payments under federal insurance programs, insureds must comply fully and completely with all of the terms and conditions of the insurance policy. In Mancini v. Redland Insurance Co., 248 F.3d 729 (8th Cir 2001), the Eighth Circuit held that the Standard Flood

---

[7] These controlling decisions are entirely consistent with similarly persuasive decisions issued by other courts mandating strict compliance with the terms and conditions of federal crop insurance policies. See, e.g., Mock v. United States, 183 F.2d 174, 176 (10th Cir. 1950) (untimely proof of loss bars recovery); Felder v. Fed. Crop Ins. Corp., 146 F.2d 638, 640 (4th Cir. 1944) (same); Spratlin v. Fed. Crop Ins. Corp., 662 F. Supp. 870, 872 (E.D. Ark. 1987) (same); Roberts v. Fed. Crop Ins. Corp., 158 F. Supp. 688, 694-95 (E.D. Wash.), aff'd, 260 F.2d 958 (9th Cir. 1958) (failure to file proof of loss bars recovery).

Insurance Policy under the National Flood Insurance Act, which also must be strictly construed, required the insurer to deny coverage where the insureds failed to submit a signed and sworn statement of the amount claimed. Id. at 733-34. "The Supreme Court has held that courts must strictly construe the statutory or regulatory limits upon disbursements of funds through federal insurance programs." Id. at 733 (citing FCIC v. Merrill, supra). "[A]n insured must comply with all policy requirements or lose the right to sue under the policy" because "such a suit would be paid out of the federal treasury, those requirements function as 'conditions precedent' to a waiver by the federal government of its sovereign immunity.'" Id. at 733-34 (quoting Wagner v. Director, FEMA, 847 F.2d 515, 518 (9th Cir. 1988)). "Given the special nature of this policy, the [insureds] must show actual and complete compliance with this requirement: it is not sufficient to show that they substantially complied or that the insurer suffered no prejudice." Id. at 734 (citing federal authority rejecting claims of "substantial compliance"). Simply stated, theories such as substantial compliance and equitable estoppel "cannot be applied to compel an unauthorized disbursement from the federal treasury." Id. at 734-35.

The factual situation that gave rise to Mancini illustrates the absolute nature of the requirement that participants in federal insurance programs through which federal monies are distributed must adhere strictly to all policy requirements, or they lose any right to receive benefits under the program. In Mancini, the insureds actually submitted prompt and timely notice of a possible insured loss, and they subsequently followed up by faxing proof of loss forms with handwritten notations by the insureds evidencing their submission of these forms. 248 F.3d at 731-732. The insurer denied the insureds' claim on the ground that the loss was already in progress on the effective date of the policy. Id. at 732. It was not until after litigation commenced that the insurer even raised the fact that the insureds had failed to comply with the

policy's requirement that they submit a signed and sworn proof of loss. Id. at 733. "The District Court found that the Mancinis believed that, by submitting the forms to Redland [Insurance Company] accompanied by a transmittal letter bearing their printed names, they had signed and sworn the proof of loss," and that they had "technically complied with the proof of loss provisions of the policy" and awarded judgment in favor of the Mancinis. Id. at 732-33. However, relying on well established precedent that "substantial compliance" with proof of loss requirements is not sufficient and that courts are powerless to prevent the enforcement of federal regulations, the Eighth Circuit held such findings could not excuse the insureds' failure to submit a proper proof of loss. Id. at 734-35. "The policy, strictly construed, permits the company to deny coverage where an insured has failed to submit a signed and sworn statement of the amount claimed, and it divests a non-complying insured of the right to sue." Id. The Eighth Circuit therefore reversed and remanded the matter for entry of judgment in favor of the insurer. Id.

Likewise, as was the case in Mancini, the Panel's "findings" that plaintiffs effectively complied with the terms and conditions of the subject insurance policy so as to qualify for indemnity payments must be rejected. The unrebutted evidence in the evidentiary record developed through the arbitration proceedings establishes that the plaintiffs failed to comply with numerous duties and obligations required of them as insureds. As previously noted, "[n]o indemnity shall be paid unless the insured complies with all of the terms and conditions of the contract." 7 C.F.R. § 457.7. Neither the Panel nor this Court is authorized either to excuse or to ignore plaintiffs' failure to comply with the terms and conditions in the sugar beet policy.

### B. The Panel Excused Multiple Breaches Of Plaintiffs' Contractual Obligations.

Despite their strict obligations under the federal crop insurance program, plaintiffs breached them, and the Panel excused their multiple breaches.

### 1. Plaintiffs Failed To Provide Timely Notice Of Loss.

As insureds, each plaintiff had a duty to provide prompt and timely notice:

> (a) In case of damage to any insured crop, you must:
>
> * * *
>
> (2) Give us notice within 72 hours of your initial discovery of damage (but not later than 15 days after the end of the insurance period), by unit, for each insured crop (we may accept a notice of loss provided later than 72 hours after your initial discovery if we still have the ability to accurately adjust the loss); . . .

7 C.F.R. § 457.8, Basic Provisions ¶ 14(a). Failure to provide timely notice of loss as required under the federal crop insurance policy bars payment of indemnities. See Felder v. Federal Crop Ins. Corp., 146 F.2d 638, 640 (1st Cir. 1944). The facts, as found by the Panel and developed below, unequivocally demonstrate: (1) no plaintiff gave notice within 72 hours of discovery of damage; (2) no more than two plaintiffs took any action prior to expiration of the fifteen day grace period to provide notice;[8] and (3) no defendant received actual notice prior to December 15, 2000.

