Exhibit A

IN THE MATTER OF 2000 MINNESOTA SUGAR BEET

CROP INSURANCE COVERAGE ARBITRATION

- - - - - - - - - - - - - - - - - - - - - - - - - - -

This document relates to all cases,

Case Numbers:

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

- - - - - - - - - - - - - - - - - - - - - - - - - - -

(The following is the deposition of TERRY J. HOCHSPRUNG, taken pursuant to Notice of Taking Deposition, by videotape, at the Holiday Inn and Conference Center, 2100 East Highway 12, in the city of Willmar, state of Minnesota, commencing at approximately 9:16 o'clock a.m., June 17, 2003.)

A. Yes.

Q. And is that your handwriting up above which begins, "Attention: Lisa and Mary?"

A. Yes.

Q. Okay. Before October 17 of 2000, had your clients contacted you about any particular cause of loss?

A. Are you pertaining to sugar beet people or corn and soybean growers, or anybody?

Q. Anybody.

A. Yeah.

Q. Okay.

A. I had losses before that.

Q. Now in relation to this notice, the Exhibit 544, what -- what caused you to send this in? Was it calls from clients --

A. My -- my wife's flower beds.

Q. Okay. Could you elaborate a little bit?

A. We live about eight miles out of town. My wife was just morning and evening scattering about covering her -- well not acres, but her several flower beds. And, you know, you're used to that -- you're used to that maybe a couple of nights in the fall just to save them, but she was doing it like four nights in a row, and I was wondering what's

going on. I mean it was getting to be every morning she'd take her blankets off and put them on every night, and I got thinking, man, that's -- that is four consecutive nights of frost. I never --

It was unusual.

Q. And so after it hit you that that was unusual, that's when you sent this in?

A. Yes.

Q. Did you receive any calls from any of your clients saying "I've got a probable or possible loss, send in a notice of claim?"

MR. BROWN: Objection, compound. Can you split that up into two, please?

Q. Well let me say it this way: Did you receive any calls from any of your clients instructing you to submit a claim that caused you to send this in?

A. Before October 17th?

Q. Yeah.

A. No.

Q. Could you go ahead and read the notice into the record. I'd do it, but I think I'm going to misread some of your handwriting.

A. Do you want me to read it out loud?

Q. Yes, if you could.

specify a cause of loss?
A. I guess I really didn't feel as though I had to at that time, because a lot of these would pertain to corn and soybeans and other policies where I also wanted to make sure that -- those policies were new that year pretty much, really new policies, and I knew that they had a whole different set of reporting deadlines from a conventional policy, and I did not want to have a farmer come in January and find out that with the -- as low as the price went on the Chicago Board of Trade that year, that he would be shorted on revenue and not know it even though he was above his guarantee on corn or beans, and I didn't want him sitting there in January and find out, he looks at his production and has a loss and be too late.
Q. Okay. So this notice was intended to relate to all crops under all these policies; correct?
A. Uh-huh.
THE REPORTER: Your answer?
THE WITNESS: Yes. Yes.
Q. And it wasn't just limited to freeze; was it? Or was it?
A. No, it wasn't just limited to freeze. That

was the primary thinking behind reporting them, but then as I thought it -- about that, I thought about these new products and I thought I should include those as well.

Q. Okay. So it was other causes of loss as well.

A. Yes.

Q. Any cause of loss that was excluded from this?

A. Excluded?

Q. Yeah, that this would not pertain to? And by "this," I mean Exhibit 544.

A. It would --

Any cause of loss that was an act of God.

Q. Okay. So anyone covered under the policies; right?

A. Yes.

Q. Do you recall, I think, a telephone call from Ms. Rinicker after you sent this in asking you if you wanted to set up claims files or if -- if you wanted IGF to set up loss packets or send out loss packets for all of your insureds?

A. After this?

Q. Yeah.

A. No.

Q. Okay. Do you have a recollection that that did not happen, or you just don't recall whether or not that happened?

A. My recall, that that just plain didn't happen.

Q. Independent of that, when you sent this notice in that I believe relates to --

Well there's no policy that you were involved with that's not listed here; right? I mean this -- this is an exhaustive list of the policies that you sold; correct?

A. The only thing that wouldn't be covered in there would be these hail -- hail policies.

Q. Okay. So aside from hail, this notice applies to all the policies for all your insureds for all the causes of loss.

A. Yes.

Q. Okay. Did you expect IGF, after getting this notice, to send out loss packets to all your insureds under all those policies for all the causes of loss?

A. After --

No.

Q. Okay. You expected them to wait until they got some additional information from you; correct?