Exhibit C1

**IN THE MATTER OF 2000 MINNESOTA SUGAR BEET CROP INSURANCE COVERAGE ARBITRATION**

| | |
|---|---|
| **This document relates to all cases except 01-CV-1637 (Fireman's Fund).** | Defendants' Post-Hearing Proposed Provisional Findings of Fact |

Defendants hereby submit their Post-Hearing Proposed Provisional Findings of Fact relating to their defenses to the claims asserted against them by approximately 402 plaintiffs in nine different cases.[1] Defendants submit these findings pursuant to Panel Order No. 10. At the Panel's direction, defendants have annotated their proposed findings with citations to the record. Citations to live testimony presented to the Panel are indicated by the name of the witness, "TP" (referring to the transcript of proceedings), and the page and line numbers (*e.g.*, "200:12" would refer to page 200, line 12). Citations to designated deposition testimony ("Depo. Tr.") provide the name of the witness and the supporting page and line numbers. PT and DT exhibit numbers reference the plaintiffs' and defendants' trial exhibit numbers, while DX exhibit numbers reference deposition exhibits. These citations, however, are not meant to be an exhaustive listing of all of the evidence supporting each finding. Certain of the findings do not contain citations. These findings are findings of ultimate fact derived from the totality of the evidence, from the inferences that can be drawn from the evidence, or from the absence of evidence on a point as to which plaintiffs bear the burden of proof.

[1] A separate hearing has been scheduled on the claims against defendant Fireman's Fund Insurance Company. Consequently, defendants have included neither plaintiffs insured by Fireman's Fund, nor defendant Fireman's Fund for purposes of these findings.

## PROPOSED PROVISIONAL FINDINGS OF FACT

### *Introduction*

By order of the United States District Court for the District of Minnesota, *In Re 2000 Sugar Beet Crop Ins. Lit.*, 228 F.Supp.2d 992 (2002) concerning the cases pending before it as Docket Nos. 01-CV-1629, 01-CV-1630, 01-CV-1632, 01-CV-1633, 01-CV-1634, 01-CV-1635, 01-CV-1636, and 02-CV-0985, and the subsequent agreement of the parties and order in the case pending as *Broderius v. RCIS* pending in the Minnesota District Court as Docket No. CO-01-648, these cases came before the Arbitration Panel to determine certain factual disputes as a prerequisite to decisions by the referring Courts of the legal consequences of factual findings made pursuant to 7 C.F.R. 457.8 ¶20, adjudication of the claims and defenses, and finally entry of judgments. The Panel's factual determinations are limited by order of the District Court to those pertinent to claims made by the plaintiffs, and defenses asserted with respect thereto, under policies of multiple peril crop insurance ("MPCI") issued as part of the federal crop insurance program. The Panel has not determined, and is precluded from determining, mixed questions of law and fact, legal conclusions, and ultimate liability (or the absence of liability) with respect to the MPCI policies issued by any of the defendants, from making any awards, and from resolving any issues, including determination of facts, relating to plaintiffs' state law claims, since state law claims have been stayed pending this arbitration.[2]

Although these cases have been consolidated before the Panel to make factual determinations involving MPCI coverage, no party has sought to certify either a plaintiffs' or a defendants' class. Plaintiffs advised the Panel and the defendants that plaintiffs did not intend to call all plaintiffs to provide testimony at the hearing. In response, defendants advised the Panel

[2] Certain of these restrictions are evident from the District Court's order (228 F.Supp. 2d at 995, 999) and others are reflected in the Engagement Letter executed by the Panel and the parties' counsel.

and the plaintiffs that it was "up to each of the plaintiffs and their counsel in these non-class action cases to decide how they [would] attempt to meet their individual burdens of proof...." Defendants agreed that they would not contend that each plaintiff's failure to appear would, in and of itself, constitute a failure of proof. However, defendants did not agree that this proceeding may be treated as a class action. Panel Order No. 7 recites these matters. Consequently, the Panel must determine the facts as they apply to each of the 402 plaintiffs and each of the defendants.

The evidentiary hearing commenced on September 8, 2003, and continued periodically thereafter for an additional twelve hearing days. The hearing was transcribed by Stirewalt & Associates. The entire transcript has been made available to all parties and their counsel during the course of the hearing and for use in annotating their respective proposed findings of fact. Because of the Panel's reliance on and reference to the transcript, the Panel hereby designates the transcript as the official transcript of the proceedings.

The Panel received pre-hearing briefs, a statement of issues, and preliminary findings from the plaintiffs and defendants before receiving evidence. The Panel heard testimony from both sides, including the testimony of plaintiffs' witnesses, defendants' witnesses, and various experts. The Panel received and admitted documentary evidence. With the exception of open issues relating to the insurance indemnity database created by Deloitte & Touche ("Deloitte") based on information supplied to it by or on behalf of the parties, the evidentiary record remained open until October 14, 2003, at which time the parties submitted their respective deposition designations and counter-designations and additional documentary evidence to the Panel. The parties submitted final documentary evidence on November 10, 2003, relating to

their respective positions on any unresolved database issues reflected in Appendix E. [DT Ex. 871.]

The Panel has considered the testimony presented (both in person and by deposition), the credibility of witnesses, the documentary evidence, the stipulations of the parties, and the arguments advanced by counsel. Based thereon, the Panel makes the following Provisional Findings of Fact concerning plaintiffs' claims for indemnity against defendants under the MPCI policies.

***The Parties***

1. Each of the 402 named plaintiffs has sued one or more defendants for indemnity payments allegedly due under the terms of the MPCI policy relating to the 2000 sugar beet crop. [*See generally* complaints filed in: *Breitkreutz Farms, Inc., et al. v. Ag Force Insurance Services, Inc., et al.*, 02-CV-0985 JEL/RLE; *Brian Broderius, et al. v. Rural Community Insurance Services*, CO-01-648; *Kenneth Abbas, et al. v. IGF Insurance Company*, 01-CV-1630 PAM/SRN; *James Ahrenholz, et al. v. Farm Bureau Mutual Insurance Company*, 01-CV-1635 DSD/JGL; *Scott A. Abbas, et al. v. Acceptance Insurance Company, et al.*, 01-CV-1633 ADM/AJB; *Darrell L. Anderson, et al. v. Farmers Alliance Mutual Insurance Company, et al.*, 01-CV-1636 DWF/SRN; *Jeffrey Agre, et al. v. Rain & Hail LLC, et al.*, 01-CV-1629 JMR/FLN; *Michael D. Holien, et al. v. Great American Insurance Company*, 01-CV-1634 DWF/AJB; *Gary Aeikens, et al. v. Hartford Insurance Company of the Midwest*, 01-CV-1632 DSD/JMM (collectively, the "Complaints".]

