Exhibit C2

68. Participation in the PIK program required that SMBSC agree to an amendment to the participating insured plaintiffs' grower agreements since the PIK agreement prevented those growers from delivering the sugar beet acreage agreed to in the annual supplement to each grower's agreement. SMBSC agreed in these amendments that the growers were permitted to determine the specific acreage to be included in the PIK program, but that the acreage must have been "in compliance with the applicable CCC/USDA guidelines (including, without limitation, the requirement that [the grower] shall not have filed a crop insurance indemnity claim with respect to such acres for the 2000 crop year." [PT Ex. 6.165] SMBSC also agreed that the sugar beets diverted to the PIK program would not be harvested by the grower or used for any other commercial purpose. Moreover, SMBSC restricted the insured plaintiffs' ability to use the diverted acreage for grazing until after the sugar beets growing on such acres were destroyed by disking, plowing, or other mechanical means.

69. In consideration of this amendment, the insured plaintiffs agreed to sell to SMBSC and SMBSC agreed to purchase the PIK certificates associated with those participating growers' acreage. [Plathe; TP 1130:8 to 1130:16; PT Ex. 10.175.] The price paid for the PIK certificates equaled:

> "the base purchase price for sugarbeets, as calculated pursuant to the Growing Agreement using the greater of (i) full harvest (*i.e.*, excluding pre-harvest sugarbeets) per acre tonnage and sugar percentage for sugarbeets delivered to SMBSC by [grower] in 2000, or (ii) the average per acre tonnage and sugar percentage for sugarbeets delivered to SMBSC during the years 1997-1999." [PT Ex. 6, see also PT Ex. 10.]

70. The beets planted by the growers who participated in the PIK program were not cultivated, or exposed to conditions, in any respect which differed from the beets planted and delivered to SMBSC for processing. [J. Plathe, TP 1129:16 to 1129:19; L. Johnson, Depo. Tr. 39:10 to 39:17; H. Ruiter, TP 1197:16 to 1197:22.] As required by the PIK agreements, none of

the yields from PIK acres were delivered to SMBSC. In order to confirm that the growers had grown sugar beets that were "harvestable," [PT Ex. 6.165] and to provide the information necessary to account for the PIK acres in the insured plaintiffs' annual production history ("APH"), [DT Ex. 156.] PIK appraisals were performed on most but not all of the diverted acreage. The PIK appraisals occurred in September and October, 2000. [J. Bakker, Depo. Tr. 36:16 to 36:19; C. Henning, TP 2018:5 to 2018:7; K. Kanten, TP 799:6 to 799:9.] The appraisals demonstrated that the sugar beets diverted to the PIK program were undamaged. Moreover, each of the insured plaintiffs who participated in the PIK program received payment for their PIK acreage. [J. Plathe, TP 1129:16 to 1129:19; H. Ruiter, TP 1197:23 to 1197:25.] No evidence has been offered by plaintiffs that they returned any or all of the PIK payments because of any damage to the beets. No evidence has been offered by plaintiffs that any plaintiff notified the PIK appraiser that his/her/its beets were damaged or otherwise not eligible for the PIK program.

71. The pre-pile phase of the 2000 campaign lasted from August 23, 2000 to approximately October 3, 2000. [Def. Stip. Adm.] Of the total tons of sugar beets delivered by the plaintiffs during the 2000 campaign, 418,000 tons (or 18.4 percent) were delivered during the prepile phase of the harvest, *i.e.*, before October 9, 2000. [J. Widner, TP 108:23 to 109:1; Def. Stip. Adm.] The pre-pile and the PIK acreage comprised thirty percent (30%) of the total 2000 sugar beet harvest. [PT Ex. 230.]; PT Ex. 257; PT Ex. 173; PT 230.]

72. The sampling performed by SMBSC during the pre-pile phase of the harvest indicated that the 2000 sugar beet crop was a very good crop. [H. Ruiter, TP 1180:9 to 1180:16.] Sugar percentages during the pre-pile phase of the 2000 harvest averaged 17.3 percent. [J. Widner, TP 254:12 to 254:20.]

73. During the pre-pile phase of harvest, SMBSC continued its efforts to resolve its financial situation by replacing CoBank as a lender. In September, it issued a Confidential Private Placement Memorandum for the sale of $100 million in senior secured notes; proceeds would provide long-term financing for the Vision 2002 capital improvement and expansion project. [DT Ex. 175.] Sale of these notes would replace CoBank's term loan. SMBSC replaced CoBank's seasonal credit facility with a $50 million loan agreement with Bank of America. SMBSC closed both financings on November 13, 2000. (PT Ex. 173 at 257100-01.]

***The 2000 Main Harvest, the "Freeze," and the Abnormally Warm Temperatures***

74. Main harvest typically was scheduled to begin in the first week of October. [J. Widner, TP 417:1 to 417:12.] However, SMBSC decided to delay the main harvest to October 9, 2000, to maximize the economic recoveries to its growers. [J. Widner, TP 130:10 to 130:18; DT Ex. 757.] SMBSC advised its growers that it would commence the main harvest on October 9, 2000, at 8:00 a.m. However, by this time one insured plaintiff, James Schmaedeka, had delivered his entire sugar beet crop to SMBSC. Moreover, 73 insured plaintiffs had delivered the entirety of their sugar beet crops on certain of their insured units by this time. A list of those who delivered all of their sugar beets on various insured units prior to any adverse weather condition is attached as Attachment 8. As a result of these pre-pile deliveries, Mr. Schmaedeka has no colorable claim for any loss due to freeze damage, and the other insured plaintiffs have no colorable claims for any such losses as to the insured units listed on this attachment.

75. Daily processing capacity of SMBSC was substantially less than the daily harvesting capacity. Consequently, during the main harvest, SMBSC stored the growers' beets at one of its twelve piling (or receiving) stations until SMBSC had them delivered to its processing plant for processing into sugar. [J. Widner, TP 110:11 to 111:12.] In 2000, these piling stations were located at Bird Island, Benson, Buffalo Lake, Clara City East, Clara City

West, Hector, Maynard, Milan, Murdock, Raymond, Redwood Falls, and Renville. [J Widner, TP111:3 to 112:27.] SMBSC directed its growers to deliver their sugar beets to one of these piling stations. [J. Widner, TP 99:18 to 100:6.] At these piling stations, the growers piled their beets into large piles, approximately 1,000 feet long by 200 feet wide by 18-24 feet high. [M. Hofer, Depo. Tr. 58:16 to 58:19.] Once delivered to SMBSC and piled into these piles, as directed by SMBSC, the beets lost their identity and were indistinguishable; thus, one insured plaintiff's beets could not be differentiated from another grower's beets. [H. Ruiter, TP 1179:10 to 1179:23.] In any event, at delivery the beets became the property of SMBSC. [Finding 48, 107, 108.]