The Panel affirmatively found that the last day of harvest was Sunday, October 29, 2000. (Findings of Fact at ¶ 28.) Accepting the validity of this finding, and taking into account the policy's grace period for late notice, notice had to be given on or before November 13, 2000.[9] This legal conclusion is unavoidable. Section 14(a) of the Basic Provisions, quoted above, requires notice "not later than 15 days after the end of the insurance period," and Section 11(b)

---

[8] The Panel found that plaintiffs R. Duncan Farms, Inc. and Brett Duncan contacted their agent within a week of the freeze. (Findings of Fact at ¶ 180.) The Panel expressly found that their agent "did not file a claim." (Id.)

[9] With over 2.3 million tons of beets and the 2000 harvest starting August 23 and ending October 29 (Findings of Fact at ¶¶ 20, 28, and 29), it is self-evident that many plaintiffs completed harvest prior to October 29, and thus their notice periods would have ended earlier than November 13. Given plaintiffs' uniform failures to give timely notice, defendants are using the November 13 date for convenience of argument, even though some plaintiffs' breaches occurred earlier.

thereof requires that the insurance period ends at the *earliest* of several specified events or dates, one of which is harvest. The arithmetic is simple: October 29 plus fifteen days equates to November 13, 2000. No more than two plaintiffs met this legal requirement, despite clear knowledge of the frost, as found by the Panel.

The Panel's undisputed findings, as well as evidence in the record, establish that all but two plaintiffs failed to provide timely notice. Specifically, the Panel found that all plaintiffs were aware of the early freeze event of October 6 through October 9, 2000, and they took action to respond to that early freeze event. (Findings of Fact at ¶¶ 21-22.) The Panel expressly found that the weather events in question were "unique and noteworthy because of both the large geographic scale and the earliness of the freeze," and that "[g]rowers in the SMBSC growing area reported seeing frost on the leaves and in the crowns of their sugar beets." (Id. at ¶¶ 35 & 47.) The Panel also expressly found that the October 6–9 freeze was "an early, wide spread, hard, and deep freeze," that it affected all plaintiffs' fields, and that it caused damage" to all the beets." (Id. at ¶¶ 34–35, 47, & 58–59.) Further, the Panel entered findings reflecting the fact that plaintiffs were made aware by their cooperative, SMBSC, *prior to* November 13, 2000, that they were experiencing significant deterioration of the sugar beets that had been harvested and stored in piles, including problems with "hot spots" and "sinkholes," and that by early November 2000 "extraction and granulation rates were down to about half of expected levels." (Id. at ¶¶ 24, 108 & 136.) Accordingly, it is indisputable that all plaintiffs had actual knowledge that the October 6–9, 2000, freeze damaged their crops, and they had this knowledge prior to November 13, 2000 (i.e., the last possible day for notice under the fifteen day grace period in the policy).

Notwithstanding plaintiffs' actual knowledge of a damaging freeze on October 6–9, no notice to defendants was given prior to December 15, 2000—more than a month and a half after the completion of harvest—through a letter by SMBSC's chief financial officer—Jeff Plathe. (Id. at ¶ 26.) That was defendants' earliest actual notice. (Id. at ¶ 140.)

The Panel relied on a series of stipulations that were entered by certain plaintiffs to reach its ultimate conclusion that notice was timely given. The text of these stipulations actually demonstrates that no timely notice was provided by the plaintiffs who are the subject of this motion.[10] Ninety of the plaintiffs explicitly stated in Stipulations 1 and 3 that neither they, nor anyone on their behalf, provided notice to any insurer at any time or in any manner prior to December 15, 2000. (Findings of Fact at ¶¶ 145 & 147.) The Panel relied on the stipulations or testimony of thirty-nine plaintiffs that they had conversations with their agents prior to November 30, 2000. (Id. at ¶¶ 148-149 (Stipulation 4) & 171.) The contents of those discussions, however, were limited to a discussion of the weather and the freeze, and the plaintiffs in this group (except for the two plaintiffs noted above) did not notify their agent or insurer of a loss occasioned from that freeze. (Id. at ¶¶ 150-169 and 172-212.)

Thirty-one plaintiffs stipulated that they had hearsay knowledge that an agent for one company, IGF Insurance Co. ("IGF"), provided notice of possible freeze damage. The agent was Mr. Terry Hochsprung. The record establishes that on October 17, 2000, Mr. Hochsprung sent a handwritten note to IGF the day after he noticed his wife covering her flowers. (See T. Hochsprung Depo. at 102-103.) Accepting Mr. Hochsprung's unchallenged testimony as true, this incident is not sufficient to establish timely notice for this sub-set of plaintiffs. First, there is

[10] A summary of the plaintiffs and the actual stipulation or finding upon which the Panel relied in reaching its conclusion that notice was given is attached to the Affidavit of Thomas H. Boyd, filed and served herewith, as Exhibit M.

no way that it can relate to the freeze event in question, which the Panel specifically found occurred October 6–9, 2000. (Findings of Fact at ¶¶ 34 – 48.) Assuming his wife did cover her flowers on October 16, 2000, that weather situation was completely unrelated to the weather event which the Panel found to have damaged plaintiffs. Second, the note was not specific to freeze damage or to any sugar beet crop; rather, it purportedly advised IGF of a "possible loss" based on an unspecified cause of loss, to every crop grown by every one of the agent's insureds under every policy they held (five of which are not at issue). (PT Ex. 100; T. Hochsprung Depo. at 109-111.) Third, Mr. Hochsprung admitted that no plaintiff contacted him before he sent in the note about any freeze damage. (Id. at 103.)

Four plaintiffs agreed to be bound by the deposition testimony of a family member or farming partner, but the findings are silent as to any notice provided by these individuals or their family member or farming partner. (Finding of Fact at ¶ 170.) Finally, the findings are completely silent with respect to the remaining fifty-three plaintiffs.