2. Each of the named plaintiffs is a member of Southern Minnesota Beet Sugar Cooperative ("SMBSC"). SMBSC was formed in 1972 by 300 growers, and the first crop processed by the SMBSC factory was planted in 1975. [PT Ex. 173; H. Ruiter, TP 1157:19 to 1158:1, Defendants' Stipulated Admissions, TP 10:14 to 19:3 ("Def. Stip. Adm.").] SMBSC is a

cooperative which is wholly owned by its members, many of whom are plaintiffs in this matter. [J. Richmond, Depo. Tr. 48:4 to 48:7, C. Watson, Depo. Tr. 102:16 to 103:2, Def. Stip. Adm.] SMBSC is a sugar beet processor that enters into individual contracts with its member-growers located in southwestern Minnesota counties to process sugar beets delivered to it by its member-growers. [DT Ex. 667; R. Mersbergen, Depo Tr. 29:17 to 29:21.] There is, however, a uniform form of grower agreement executed by SMBSC and each member. [DT Ex. 66.] Each member grower owns a specified number of shares in SMBSC [J. Plathe, TP 1094:20 to 1095:11.] Each share owned by a member grower entitles that member grower to plant and harvest for processing by SMBSC one acre of sugar beets. [J. Plathe, TP 1093:22 to 1094:11.] SMBSC's members farm more than 120,000 acres. [J. Plathe, TP 1094:3 to 1094:5, Def. Stip. Adm.] SMBSC is not a party to any of the cases pending before this Panel. Nor is SMBSC insured under any MPCI policy at issue in this case. [J. Plathe, TP 1084:14 to 1084:22; S. Johnson, TP 1904:14 to 1904:1; S. Woody-Coussens, TP 2186:9 to 2186:12.]

3. During the course of these proceedings, the Panel was advised in briefing that one plaintiff, Mr. Todd Ahrenholz, insured by Farm Bureau Mutual Insurance Company of Iowa, died during the pendency of these proceedings. [Defs. Memorandum in Support of Taking All Plaintiffs' Depositions, dated May 2, 2003, p. 2.] Plaintiffs have not substituted a party in his stead, nor has his estate or any personal representative sought substitution.

4. Plaintiffs have asserted the right to indemnity for sugar beets grown on acreage owned by and delivered by two individuals, Brian Schlegel and Chris Schlegel. Neither of these individuals filed suit in any of the cases pending before this Panel. [*See generally,* the Complaints; S. Woody Coussens, TP 2133:18 to 2133:25; Final Deloitte Report.]

5. Two plaintiffs executed written withdrawals of their claims for indemnities on their 2000 sugar beet crops. [DT Ex. 244; DT Ex. 246; S. Arhenholz, Depo. Tr. 51:3 to 51:17; L. Ingwersen Depo. Tr. 14:20 to 15:8.] One plaintiff, Marvin Kiecker, executed a release of all claims in January 2001. [Defendants' Submission Concerning Database Issues.]

6. Twenty-seven plaintiffs have executed assignments of their respective claims in favor of third-parties who are not parties to any of these cases. The names of these plaintiffs as well as the insurance company defendants are contained in Attachment 1.[3] Plaintiffs have provided no evidence that any of these assignees asserted the rights of or complied with any of the plaintiffs' obligations under the MPCI policy. [DT Ex. 844; DT Ex. 1; (7 C.F.R. §457.8 ¶29 "Assignment of Indemnity").]

7. Various plaintiffs in these cases obtained their sugar beet MPCI coverage in 2000 through an alliance between SMBSC and Farm Credit Services of Minnesota Valley ("Farm Credit"). [J. Plathe, TP 1088:7 to 1088:14.] As part of its Vision 2002 business plan, SMBSC created an insurance agency and used it to form this alliance for the sale of crop insurance, in which SMBSC and Farm Credit split commissions on a 50/50 basis for those members who already obtained crop insurance from or later transferred it to Farm Credit. [PT Ex. 182.] This alliance was a source of profit to SMBSC [PT Ex. 182], but was discontinued at the end of 2001. [J. Plathe, TP 1088:7 to 1088:21.] In the 2000 crop year 38 plaintiffs in these cases obtained their sugar beet MPCI coverage under this alliance. See names of plaintiffs in Attachment 2.

8. Each defendant is an insurance company (or an affiliate) who was approved by the Federal Crop Insurance Corporation ("FCIC") to sell and service, and who did sell and service, crop insurance in 2000 under the comprehensive congressionally-mandated federal crop

[3] All information contained in each attachment to these findings is incorporated herein as if it were set forth as a finding herein.

insurance programs established pursuant to the Federal Crop Insurance Act ("FCIA"). [7 U.S.C. §1501 *et seq.*; Defendants' Admission contained in Answers to Complaints.]

***The Comprehensive Federal Crop Insurance Program***

9. The FCIC, an agency and instrumentality of the United States Department of Agriculture ("USDA"), was created to provide and administer the federal crop insurance program for America's agricultural producers. [7 U.S.C. §1503; Def. Stip. Adm., TP 16:19 to 17:6; K. Ackerman, TP 1398:16 to 1398:22; K. Arrigo, TP 1522:4 to 1524:12.]

10. The Risk Management Agency ("RMA") is a USDA agency which provides operational, managerial, and personnel support for the FCIC. [Def. Stip. Adm., TP 16:19 to 17:1, 17:6 to 17:10; K. Ackerman, TP 1398:22 to 1399:4; K. Arrigo, TP 1522:4 to 1524:12.]