76. Pending the start of the main harvest, the SMBSC growing area experienced below freezing ambient temperatures starting the morning of October 6. [PT Ex. 164.] These temperatures varied in severity and duration across the area. [Jaggard, TP 2416:19 to 241710; 2423:6 to 2424:13; PT Ex. 305.]

77. Although ambient air temperatures fell below 32° F in the SMBSC growing area, that fact is insufficient to establish that these temperatures caused damage to the sugar beets. Nor does this fact establish that every single beet in the affected SMBSC growing area was impacted in the same manner by these varied temperatures. [Jaggard TP 2424:15 to 2424:25.]

78. The temperature of a beet root is not identical to the ambient air temperatures unless the ambient air temperatures have been stable for a significant period in order to permit the soil temperatures to equalize to the ambient air temperatures. Soil temperatures and the beet canopy protect the beet root from freezing ambient air temperatures for a period of time. [K. Jaggard, TP 2534:14 to 2534:24; S. Martin TP 2281:8 to 2282:10.] No damage occurs to the

sugar beet unless the actual beet root reaches temperatures of between 26° to 28° F. [Martin, TP 2332:23 to 2333:8; 2333:22 to 2334:2.]

79. SMBSC compiled weather data in four areas, termed "weather stations" by it. These weather stations were located at Hector, Olivia, Renville, and Clara City. The weather data is compiled through data loggers with thermocouples and ambient air sensors. The data monitored included ambient air temperatures, relative humidity, and soil temperatures at these locations. SMBSC used this information as a tool together with the climatological information it obtained, in part, from the national weather service. The information recorded the temperature in the crown of the beet and the ambient air temperatures on an hourly basis. [Bredehoeft, Depo. Tr. 11:16 to 13:21, 16:19 to 17:14, 24:23 to 27:19, 27:25 to 28:12, 28:20 to 32:8; DT Ex. 779.]

80. As Dr. Jaggard explained, the 2000 readings from SMBSC's weather stations were sufficiently reliable that they should be treated as credible indicators of beet temperatures. [Jaggard, TP 2412:13.] In fact, the readings generated from SMBSC's stations constituted the only data which SMBSC itself contemporaneously generated pertinent to the freeze.

81. During the period when ambient air temperatures fell below freezing, the data compiled with the data loggers at the SMBSC weather stations confirm varying impact of the cold temperatures throughout the area. For instance, at the Renville, Clara City, and Olivia weather stations, untopped beet temperatures never declined below 28° F even when recorded ambient temperatures during the late night and early morning hours (approximately midnight to 9:00 a.m.) October 6-11 fell below 28° F (and at times significantly below 28° F); on the other hand, untopped beet temperatures at the Hector station during this period did fall below 28° F. [DT Ex. 779.] The untopped beet temperatures are the relevant ones because the parties agree that no topped beets were exposed to freezing conditions. [Def. Stip. Adm.] SMBSC's weather

station data compel two conclusions: (1) freezing ambient air temperatures varied in severity and duration throughout the region, and (2) not all unharvested beets actually froze at the time of the freeze, although subjected to cold ambient air. The readings from these stations also confirm the accuracy of the expert testimony concerning the protective, insulating effects of soil temperatures at this point (September-October) of the growing season. [Jaggard, TP 2534:14 to 2534:21; DT Ex. 779.]

82. With limited exceptions, *i.e.*, the data from SMBSC's weather stations, SMBSC did not monitor the temperature of beet roots in 2000. [M. Hofer Depo. Tr. 56:17 to 56:22.] There was no evidence that SMBSC monitored the internal temperatures of the sugar beets when delivered. [Widner TP 240:16 to 241:21.] Plaintiffs have offered no evidence that any one of them independently monitored the internal temperature of beets.

83. The cold ambient temperatures described above included, in SMBSC's words, a "heavy freeze" early Sunday morning, October 8, 2000. [DT Ex. 9.] As a result, full harvest, which had been scheduled to begin on October 9, was delayed until October 10 at a time yet to be determined. [DT Ex. 9.]

84. On October 9, 2000, the SMBSC agricultural staff inspected the fields and observed crown frost in some of the fields. SMBSC advised the growers that because of the frost damage that had occurred over the weekend, SMBSC was not going to permit deliveries at most of its piling stations. [Widner TP 263:23 to 264:19.]

85. On Tuesday, October 10, SMBSC decided to delay full harvest further – until 2:00 p.m. on Wednesday, October 11, at all piling stations other than Renville and Redwood Falls and until 2:00 p.m. on Thursday, October 12, at those two stations. [PT Ex. 230; J. Widner, TP 150:5 to 150:14.]

86. Below freezing ambient temperatures ended on the night of October 10-11, 2000. [PT Ex. 164.] On October 11, 2000, SMBSC confirmed that full harvest and delivery operations would commence that day at all piling stations other than Renville and Redwood Falls and the next day at these two stations. [DT Ex. 10.] At this time, SMBSC again notified the insured plaintiffs that "frost damage" had occurred to the sugar beets and that SMBSC would exercise its right under the growers agreement to reject entire loads of sugar beets for frost damage. [PT Ex. 32; G. Kleven, TP 455:9 to 455:12; J. Widner, TP 148:4 to 148:19.]

87. Based on the foregoing chronology and communications, SMBSC delayed full harvest as a result of the freeze for two days (from October 9 to October 11) at all stations other than Renville and Redwood Falls and for three days (from October 9 to October 12) at Renville and Redwood Falls. (Findings 85.) The only exception was limited harvesting for immediate processing and short term storage at two stations. (Finding 86).