These evidentiary shortcomings on notice should be fatal to plaintiffs' claims for coverage under the federal crop insurance program. The multiperil crop insurance policy mandated by the FCIC, and under which all of the plaintiffs in the above-captioned consolidated cases seek indemnity payments, expressly imposes upon *each* insured the burden of proof to "establish . . . that the loss of production or value was caused by one or more of the insured causes specified in the crop provisions." Basic Provisions ¶ 14(e). Plaintiffs cannot avoid their burden of proof under the federal multiperil crop insurance policy. Bartness v. Federal Crop Ins. Corp., 845 F.2d 1258, 1260-61 (5th Cir. 1988); R&R Farms v. Federal Crop Ins. Corp., 788 F.2d 1148, 1151 (5th Cir. 1986). The Panel nonetheless failed to require plaintiffs to meet their individual burdens of proof and ignored the unrebutted evidence in the record as to the notice

requirement. Regrettably, as will be further detailed below, the Panel likewise ignored clear evidence and excused numerous other instances in which plaintiffs breached their duties under the policy.

2. **<u>Plaintiffs Failed To Leave Representative Samples Of Their Crops</u>.**

Plaintiffs' federal crop insurance policy required them to leave specific samples of their crop in the field:

> (a) In case of damage to any insured crop, you must:
>
> * * *
>
> (3) Leave representative samples intact for each field of the damaged unit as may be provided by the crop provisions; . . .
>
> (4) Cooperate with [the insurer] in the investigation or settlement of the claim, and, as often as we reasonably require:
>
> (i) Show us the damaged crop;
>
> (ii) Allow us to remove samples of the insured crop; . . .

7 C.F.R. § 457.8, Basic Provisions ¶ 14(a)(3)-(4)(i)-(ii). The Crop Provisions specifically define the length and width of the samples that each insured is to maintain:

> (a) Representative samples of the unharvested crop must be at least 10 feet wide and extend the entire length of each field in the unit. The samples must not be harvested or destroyed until the earlier of our inspection or 15 days after harvest of the balance of the unit is completed; . . .

7 C.F.R. § 457.109, Basic Provisions ¶ 12(a). These provisions coexist with the notice requirements so as to require the insureds to maintain representative samples until the last possible date by which they can provide notice to the insurers of a possible loss.

Compliance with this particular requirement was critical because, as the Panel found, "[u]pon delivery to the piling stations, an individual grower's beets are commingled with those of other growers whereupon *they loose* [sic] *their separate identity and can no longer be identified as having been grown by a specific grower*." (Findings of Fact at ¶ 13) (emphasis

added). Thus, check strips would have at least provided defendants with some opportunity to evaluate samples of the beets that were actually insured with respect to a given insured.

The Panel found that plaintiffs failed to leave "check strips" of the sort required by the policy. (Findings of Fact at ¶ 139.) Plaintiffs' failure to show the insurers the damaged crop and allow the insurers to remove samples, prior to the time each plaintiff's crop had been harvested and commingled with the crops of other growers, bars coverage. The Panel accurately found that, when they eventually were contacted on behalf of plaintiffs, defendants promptly notified them that their failure to leave representative samples constituted a basis for denial of coverage. (Findings of Fact at ¶ 26.)

### 3. **Plaintiffs Failed To Make Timely Submission Of Claims For Indemnity.**

Plaintiffs' federal crop insurance policy gave them two months after the end of the insurance period to satisfy their duties, establish all of the facts underlying their claims, and provide all information necessary to adjust or settle their claims:

> (c) In addition to complying with all other notice requirements, you must submit a claim for indemnity declaring the amount of your loss not later than 60 days after the end of the insurance period. This claim must include all the information we require to settle the claim.

7 C.F.R. § 457.8, Basic Provisions ¶ 14(c). Failure to do so bars any claims for indemnity under the policy. See Mancini, 248 F.3d at 733-34 (insured's failure to submit signed and sworn proof of loss showing claimed amount barred suit). See also Byrne, 289 F. Supp. at 874 (insured's failure to submit timely indemnity claim on prescribed form within 60 days of loss barred recovery under policy).

As established in Part II.B.1. with respect to notice, harvest ended October 29, 2000, and this ended the insurance period. The sixtieth day thereafter was December 29, 2000. All plaintiffs failed to submit timely claims for indemnity pursuant to their contractual obligation

under Section 14(c) of the Basic Provisions, and plaintiffs submitted no evidence to the contrary. Nor did the Panel find that the plaintiffs satisfied their duty to submit a claim for indemnity. This obligation is "in addition to" plaintiffs' separate notice obligations. Their failure to comply with it bars coverage.

**4. Plaintiffs Refused To Submit To Examinations Under Oath.**

The terms of plaintiffs' crop insurance policy expressly required each of them to submit to examinations under oath with regard to the damage or loss claimed:

(d) Upon [insurer's] request, you must:

* * *

(2) Submit to examination under oath.

7 C.F.R. § 457.8, Basic Provisions ¶ 14(d)(2). During the course of discovery preceding the evidentiary hearing, and in the evidentiary hearing itself, some plaintiffs did submit to examinations under oath. However, notwithstanding timely demand made by defendants, the vast majority of plaintiffs refused to submit to examinations under oath.

Prior to the commencement of the evidentiary hearing, the FCIC issued Final Agency Determination-019 ("FAD-019") on August 5, 2003, which addressed each insured's obligation to submit to examinations under oath pursuant to the Basic Provisions.[11]

> The Federal Crop Insurance Corporation ("FCIC") agrees that *Section 14(d)(2) requires an insurer to submit to an examination under oath and that initiation of arbitration proceedings does not change this requirement.* There is nothing in Section 14(d)(2) that places any restrictions on when such examination may take place or links it in any way to the arbitration or any other legal process. *If the matter is in arbitration, the insurance company has the right to question the insured under oath in conjunction with that proceeding.*

[11] Any participant in the federal crop insurance program "may seek interpretations of those provisions of the Act [i.e. FCIA] and the regulations promulgated thereunder that are in effect for the crop year in which the request . . . is being made . . . ." 7 C.F.R. § 400.765(b). On May 9, 2003, defendants submitted their request for a final agency determination on the interpretation of Section 14(d)(2) which eventually resulted in the issuance of FAD-019.