11. The provisions of the MPCI policy at issue in this case were promulgated by the FCIC as part of regulations issued pursuant to the FCIA, as amended. [K. Arrigo, TP 1524:13 to 1527:17.] The relevant regulations are codified at 7 C.F.R. §§ 457.8 ("Basic Provisions") and 457.109 ("Crop Provisions"). [K. Arrigo, TP 1524:13 to 1524:17.] In addition to the Basic Provisions, which are applicable to all crops (as designated by the Manager of the FCIC and approved by its Board of Directors), and the Crop Provisions, which are specific to a given crop (such as sugar beets), the MPCI policy has a component called the Special Provisions, which are developed, issued, and published by the FCIC. [K. Arrigo, TP 1518:20 to 1519:1.] The Special Provisions establish coverage terms on a county-by-county basis for each type of crop eligible to be insured. [D. Voy, TP 1743:17 to 1745:10.] Each of the policies of insurance sold by each defendant contained the following language, as part of the preamble to the basic Provisions. [DT Ex. 1.]

> This insurance policy is reinsured by the [FCIC] under the provisions of the Federal Crop Insurance Act, as amended (the Act) (7 U.S.C. 1501 et seq.). All provisions of the policy and

> rights and responsibilities of the parties are specifically subject to the Act…and ***may not be waived or varied in any way by the crop insurance agent or any other agent or employee of FCIC or the company.*** (emphasis added)

12. In 1980, the FCIA was amended to restructure the federal crop insurance program to capture the private sector's marketing and product innovation capabilities to increase participation in the program. Before 1980, the private sector was not involved in the sale or servicing of federal crop insurance, and the FCIC was the direct insurer under the program. After the 1980 amendments, the private sector became the marketers and direct insurers of MPCI coverage. At the time of these suits, all MPCI coverage was sold under the names of private sector participants, including one or more of the defendants. [K. Ackerman, TP 1401:2 to 1402:4; K. Arrigo, TP 1522:8 to 1522:18.]

13. The basic relationship between the FCIC and each of the defendants is established in the FCIA, federal regulations, and the Standard Reinsurance Agreement ("SRA"). Each defendant executed a separate SRA with the FCIC, all of which contain identical terms and conditions. [K. Ackerman, TP 1401:2 to 1401:18, 1404:22 to 1405:13; DT Ex. 8.]

14. The federal government's role in the sale, implementation, and loss adjustment for federal crop insurance is pervasive. Each of the defendants was required to write identical MPCI coverage on terms and conditions established by FCIC and RMA, not the defendants. [S. Johnson, TP 1903:4 to 1903:16, 1903:22 to 1904:13; K. Ackerman, TP 1404:22 to 1404:13.] The price of the premiums to be charged by the defendants for MPCI coverage is established by the FCIC. [K. Arrigo, TP 1635:20 to 1686:2.] The insureds' premium for federal crop insurance is substantially subsidized by the federal government. [C. Watson, Depo. Tr. 55:2 to 55:5; K. Ackerman, TP 1405:10 to 1405:13.] The FCIC determines which private insurance companies can participate in the federal crop insurance program. [K. Ackerman, TP 1401:2 to 1402:4.]

Each defendant was required to accept any applicant to the federal crop insurance program. [K. Ackerman, TP 1408:22 to 1409:24.] Defendants could refuse coverage only to applicants whom the FCIC determined to be "ineligible." [K. Ackerman, TP 1409:17 to 1409:24. *See also*, 7 U.S.C. §1508(k)(1); and DT Ex. 1, ¶ 2 "Life of Policy, Cancellation, and Termination," (7 C.F.R. 457.8 (2)).]

15. As reinsured companies, the insurance company defendants do not have underwriting authority or discretion with respect to MPCI policies. [S. Johnson, TP 1903:4 to 1903:10.] The insurance company defendants cannot take into consideration the practices, equipment, manpower, personnel, or procedures employed by the applicant's processor in issuing a federal MPCI sugar beet policy. [S. Johnson, TP 1903:22 to 1904:13.]

16. When an insured agricultural producer sustains a loss, or submits a notice of damage or a notice of loss, the FCIC has mandated that only its loss adjustment procedures and methods are to be used. The RMA on behalf of the FCIC determines what loss adjustment procedures are to be used when an insured claims such a loss. This obligation to follow federally mandated loss adjustment procedures and methods is made explicit to all participants in the federal crop insurance program, and these procedures and methods are contained in federally published manuals and handbooks. The defendants had no authority to create or modify any of these procedures. The defendants' compliance with the regulations, procedures, and SRA, including claimed sugar beet losses, was monitored and enforced by RMA. [DT Ex. 8, §V.I.1; 7 C.F.R. § 400.168(d); K. Ackerman, TP 1414:5 to 1414:18; K. Arrigo, TP 1526:6 to 1526:15, 1681:13 to 1683:10; R. Trier, TP 1696:17 to 1697:5; D. Voy, TP 1741:25 to 1742:6, 1743:17 to 1745:10; PT Ex. 28; DT Ex. 6; DT Ex. 7.]

***The Plaintiffs' MPCI Policy***

17. The provisions of the MPCI policy at issue in these cases specifically state that "no indemnity shall be paid unless the insured complies with all terms and conditions of the contract." Thus, the defendants' obligations under the MPCI policy to make any indemnity payments to any of the plaintiffs are not triggered unless and until each plaintiff establishes that he/she/it has complied in each and every respect with obligations stated in the MPCI policy. [DT Ex. 1 (7 C.F.R. §457.7).]

18. The terms of the MPCI policy required each plaintiff who desired to participate in the federal crop insurance program for their sugar beets to submit an application for insurance or to confirm continuation of coverage. Plaintiffs were required to submit applications to their crop insurance agents or to confirm continuation of coverage on or before the applicable sales closing date, which in this instance was March 15, 2000. The submitted application was required to contain, among other things, the name of any other person having a share or interest in the crop. "No other person's interest in the crop may be insured under an application unless that person' interest is clearly shown on the application and unless that other person's interest is insured in accordance with the procedures of the [FCIC.]" With limited exceptions, insurance attaches "only to the share of the person completing the application and will not extend to any other person having a share in the crop...." [DT Ex. 1, ¶¶1 ("insured"), 10(a) ("Shared Interest"); 7 C.F.R. § 457.7 "The application and policy"; 7 C.F.R. §§ 457.8(1); 457.8 (10)(a); Special Provisions.]