88. On October 11, 2000, SMBSC admonished the plaintiff growers to be mindful of the fact that the cold weather conditions had varying impact on their sugar beet crop. "Fields that are low lying or that have poor canopy are more susceptible to showing frost damage as compared to others on higher ground with better canopy." [DT Ex. 10.] SMBSC instructed the plaintiff growers to "leave these fields to heal." [DT EX. 10.] SMBSC further recognized the varying condition of the sugar beets in the different growing areas, and, therefore, delayed the opening of the Renville and Redwood Falls piling stations for an additional day due to the colder nighttime temperatures in those areas. [PT Ex. 32; PT Ex. 230.] Plaintiffs also understood based on their previous experience that the effect of a freeze was not identical on each beet in every field. However, plaintiffs have failed to present evidence that any one of them treated these sugar beets in any manner differently than those not subjected to these freezing conditions. In

fact, several plaintiffs testified that they did not treat their sugar beets any differently following the freezing conditions. [G. Knudson, Depo. Tr. 14:21 to 14:23.; T. Cole, Depo Tr. 27:12 to 27:16; D. Daugherty, Depo. Tr. 55;4 to 55:7; L. Johnson, Depo. Tr. 52:7 to 52:10.]

89. On October 11, 2000, SMBSC also warned all plaintiffs that it would reject loads that "have frost damage ...." [PT Ex. 32.]

90. Prior to 2000, SMBSC had rejected entire fields of beets due to freeze damage. In 1995, early November freezing conditions caused SMBSC to terminate harvest. [PT Ex. 122 at 10038.] Dr. Widner then wrote various SMBSC members rejecting beets as having zero value, so that they could pursue insurance claims; at least ten members received such letters in which SMBSC (per Dr. Widner) rejected unharvested yields from at least seventeen fields. [PT Ex. 117.]

91. The freeze which occurred in October 2000 in the SMBSC growing area was a Phase II freeze under its Guidelines for Harvest Procedures for Frozen Beets, as Dr. Widner testified. (J. Widner, TP 366:12 to 367:1.] SMBSC characterizes a Phase II freeze as one in which there is "deep crown frost" of two to three inches. [DT Ex. 538.] A Phase II freeze, according to SMBSC's Guidelines, differs from a Phase I freeze in that a Phase I freeze entails only "light crown frost with temperatures slightly below freezing." Conversely, a Phase II freeze involves deep crown frost (2-3"). Correspondingly, a phase III freeze involves deep crown frost over a wide area of the SMBSC growing region, with temperatures "slow to moderate," and "a relatively high percentage of the crop remaining to be harvested." (*Id.*) At the time of the below freezing temperatures, a relatively high percentage of the 2000 sugar beet crop remained to be harvested. Consequently, since SMBSC characterized this weather event as a Phase II freeze event, the freezing conditions were not considered by SMBSC to be uniform over a wide area.

This is a critical fact because plaintiffs' theme at the hearing, and a portion of their evidence, was to the effect that all of the unharvested crop uniformly was rendered unsuitable for processing throughout the entire SMBSC growing area. [S. Martin, TP 2277:11 to 2277:17.]

92. There can be no doubt that the freezing conditions produced no damage other than crown frost. Dr. Widner affirmed that only crown frost was observed in an e-mail which he sent on February 7, 2001, to SMBSC's Chief Executive Officer. [DT Ex. 405.] He also described the event as a matter of crown frost in an e-mail on November 27, 2000, to an employee of a periodical publication, the "Sugar Producer." [PT Ex. 134.] Plaintiffs' expert, Dr. Martin, after being presented with a variety of weather data (including soil temperature data) on cross-examination, candidly conceded that the freezing conditions encountered in 2000 in the SMBSC growing region would cause nothing more than crown frost. [Martin, TP 2300:23 to 2301:10.]

93. That the extent of the freeze was limited to crown frost, and did not reach the root, is significant. Plaintiff's expert, Dr. Martin, testified that crown frost can be dealt with and result in a storable beet. [Martin, TP 2351:4-8.] Defendants' expert, Dr. Jaggard, concurred with this testimony. [Jaggard, TP 2542:16 to 2542:21.] In view of this unanimity of testimony between the two scientific experts, the Panel finds that the ultimate extent of the damage claimed by plaintiffs had to have been caused by factors other than, or in addition to, but not solely as a result of the below freezing ambient temperatures in October.

94. On October 11, the day full harvest commenced, ambient air temperatures soared to above 65° F. Fifteen of the eighteen harvest days after October 10 were 55° F or above, and eleven of these days were 65° F or above. Beginning the October 11 commencement of full harvest, as many as eight harvest days were 70° F or more. Some harvest days exceeded 80° F. Five of the eighteen nights were 50° F or above and three evenings remained at 55° F or above.

In fact, temperatures on October 19, 2000, were the warmest on record in many parts of Minnesota, including portions of the SMBSC growing areas. [Materials sent 1/01 by Widner to Martin.] Notwithstanding these abnormally warm harvest temperatures, and contrary to established and recognized harvest practices, SMBSC did not suspend harvest of the sugar beets. Moreover, plaintiffs provided no evidence that any one of them independently suspended harvest, notwithstanding SMBSC's failure to do so. All sugar beets harvested after October 10, 2000, (nearly 80% exclusive of PIK acres) were delivered when ambient temperatures were higher than 50° F, and approximately 40% of the entire 2000 crop was harvested and delivered when ambient air temperatures exceeded 65° F. More sugar beets were harvested and delivered on each of the three days that exceeded 80° F than on any other day during the harvest period. These three days represented 23% of the main harvest. [Deloitte Final Report; PT Ex. 305; DT Ex. 374; DT Ex. 757; DT Ex. 779.]

***SMBSC's and Its Members' Negligence, Mismanagement, and Failure to Follow Good Farming Practices***

95. Under the MPCI policy, insurance is provided against a loss caused only by an adverse weather condition occurring within the insurance period. [DT Ex. 1, 7 C.F.R. § 457.8(12)(Cause of Loss).] A freeze is an adverse weather condition. [Def. Stip. Adm.] However, losses that are avoidable or caused by events not included in the Crop Provisions are not entitled to insurance protection. [*Id.*] The MPCI policy that covered the insured plaintiffs' sugar beets stated that coverage existed for "only unavoidable loss of production directly caused by specific causes of loss contained in the Crop Provisions. All other causes of loss, including but not limited to the following, are NOT covered: negligence, mismanagement, or wrong-doing...or failure to follow recognized good farming practices for the insured crop" (original emphasis). [DT Ex. 1.] The MPCI policy defines "good farming practices" as the cultural

practices used to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance. These are to be compatible with agronomic and weather conditions in the county. [K. Arrigo, TP 1557:4 to 1559:11; DT Ex. 1, 7 C.F.R. § 457.8(1) (Definitions of "good farming practices").]