> *FCIC also agrees that refusal to submit to an examination under oath constitutes a breach of policy requirements.* Such a breach could jeopardize receipt of any indemnity if a refusal to submit to the examination under oath results in the inability to accurately determine the amount of loss or whether a loss occurred.
>
> In accordance with 7 C.F.R. § 400.765(c), *this Final Agency Determination is binding on all participants in the Federal Crop Insurance program for Crop Year 2000.*

FAD-019 (emphasis added). As "producers with valid crop insurance policies," FAD-019 is binding on all plaintiffs in the above-captioned consolidated proceedings. 7 C.F.R. §§ 400.765(c) & 400.766.

Notwithstanding each insured's obligation to submit to examinations under oath, plaintiffs moved for an order providing that no such depositions take place in connection with the arbitration proceedings. (Findings of Fact at p. 4 n.1.) The Panel ultimately granted the relief sought by plaintiffs and strictly limited defendants' ability to conduct examinations under oath of each insured, limiting any depositions to a single issue (notice) but then permitting even those depositions to be avoided if plaintiffs subscribed to one of various notice stipulations approved by the Panel.[12] The Panel was not authorized to eliminate the insureds' obligation to submit to an examination under oath. Based on the Panel's improper ruling, 294 of the 402 plaintiffs refused to submit to examination. (Findings of Fact at ¶ 144.) Defendants were thus placed in a situation where the Panel was making findings concerning, and awarding indemnity payments to, hundreds of insureds whom defendants never were permitted to examine under oath either in a deposition or at the evidentiary hearing. The failure of these plaintiffs to submit to examination under oath bars coverage.

---

[12] The Panel specifically acknowledged that "[t]he insurer-defendants at all pertinent times preserved their objection to this procedure and memorialized their demand to take depositions of each grower-plaintiff on a full range of issues they believe were invoked by this dispute." Id. at 4.

### 5. Certain Plaintiffs Failed To Prove A Condition Of Coverage.

As a condition of obtaining crop insurance for sugar beets, plaintiffs had to prove the existence of valid agreements with a beet processor. 7 C.F.R. § 457.109, ¶¶ 7(a)(3) and 12(b). Eight plaintiffs failed to prove the existence of such agreements, and defendants raised with the Panel this specific proof failure. (Defendants' November 10, 2003 post-hearing submissions to Panel, at p. 12 & Attachment 4; Defendants' April 29, 2004 submission to Panel, at p. 23) (showing absence of Grower Agreements for Blarco, David Hinrichs, James Hinrichs, Michael Holian, (Jay Johnson) Kevin Hoc Farms, Aaron Pape, David Telford, and White Horse Farms.) Although this proof failure involves a relatively small number of plaintiffs, it succinctly illustrates the Panel's willingness to disregard plaintiffs' contractual and regulatory obligations and to award indemnities despite plaintiffs' failures to meet such obligations.

### C. Plaintiffs' Claims Of Latent Crop Damage Do Not Eliminate Their Obligations To Comply With All The Terms And Conditions Of The Federal Crop Insurance Policy.

Plaintiffs' failure to give timely notice cannot be excused. The Panel found that plaintiffs experienced a freeze-thaw cycle starting October 6 and ending October 9, 2000. (Findings of Fact at ¶¶ 34-38.) Plaintiffs' own expert testified, unequivocally and without reservation, that there could not have been a worse scenario for unharvested sugar beets. (S. Martin, TP 2261:24-2262:6). Her written opinion also advocated this proposition. (PT Ex. 42, p. 1.) Significantly, for notice of loss purposes, the same expert also testified that this had been known in the industry for decades prior to 2000. (S. Martin TP2343:24-2344:8.) Plaintiffs cannot sponsor a scientific expert who claims that they experienced on October 6-9 the worst possible scenario for unharvested sugar beets, but then fail to give notice of loss on or before November 13, 2000.

Indeed, the same sort of freeze-thaw cycle and potential for latent damage occurred in A.W.G. Farms, Inc. v. Federal Crop Ins. Corp., 757 F.2d 720 (8th Cir. 1985), where, in contrast

to the instant case, the growers provided prompt and timely notice. Id. at 724 & 728. There is no reason to excuse plaintiffs' failure to provide notice when, some fifteen years earlier, similarly situated insureds gave timely notice. There likewise can be no excuse for plaintiffs' failure to maintain check strips for inspection by loss adjusters or, at a bare minimum, to retain samples of harvested beets for a later inspection or testing by insurers.

The Panel nonetheless effectively rewrote the notice requirements, as well as other terms and conditions for coverage, based on its conclusion that the crop had sustained latent damage that was not immediately ascertainable. (Findings of Fact at ¶¶ 213-217 & 223-224.) However, the Court cannot "bend" the rules to dispense federal money even where there are extenuating and sympathetic circumstances. "[N]ot even the temptations of a hard case will provide a basis for ordering recovery contrary to the terms of the regulation, for to do so would disregard 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'" Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 420 (1990) (quoting FCIC v. Merrill, 332 U.S. at 385-86). This is not a callous or heartless formality, but instead an abiding recognition that the executive and judicial branches cannot be used to usurp the exclusive authority of Congress to appropriate federal funds.