19. Nineteen plaintiffs, the names of whom are on Attachment 3, were not named insureds under MPCI policies in 2000. Plaintiffs have alleged that these individuals hold a "substantial beneficial interest" in another plaintiff's policy of insurance. However, plaintiffs in this case have not submitted the applications for insurance, and they have provided the Panel

with no evidence of each plaintiff's interest in the crop. Consequently, these plaintiffs have not established, and the Panel cannot find, that those plaintiffs identified in this paragraph are insureds' under an MPCI sugar beet policy applicable to the 2000 crop year. [S. Woody-Coussens, TP 2138:1 to 2139:12; Final Deloitte Report.]

20. Plaintiffs have failed to establish that Norfolk Farms and Mark Melberg contracted with any defendant for federal crop insurance coverage for their shares in its 2000 sugar beet crop or any interests therein. [Final Deloitte Report, Appendix D.]

21. As a condition of coverage, the MPCI policies for each insured plaintiff covered only sugar beets that were grown under a sugar beet processor contract, and which were not excluded from the processor contract at any time during the crop year. This coverage condition is set forth in Section 7(a)(3) of the Sugar Beet Crop Provisions. [DT Ex. 1 (7 C.F.R. § 457.109).] The MPCI policies required that each of the sugar beet processor contracts under which the sugar beets were grown contained, at a minimum the following:

> "(1) The [grower's] commitment to plant and grow sugar beets, and to deliver the sugar beet production to the processor;
>
> (2) The processor's commitment to purchase the production stated in the contract; and
>
> (3) A price or formula for a price based on third party data that will be paid to the [grower] for the production stated in the contract."

[DT Ex. 1 (7 C.F.R. § 457.109(1) ("sugar beet processor contract")).]

22. Providing a copy of the processor contract was, and remains, a mandatory obligation of any plaintiff claiming damage or loss. [DT Ex. 1, 7 C.F.R. § 457.109(12)(b) ("Duties in the Event of Damage or Loss").] In these cases, the "grower agreement" referenced herein constitutes the "processor contract" referenced in the MPCI policy.

23. Plaintiffs have submitted evidence to establish that, with respect to the 2000 sugar beet crop year, most, but not all, named plaintiffs entered into a grower agreement with SMBSC. Plaintiffs have failed to establish that those plaintiffs listed on Attachment 4 had a grower agreement with SMBSC. The grower agreements established the business relationship between SMBSC, as the processor of the sugar beets, and its member-growers, including plaintiffs other than those listed on Attachment 4. [PT Ex. 3.]

24. Plaintiffs, other than those specifically referenced below, contracted with one or more of the defendants for federal crop insurance coverage for their 2000 sugar beet crop; these plaintiffs are considered "insured plaintiffs."[4] More specifically, the names of the insured plaintiffs and the respective insuring defendants together with the respective policy numbers are listed on Attachment 5. [Deloitte Final Report; S. Woody-Coussens, TP 2131:2 to 2131:25, 2125:6 to 2125:17.] In view of findings 4, 5, 19, and 20, those plaintiffs explicitly are excluded from the term "insured plaintiffs" and have no right to recover any insurance indemnities, even though other plaintiffs may possess such a right (assuming that their individual burdens of proof are met as to all contested issues applicable to them). In addition, similarly assuming that some plaintiffs may meet their individual burdens of proof, the same cannot be said for the individuals identified in findings 3, 6, and 23, due to the serious issues raised therein which are fundamental prerequisites to any recovery.

25. The MPCI contract of insurance consisted of "the accepted Application, the Basic Provisions, the Crop Provisions, the Special Provisions, the county Actuarial Table, and any amendments or options thereto." The insured plaintiffs' and the insuring defendants' rights and obligations under the MPCI, accordingly, are established and defined in the Basic Provisions, the

[4] The Panel uses the term "insured plaintiffs" subsequently herein to refer to those plaintiffs who have met their burden to establish they are insured, as set forth in finding 24.

Crop Provisions, and the Special Provisions of the MPCI policy. The MPCI policy explicitly states that if a conflict exists among the policy provisions, "the order of priority is as follows: (1) The Catastrophic Risk Protection Endorsement, as applicable; (2) the Special Provisions; (3) the Crop Provisions; and (4) these Basic Provisions (§457.8), with (1) controlling (2), etc." [DT Ex. 1 (7 C.F.R. §§ 457.7 ("The Contract"); 457.8, ("Agreement to Insure"); 457.109).]

26. No insured plaintiff had a written agreement, within the meaning of Section 18 of the Basic Provisions, which altered, amended, or modified his sugar beet crop insurance coverage in 2000. [Defs. Stip. Adm.]

27. The MPCI policies were production policies and insured the various insured plaintiffs' sugar beet yields. [K. Ackerman, TP 1465:1 to 1465:8.] Consequently, each of the insured plaintiffs was required to report his/her/its production to the defendants for the previous crop year in a production report, *i.e.*, "a written record showing [the] annual production" of the insured plaintiffs so that historic yield for each insured plaintiff could be determined. Coverage level percentages were selected by each insured plaintiff, and each insured plaintiff chose the applicable price election, *i.e.* the amounts used for computing the value per ton for determining the premium and any indemnity under the policy. [K. Ackerman, TP 1434:19 to 1435:22; K. Arrigo, TP 1568:1 to 1568:14.] The production guarantee (*i.e.*, the amount of the insurance) equals the number of tons of sugar beets determined by multiplying the approved yield per acre by the coverage level percentage selected by each insured plaintiff. [K. Arrigo, TP 1567:10 to 1568:20.][5] The production guarantee is expressed in standardized tons. A standardized ton equals a ton of sugar beets containing the percentage of raw sugar specified in the Special Provisions. The applicable insurance coverage for each insured plaintiff, by unit, including the

insured acres, price election, coverage level percentages, production guarantee, and the applicable county average raw sugar percentages are listed in Attachment 6. [DT Ex. 1, Crop Provisions, (7 C.F.R. § 457.8(1) ("Price Election", Production Guarantee", "Production Report"), 7 C.F.R. §§ 457.8(3); 457.8(15); 457.109(1); 457.109(3)); S. Woody-Coussens, TP 2155:8 to 2156:20, 2158:25 to 2159:12.]