96. Plaintiffs were compelled by their agreements with SMBSC to follow its directions with respect to harvest and delivery of their 2000 beet crops. [DT Ex. 66, § 8.] To their detriment, as a result of SMBSC's negligent mismanagement of the harvest under the cold and the abnormally warm conditions experienced in October 2000, plaintiffs unfortunately are confronted with a legitimate charge by defendants that they may not recover due to the coverage exclusion discussed in finding 95.

97. Sugar beets are living organisms that respire. Unless a sugar beet has been subjected to deep freezing, sucrose contained in the sugar beets is used as an energy source in normal respiration. It has been estimated that this normal respiration causes approximately 70% of sugar loss during storage, and decay accounts for approximately 10%. The remaining 20% of sucrose losses are the result of fermentation when oxygen is low because of poor ventilation, freezing and thawing cycles, and root desiccation. Increase in the respiration rate of stored sugar beets will cause additional loss of sucrose while the sugar beet is in storage. The warmer the beet tissue, the faster is the rate of respiration, which leads to a faster rate of deterioration of the sugar beets. [K. Jaggard, TP 2393:11 to 2393:20; DT Ex. 507; DT Ex. 785; DT Ex. 787; DT Ex. 316.]

98. Additionally, sugar beets are best harvested for long term storage when beet root temperatures are between 39°-43° F. [J. Widner, TP 244:7 to 244:9.] According to sugar beet industry practices prevalent in 2000 and SMBSC's frost directives, in the event of a frost, beets

should be cut open at random whenever the ambient air temperature reaches 32° F. [DT Ex. 507, DT Ex. 538.] When frost damage is present and greater than ¼ inch, and/or the ambient air temperature reaches 26° F, beets should not be accepted for storage until there is no longer evidence of frost damage. [DT Ex. 507, see also DT Ex. 774, ¶ 1.]

99. The Panel heard substantial evidence regarding harvesting and storage practices, including the extent to which these practices affect respiration rates and long-term storability of beets harvested under less than ideal conditions. The Panel now turns to its specific findings on the practices which the witnesses most frequently discussed.

100. Although disagreement currently exists within the sugar beet industry as to the proper level at which a grower should top a healthy sugar beet, good farming practices dictate that topping a sugar beet which has experienced crown frost using the lowest setting on the scalpers will maximize sucrose recovery, improve the storability of the sugar beet, and maximize the economic recoveries from the processing of those sugar beets. [K. Jaggard, TP 2385:23 to 2387:3, 2387:4-2389:25; PT Ex. 261.] Indeed, no rational basis exists not to remove the crown frost from a sugar beet that has experienced a freeze/thaw cycle since that practice will remove a significant portion of any damage without appreciably increasing any adverse respiration rate. [K. Jaggard, TP 2390:16 to 2390:20.] There are three bases for this conclusion. First, Dr. Jaggard's testimony and his illustrative exhibits plainly depict the benefits of scalping beets with deep crown frost at the lowest setting. [Jaggard, TP 2383:10 to 2387:3.] Second, the growers in the Sidney, Montana, area used this technique when dealing with similar, or worse, freezing conditions in October 2000, and they sustained very limited losses. [Finding 115.] Third, subsequent to 2000, SMBSC changed its prior practice of scalping to the lowest leaf scar

to encouraging more "aggressive scalping" of the sugar beet. [PT Ex. 174 at 257049 and 257053; (DX 661); PT Ex. 305 – Revenue per acre influence by scalping technique.]

101. Topping the beets more aggressively was a feasible practice in 2000, as Dr. Jaggard testified and as the Sidney experience demonstrated. However, in 2000, SMBSC did not direct any alteration in its topping directives as a result of the crown frost observed in the sugar beets.

102. In fact, SMBSC documents indicate that topping of beets may not have been as extensive in 2000 as required by the grower agreement. [Compare DT Ex. 66 and PT Ex. 138.] Dr. Widner specifically raised the level of topping in an e-mail to Mr. Ritacco dated December 11, 2000, and addressing the 2000 frost. He asked: "For example, should we have accepted a certain quantity of beets scalped to the lowest leaf scar following the freeze?" [PT 138.] Scalping at that level should not have been even an issue, both given the presence of crown frost and the grower agreement's **requirement** that delivered beets "will be properly topped at the base of the bottom leaf …." [DT Ex. 66, § 8.]

103. SMBSC's apparent failure to enforce the contractual requirement of topping to the lowest leaf scar undoubtedly caused a substantial amount of freeze damaged crown tissue to be piled. Plaintiffs have offered no evidence that they independently followed this prudent practice to remove the damaged crown frost tissue, and the Panel finds that they did not remove any of the crown frost for those beets delivered to SMBSC following October 9, 2000. [PT Ex. 173; PT 305.]

104. According to sugar beet industry practices prevalent in 2000, sugar beets should not be harvested above 50-55° F unless they are to be placed in ventilated storage, and they

should not be harvested at all when temperatures reach 65° F or greater. [K. Jaggard, TP 2520:18 to 2521:3; 2522:4 to 2522:8; J. Widner, TP 252:5 to 252:12, 248:11 to 248:18; DX 739.]

105. SMBSC's agriculturists were aware of industry practices regarding harvesting under warm conditions. SMBSC's staff regularly counseled with and received information from other sugar beets processors in comparable growing areas. [See generally, J. Widner TP.] Beet processors exchanged information regarding harvesting and processing practices and procedures. [J. Richmond, Depo. Tr. 45:13 to 46:10.] However, SMBSC and the insured plaintiffs ignored this information, and they chose to proceed with their harvest without significantly altering their respective practices or procedures relating to harvesting or storage of the sugar beets to account for abnormally warm weather conditions.