The strict application of the federal crop insurance program that is funded with federal money does not mean that the insureds were left without any remedies. On the contrary, plaintiffs had other recognized options and potential remedies to pursue so as to alleviate any unfair or unanticipated hardships. Congress may always choose to exercise its powers to expand recoveries or otherwise provide for appropriate legislative relief to address specific situations. Office of Personnel Mgmt., 496 U.S. at 428. "Congress continues to employ private legislation

to provide remedies in individual cases of hardship . . . . Where sympathetic facts arise [such private legislation is] the means by which these facts can be addressed." Id. at 431.

As a matter of fact, plaintiffs engaged a former Manager of FCIC, Kenneth Ackerman, to pursue "legislative solutions" on their behalf, thus demonstrating a recognition by plaintiffs that this was an available and appropriate means for seeking redress of any claimed hardship or unfairness. (K. Ackerman, TT 1449:23-1450:8.) Indeed, the insureds actually achieved at least partial success in their efforts to gain congressional attention and secure a legislative solution as manifest by (1) the introduction of proposed legislation by Representative Mark Kennedy which, if it had been enacted, would have provided the insureds with the relief that the Panel eventually gave them (K. Ackerman, TP 1447:10-23, 1450:13-19); and (2) obtaining an appropriation of Commodity Credit Corporation sugar worth approximately $4,664,000 in the federal government's fiscal 2002 budget. (J. Plathe, TP 1137:3-11; Defendants' November 10, 2003 post-hearing submissions to Panel, at p. 93.)

Merely because this "legislative solution" did not provide plaintiffs with everything they hoped for does not mean that they can use the judicial system to obtain the distribution of federal funds that have not been authorized. Indeed, given that Congress denied their request for any further relief, it is wholly inappropriate for the Panel or this Court to redefine the applicable regulations and governing policy terms to provide federal funds to the plaintiffs under a judicially expanded federal crop insurance program.

Finally, plaintiffs' efforts to shift the risk of "latent" or "hidden" damage from the insured to the insurers and, therefore the public fisc, would radically transform the nature of this federal program from crop insurance to business insurance. Specifically, as applied by the Panel, the amount of any indemnity payable will be determined only after the crops had been processed

and the insureds are allowed to wait and see whether they made a profit to determine whether they have suffered a "loss." (Findings of Fact at ¶¶ 57 & 65.) This is wholly at odds with the terms of the insurance policy and the very nature of the type of insurance that is provided through the federal crop insurance program. As plaintiffs' own crop insurance expert (former FCIC Manger Ackerman) testified, the federal crop insurance program for sugar beets only insures against damage to crop production (e.g., reduced tons of beets harvested or bushels of corn, soybeans, or wheat harvested). (K. Ackerman, TP1464:24-1465:8; 1466:20-1467:12.) The Panel's approach ignored actual production and instead sought to guarantee plaintiffs a profitable harvest. In doing so, the Panel made findings wholly incompatible with the federal crop insurance program and public policy protective of the federal fisc.

## IV. DAMAGES WERE IMPROPERLY CALCULATED UNDER SECTION 13(e) OF THE SUGAR BEET CROP PROVISIONS.

The Panel made five fundamental and clear errors in awarding indemnity to plaintiffs. First, the Panel improperly computed plaintiffs' losses under the wrong provision of the policy, using the Section 13(e) calculation formula reserved for beets that are unsuitable for processing, even though it is undisputed that the beets in question were actually processed. Second, the Panel's computation of plaintiffs' losses was in plain contravention of the Eighth Circuit's controlling decision in A.W.G. Farms. Third, the Panel's computations are impermissible under the terms of the policy due to plaintiffs' utter failure to establish the requisite elements to qualify for indemnity payments under Section 13(e). Fourth, in applying the wrong calculation formula to determine the amount of the indemnity payments, the Panel made the clearly erroneous finding that all but a small portion of the post-freeze beets had no value whatsoever, even though those beets were processed into sugar and sold, and even though the conduct and admissions of plaintiffs and their cooperative, SMBSC, can only support the finding that those post-freeze

beets had some positive value (which plaintiffs never sought to quantify). Finally, the Panel refused to take into account the payments plaintiffs received from SMBSC for the crop as well as payments they received from the federal government. These clear errors, individually and collectively, result in windfalls to plaintiffs that are at odds with the explicit language of the applicable regulations, the terms of the subject multiperil crop insurance policy, and the public policies underlying the federal crop insurance program.

### A. Plaintiffs' Indemnity Payments, If Any, Should Have Been Calculated Under Section 13(d) Of The Sugar Beet Crop Provisions Because The Beets Were Processed Into Sugar.

The Sugar Beet Crop Insurance Provisions provide that indemnities for losses may be calculated in one of two mutually-exclusive ways. 7 C.F.R. § 457.109. First, if the beets "meet[] the minimum acceptable standards contained in the sugar beet processor contract or corporate resolution," any indemnity shall be calculated according to Section 13(d), which accounts for the sugar that is present in the beets and thus can be extracted. Id. at § 13(d). If the beets do not meet the minimum acceptable standards for processing, then any indemnity shall be calculated according to Section 13(e), which does not account for the sugar that actually is present in the beets because that sugar will not be extracted. Id. at § 13(e). It is undisputed that the beets harvested by plaintiffs following the freeze were processed into sugar. (Findings of Fact at ¶¶ 28-32.) Therefore, any indemnities to which plaintiffs might be entitled should be calculated according to Section 13(d) rather than Section 13(e). Therefore, the Panel clearly erred when it chose to calculate indemnity payments under Section 13(e) rather than Section 13(d).