28. The MPCI policies provided that coverage began "on each unit or part of a unit at the later of acceptance of the application or the date the sugar beets were planted." The parties have not disputed that, for those insured plaintiffs who planted sugar beets, insurance coverage commenced at least by May 31, 2000 (the final planting date) for their 2000 sugar beet crop. [DT Ex. 1, Crop Provisions (7 C.F.R. §§ 457.8, "coverage begins"; 457.8(11)(a); 7 C.F.R. § 457.109(1), "Crop Year", Special Provisions, "Final Planting Date").]

***Witnesses***

29. Plaintiffs and defendants called a number of witnesses both in person and by deposition. The following paragraphs identify the parties' principal witnesses and provide the Panel's general observations regarding the weight accorded their testimony. Any more specific observations are made in connections with topical or subject matter findings.

30. The plaintiffs' witnesses included nine named plaintiffs who testified in person. The Panel considers these witnesses to have expressed their sincerely held beliefs and to have recounted in a credible fashion their experiences with the 2000 sugar beet crop. In addition, the Panel believes that those plaintiffs whose testimony was offered (whether in person or by deposition designations and counter-designations) were experienced sugar beet growers, knowledgeable business persons, and attentive to the condition of their beet production. The

[5] For example, if an insured grower's approved yield (computed as an historical average) is twenty tons per acres, and if the insured purchases coverage at the seventy-five percent level, the prediction guarantee would be fifteen tons per acres. Production below that level, therefore, would trigger potential payment of an insurance indemnity.

Panel also gives credence to the testimony of other witnesses who described the plaintiffs as sophisticated in matters involving sugar beets and as hardworking farmers. [R. Haney, TP 1881:24 to 1882:6; B. Olson, TP 2075:5 to 2075:9; M. Splettstaszer, Depo Tr. 49:18 to 49:22; D. Lappegard, Depo. Tr. 22:11 to 22:18.]

31. Dr. Jimmy Widner was a key witness called by plaintiffs. He began working at SMBSC as head of its agricultural operations in 1983 and retired in 2002. [J. Widner, TP 80:22 to 81:2, 85:21 to 85:25, 93:11 to 94:15.] In the 2000 crop year, Dr. Widner's position was Vice-President of Agriculture, and he retained this position until he retired. [J. Widner, TP 94:22 to 95:4.] As a general matter, the Panel found him to be knowledgeable about the scientific aspects of sugar beet cultivation and to be earnestly committed to the interests of SMBSC's members. Dr. Widner, however, frequently was not responsive to questions directly asked of him, and at times he appeared equivocal and defensive, especially when cross-examined.

32. Mark Suhr was SMBSC's Vice-President of Operations during the crop year 2000 harvest and processing campaign. [M. Suhr, TP 851:6 to 852:24.] He no longer works for SMBSC. [M. Suhr, TP 855:9 to 855:11.] Plaintiffs called Mr. Suhr has a witness in their case in chief, and the Panel found him to be knowledgeable, credible, and forthright in answering questions.

33. Jeff Plathe was SMBSC's Vice-President of Administration and chief financial officer during the crop year 2000 harvest and processing campaign. [J. Plathe, TP 1004:16 to 1004:19.] He began working at SMBSC in 1975 and continues to be employed by it. [J. Plathe, TP 1007:9 to 1007:18.] The Panel found Mr. Plathe to be experienced in financial and administrative matters and credible when testifying about such issues. The Panel considered, but

did not give substantial credence to, Mr. Plathe's testimony about other issues, including his testimony on operational and economic matters.

34. The plaintiffs called Dr. Susan Martin as their scientific expert. She has extensive experience with sugar beet physiology. [S. Martin, TP 644:10 to 664:22 and PT Ex. 161.] The Panel found her to be a capable scientist and knowledgeable about the subject matter of her testimony. The Panel found Dr. Martin, however, to be less than fully responsive during cross-examination, as evidenced by her unwillingness at times to concede the obvious.

35. The plaintiffs also called Kenneth Ackerman as an expert witness. Mr. Ackerman is a lawyer who served as Manager of the FCIC from 1993 to January 20, 2001. [K. Ackerman, TP 1394:21 to 1394:24.] After leaving government service in January 2001, Mr. Ackerman was employed as co-counsel along with Dorsey & Whitney, plaintiffs' law firm in these cases and counsel for SMBSC; among the matters handled by Mr. Ackerman, as co-counsel, was an effort in 2001 to obtain enactment of legislation which would have paid plaintiffs for the losses claimed in these cases. [K. Ackerman, TP 1444:14 to 1446:22.] The Panel found Mr. Ackerman to be knowledgeable about the federal crop insurance program in general. However, he had little or no substantive experience with sugar beet coverage while employed by the government. This fact, combined with the dual role served by Mr. Ackerman as advocate for SMBSC and its members, led the Panel to attach little credence to Mr. Ackerman's expert testimony. In the end, he offered the Panel a lawyer's interpretation of government regulations and bulletins, which this Panel also is capable of doing and which the Courts ultimately will do in these cases.

36. Defendants' first witness was Kimberly Arrigo. Ms. Arrigo is a member of the Office of General Counsel of the USDA and assigned to work full time on the federal crop insurance program, a role she has performed for 10 years. [K. Arrigo, TP 1517:5 to 1517:18.]

Ms. Arrigo specifically was authorized to testify by the Administrator of RMA, who also is the Manager of FCIC, on three subjects: (1) the agency's official interpretation of the Basic Provisions, the Sugar Beet Crop Provisions, the Loss Adjustment Manual, the Sugar Beet Loss Adjustment Handbook, and the two Manager's Bulletins in question in these cases, MGR-01-010 and MGR-01-010.1; (2) her expertise with respect to the federal crop insurance program; and (3) her personal knowledge of factual matters. [DT Ex. 862.] The Panel found Ms. Arrigo's testimony to be informative, especially concerning the two bulletins, because she was the principal author and involved in all aspects of their consideration, preparation, and implementation. The Panel accords substantial deference to her interpretations of the Basic Provisions and Sugar Beet Crop Provisions, which are FCIC regulations, and the two bulletins, because she specifically was authorized to give this testimony. As with Mr. Ackerman's testimony regarding all legal matters, Ms. Arrigo's testimony on legal matters other than the agency's interpretations of its regulations and bulletins ultimately presents issues which only the referring Courts can resolve.