106. The cold temperatures experienced in the SMBSC growing region and the subsequent abnormally warm temperatures experienced in the region in October should have had an impact on how, when, and if the insured growers would harvest their sugar beets. The practices used in 2000 by beet growers in Sidney, Montana, who experienced temperatures similar in severity and duration to the temperatures affecting growers at other processors [DT Ex. 523], the standards and practices used by American Crystal Company for harvest of beets during various weather conditions, [DT Ex. 538], thirty years of general industry knowledge about the impact on the long-term ability to store sugar beets that have been subjected to the freeze-thaw cycles, plaintiffs' prior experience with freeze/thaw cycles, and SMBSC's own subsequent change in its practices shortly after its 2000 experience [PT Ex. 174 at 257049] unequivocally suggest that practices could and should have been used by the plaintiff growers and directed by SMBSC to eliminate, or at least to mitigate, any damage or loss that the plaintiff growers allegedly sustained to their sugar beet crop. [R. Fullmer Depo. Tr. 18:8 to 19:6; DT Ex. 774.]

107. The negligence, mismanagement, and good farming practices issues extend beyond implementation of alternative practices. They include failing to follow practices actually prescribed by SMBSC. The Panel has noted the issue of failure to top beets to the specified level. In addition, and contrary to its admonitions to the growers and its express right in the grower agreement, SMBSC did not reject any of the beets delivered to it for processing. The grower agreement expressly granted SMBSC the right to reject "diseased, frozen or damaged beets; sugarbeets with less than 12% sugar, or less than 80% purity: sugarbeets which, in [SMBSC's] opinion, are not suitable for the manufacture of sugar; [and] sugarbeets as to which, [in SMBSC's] opinion, the terms and conditions of this agreement have not been properly complied with or for any other bona fide reason." This provision is nearly identical to the provision in the American Crystal grower agreement. [DT Ex. 510, see 11(b); DT Ex. 66 ¶(8).] Dr. Widner's counterpart at American Crystal, Mr. David Berg, understood pursuant to these terms that once the processor takes control of the sugar beets at delivery in order to process them, the processor is "stuck with them." [D. Berg, Depo. Tr. 34:15 to 38:1; see also D. Berg, TP 1797:3 to 1797:6; J. Widner, TP 202:12 to 202:14; 383:23 to 384:8; DT Ex. 66, Section 8.]

108. Yet, knowing of the crown frost experienced in some fields, knowing the scientific affect of a freeze/thaw cycle to the molecular structure of the sugar beets, knowing that it had accepted beets with frozen and raggy tops, being aware of the elevated internal beet temperatures due to the extreme warm temperatures, and recognizing that the ambient air temperatures were too hot to harvest with SMBSC's lack of ventilated storage, SMBSC took possession and title to the sugar beets at the time of delivery. Once SMBSC accepted possession of the sugar beets for processing, SMBSC undertook control of the sugar beets and therefore was responsible for adequately storing the beets. [S. Martin, TP 2329 to 2331:8, 2343:24 to 2344:8,

2260:19 to 2261:6; K. Jaggard, TP 2385:23 to 2387:3, 2393:11 to 2393:20; M. Suhr, TP 905:18 to 908:2, 979:13 to 801:4.]

109. Plaintiffs also admitted, and this Panel therefore finds, that once the sugar beets are delivered and accepted for processing, that the proper storage and processing of the sugar beets was the sole responsibility SMBSC. [*See, e.g.*, R. Broderius Depo. 26:22-27:5; R. Fagen Depo. 31:14-18; D. Hultgren Depo. 93:1-94:8; R. Janssen Depo. 82:12-83:3, 83:12-23; W. Jungers Depo. 28:11-29:7; R. Kramer Depo. 108:20-22; R. Sachariason Depo. 85:13-20, 86:3-7, 86:23-87:12; R. Schwitters Depo. 45:18-46:16, 46:21-48:1.]

110. Additionally, SMBSC did not reject a single load of sugar beets delivered to it by the insured plaintiffs at the time of delivery. SMBSC accepted every truckload of beets for the manufacture of sugar. SMBSC tested the beets for sugar content and purity. SMBSC processed these beets into sugar although the results were not as SMBSC had hoped for or projected. Nonetheless, the beets were clearly "suitable for the manufacture of sugar" since SMBSC manufactured over 3,599 cwt. of sugar from these sugar beets. [J. Plathe TP. 1112-1117; PT. Ex. 173, p. 30, Compare PT Ex. 8 (3,688, cwt).]

111. On October 11, 2000, SMBSC instructed plaintiffs to take a representative sample of ten beets before harvesting each field and to cut a cross section to ensure that the beets were healed. SMBSC advised the plaintiffs on what to look for in a frost-damaged beet. Specifically, SMBSC told the plaintiffs to cut a cross-section of each beet and to determine if the beets had healed. [PT Ex. 32.] This would be done by comparing the color of the top three inches to the bottom three inches and noting if the color of the two sections was the same (white to dry in appearance). SMBSC advised the plaintiffs that if there was discoloration or moisture in the top area of the beet, beets in those fields should be left for later harvest. Plaintiffs have failed to

present evidence that each of them complied with this directive for each field. [R. Boike, Depo. Tr. 28:10 to 29:20; R. Mersbergen, Depo. Tr. 136:12 to 136:16; G. Kleven, TP 481:17 to 482:3.]

112. With respect to those plaintiffs who have submitted evidence, regarding their checking of beets for freeze damage, their practices varied widely. Some plaintiffs cut open their beets and saw frost damage. [S. McNeil, Depo. Tr. 8:13 to 8:21; N. Prokosch, Depo. Tr. 7:10 to 7:18.] Others such as James Nyquist and Ken Olson cut open their beets and saw damage in some beets but not others. [J. Nyquist, Depo. Tr. 23:8 to 23:16; K. Olson, Depo. Tr. 25:21 to 25:25.] Don Hartung of plaintiff Hartung Farms, Inc. and Michael D. Holien cut open the beets after the healing process and continued to see some, but not as much damage to the beets. [D. Hartung, Depo. Tr. 62:8 to 62:12; M. Holien, Depo. Tr. 28:17 to 29:12, 39:1 to 40:3.] Yet they harvested the beets in any event. [D. Hartung, Depo. Tr. 62:13 to 62:16; M. Holien, Depo. Tr. 28:25 to 29:1.] Other plaintiffs cut open their beets and determined that the beets were "white all of the way through" and therefore, "good and storable beets." [R. Schwitters, Depo. Tr. 88:12 to 88:22; 119:17 to 119:23; T. Jacobs, Depo. Tr. 26:19 to 26:21, 22:14 to 22:18; K. Kanten, TP 793:8 to 793:10, 794:5 to 794:8.] Several plaintiffs, such as Mark Grussing and Troy Elfering, testified that they did not cut open their beets at all or they could not remember if they did, and the record is silent as to the practice of the majority of plaintiffs. [M. Grussing, Depo. Tr. 26:1 to 26:4; T. Elfering, Depo. Tr. 32:23 to 33:9.] Attachment 9 is a list of those plaintiffs who failed to establish that they cut open their beets or to whom the record is silent as to this fact.