The very evidence relied upon by the Panel shows that the post-freeze beets were processed which, in turn, requires that the indemnity must be calculated under Section 13(d). The Panel stated that indemnity payments should be made in accordance with the March 2, 2001,

Manager's Bulletin ("MGR-01-010") issued by the Risk Management Agency ("RMA").[13] (Findings of Fact at ¶¶ 84-85.) However, MGR-01-010 specifically states that the determination of whether beets meet the minimum acceptable standards, and, therefore, whether indemnity will be calculated under Section 13(d) or 13(e), must be made "at the time of processing." (Id. at ¶ 84 (quoting MGR-01-010).) RMA's authorized representative, Kimberly E. Arrigo, testified that under this language, growers cannot declare that beets were unsuitable for processing *after* processing. (K. Arrigo TP, 1572:13-1573:6.) Thus, when the beets were at the processing plant, plaintiffs had a choice either (1) to declare that the beets were unsuitable, not process them, and make a claim for indemnity under Section 13(e); or (2) to process the beets and make a claim for indemnity under Section 13(d). Because it is undisputed that the beets were processed, plaintiffs can only qualify for indemnity payments, if any, as calculated under Section 13(d). At the hearing before the Panel, plaintiffs elected not to offer any proof of their beets' value under Section 13(d). Because their processed beets only qualified for indemnity under Section 13(d), there was a failure of proof of the amount of injury, if any, sustained by plaintiffs as a result of a covered weather event (i.e., the freeze of October 6-9).

The Panel's utilization of Section 13(e), when only 13(d) applies, is more troubling than its overlooking plaintiffs' proof failure. First, the Panel completely ignored RMA's second Manager's Bulletin ("MGR-01-010.1") and Ms. Arrigo's testimony concerning it. As MGR-01-010.1 and her testimony made clear, if any indemnities on processed beets were payable, the computation only should be made under Section 13(d), and indemnities under Section 13(e) would be limited to discarded beets using the factors in that bulletin. (K. Arrigo TP, 1570:8-1571:7.) Second, determining the *measure* of loss is a classic legal conclusion which

[13] RMA administers the federal crop insurance program on behalf of the FCIC. (Findings of Fact at ¶ 6.)

only a court can render. See Creek v. Village of Westhaven, 144 F.3d 441, 447 (7th Cir. 1998). Thus, the Panel's determination to use Section 13(e) as the only measure of loss was an improper conclusion—under this Court's order, Section 20(a) of the Basic Provisions, and the Engagement Letter.

**B. The Eighth Circuit Has Held That The Ultimate Determination As To "Acceptability" Is Determined "When The Beets Are About To Be Processed."**

Defendants' position on the proper measure of any indemnity payable is directly supported by the Eighth Circuit's decision in A.W.G. Farms, supra. In determining whether indemnity should be awarded under the predecessors of current Sections 13(d) and 13(e), the court held that the "acceptability of beets cannot be determined until sometime after delivery when the beets are *about* to be processed." 757 F.2d at 727 (emphasis added). Based on this clear holding, any beets that are processed must, by definition, be deemed to be "acceptable" for purposes of calculating any indemnity payments that may be owed.

Indeed, this is the only actuarially sound approach. If a grower could process beets and, if unhappy with the final yield, declare after the fact that the beets were unsuitable for processing, then the federal government would become insurers of growers' processing procedures. However, as plaintiffs' own crop insurance expert testified, defendants are only insurers for losses caused by a covered weather event. (K. Ackerman, TP 1424:14-20.)

**C. Plaintiffs Failed To Establish All Of The Elements Necessary To Calculate Indemnity Under Section 13(e).**

To calculate indemnity under Section 13(e), one must:

(1) Divid[e] the gross dollar value of all of the damaged sugar beets on the unit (including the value of cooperative stock, patronage refunds, etc.) by the local market price per pound on the earlier of the date such production is sold or the date of final inspection for the unit;

(2) Divid[e] that result by 2,000; and

(3) Divid[e] that result by the county average raw sugar factor contained in the Special Provisions for that purpose.

7 C.F.R. § 457.109, § 13(e). To complete this calculation, plaintiffs must establish several facts upon which the record is silent. Thus, even if Section 13(e) were applicable, there was a proof failure by plaintiffs.

First, plaintiffs failed to establish the "gross dollar value of all of the damaged sugar beets on the unit." As set forth in greater detail below, the post-freeze sugar beets definitely had a value greater than zero, but plaintiffs failed to offer any evidence allowing a trier of fact to determine that value. Plaintiffs staked everything on a zero-value finding. As that finding is clearly erroneous, plaintiffs must bear the consequences of their failure of proof.

Second, plaintiffs failed to establish the "value of cooperative stock, patronage refunds, etc." relating to the damaged crop.

Third, plaintiffs failed to establish the "local market price per pound" of sugar on either the date each production was sold or the date it was inspected.

Plaintiffs' failure to establish the evidentiary basis for these essential and required elements is fatal to the Panel's calculation of indemnity payments under Section 13(e).

**D. <u>The Panel's Finding That Post-Freeze Sugar Beets Had A Gross Dollar Value Of Zero Is Wholly Unsupported And, In Fact, Conflicts With The Unrebutted Record</u>.**

In calculating an insured's indemnity under Section 13(e) of the Sugar Beet Crop Insurance Provisions, the payment must be adjusted by the "gross dollar value of all of the damaged sugar beets on the unit (including the value of cooperative stock, patronage refunds, etc.) . . ." (¶ 13(e)). In an astonishing conclusion, the Panel found that "[e]xcept for those harvested and processed within 7 days following Thursday, October 12, 2000, the gross dollar value of the sugar beets harvested after the freeze was zero (0)." (Findings of Fact at ¶ 54.) This

finding is wholly unsupported by the record; conflicts with the unrebutted evidence in the record; and conflicts with other findings made by the Panel.