37. Defendants also called two other government witnesses, Robert Trier (an investigator with the St. Paul office of RMA's Risk Compliance Division) and Duane Voy (a senior member of RMA's Regional Office encompassing sugar beet growing areas of Minnesota and the Dakotas). [R. Trier, TP 1691:8 to 1691:9, 1694:14 to 1694:16; D. Voy, TP 1738:9 to 1738:10.] Both were authorized by RMA to appear as fact witnesses. [DT Ex. 863 and DT Ex. 864.] Both men were part of an effort by RMA to investigate the merits of plaintiffs' insurance coverage claims in January and February 2001. Mr. Trier was a primary author of his office's report [DT Ex. 757] summarizing this investigation. [Trier, TP 1702:10 to 1702:25.] The Panel found the testimony of Messrs. Trier and Voy to be informative and credible. The credibility of

their testimony was enhanced by their status as representatives of RMA who were authorized to speak for the government and whose knowledge of matters was acquired outside the adversarial process of litigation at a time closely situated to the events in question concerning the 2000 sugar beet crop.

38. Defendants also called four representatives of the insurance companies to testify in person: Robert Haney, Steve Johnson, Craig Henning, and Barry Olson. The Panel found their testimony to be informative and these witnesses to be credible. Defendants also designated and counter-designated deposition testimony of other companies' claims personnel, crop insurance adjusters, and an agent. Although the Panel cannot make an observation about the credibility of this designated testimony, as it relates to the demeanor of these witnesses, the Panel does view this testimony to be useful and informative, especially on issues such as notice and related lost adjustment requirements, procedures, and practices.

39. Defendants presented deposition testimony by Michael Hofer. Mr. Hofer in 2000 was SMBSC's Director of Agricultural Operations; he directly supervised the agricultural staff and reported to Dr. Widner. [M. Hofer, Depo. Tr. 15:14 to 15:18; J. Widner, TP 101:7 to 102:3.] The Panel found the videotaped excerpts to be informative, especially as to matters related to notice and plaintiffs' awareness of problems with the 2000 sugar beet crop.

40. Defendants also presented deposition testimony by two employees of other processors of sugar beets: David Berg, Vice-President for Agriculture of American Crystal Sugar Company, and Russell Fullmer, Agriculture Manager in 2000 at Imperial Sugar Company's Sydney, Montana, plant. [D. Berg, Depo. Tr. 28:1 to 28:4; R. Fullmer Depo. Tr. 12:22 to 13:17.] The Panel found that this testimony provided very useful information about practices used by other similarly situated processors who deal with weather events of the types

experienced in the SMBSC growing area during the 2000 harvest – both as to freezing conditions and as to abnormally warm conditions. The Panel found Mr. Fullmer's photographs of freeze damaged beets and his related testimony to be particularly interesting and informative.

41. Defendants called Shauna Woody-Coussens of Deloitte to testify about two matters: the indemnity database developed using relevant information provided by plaintiffs, SMBSC, and defendants, and defendants' positions on plaintiffs' damage claims. The Panel found Ms. Woody-Coussens to be an informative and credible witness.

42. Defendants' last witness was their scientific expert, Dr. Keith Jaggard. Like Dr. Martin, Dr. Jaggard has extensive experience with sugar beet physiology. [K. Jaggard, TP 2366:14 to 2371:6 and DT Ex. 851.] Dr. Martin candidly described Dr. Jaggard as a well respected scientist who has done wonderful work on sugar beet physiology. [S. Martin, TP 2220:10 to 2221:1.] The Panel agrees with her assessment and found Dr. Jaggard's testimony to be useful and informative. Unlike Dr. Martin on occasions, he was fully responsive to questions posed during cross-examination. The Panel does not accept plaintiffs' attack on Dr. Jaggard based on the fact that he is a resident of the United Kingdom, where he has gained the bulk of his experience.

43. Al Ritacco was SMBSC's President and Chief Executive Officer during the 2000 crop year; Mr. Ritacco died in June 2001. [J. Plathe TP 852:23 to 853:2; 96:19 to 97:1.] As a result, the Panel received no testimony from Mr. Ritacco, although he undoubtedly would have had important testimony to offer had he lived.

***Pre-Harvest Events***

44. There is no dispute that plaintiffs planted their 2000 crop year sugar beets in the spring in a timely fashion and cultivated them throughout the growing season.

45. The MPCI policy covered the insured plaintiffs' sugar beets planted on an insured unit basis. For the crop year 2000, each insured plaintiff planted sugar beets pursuant to the terms of his/her/its respective grower agreement on insured units. The MPCI policy requires that any loss to these sugar beets is determined on a unit basis. [Deloitte Database, DT Ex. 1 policy, §457.8(1) (definition of "Basic Unit"); §457.109(13).]

***Principal Terms of the Grower Agreement***

46. The terms of the grower agreements, executed by each insured plaintiff and SMBSC, committed those plaintiffs to grow and deliver their respective sugar beets to SMBSC, and they committed SMBSC to purchase the grower's production based upon the formula set forth in the agreement. [DT Ex. 66, Sections 1, 2 and 3; J. Widner, TP 96:11 to 96:13; J. Plathe, TP 1129:22 to 1130:3.] Consequently, the sugar beets delivered by the members of SMBSC were the only source of sugar beets available to SMBSC for processing.

47. Under the terms of the grower agreements in effect for the 2000 sugar beet crop, each insured plaintiff ceded to SMBSC determination of basic agronomic issues, including harvest and delivery decisions related to the sugar beet crop. For example, Section 7 concerned the type of seed to be planted, which SMBSC furnished to its members. Section 10 directed the conditions by which chemicals were or were not to be applied to a member's crop. SMBSC designated and directed the times, quantities, and place of delivery of the plaintiffs' sugar beets. SMBSC further controlled the method of harvest, directing that all sugar beets were to be "topped at the base of the bottom leaf." [DT Ex. 66, Sections 7, 8, and 10.]

48. In addition, the grower agreements executed by SMBSC explicitly stated:

> "In order that the Cooperative may borrow money on the security of the sugarbeets it handles, upon delivery to, and acceptance by [SMBSC] of the sugarbeets as provided for herein, title thereto shall be deemed to vest, and shall be vested in [SMBSC]

[DT Ex. 66, Section 13.]