113. The plaintiffs also failed to establish that each of them properly defoliated their sugar beets upon commencement of the full harvest. SMBSC admitted that they had accepted beets with "raggy tops," *i.e.*, beets in which the foliage had not been properly removed. [PT Ex. 34.] Dr. Widner admitted this to Dr. Martin when he advised her that some but not all growers

had used a stalk chopper ahead of the defoliator in order to "properly remove all of the green material." [PT Ex. 161.] Delivery of such beets violated Section 8 of the SMBSC grower agreement. [DT Ex. 66.] Those who had not, delivered beets with raggy, frozen tops, which were accepted for processing by SMBSC. [M. Suhr, TP 905:18 to 908:2, 979:13 to 980:4.] SMBSC advised the growers on October 18 that "beets with frozen tops had been plugging up the slicers." [PT Ex. 34.] Knowing that these beets had frozen tops, SMBSC accepted these beets for processing, nonetheless.

114. SMBSC's actions in 2000 stand in stark contrast with the actions taken by the growers in Sidney Montana. First, rather than accepting all sugar beets at delivery for processing into sugar as SMBSC did, the processor rejected all unharvested beets before delivery due to the freezing conditions. [R. Fullmer Depo. Tr. 18:8 to 19:6.] This is similar to what SMBSC had done in November 1995.

115. Unlike SMBSC and its growers, the Sidney area growers altered their normal harvesting, defoliating, and storage practices. Harvest was suspended for seven days rather than the two days SMBSC generally suspended its growers' harvest (three days at Renville and Redwood Falls). The Sidney area growers were not permitted to deliver twenty-four hours a day/seven days a week as were the SMBSC growers. [R. Fullmer Depo. Tr. 72:16-73:6.] Instead, their piling stations were closed on weekends, and operating hours were reduced from Monday through Friday to reduce the amount of time the beets were in storage before processing, thereby reducing deterioration in the piles. [R. Fullmer Depo. Tr. 73:16 to 74:7.] Unlike SMBSC's growers who did not properly defoliate their beets, even to the extent required by the grower agreement, the Sidney area growers lowered their scalping knives to remove all of the crown frost damage from the sugar beets. [R. Fullmer Depo. Tr. 23.8 to 24.4.] Finally, a

greater portion of the Sidney beets were stored using passive ventilated storage for the beets. Rather than suffering a processing or storage loss, the Holly growers received $37.71 per ton for their post-freeze beets, they received $38.92 per ton for their pre-freeze beets. [R. Fullmer Depo. Tr. 39.6 to 39.17.]

116. Instead of suspending the harvest longer to deal with the freeze or later in October to deal with higher than normal temperatures, SMBSC's approach was to complete the harvest as quickly as possible, keeping all piling stations open twenty-four hours a day and hiring three hundred part time workers. [PT Ex. 124; J. Widner, TP 204:14 to 204:23.]

117. Another error made by SMBSC in 2000 was its failure to continue checking the frost damage until the end of harvest. It did check deliveries for frost damage for a couple of days after main harvest began, but stopped doing so after several truckloads of each member had been sampled. [Widner, TP 265:11 to 266:6; 377:21 to 378:8.] Dr. Jaggard testified that this was an error on SMBSC's part. [Jaggard, TP 2375:17 to 2375:2.] The Panel believes his testimony. Not only was he a credible witness, but his point was illustrated plainly and graphically by Mr. Fullmer's testimony and his pictures of beets sliced open on October 18 which still showed frost damage on the **eighth** day after the Sidney area growers resumed their post-freeze harvest. [R. Fullmer, Depo. TP 59:19 to 60:4.] This evidence persuasively showed SMBSC's negligence by its cessation of an obviously prudent practice.

118. The Panel now turns to the ventilation issue raised by defendants. The Panel does not understand defendants to be arguing that SMBSC should have increased its ventilated storage during the 2000 harvest, a plainly impractical alternative. Instead, the Panel views defendants' position to be that SMBSC placed too much reliance on pile splitting and invested too little in

increasing its ventilated storage. [Jaggard, 2376:23 to 2376:25; 2400:78 to 2400:13; 2400:22 to 2401:18.]

119. In 2000, SMBSC did not use passive ventilation to cool the sugar beets at its piling stations. [J. Widner, TP 358:7 to 359:2.] SMBSC only had forced air ventilation in one pile at one of its piling stations, the factory in Renville. [PT Ex. 208; J. Widner, TP 124:19 to 124:24; Mr. Suhr, TP 958:13 to 958:16.] However, SMBSC did not use the forced air ventilation at this location until December 6, 2000, after a significant portion of the insured plaintiffs' beets had been processed into sugar. [PT Ex. 7.] Nonetheless, SMBSC accepted approximately 80% of the harvest when temperatures exceeded those recommended for harvest and long term storage unless some type of ventilation is available. [PT Ex. 305; PT Ex. 7.] Of this 80%, the plaintiff growers harvested and SMBSC accepted over 38% the crop during a period when generally accepted harvest and storage practices required a complete suspension of the harvest. [PT Ex. 7; see also demonstrative charts "Too Hot Too Harvest & Store". K. Jaggard, TP 2437:1 to 2437:25; J. Elfering, Depo. Tr. 29:7 to 29:13, 29:15 to 29:22; Final Deloitte Report]

120. Although Dr. Widner believed that forced air and passive air ventilation had some limited utility, he was an advocate of pile splitting to produce, in his judgment, the same effect as passive air ventilation. [J. Widner, TP 121:15 to 122:22.] "Pile splitting" involves creating a lengthwise valley in the middle of a pile, and a typical pile at SMBSC in 2000 was 1000 feet long and 200 feet wide. [*Id.*, M. Hofer, TP 58:16 to 58:19.]