**1. The Panel's Findings Establish That Plaintiffs Obtained Millions Of Pounds Of Sugar From Beets Which Supposedly Had Zero Value.**

The Panel's findings establish that the post-freeze beets actually had substantial positive value, as those findings reflect that plaintiffs' cooperative, SMBSC, obtained millions of pounds of sugar from the post-freeze beets. Specifically, the Panel found that plaintiffs harvested a total of 2,333,031 tons of beets in the 2000 harvest, and in a normal harvest year this "would have yielded 600 million pounds of sugar." (Findings of Fact at ¶¶ 28 & 33.) The Panel also found that, allegedly because of the freeze, the actual production from the 2000 harvest was only 59% of the expected 600 million pound yield. (Id. at ¶ 33.) If the Panel's findings are taken as true, then the 59% yield only could come from 539,214 tons of beets—the 462,214 tons harvested before October 6, 2000, plus the 77,000 tons of post-freeze beets found by the Panel to be reasonably processable. (Id. at ¶¶ 28 and 68.) Yet this 539,214 tons of beets represents only 23.11% of the total 2,333,031 ton harvest. In other words, in order to reach the conclusion that the post-freeze beets had a gross dollar value of zero, the Panel found that *only 23.11% of the harvest produced 59% of the expected yield from that harvest*. The physical impossibility of the Panel's approach reveals the total lack of credible evidentiary support for its "zero gross dollar" value finding.

To sustain the Panel's findings, the pre-freeze beets would have to have had almost triple the usual sugar content. No one has made any such allegation, and the Panel has not identified or cited any evidence in the record that could support such a conclusion. In fact, in 2000, the processed beets had an average sugar content of 15.9% (Defendants' April 29, 2004 submission

to Panel, at p. 5), which exceeded the typical sugar content for the sixteen affected counties by only 0.9%. (DT Ex. 1).

Thus, the Panel's findings are clearly erroneous, and the 1,387,748 tons of post-freeze beets that were processed actually yielded hundreds of millions of pounds of sugar.[14]

By definition, then, post-beets had a gross dollar value greater than zero. By treating these processed beets as having a gross dollar value of zero, the Panel sought to give plaintiffs a double recovery: plaintiffs' cooperative, SMBSC, was able to sell sugar and co-products obtained from post-freeze beets, and then plaintiffs themselves would be awarded indemnity for those post-freeze beets as if they had no value whatsoever. This is simply wrong. The Panel's zero gross dollar value finding cannot stand and must be vacated.

**2. <u>SMBSC Recorded The Positive Value Of The Post-Freeze Beets</u>.**

In finding that all but 77,000 tons of post-freeze beets had a zero gross dollar value, the Panel also ignored the uncontroverted evidence from plaintiffs' and SMBSC's records demonstrating that the processed beets had a positive value during the period when they were processed. For instance, the positive value of those beets is evidenced by SMBSC's November 15, 2000, letter to plaintiffs projecting a positive value of $31.19 per ton; SMBSC's November 30, 2000, letter to plaintiffs again projecting a positive value of $31.89 per ton; and SMBSC's January 1, 2000, letter to plaintiffs which *still* projected a positive value of $31.89 per ton. (PT Exs. 186, 187 & 190.) As late as January 22, 2001, SMBSC's Vice President of Agriculture, Dr. Jimmy Widner, reported to SMBSC's Board of Directors that approximately 225,000 tons of "good quality beets" remained at the Renville, Clara City West, and Murdock

14 The processability of freeze-damaged beets is not disputed. Plaintiffs' own expert testified that freeze-damaged beets, if properly stored, can be processed during a freeze and for weeks thereafter. (S. Martin, TP 2262:7-20.) Defendants' expert concurred. (K. Jaggard, TP 2384:16-23.)

piling stations. (PT Ex. 209.) Indeed, from that date through February 9, 2001, SMBSC's average daily production of sugar from these beets exceeded the average daily production between October 13 and October 19, 2000, when, according to the Panel, SMBSC had beets suitable for processing (i.e., beets with a positive value). (Defendants' April 29, 2004 submission to Panel, at pp. 7-8; Findings of Fact at ¶ 68). In fact, even as late as July 5, 2001, SMBSC still was projecting a positive value of $3.03 per ton for all beets delivered *after* the freeze, despite having discarded 483,069 tons of those beets, experienced less then normal recoveries of sugar and co-products from processed beets, and encountered higher than normal processing costs. (DT Ex. 658.) Thus, even after the cooperative had been processing post-freeze beets for months, SMBSC still recognized that the post-freeze beets had a positive value. These actions belie any finding of zero gross dollar value.

3. **The Panel Improperly Relied On Post-Harvest, Post-Processing Financial Matters To Derive A Zero Gross Dollar Value, Thus Making Defendants The Insurers Of Plaintiffs' Profitability Rather Than Yield.**

Ultimately, the only way the Panel could reach its zero gross dollar value computation was by improperly factoring in SMBSC's costs of handling freeze damaged beets, including fines and penalties incurred by it through improper disposal of the discarded beets; decreased revenue from sales of sugar and co-products; and other post-harvest, post-processing financial matters. (J. Plathe, TP 1141:19-1142:5.) In doing so, the Panel essentially made defendants insurers of the harvest's profitability. As a matter of law, this is improper and without any support in the statutes, regulations, and case law governing crop insurance.[15]

Finally, SMBSC's own actions render patently erroneous the Panel's zero gross dollar value finding for all but 77,000 tons of post-freeze beets. Following the freeze, SMBSC staff

---

[15] Such an approach was legally impermissible, as it clearly violated the Eighth Circuit's approach in A.W.G. Farms. See Part IV. B., supra.

checked fields for freeze damaged beets and inspected beets as they were delivered. (Findings of Fact at ¶¶ 96-99.) Following these inspections, it was determined that all beets accepted met the minimum sugar content and purity standards for acceptance under the Grower Agreement. (J. Widner, TP 279:12-14, 381:25-383:2). SMBSC, therefore, accepted all beets delivered to it after the freeze and did not exercise its right under each Grower Agreement to reject unsatisfactory beets. (J. Widner, TP 279:12-14).