***SMBSC's Financial Situation***

49. In 2000, SMBSC's borrowing requirements were significant, and SMBSC was experiencing financial stress due in part to a boiler failure in 1999, a $100 million expansion project which SMBSC entitled Vision 2002, lower than projected sales of stock, and some of the lowest sugar prices in recent history. [J. Plathe, TP 1031:21 to 1031:25; M. Suhr, TP 887:7 to 887:9, 984:7 to 984:12.]

50. At the outset of 2000, SMBSC maintained both its seasonal line of credit and long term credit facility with CoBank. [J. Plathe, TP 1065:20 to 1065:25, 1103:2 to 1103:22.] These credit facilities were secured by SMBSC's plant and equipment and the by-products of the sugar beets, including the processed sugar. [J. Plathe, TP 1030:7 to 1030:11.] On or about January 31, 2000, CoBank advised SMBSC that "certain loan agreement provisions and covenants were not satisfied as of November 30, 1999, December 31, 1999, and may remain in a noncompliant status through March 31, 2000." [DT Ex. 859.] SMBSC had projected future collateral shortfalls of over $11 million for January and February, 2000. Moreover, SMBSC had over-advanced to its growers payments for their 1999 sugar beet harvest. [J. Plathe, TP 1032:18 to 1033:4.] Nonetheless, CoBank agreed to waive these defaults and to modify the lending arrangement to permit $12 million in lending in excess of the collateral limitations imposed for January and February of 2000. CoBank agreed to waive the SMBSC shortfall of working capital through March 2000, and permitted SMBSC to make a third installment on payments to growers for their 1999 sugar beets at 20% of the estimate of the purchase price defined in the Grower Agreement. [DT Ex. 859.]

51. However, CoBank was not seeking to retain SMBSC as a customer. As subsequent findings will show, SMBSC actively was seeking replacements for the CoBank credit

lines during harvest. In fact, in March, 2000, CoBank advised SMBSC that CoBank and its participating lenders would not extend the seasonal line beyond September 30, 2000, and that SMBSC would be required to reduce its seasonal line from $55 million to $33 million after September 30, 2000. [J. Plathe, TP 1104:16 to 1105:1.] CoBank suggested to SMBSC that it should consider altering its beet payment procedures by reducing the advances made to growers and/or by making later payments to them. [J. Plathe, TP 1105:2 to 1105:8; DT Ex. 859.]

52. SMBSC ignored both of these suggestions. [J. Plathe, TP 1105:9 to 1105:10.] In fact, cognizant of CoBank's recommendations regarding grower advances and recognizing it had over advanced payments to its growers for their 1999 crop, in July 2000, SMBSC engaged in its normal process of compiling information to estimate its growers' sugar beet payments for the 2000 harvest and to establish the operating budget applicable to the 2000 harvest. SMBSC analyzed historic key indicators and factored in improvements made to the processing procedures. Each department was asked for forecasts relevant to the 2000 sugar beet crop and its processing. [J. Plathe, TP 1014:22 to 1016:3.]

53. SMBSC's cash flow is seasonal. SMBSC can only make its November grower payments if it had normal levels of inventory of sugar and its by-products so that it could borrow two-thirds of the amount necessary to make those payments. When processing and slicing is normal, SMBSC can accumulate two to two and a half million dollars a week in its borrowing base, thereby making its ability to borrow "really quite good." [J. Plathe, TP. 1029:18 to 1030:17.]

54. SMBSC for a number of years would try to get the lenders to accept "[SMBSC's] beet inventory" as part of its collateral borrowing base. However, SMBSC was not able to

convince the lenders to do so. The lenders did permit as collateral the by-products of the sugar beets, including sugar, thick juice, and molasses. [J. Plathe, TP. 1090:6 to 1092:5.]

55. SMBSC's management and Board of Directors were well aware of, and communicated to the shareholders, the severe economic and financial difficulties they faced going into the 2000 harvest, which included record low sugar prices compounded by poor by-product prices. [DT Exs. 103 & 248.]

***Crop Year 2000 Projections***

56. In late July and early August 2000, departmental forecasts were given to senior management, including Mr. Plathe, who as SMBSC's chief financial officer, was the individual at SMBSC responsible for working with CoBank on SMBSC's lending arrangements. [J. Plathe, TP 1004:16 to 1004:19.] Senior management then was to make any necessary adjustments to the assumptions made by the departments which would impact the budget and the projected payments to the growers. [J. Plathe, TP 1016:4 to TP 1016:10.] By mid-August, SMBSC's senior management prepared its final recommendations regarding the operating plan, budget, and the projections for beet payments to the growers for the 2000 crop year to submit to SMBSC's Board of Directors for its approval. [J. Plathe, TP 1016:11 to 1016:18.]

57. At all times relevant to this case, SMBSC's Board of Directors was largely composed of grower-members of SMBSC. [N. Rudeen, TP 1205:5 to 1205:9; H. Ruiter, TP 1063:9.] Until December 2000, the Board was chaired by plaintiff Steve Kramer; thereafter, plaintiff Neil Rudeen has served as SMBSC's Board chairman. [PT Ex. 257 and PT Ex. 173; J. Plathe, TP 1098:14 to 1098:17; N. Rudeen, TP 1204:15 to 1204:23.]

58. On August 15, 2000, the operating budget and the projections for the payments to growers for the 2000 crop year were submitted to SMBSC's Board for approval. The Board approved a projected payment to the growers of $30.08/ton. [J. Plathe, TP 1019:19 to 1019:22.]

The Board, in reaching its decision, did not consider or discuss, was not advised of, or did not care about the impact that the reduction in its lending capacity had on operations of SMBSC.

59. On August 18, 2000, Mr. Plathe of SMBSC sent a letter to its members advising them of the projections. Additionally, for those growers who wished to defer their advances on the 2000 crop into 2001, Mr. Plathe enclosed an amendment to the grower's agreement for execution. Finally, Mr. Plathe advised the growers that the timing and the amount of the October 15, 2000 final payment for the 1999 crop was dependent on the "amount and timing of the business interruption claim pending with the two insurance carriers." [DT Ex. 444; DT Ex. 277.]