121. While pile splitting does permit more air flow, thus permitting dissipation of heat built up through respiration of stored beets, it also creates more surface exposed to alternating freezing and thawing. [K. Jaggard, TP 2401:5 to 2401:9; R. Fullmer Depo. Tr. 91:17 to 94:2.] This is detrimental, as explained elsewhere in the Panel's findings. [Findings 122, 123]

122. Another detriment to pile splitting as a ventilation technique is the time consumed by doing the splitting. [K. Jaggard, TP 2401:10 to 2401:18.] SMBSC's own experience dramatically demonstrates this limitation. SMBSC's twelve piling stations had a total of twenty-three piles in 2000. It took two days to split lengthwise a pile at Clara City West in 2000. [PT Ex. 125.] Pile splitting still was continuing in late November and early December of 2000. [PT Ex. 135 and PT Ex. 136.] That pile splitting was continuing at this point obviously would not be unusual, since splitting cannot begin until harvest ends and beets are piled, and six to seven weeks then would be required to complete the task.

123. This case illustrates the serious limitations of pile splitting as a ventilation technique. Beets, simply through the normal harvest, delivery, and piling process, experience elevated respiration rates. [J. Widner, TP 316:19 to 317:5; K. Jaggard, TP 2393:11 to 2394:5; S. Martin, TP 690:8 to 690:16; DT Ex. 507.] Respiration rates were elevated further due to the abnormally warm temperatures when full harvest commenced after the freeze, especially from October 18 through completion of harvest. [PT Ex. 164; K. Jaggard 2393:11 to 2393:20.] This period and the following days would have been an opportune time to use passive or forced air ventilation tubes, in conjunction with cooler night time temperatures (when many nights were in the 33-35°F to 47-49°F range), to promote dissipation of the internal heat generated by respirating beets [R. Fullmer Depo. Tr. 79:14 to 80:12; PT Ex. 164; K. Jaggard, TP 2399:7 to 2399:17.]

124. SMBSC's Vice President of Agriculture, Dr. Widner, admitted to the cooperative's Chief Executive Officer on February 7, 2001, that the freeze was not the problem. He specifically stated, after noting the effect of "very low rainfall" on the tops (but not the roots) of the beets and the freeze: "I am convinced that we could have handled the effects of the

drought alone, except for the ***complications of the higher than normal temperatures in late October.***" [DT Ex. 405.] Dr. Widner affirmed this statement when he testified at the hearing. [J. Widner, TP 367:24 to 368:11.] The Panel finds that the higher than normal late October temperatures described in writing by Dr. Widner nearly three years ago provide a more credible explanation for the severity of the damage now claimed than does the plaintiffs' argument that all unharvested beets at the time of the freeze were rendered unsuitable for processing simply as a result of the freeze. The Panel also notes that its position is well supported by the written opinion and testimony of defendants' expert, Dr. Jaggard. [DT Ex. 851; K. Jaggard, TP 2392:7 to 2394:15.]

125. Many plaintiffs began their main harvest when directed. However, not all plaintiffs who planted sugar beets harvested their sugar beets and delivered those beets to SMBSC for processing. Those plaintiffs who did not harvest or deliver their sugar beets on one or all of their insured units are reflected on Attachment 10. As to those plaintiffs who harvested their 2000 crops during full harvest and delivered their crops to SMBSC, the sugar beets were taken in trucks directly to the piling stations to which those plaintiffs were assigned. [Def. Stip. Adm., TP 12:25 to 13:8.]

***SMBSC's and Its Members' Actual Knowledge of Injury, Deterioration, or Loss in October 2000***

126. As set forth in Section 12 of the Basic Provisions and Section 10 of the Sugar Beet Crop Provisions, the insured plaintiffs' MPCI policies protected the insured portions of their 2000 beet crops from loss of production based on adverse weather conditions. [DT Ex. 1 – see Section 1.] There is no dispute that a freeze is an adverse weather condition. The definition of "damage" in the Basic Provisions determines damage to be "[i]njury, deterioration, or loss of production of the insured crop due to insured or uninsured causes." [DT Ex. 1, "damage").] As

the following findings demonstrate, SMBSC and its members had actual knowledge of such damage in October 2000.

127. At least three electronic communications from SMBSC to its members from October 8-18 informed plaintiffs of a "heavy" freeze, of prospective rejection of loads with "frost damage" or with unsatisfactorily defoliated beets, and of delivery of beets "with frozen tops that had been" adversely affecting processing. [PT Ex. 31; PT Ex. 32; PT Ex. 34.] In addition, the October 18 communication advised plaintiffs of the seven-day average granulation rate (*i.e.*, since full harvest had begun) of 11,981 hundred weight – approximately half of what it should be, according to Dr. Widner and Mr. Suhr. [J. Widner, TP 286:16 to 286:24.] According to Mr. Suhr, SMBSC's members are very sophisticated and they understand the significance of a low granulation rate. [M. Suhr, TP 984:1 to 984:6.]

128. The temperature changes over the October 6-10 period produced a daily, alternating freeze-thaw cycle. That is evidenced by the ambient temperature data which SMBSC generated and on which Dr. Martin relied, as well as Dr. Widner's admissions during cross-examination. [PT Ex. 164; PT Ex. 161; Martin TP, 2221:6 to 2221:9.]

129. According to Dr. Martin, plaintiffs' expert, an alternating free-thaw cycle represents "the worst possible situation…." [PT Ex. 161 and S. Martin, TP 705:12 to 705:17.] Because the situation which she described was based on publicly available weather data, which SMBSC monitored, some damage from such a cycle had to be known in the October 6-11 period by SMBSC and its members, including plaintiffs. Plaintiffs offered no satisfactory explanation of their failure to recognize the importance of the freeze-thaw cycle which they experienced. Even if they personally did not recognize this, plaintiffs characterized SMBSC's agricultural staff as experienced and knowledgeable. [B. Kubesh, Depo. Tr. 26:4; M. Holien, Depo. Tr.

29:16 to 29:18.] This is significant because Dr. Martin candidly testified that the conditions experienced in the SMBSC growing area in early October had been recognized in the industry as "the worst possible situation" since the mid-1970s. [S. Martin, TP 2261:24 to 2262:6.]