Although the Panel found that the polarimetric testing which led SMBSC to accept the post-freeze beets was insufficient to detect freeze damage (Findings of Fact at ¶¶ 69-72), this finding ignores the uncontroverted evidence that SMBSC knew of the deficiencies in polarimetric testing, yet used the polarimetric tests and relied on their results for all business purposes, including projecting the quality of the crop, accepting sugar beets for processing, advancing payments to its growers, and providing sugar content results to the USDA and RMA during their investigation. (J. Widner, TP 105:1-106:13.) Indeed, if the polarimetric tests conducted by SMBSC are not accepted as determinative of the sugar content, then plaintiffs have failed to offer *any* evidence that their harvested production fell below the minimum sugar level content contained in the Special Provisions and were unsuitable for processing. Plaintiffs and the Panel cannot discount the reliability of this testing to explain why SMBSC accepted beets that allegedly had no value, and then rely exclusively upon that same testing to conclude that the post-freeze beets were unsuitable for processing.

In short, the Panel's finding that all but 77,000 tons of post-freeze beets had a gross dollar value of zero is wholly unsupported, clearly erroneous, and roundly rebutted by the uncontradicted evidence that all of those post-freeze beets had a positive value which plaintiffs failed to quantify.

### E. The Panel Improperly Purports To Award Plaintiffs Payments In Excess Of Their Losses.

Section 35 of the Basic Provisions, which allows growers to receive compensation for their damaged crops from other sources, expressly states that "[t]he total amount received from all such sources may not exceed the amount of your actual loss." 7 C.F.R. § 457.8, ¶ 35. The Panel has directly contravened this regulation by failing to account for payments plaintiffs received from Farm Services Agency ("FSA"), Commodity Credit Corporation ("CCC"), and SMBSC for their 2000 crop.

In calculating the indemnity payments found to be due to plaintiffs, the Panel assumed that no plaintiff had received any payment from any source for his or her 2000 crop, except for the payments a few plaintiffs had received from one defendant not a party in these consolidated cases. (Findings of Fact at Attachment A.) Even though the Panel separately listed the payments which plaintiffs received from FSA and CCC (Findings of Fact at ¶ 87 & Attachment A), the Panel did not factor those payments into the indemnity payments due from defendants.

It is also undisputed that, ultimately, "[a]ll money that the SMBSC earned through processing the crop is ultimately returned to the growers after the expenses are paid." (Findings of Fact at ¶ 3.c.) Nonetheless, although plaintiffs received substantial payments from SMBSC resulting from the sale of sugar from post-freeze beets (Defendants' Post Hearing Proposed Findings at Attachment 22), those payments were likewise excluded by the Panel from the calculation of indemnity due to plaintiffs.

Instead of reducing plaintiffs' indemnity to account for these collateral payments, the Panel made the conclusory finding that, "[c]onsidering the evidence as a whole, including the payments made to growers, no grower will receive a double recovery even considering the amount of FSA and CCC payments set forth in Attachment C." (Findings of Fact at ¶ 87.) This

finding is without support in either the evidentiary record or in logic. The Panel conceded that it awarded plaintiffs indemnity for the full (and inflated)[16] value of their post-freeze beets, as if none of that value had been recouped; admitted that plaintiffs received payments for a portion of that lost value from FSA and CCC; and understood that plaintiffs received payments from SMBSC resulting from the sale of sugar obtained from post-freeze beets, again compensating plaintiffs for a portion of that allegedly lost value.

In awarding plaintiffs indemnities based on a 100% loss, in light of admitted evidence that plaintiffs have previously recouped a portion of that loss, the Panel has utterly disregarded Section 35 which requires that the total indemnity may not exceed the amount of the insureds' actual loss and must, therefore, be vacated.

## CONCLUSION

Defendants are entitled to summary judgment on Count I because the plain and unambiguous terms of the applicable federal regulations and insurance policy at issue, when applied to the *material facts* contained in the evidentiary record and as found by the Panel, establish as a matter of law that plaintiffs are not entitled to indemnity payments.

Dated: October 7, 2004

By: s/Thomas H. Boyd
Thomas H. Boyd, #0200517
Matthew D. Spohn, #0313567
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
Tel: (612) 604-6400
Fax: (612) 604-6800
tboyd@winthrop.com
mspohn@winthrop.com

16 Even though the Panel found that the pre-freeze estimated value of the beets was only $30.08 per ton, for purposes of its no-double-recovery finding the Panel inexplicably found that the anticipated value of the 2000 crop was $40.00 per ton. (Findings of Fact at ¶¶ 51 & 87.)

P. John Owen (KS Bar #11835; MO Bar #22523)
National Crop Insurance Services, Inc.
7201 West 129th Street, Suite 200
Overland Park, KS 66213
(913) 685-2767
johno@ag-risk.org

STINSON MORRISON HECKER L.L.P.
Kristin L. Farnen (AZ Bar # 16177; MO Bar # 30620; KS Bar #17517)
2600 Grand Avenue
Kansas City, MO 64108-4606
(816) 691-2600
kfarnen@stinsonmoheck.com

Attorneys for Defendants

Michael J. Davenport
RAIN AND HAIL LLC
9200 Northpark Drive
Suite 300
Johnston, IA 50131-3006
(515) 559-1000
Michael.davenport@rainhail.com

Co-counsel for Defendant Rain and Hail, LLC

2140909v4