60. As the harvesting season approached, SMBSC needed to ensure maximum revenue due to "the projected beets payment for 2000 at $30.08/ton and a price of sugar estimated at $3.38…" per hundred weight. [DT Ex. 382.] Based on these projections, the decline in sugar prices, and a projected 16.7% sugar content and 21 ton per acre sugar crop for 2000, SMBSC recognized in late August or early September 2000 that "most shareholders will not break even this year." (Id.) Consequently, SMBSC directed its Director of Agricultural Operations, Mr. Hofer, to examine all opportunities for increasing revenue. Mr. Hofer conducted a risk/reward analysis of delaying harvest. [J. Widner, TP 330:18 to 331:10.] Mr. Hofer used the 1999 crop year to demonstrate that gross revenues could increase between $906,463 and $1,806,534 by delaying harvest. However, Mr. Hofer also noted the inherent risks associated with delaying harvest. [J. Widner, TP 331:7 to 332:3.] In 1984, the growers had experienced freeze/thaw cycles, and as a result lost 300,000 tons of sugar beets. [DT Ex. 382.] Mr. Hofer concluded that this type of risk could be "managed" through the grower's federal crop insurance coverage, and that a "managed approach of delaying harvest offers us all greater possible returns

for less risk...." [DT Ex. 382.] [J. Widner, TP 332:4 to 332:9.] Fundamental to Mr. Hofer's recommendation to delay harvest was his advice that the growers should "choose fields that would qualify your self [sic] for maximum insurance coverage." Mr. Al Ritacco, President and Chief Executive Officer of SMBSC, directed that harvest be delayed for the 2000 crop year. [J. Widner, TP 328:10 to 328:20; 329:9 to 329:13.]

***The Pre-pile Harvest and PIK Acreage***

61. A typical campaign for harvesting and processing sugar beets would begin approximately late August or early September and end in March. The harvest related to each campaign is divided into two segments, the pre-pile phase of the harvest and the main (or full) harvest. Growers are given an economic incentive to harvest a portion of their beets early, even though the sugar content of those beets is not as great as it would be during main harvest. [DT Ex. 452.; J. Widner, TP 108:1 to 109:16; M. Suhr, TP 899:9 to 899:21; J. Plathe, TP 1056:18 to 1056:22.]

62. The pre-pile phase served an important role for both SMBSC and its growers. First, it provided SMBSC an opportunity to get the sugar-processing factory operational and to get "all the bugs worked out." [M. Suhr, TP 887:25 to 888:11.] It permitted the growers to get into their fields and open them up. [ M. Suhr, TP 887:25 to 888:11.] Finally, by that time, the prior years' processed sugar inventory had been substantially depleted. [J. Plathe, 1034:15 to 1034:24.] Consequently, beets were needed to process into sugar to market for sale and to maintain the collateral base for the credit facilities.

63. Prior to the pre-pile harvest, SMBSC sampled the beets for sugar content and quality to project the quality, quantity, and sugar content of the entire 2000 crop. SMBSC sampled these beets randomly from a 10 linear foot strip using the polarimetric test. This size of strip was necessary in order to provide SMBSC an adequate number of beets in order to

extrapolate into tons per acre. In short, SMBSC required an adequate check strip (similar to the check strips required under the MPCI policy) to test the beets for quality and sugar content. [J. Widner, TP 103:7 to 104:6; 105:7 to 105:10, 322:19 to 324:6; R. Haney, TP 1837:21 to 1838:2 DT Ex. 1 (7 C.F.R. §757.109(12)(a)).] Plaintiffs contend that the polarimetric method for testing the sucrose content of sugar beets is not reliable. [J. Widner, TP 105:7 to 107:1; S. Martin, TP 712:23 to 714:21; 715:9 to 715:19.] Whether or not this contention is true, the Panel finds that SMBSC knew of its deficiencies, yet used the polarimetric tests and relied on their results for all business purposes, including projecting the quality of the crop, accepting sugar beets for processing, advancing payments to its growers, and providing sugar content results to the USDA and RMA during their investigation. SMBSC may not rely on these tests for these purposes and then attack the validity of those test results when it does not suit its or its members' purpose. [DT Ex. 374.]

64. SMBSC directed not only when harvest began, but also where the growers were to deliver their sugar beets. [DT Ex. 66; R. Mersbergen, Depo. Tr. 29:17 to 29:21.]

65. Processing during the pre-pile harvest generally was at a rate that did not require the sugar beets to be stored or, if stored, only stored for two to four days. [J. Widner, TP 108:3 to 108:16; see also TP 11:18 to 11:24.]

66. SMBSC notified its growers that the prepile phase of the 2000 harvest would commence on August 23. [M. Suhr, TP 887:18 to 887:22.] SMBSC consolidated its pre-pile deliveries to four piling stations, Renville, Murdock, Hector, and Clara City West. Additionally, SMBSC changed its prior practices, which had allowed a grower to open any field for pre-pile harvest, so that SMBSC had more control over the pre-pile harvest decisions. SMBSC notified the growers that SMBSC's agricultural staff would select the individual fields to be harvested

and would request that the growers deliver a specified tonnage from only those pre-selected fields.

67. Some of the insured plaintiffs participated in a federal Payment in Kind ("PIK") program. The PIK program was established by the USDA and administered by the Farm Service Agency ("FSA"). The program was established to divert sugar beet acreage from production in crop year 2000 to control the amount of sugar placed in the market. The PIK program was not a part of the federal crop insurance program. Each insured grower who participated in the PIK program executed an agreement for participation in the program. To be eligible to receive PIK payments, each insured plaintiff was required to certify that "a crop insurance payment, including indemnity and replant payments, has not been received, applied for, nor ***will be applied*** for on the contract acres." (Emphasis added). Moreover, the insured plaintiffs participating in the PIK program were required to certify that the sugar beets on the contract acres were "harvestable, or would be harvestable if not diverted under the contract, and would be harvested for sugar for use as refined sugar..." if the acres had not been accepted into the PIK program. [PT Ex. 6.165.] The insured plaintiffs were not permitted under the PIK agreement to harvest the sugar beets subject to the PIK acres, deliver those acres to SMBSC for processing, or otherwise make commercial use of those sugar beets. Nor were the insured plaintiffs permitted under the PIK agreement to plant substitution acreage to replace the acreage that was diverted to the PIK program. Therefore, the PIK acres were excluded from the SMBSC processing contract and were not eligible for MPCI coverage. The names of those insured plaintiffs participating in the PIK program together with the insured acres diverted to the PIK program are contained in Attachment 7. [J. Plathe, TP 1108:18 to 1109:14.]