130. Since the mid-1970's, the scientific impact to the molecular structure of sugar beets subjected to freezing and thawing conditions and warm temperatures has been commonly known within the sugar beet agricultural scientific community. [S. Martin, TP 2343:24 to 2344:8, 2260:19 to 2261:6; DT Ex. 786; DT Ex. 787.] It has been commonly known for at least 30 years that beets that are subjected to this freeze/thaw cycle have diminished long term storage capabilities. [S. Martin, TP 724:9 to 724:19.] However, sugar beets that have been subjected to these conditions are suitable for successful processing if harvested and stored properly or processed shortly after harvest. [K. Jaggard, TP 2383:21 to 2384:23; S. Martin, TP 2262:7 to 2262:16; DT Ex. 851.]

131. In addition to the foregoing actual knowledge of SMBSC and its members, SMBSC had much more specific knowledge that the 2000 crop was damaged which it gained through the results of its processing activities in October. According to Mr. Suhr, SMBSC's Vice President for Operations, the following facts were known by SMBSC in October 2000:

- Between days 41-51 of processing, cossette and raw juice purities declined and never recovered; in fact; these purities continued to deteriorate.
- Between days 61-71 of processing, cossette and raw juice purities showed a marked differential between the 1999 and 2000 crops.
- Around day 51 of processing, beet quality showed a marked deterioration, as measured both by tons and by percentages of non-sugars.

- Around day 46 of processing, the extraction rate began to decline and never recovered.
- Between days 57-65 of processing, diffusion purity evidenced a marked, and adverse, decline compared to the 1999 crop.

[DT Ex. 249; M. Suhr, TP 988:2 to 989:16.] Processing began on August 26, 2000. [M. Suhr, TP 966:25 to 967:8.] Thus, the following dates and ranges of dates can be determined for the knowledge described above: days 41-51 equate to October 6-16, days 61-71 equate to October 26 – November 5, day 51 equates to October 16, day 46 equates to October 11, and days 57-65 equate to October 22-30. [See Demonstrative exhibits Cossett & Raw Juice Purity; Diffusion Purity; 7-day Average Extraction.]

132. Plaintiffs' expert witness, Dr. Martin, candidly wrote and testified that juice quality and slice rates would be expected to decline beginning several weeks after the freeze-thaw cycle believed by her to have been experienced. [PT Ex. 161 at 111337; Martin TP, 2322:23.] She admitted on cross-examination that, based on the dates of the freeze-thaw cycle, deterioration resulting from it would be evident by the end of October. [S. Martin, TP 2345:2 to 2345:7.]

133. Defendants' expert witness, Dr. Jaggard, opined that any damage from the frozen beets would become known in October 2000 through the processing of them. [DT Ex. 851; S. Martin, TP 2345:2 to 2345:7.]

134. There can be no doubt that, in late October 2000, SMBSC knew that "the beets in storage were showing significant signs of deterioration with lower than expected juice purities and recovery rates in the factories." This point was made by Mr. Plathe when he wrote the Minnesota FSA Director seeking federal disaster assistance on January 4, 2001. [PT Ex. 212.]

135. Thus, it is indisputable that SMBSC and its members had actual knowledge of damage during harvest and, in all events, no later than October 31, 2000.

***SMBSC's and Its Members' Actual Knowledge of Injury, Deterioration, or Loss in November 2000***

136. As the following findings establish, SMBSC's and its members' actual knowledge of damage (defined in Section 1 of the Basic Provisions as "[i]njury, deterioration, or loss of production") continued and, in fact, increased in November 2000. This is significant whether the end of the insurance period is treated as the last day of any plaintiff's harvest, which defendants have stipulated to be October 27, 2000, or as November 15, 2000, which is the applicable calendar date under Section 9 of the Sugar Beet Crop Provisions and Section 11 of the Basic Provisions for determining the latest possible date for ending the insurance period. [DT Ex. 1.] The last possible date for notice of damage or written notice of loss was November 11, 2000 (treating the last day of any plaintiff's harvest as the end of the insurance period) or November 30, 2000 (treating November 15 as the end of the insurance period). [K. Arrigo, TP 1541:6 to 1541:24; S. Johnson, TP 1920:6 to 1920:13.] For purposes of this matter, the Panel finds the last possible date for timely notice to be November 11, 2000, because Section 11 of the Basic Provisions specifies that the insurance period ends "at the earliest of" several enumerated events, one of which is harvest. [DT Ex. 1.] In its endeavor to make findings which are as complete as possible, the Panel notes the increased level of SMBSC's and its members' actual knowledge throughout November 2000.

137. SMBSC advised its members of "7-day average granulation" rates twice in November prior to November 11. [M. Suhr, TP 971:19 to 973:25.] On November 3, the seven day average was reported to be 16,396 hundred weight, and on November 7 the seven day average was reported to be 13,609 hundred weight. In both instances, average daily slice,

respectively, was 12,727 tons and 12,481, tons. [PT Ex. 35; PT Ex. 36.] The factory's daily slicing capacity is approximately 12,000 tons, and normal daily granulation is approximately 23,000 hundred weight. [Widner, TP 116:23 to 117:6; Suhr, TP 883:24 to 884:16.] Thus, despite meeting normal expectations for tons sliced, the 2000 harvest showed marked deterioration in actual sugar production, with production in the 60% - 75% range. [PT Ex. 8.] SMBSC's members are sophisticated and follow closely reports on granulation.

138. As reported by SMBSC, "7-day average granulation" remained deficient for the balance of November – 15,509 hundred weight reported November 15, 6,264 reported November 27, and 9,616 reported December 1. [PT Ex. 37; PT Ex. 8.] All of these reports showed daily granulation well below the norm, even during one seven day period when daily slice exceeded the norm, as reported for the seven days ending November 15. (PT Ex. 37.)

139. Qualitative tests used in the factory to measure the 2000 crop likewise brought only negative news in November. November 1 was the sixty-seventh day of processing, and November 30 was the ninety-seventh day (based on August 26 as the first day of processing). Cossette and raw juice purities and diffusion purity continued to decline; the extraction rate remained at or below 80% throughout the month, with frequent levels below 65%; and impurities remained high. [DT Ex. 249 and PT Ex. 302.]

140. Hot spots can be a sign of deterioration of stored beets. A "hot spot" is a portion of a beet pile where the temperature is higher than adjacent areas of stored beets. [J. Widner, TP 170:01 to 170:13.]

141. Sink holes are a sign of deterioration of stored beets. A "sink hole" is a portion of a beet pile which has sunk below the level of adjacent areas of stored beets. [J. Widner, TP