Exhibit C3

190:2 to 190:18.] The presence of both sink holes and hot spots is indicative of deterioration of stored beets. [J. Widner, TP 184:16 to 184:21, 197:20 to 198:1.]

142. Juicing is a sign of advanced deterioration of stored beets. The presence of "juicing" means that elevated respiration rates of beets have caused them to deteriorate to the point that the beets' structure has collapsed so that the once solid beets have begun to liquefy. [J. Widner, TP 211:14 to 211:24.]

143. Juicing indicates that a "disaster" is occurring within the storage piles. [Fullmer Depo. Tr. 37:1 to 37:12.] Juicing should never occur within days of the end of harvest. If juicing occurs at all, it would only begin toward the end of the processing campaign, sometime in January or February at the earliest. [D. Stamer, Depo. Tr. 27:17 to 27:20.] Dr. Widner had never seen juicing this early in his 32 years of experience. [J. Widner, TP 414:6 to 414:9.]

144. Generally, the plaintiffs also understood that juicing indicated significant deterioration within the storage piles. [M. Anderson, Depo. Tr. 26:5 to 25:11; J. Bakker, Depo. Tr. 8:10 to 8:17.] Some plaintiffs, namely Harlan Pieper, Philip Pieper, and Scott Tersteeg even saw that juicing was occurring in the piles early in the campaign. [H. Pieper, Depo. Tr. 32:2 to 32:12; P. Pieper, Depo. Tr. 7:15 to 7:10; S. Tersteeg, Depo. Tr. 24:1 to 24:10.]

145. SMBSC reported to plaintiffs in November 2000 that there was deterioration and, in particular, that hot spots and sinkholes were appearing in piles. There were two such communications prior to November 11 – one on November 3 (hot spots at the Buffalo Lake and Clara City West stations) and November 7 (sink holes and deterioration at the Clara City West and Maynard stations). [PT Ex. 35; PT Ex. 36.] On November 15, SMBSC informed plaintiffs of deterioration at the Bird Island and Redwood Falls stations. [PT Ex. 37.] As the end of November approached, SMBSC told plaintiffs on November 27 of unusual deterioration in the

beet piles, of the apparent need to discard 150,000 tons of beets, and of piles at Buffalo Lake, Hector, Redwood Falls, and Renville which were in the worst condition.

146. Plaintiffs are experienced beet growers and understand the significance of hot spots, sink holes, and juicing. Those plaintiffs who testified (either in person or by deposition) admitted that they appreciated the significance of such signs of deterioration. (See Attachment 11, which provides a listing of such plaintiffs together with citations to the record where such testimony was given.)

147. As the following findings indicate, SMBSC had substantially greater knowledge of serious deterioration in the storage piles than its members had, most of which it did not communicate to plaintiffs until later than fifteen days following the end of the insurance period. Some of this knowledge came from frequent physical inspections of the beets at the twelve piling stations. [PT Ex.115.] SMBSC also monitored the activity of the beets in the piles using thermal scan imaging. [J. Widner, TP 178:1 to 178:21.] Any notable event was recorded in a log that was sent to the processing plant. [J. Widner, TP 309:7 to 309:21.] There the Director of Agricultural Operations, Mr. Hofer, would review the information and discuss action to be taken with the Vice President of Operations, Mr. Mark Suhr, who was responsible for the processing activities of SMBSC.

148. As early as October 30, 2000, SMBSC saw abnormal deterioration in the storage piles. The Buffalo Lake site exhibited suspicions of juicing. [PT Ex. 115]

149. By October 31, 2000, the juicing at Buffalo Lake was confirmed by SMBSC. [DT Ex. 375.] On November 2, 2000, juicing was reported in the beets piled on October 12 at Clara City West. On November 3, juicing was detected at Bird Island and Renville. On November 4, juice was running at Maynard and Redwood Falls. By November 8, juicing was

occurring at Murdock, and two days later, on November 10, 2000, juice was visible at Hector. By November 10, at least eight of the twelve piling stations had reported juicing. Thus, prior to the last date when notice would have been timely (the end of the insurance period plus fifteen days), SMBSC had actual knowledge of widespread juicing, the most serious evidence of advanced deterioration. [DT Ex. 375; PT Ex. 8.]

150. On November 7, SMBSC knew, but did not advise plaintiffs, that there were 72,000 tons of deteriorated sugar beets and that it would have to discard approximately 24,000 tons. On that date, Mr. Hofer, SMBSC's Director of Agricultural Operations, e-mailed two of its Vice-Presidents, Dr. Widner and Mr. Suhr, a report on pile conditions. This report provided a station-by-station estimate of deteriorated beet tonnage and the expected level of discards. [PT Ex. 127; M. Suhr, TP 205:1 to 207:25.]

151. Mr. Hofer held a meeting of his agricultural staff on November 9, 2000, and reported the results to Dr. Widner. His e-mail of that date informed Dr. Widner of visible sink holes at six stations and of visible juicing at five stations. [PT Ex. 128.] Mr. Hofer e-mailed Dr. Widner on November 10 to advise him that the November 9 e-mail had failed to report both sink holes and juicing at another station, thus bringing to seven the number of stations with visible sink holds and to six the number with visible juicing. [PT Ex. 129.] The November 10 e-mail also reported that 87,000 tons of deteriorated sugar beets had been identified.

152. SMBSC's inspection reports of piling station conditions actually establish that, as of November 2000, 3 stations had sinkholes (or the equivalent) and 9 stations had juicing. [PT Ex. 125.] By November 11 (the last date for timely notice), the number of stations with visible sink holes (or the equivalent) was 3, and the number with visible juicing was 9. [PT Ex. 115.]

153. SMBSC began discarding beets during the first two weeks of November, and a number of plaintiffs observed the discarding of beets [M. Hofer, Depo. Tr. 137:8 to 137:25.] In this regard, the Panel notes that the amount of beets expected on November 7 to be discarded was approximately 24,000 tons [Finding 150], but that nine days later, November 16, SMBSC had increased the estimate to 30,000 to 45, 000 tons. [PT Ex. 132.]

154. According to Mr. Hofer, the growers expressed their "alarm" at these problems, and voiced their concerns about discards to SMBSC personnel. On November 16, 2000, SMBSC responded to the alarmed growers with an agricultural report that tried to assuage these concerns. SMBSC advised the growers that it was "working through pockets of deterioration. The goal is to set aside for discard the beets that show the highest deterioration, and bring the balance to the factory. When sorting out the areas showing the highest degree of deterioration at the pile site we use a great deal of subjective decisions [sic]" [M. Hofer, Depo. Tr. 137:4 to 137:25.]

155. Thus, SMBSC's internal records make it indisputable that it had actual knowledge of very severe damage in the storage piles before the last date for timely notice of damage or notice of loss came and went (November 11). It also is clear that SMBSC shared some of this knowledge with plaintiffs. The principal types of information which it withheld related to the existence of juicing (*i.e.*, evidence of severe deterioration), the number of piles with sink holes, and the extent of tonnage anticipated to be discarded. Despite the absence of any evidence that this type of information was conveyed to plaintiffs, other information was conveyed that was sufficient to alert plaintiffs to serious deterioration, namely: low granulation rates and the existence of hot spots and sink holes. Also, based on the testimony of Mr. Hofer and certain

plaintiffs, it is clear that some, if not all, plaintiffs had actual knowledge before mid-November that there was juicing and that beets were being discarded within days of the end of harvest.

***Plaintiffs' Untimely Notice***

156. Despite the actual knowledge of SMBSC and its members, only one plaintiff testified that he gave notice shortly after the freeze by contacting his agent, but this plaintiff then withdrew his claim on November 11, indicating that he would not have a loss for his 2000 beet crop. [H. Dahlager Depo. 44:23-46:12; DX 845.] Otherwise, no timely notice of damage or notice of loss was provided to defendants. The following findings are pertinent to this finding.

157. The MPCI policy provides that the insurance period ends for each plaintiff upon the earliest of the following events to occur (i) when the tons delivered to the processor equal the amount stated in the sugar beet processor contract, (ii) the lifting and topping of beets on the insured unit, or (iii) November 15, 2000. [DT Ex. 1 – section re: insurance period.] Consequently, the insurance period ended for each plaintiff at the time he/she/it harvested the beets. [K. Arrigo, TP 1587:6 to 1589:3.]

158. Harvest ended at different times for plaintiffs. For those plaintiffs who delivered sugar beets to SMBSC, the last day of delivery by any grower was October 29, 2000. Harvest was complete by all plaintiffs who harvested sugar beets no later than this date. The vast majority of plaintiffs, however, harvested their sugar beets on or before October 27, 2000. [Def. Stip. Adm.] The Panel believes it is appropriate, for purposes of discussing the issue of untimely notice, to use October 27 as the end of the insurance period. First, all but ten plaintiffs completed their beet deliveries to SMBSC on or before that date (leaving six who finished their harvest on October 28 and four who finished on October 29). Second, in the circumstances of this matter, the difference of two days (or even a week) does not alter the situation, *i.e.*, all plaintiffs had sufficient knowledge to give notice no later than November 11. Only one plaintiff

did, yet he withdrew his claim on November 11. Plaintiffs have failed to prove that each one of them did (with the exception of Mr. Dahlager, who withdrew his claim). A list of the dates that each plaintiff delivered his/her/its sugar beets on the unit is attached hereto as Attachment 12. [Final Deloitte Report; Def. Stip. Adm., TP 10:14 to 18:22.]

159. Consequently, the insurance period ended for the last plaintiff to deliver sugar beets to SMBSC on October 29, 2000. The insurance period ended earlier, on or before October 27, for virtually all other plaintiffs who planted and delivered sugar beets following the freezing conditions. [DT Ex. 1.]

***Overall Quality of Plaintiffs' 2000 Beet Crops***

160. At the hearing, plaintiffs contended that all beets harvested after October 10, 2000, were freeze damaged and unsuitable for processing.

161. It is neither plausible nor probable that each and every beet harvested after October 10, 2000, was freeze damaged and unsuitable for processing. [Jaggard, JP 2424: 15-25.] At a minimum, this finding is fundamentally correct because the temperature data from SMBSC's own weather stations showed that beet temperatures at three of its four monitoring stations did not reach 28° F or lower over the period of cold temperatures, even though ambient temperatures were that cold or colder.

162. Experience demonstrates, and this Panel finds, that beets that have been through a freeze or a freeze/thaw cycle are suitable for manufacture into sugar. Also, as noted above, plaintiffs' expert, Dr. Martin, admitted that beets with crown frost can be stored and suitable for processing.

163. Those plaintiffs who did harvest and deliver their sugar beets to SMBSC for processing generally believed that they had produced a good and storable crop. Testimony from at least 56 plaintiffs confirmed this belief. See Attachment 13. SMBSC acknowledged in its

Fiscal Year 2000 Annual Report, published in December 2000, that the "beets went into the storage piles in generally good condition. [PT Ex. 257.]

164. In addition, the testimony clearly showed that freezing conditions during harvest are not infrequent. Some plaintiffs, in fact, characterized the freeze in 2000 as similar to earlier freezes which they had experienced. [R. Broderius, Depo. TR 18:6 to 19:10; R. Boike, Depo. TR 13:7 to 13:22; D. Brouwer Depo TR 27:12 to 28:2; W. DuHoux, Depo. TR 22:18 to 22:23.]

165. Upon delivery of the sugar beets, SMBSC weighed each truckload of beets and took samples of each grower's sugar beets. SMBSC sent these samples to its laboratory for testing to establish the beet quality and sugar content for each grower. Once these samples were tested, the beets were discarded by SMBSC. [J. Widner, TP 325:7 to 325:11.] These tests and the resulting production reports established a better than average crop had been delivered by the plaintiff growers. The average sugar content of the beets at delivery was 17.36% and the average tonnage was 20.98 tons per acre. The actual sugar content at delivery exceeded the projected 16.60% sugar content, and the average tonnage of 20.98 tons per acre exceeded the projected 20.5 tons per acre. SMBSC published the results of the 2000 harvest as compared to the previous nine years in its 2001 Annual Report. That comparison revealed that the 2000 sugar beet crop resulted in the realization of 21.2 tons per acre, which was the third highest production in ten years. Moreover, the 17.33% sugar content was the second highest sugar content in ten years. [PT Ex. 173, p. 30.]

166. Additionally, all plaintiffs' deliveries for each of their insured units exceeded the standards contained in the growers agreement with SMBSC of a 12% sugar content or a purity of 80%, and each exceeded the county averages contained in the Special Provisions of the MPCI policy. A list of the net tons delivered, the weighted average sugar content of those beets,

harvested acres and the applicable county average for sugar content pursuant to the Special Provisions for each plaintiffs' insured unit is contained in Attachment 14. [DT Ex. 1 (Special Provisions); Final Deloitte Report.]

167. The plaintiffs have offered no evidence of each plaintiffs' individual sugar content for their sugar beets other than that reflected in their own delivery records and as compiled in the Deloitte database submitted to the Panel. [Final Deloitte Report.]

168. The production delivered by each insured plaintiff exceeded the production guaranty of that plaintiff, except those limited plaintiffs reflected on Attachment 15. [Final Deloitte Report.]

169. On October 26, 2000, SMBSC's Vice-President of Agriculture, Dr. Widner, advised his long time friend and advisor, Dr. Susan Martin, that notwithstanding the freezing temperatures, "basically, [SMBSC was] able to harvest the crop at peak sugar and tons." [J. Widner, TP 227:12 to 227:20, 354:16 to 354:25; S. Martin, TP 665:19 to 666:17.] He noted the variances in the growers' production by indicating that some but not all of the growers' fields would reach "10,000 lbs. of recoverable sugar per acre – 28 [tons per acres] at 19% sugar and 0.98% loss to molasses." He concluded that notwithstanding these strong delivery statistics, the grower payment still would be relatively low "because of the lowest net selling price of sugar in 18 years." [PT Ex. 161.]

170. On December 4, 2000, Mr. Ritacco notified that growers that the printing of the Fiscal Year 2000 Annual Report purposely been delayed to accommodate a November 20 payment made to SMBSC from their insurance company on its business interruption claim. Shortly, thereafter, SMBSC issued its 2000 Annual Report. In the report, Dr. Widner reported

on the 2000 crop. He noted that a record number of acres were planted to sugar beets by the growers. He further reported:

> "The hard work of shareholders and agriculturists also combined with mostly favorable growing conditions for a crop of near record proportions. Shareholders delivered 2,333,000 net tons at an average sugar content of 17.33.% This is from 110,000 actual harvest acres after approximately 11,000 were assigned to the PIK program."

Dr. Widner concluded that the "beets went into the storage piles in generally good condition." [J. Widner, TP 214:2 to 215:2; PT Ex. 257.]

171. On January 22, 2001, SMBSC's Board met. At that meeting Dr. Widner reviewed the sugar beet piles and indicated that approximately 255,000 tons of "good quality beets" beets remained at Renville, Clara City West, and Murdock and about 196,000 tons of "fair to poor quality beets" remained at Bird Island, Redwood falls, Hector, Maynard, and three piles at the Renville station. He noted that the two piles at Renville would be blended with the Clara City West and Murdock piles. [PT Ex. 209.]

172. SMBSC reaffirmed that beets acceptable for processing remained on February 1, 2001. (PT Ex. 238.) SMBSC did so again on February 16, 2001, in a report to Bank of America, but warned that it soon would be necessary to turn to "fair and poor beets to see if we can economically process them." [PT Ex. 217.]

173. At the January 22, 2001 Board meeting, the Board voted to accept management's proposed grower payment of $19.68/ ton. [PT Ex. 209.]

174. The January 22 Board vote affirms that post-freeze beets had a positive value and provides additional evidence negating plaintiffs' claim that those beets had zero to negative value.

175. SMBSC processed these beets into sugar although the results were not as SMBSC had hoped for or projected. Nonetheless, the beets were clearly "suitable for the manufacture of sugar" since SMBSC manufactured over 3,599 cwt. of sugar from these sugar beets. [PT Ex. 173, p. 30.]

176. At the hearing, plaintiffs contended that all beets harvested after the October freeze were unsuitable for processing. In light of the evidence reflected in these findings, the Panel finds such a broad, sweeping contention not only to be implausible, but also contradicted by documentary evidence generated during the 2000-2001 processing campaign. In addition, such a position is contradicted by their expert's report and her testimony, because Dr. Martin explicitly wrote and testified that beets as badly damaged as plaintiffs were alleged to be can be processed for "a week or two when held under good storage conditions." [PT Ex. 42; S. Martin, TP 2262:7 to 2262:20.] Unless plaintiffs elect to abandon their contention that SMBSC stored beets appropriately, Dr. Martin's views must be treated as negating plaintiffs' claim that all post-freeze beets had no value. In any event, Dr. Widner's January 22 report and SMBSC's statements of February 1 and 16 negate that claim as well as undermine the claimed severity of the freeze.

***SMBSC's Financings and Its Beet Payments to Plaintiffs***

177. On October 27, 2000, CoBank notified SMBSC that it would extend its seasonal line of credit only through November 14, 2000 at which time it expected new financing to replace CoBank's loans to SMBSC. [J. Plathe, TP 1105:25 to 1106:17; SMBSC 258475.] CoBank further notified SMBSC that no CoBank financing could be used to fund any additional 1999 crop payments. [DT Ex. 859.] Nor could SMBSC use the CoBank financing to fund the advances for the 2000 crop, the first of which SMBSC was scheduled to make on November 15,

2000. Rejection of the sugar beets at delivery would substantially impair the ability of SMBSC to close the new financings scheduled to replace CoBank's loans. Moreover, rejection of the crop would have prevented SMBSC from manufacturing the sugar needed to maintain its collateral base for the proposed new financings. [DT Ex. 859; PT. Ex. 186; J. Plathe, TP 1090:6-1091:23.]

178. On November 13, 2000, SMBSC closed new loans for a total of $150 million. [J. Plathe, TP 1103:2 to 1103:7.] SMBSC was not limited in using its new seasonal credit facility to make the first scheduled grower advance.

179. On November 15, 2000, notwithstanding SMBSC's knowledge of the pending storage disaster, decline in extraction, and other deficiencies of the crop as it was being processed, SMBSC made its first advance to the growers. [J. Plathe, TP 1017:18 to 1020:13.] Specifically, SMBSC advised the growers that the "actual yield for the 2000 crop was 17.37% sugar and 21.28/tons/acre." This yield was higher than that projected in August. As a result, the "higher [than projected] sugar content increased the actual payment amount for average quality beets to $11.59/ton from the projected amount of $10.48." [PT Ex. 186.] This represented an increase in the projected November 15 payment in the amount of $1.11 per ton.

180. On that same day, the SMBSC Board of Directors conducted its monthly meeting. Dr. Widner gave the agricultural report. Notwithstanding the internal communications between the agriculture and operations departments on November 7 in which it was disclosed that 72,000 tons were deteriorated and approximately 24,000 tons would be discarded, Dr. Widner only reported that "approximately 1,000 tons of sugarbeets have been discarded at [Clara City West] and Bird Island." He also reported that beet storage was being monitored closely due to the above normal temperatures occurring in October. He noted that SMBSC was splitting the

storage piles, hot spots were being removed and blended with "quality beets" for processing. He did not advise the Board that juicing had occurred by that time at no less than 8 of the 12 piling stations. [PT Ex. 206.]

181. On November 27, after the first advance and after its new loans had closed, SMBSC advised its growers of unusual deterioration in the beet piles and reported the likelihood that up to 150,000 tons of beets may need to be discarded. SMBSC had only discarded a total of 80,000 tons of sugar beets the prior year. [PT Ex. 257.] Yet, no insured plaintiff provided a notice of loss or a notice of damage to his/her/its insurance company. [*See generally* J. Plathe TR 1052:6 to 1053:15.]

182. On November 30, 2000, nearly six weeks after the factory operational declines were first noted, SMBSC made its second beet payment to the growers. [J. Plathe, TP 1026:5 to 1026:23.] Actual yield at that time was reported by SMBSC to be 21.20 tons/acre and 17.38% sugar content. Again, these figures were higher than projected, and resulted in a higher than projected November 30 advance to the growers. [PT Ex. 187.] The November 30 payment initially had been projected to be $6.55 per ton. The payment actually made was $7.25 per ton, an increase of seventy cents per ton. [*Id.*] When combined, the November 15 and 30 payments exceeded by $1.81 per ton the projections made in August.

183. Some SMBSC members elected to defer their November 15 and 30 payments to 2001. On January 1, 2001, SMBSC paid advances to those growers who had deferred receipt of their November advances. [J. Plathe, TP 1054:1 to 1054:15; PT Ex. 190.] Rather than adjusting these advances for any alleged loss sustained by the growers, SMBSC paid these advances on the higher than projected amounts.

184. The Panel finds that the November 1 and 15 and January 1 beet payments, although accurately described by Mr. Plathe as advances, are indicative of a much better crop than plaintiffs' described at the hearing. It simply is not consistent, on one hand, for plaintiffs to assert that SMBSC's management, including its agricultural staff, were professionals of substantial intelligence, experience, and integrity, and for them to claim, on the other hand, that all beets delivered after October 10 were unsuitable for processing. SMBSC knew enough about the quality of the 2000 crop, as findings 126-155 show, by November 15 not to expose itself and its members to the risks of over-advancing, assuming it was operating in a prudent and competent fashion, on a crop entirely unsuitable for processing.

185. On December 11, 2000, the Board of Directors conducted a meeting to appoint the officers of SMBSC. None of the SMBSC officers or employees were present at that meeting. A motion was made to appoint Mr. Ritacco as CEO and President. Although the motion carried, the vote was not unanimous. [PT Ex. 207.]

186. On December 19, SMBSC conducted a another Board meeting. At that meeting Dr. Widner advised the board, that 78,000 tons of beets had been discarded. Although Dr. Widner reported that the beets were found to be in poor condition, he noted that the beets piled at the Benson piling station appeared to "have the better quality beets." Mr. Ritacco reviewed with the board "SMBSC's request from the insurance companies to cover the ***loss in the piles***." (emphasis added). Mr. Ritacco also advised the board that SMBSC was analyzing its costs for rebudgeting and cost reductions. Finally, Mr. Ritacco reported on "a rumor brought to his attention by a shareholder that a number of shareholders stated they would not raise sugarbeets while the current CEO [Mr. Ritacco] was employed by [SMBSC.]" [PT Ex. 208.]

***SMBSC's Purported Notice to Defendants***

187. On December 15, 2000, some but not all of the defendants received a facsimile from Mr. Plathe of SMBSC. [J. Plathe, TP 1124:22 to 1125:22; PT Ex. 16, PT Ex. 19, PT Ex. 20.] Defendants Ag Force Insurance Services Inc., NAU Country Insurance Company, and Mountain States Insurance Company ("NAU defendants") did not receive this facsimile. The virtually identical facsimiles stated that "...in early October 2000 low temperature causing frost damage damaged all sugar beets grown in Minnesota for Southern Minnesota Beet Sugar Cooperative. On behalf of our Shareholder/Growers, we are giving notice that the frost damaged sugar beets will result in significant loss...We are encouraging each of our Shareholder/Growers to contact their multi-peril crop insurance agent and put them on notice as well."

188. The terms of the MPCI policy at issue in this case provide that "any person may sign any document relative to crop insurance coverage on behalf of any other person covered by such a policy, provided that the person has a properly executed power of attorney or such other legally sufficient document authorizing such person to sign." [DT Ex. 1 §457.8(3)(h).] Plaintiffs have provided the Panel with no evidence that SMBSC was authorized to act on behalf of any plaintiff with respect to the insured plaintiffs' insurance coverage, nor have the plaintiffs offered any evidence that SMBSC was granted any right or authorization to provide any notice on any plaintiffs' behalf. In fact, the evidence presented to the Panel indicates that Mr. Plathe took it upon himself to send these communications to the defendants. The plaintiffs did not know that the letters sent to the insurance companies by SMBSC had been sent, until they received the correspondence from SMBSC that such correspondence had been sent. [G. Kleven, TP 559:15 to 560:24; R. Schwitters, Depo. Tr. 118:9 to 118:14, 118:16 to 118:21, 118:24 to 119:11; R. Kramer, Depo. Tr. 103:21 to 104:12; W. Jungers, Depo. Tr. 103:12 to 103:22; R. Janssen, Depo. Tr. 92:18 to 93:8.]

189. Although the Panel has received some evidence that some unidentified individual insured plaintiffs sent individual notices of loss to their insurance agents following the December 15 facsimiles, the plaintiffs have failed to identify these plaintiffs who may have sent individual notices and when those notices were sent. For example, defendant The Hartford received unidentified individual notices from some, but not all of its insureds beginning on December 15, 2000, and continued to receive notices up to and including March 22, 2001. [Steve Johnson TP 1911-1912, 1916-1917.] The NAU defendants received notices of loss from the agent of five of its six insureds in February and March 2001, and it never received a notice from the sixth insured. [B. Olson, TP 2052:14 to 2053:2, 2058:20 to 2059:5.]

190. SMBSC did not undertake to give any notice of damage or loss on behalf of plaintiffs until December 15, 2000. (Plathe, TP 1053:6 to 1053:25; 1124:22 to 1124:25.] However, there can be no doubt that SMBSC had sufficient knowledge in the fall of plaintiffs' MPCI coverage for their beet crops. First, it was itself an insurance agency engaged in an alliance with Farm Credit for selling MPCI coverage to its members. (Finding 7.) Second, it explicitly took into consideration both the existence of coverage and the terms of members' MPCI policies when it engaged in a risk assessment of delaying the 2000 harvest in order to increase sugar content and, therefore, the revenue potential for the 2000 crop. (PT Ex. 122 at 3.) No evidence was offered which adequately explained SMBSC's delay in purporting to give any notice until December 15, 2000.

***Defendants' Responses to Plaintiffs' Failure To Provide Timely Notice***

191. The procedures for establishing a claim for loss to any insured crop are set forth in Section 14 ("Your Duties") of the Basic Provisions. 7 C.F.R. § 457.8. Additional procedures applicable to claimed sugar beet losses are set forth in Section 12 of the Sugar Beet Crop Provisions. 7 C.F.R. § 457.109. These procedures include, at a minimum, four levels of

communications between an insured and an insurance company: (1) notice of damage; (2) notice of loss; (3) implementation of loss adjustment procedures; and (4) ultimately a claim for indemnity. [DT Ex. 1.]

192. Notice of damage must be given "within 72 hours of initial discovery of damage (but not later than 15 days after the end of the insurance period), by unit, for each insured crop...." The MPCI policy defines "damage" as any "injury, deterioration, or loss of production of the insured crop due to insured ***or uninsured*** causes." (Emphasis added). This notice provision is mandatory irrespective of whether the insured believes that the insured crop has been damaged from an insured cause of loss. [DT Ex. 1, Basic Provision, §§ 1 and 14.] In fact, various of the insurance companies acknowledge the distinction between these notices on the notice of loss forms, which contain both a "loss" and "probable loss" designation. See e.g., [DT 839.]

193. Although the MPCI policy permits a late notice of loss and a late notice of damage to be issued, that process is not mandatory or required. Moreover, such a notice is only proper if it does not impact the insurance companies ability to "accurately adjust the loss." [K. Arrigo, TP 1584:1 to 1585:23, 1661:19 to 1661:24; DT Ex. 1 §457.8(14)(a)(2); PT Ex. 28.]

194. Receipt by an insurance company of either a notice of damage or a notice of loss allows the insurer to send an adjuster to gather information regarding the damage. This information gathering includes inspecting and photographing the crop and taking samples of the crop. [Voy TP 1769; Steve Johnson 1925; R. Haney, TP 1885:4 to 1885:13; Steve Johnson, TP 1951:7 to 1951:14.] In short, notices of either damage or loss permit an insurance company to compile in a timely manner all of the information needed to verify a claim and to prevent either

an underpayment or an overpayment of an indemnity. [DT Ex. 1, §§457.8(14)(a)(1); (14)(c); 457.8(1) definitions of "damage," "notice of loss," "notice of damage;" PT Ex. 28.]

195. Upon receipt of a notice of damage, the defendants respond in a variety of ways. The Hartford generally encouraged its insureds to submit notices of damage when an insured believed that a loss is possible. [Steve Johnson, TP 1946:17 to 1946:21.] On receipt of that notice, it opens a loss packet. [Steve Johnson, TP 1917-1918, 1947; 1946:22 to 1947:11.] If IGF received a notice of possible loss, IGF would contact the insurance agent to determine if the grower and the agent wanted a claims file opened. [C. Henning, TP 2016:18 to 2017:1.] Rain and Hail assigns the file to an adjuster who then compiles information from the grower to verify the claim. [R. Haney, TP 1817:14 to 1818:4.]

196. Certain plaintiffs insured by defendant IGF rely on a communication sent on October 17, 2000, by their insurance agent, Mr. Terry Hochsprung, as satisfying the requirement to provide notice of damage. [See list of Plaintiffs in Attachment 16. [Stip. 2.]] Mr. Hochsprung unilaterally sent a handwritten note to IGF indicating that every crop (whether or not those crops were sugar beets) grown by every customer of his (whom he did not name) might be affected by the freezing temperatures. [T. Hochsprung Depo. Tr. 101:8 to 102:4, 103:21 to 104:15; PT Ex. 100.] Mr. Hochsprung had not spoken to any plaintiff before sending this note. Mr. Hochsprung did not expect IGF to take any action relating to any plaintiff when he sent this notice. [T. Hochsprung Depo. Tr. 114:23 to 115:6.] Moreover, Mr. Kyle Peterson contacted Mr. Hochsprung at some point in October to advise him that Mr. Peterson might have a loss. Mr. Peterson admitted that it was a "wise business practice" to do so irrespective of whether the loss was probable or not. [K. Peterson, TP 770:22 to 771:21.] However, Mr. Peterson has no knowledge what action Mr. Hochsprung took, if any, on his behalf or on

behalf of any other plaintiff. [K. Peterson, TP 771:22 to 775:7.] Nor has Mr. Peterson established that any specific notice relating to him or his sugar beets was provided to defendant IGF. Nor has Mr. Peterson established that he confirmed, in writing, his oral communication with Mr. Hochsprung.

197. The Panel finds that the blanket communication sent by Mr. Hochsprung covering a variety of crops grown by a variety of unidentified customers about which he instructs that no action be taken is insufficient to establish notice of damage by any plaintiffs. The Panel does find that no plaintiff was prevented from providing a notice of damage. [K. Peterson, TP 772:14 to 773:18.]

198. Insureds under an MPCI policy are not penalized in any manner for submitting a notice of damage or a notice of loss even if the damage is due to an uninsured cause of loss. [G. Kleven, TP 531:3 to 531:11; R. Heller, TP 630:13 to 630:21; K. Arrigo, TP 1587:2 to 1587:5; R. Haney TP 1815:23 to 1816:1.] The insureds' premium will not increase, nor will the insureds' future crop insurance coverage be jeopardized. If a claim file is opened by an insurance company after receiving a notice of damage, and then an insured determines that he/she/it did not suffer an insurable loss, the claim can be withdrawn without consequence to the insured. [K. Peterson, TP 773:19 to 774:3.] Thus, the Panel finds that providing a notice upon discovery of any initial damage would have been a prudent business practice in which to engage, without adverse consequences. [See K. Peterson, TP 770:22 to 771:21.] Beyond simple prudence, the policy defines "damage" in Section 1 and requires timely notice of damage in Section 14 of the Basic Provisions [DT Ex. 1] whether the damage is "due to insured or uninsured causes of loss." The Panel necessarily infers from this provision that notice should be given whenever a prudent

insured has reason to believe there is or may be any damage, especially since there are no adverse consequences to giving notice.

199. Written notice of loss must be given whenever damage is probable. In accordance with Section 14(f) ("Your Duties") of the Basic Provisions, notice of loss "must be confirmed in writing within 15 days" even if notice of damage previously has been given, either by telephone or in person, to an insurance agent. [DT Ex. 1.]

200. No plaintiff (other than Mr. Dahlager) provided any notice of damage or any notice of loss in the months of October and November, notwithstanding all plaintiffs' and SMBSC's actual knowledge that there was damage to the 2000 crop, as recited in findings 126-155. Plaintiffs' admissions and stipulations regarding the giving of notice are set forth in findings 201-204.

201. The 168 plaintiffs listed on Attachment 17 stipulated that neither "they [n]or anyone on their behalf provided notice, whether directory or through agents, representatives, or otherwise (including without limitation PIK appraisers or adjusters), to any insurer at any time or in any manner prior to December 15, 2000." [Stipulation 1.]

202. The 27 plaintiffs listed on Attachment 16, although having been told that an insurance agent (or agency) provided some notice of potential, possible, or probable freeze damage to an insurance company, stipulated that they have no personal knowledge of this fact, or the circumstances involved in the agent's (or agency's) decision to provide notice. They have not provided corroborating evidence to establish any of these facts or the fact that this notice complied with the provisions of the MPCI policy. Pursuant to plaintiffs' stipulation, these individuals did not communicate, directly or indirectly, with agents (or agencies), adjusters, or

any insurance company employees or representatives prior to December 15, 2000. [Stipulation 2.]

203. The 19 plaintiffs listed on Attachment 18 either recalled or were informed that a PIK adjuster was in one or more of their fields appraising a portion of their 2000 sugar beet crop after the freeze, but they did not testify or provide testimony that they had communications with the PIK adjusters. Nor did they testify or establish that they or anyone on their behalf provided notice, whether directly or through agents, representatives, or otherwise (including with limitation PIK appraisers or adjusters), to any insurer at any time or in any manner prior to December 15, 2000. Nor have these plaintiffs established that they provided any written confirmation after any PIK appraisers or adjusters were in their field.

204. The plaintiffs listed on Attachment 19 relied solely on their verbatim discovery responses. To the extent that plaintiffs have provided those responses to the Panel, those responses do not establish that those communications either notified the defendants of damage or of a probable loss. Nor have these plaintiffs established that they have confirmed any communications in writing as required by the MPCI policy.

*Defendants' Attempts To Adjust the Alleged Losses*

205. To the extent the defendants began receiving the communications from SMBSC and the growers concerning their 2000 sugar beet crop, they attempted to respond in accordance with their loss adjustment obligations. Each made a determination as to whether information existed by which it could determine if damage occurred to the crop, if any such damage was caused by an insurable event, if the damage occurred during the insurance period, and to what extent any such damage caused an insurable loss. Some sent adjusters to the fields while others knew that no beets remained to inspect. [Steve Johnson TP, 1917-1918; 1991:21 to 1992:8; 1997:15 to 1998:7; 2000:17 to 2000:22; M. Vetter TP, 32:3 to 32:11; C. Henning, TP 2002:10 to

2002:17; B. Olson, TP 2060:15 to 2061:7; 2067:7 to 2067:24.] Information was requested from SMBSC, but none was provided. [C. Henning, TP 1914:23 to 1997:14.]

206. Because of the tardiness of the notice, the commingling of the crop, and the lack of any check strips, the defendants concluded that they could not obtain the requisite information, and advised their insureds that they could not adjust the claim. [C. Henning, TP 1991:21 to 1992:8; 1997:15 to 1998:7; 2000:6 to 2000:22; S. Johnson, TP 1926; 1962-1963; B. Olson, TP 2067:7 to 2067:24.]

207. When defendant NAU inquired why it was receiving notice from its insureds so late, it was advised that the growers did not believe they had a loss, but that SMBSC told them to send the notice, and so they did. [B. Olson, TP 2059:9 to 2050:19.]

208. Shortly after Farm Bureau received the December 15 communication from SMBSC, two of its three insureds' withdrew their claim. Todd Arhenholz, now deceased, and James Arhenholz executed written MPCI withdrawals dated January 24, 2001. In doing so, these plaintiffs withdrew all claims up to and including the date of the withdrawal and acknowledged that their production met or exceeded their guarantee, *i.e.*, that they suffered no insured loss. [DT Ex. 244; DT Ex. 246; S. Arhenholz, Depo. Tr. 51:3 to 51:17; L. Ingwerson Depo Tr. 14:20 to 15:8.]

209. The Hartford conducted a comparably more extensive investigation than did some companies. [S. Johnson, TP 1917-1918; M. Vetter Depo. Tr. 32:3 to 32:11.] It opened claims files and then sought guidance from the RMA's St. Paul Regional Service Office on how to proceed properly with these notices. [S. Johnson, TP 1917-1918; 1947; 1912-1913.] The Hartford researched relevant weather data. [S. Johnson, TP 1917-1918; M. Vetter Depo. Tr. 32:3 to 32:11.] The Hartford requested production and delivery records together with other

information and documentation from the plaintiffs, but were refused the requested information. [S. Johnson, TP 1931-1932, 1945.] Like the remaining defendants, The Hartford also concluded that, with the information available to it, it could not adjust a loss. The RMA, through Mr. Trier, confirmed that The Hartford had appropriately responded. [S. Johnson, TP 1914-1916, 1929; DT Ex. (702).]

210. The untimely notifications received by the insurance company defendants prejudiced their ability to adjust accurately the claims as required by the RMA and FCIC. By the time SMBSC sent the fax to certain of the insurance company defendants, the notices of loss were significantly late, all of the sugar beets had been harvested, delivered, and accepted by SMBSC, and all of the sugar beets had been commingled with other plaintiffs who were insured by other companies. In addition, a significant portion of the 2000 crop had been processed when the faxes were sent [PT Ex. 8.]. Any beets that had remained in the field, because they had been diverted under the PIK program, would have experienced significant adverse weather conditions following the end of the insurance periods for each plaintiff, thereby making any inspection of those beets meaningless. Additionally, the insurance companies did not have access to the information that they needed to determine whether the loss occurred during the insurance period or such other time, nor could the insurance companies determine the cause of any purported loss. [D. Hovland, Depo. Tr. 43:13 to 44:22; R. Haney, TP 1843:12 to 1843:24; C. Henning, TP 2000:6 to 2000:10; 2003:16 to 2003:19; 2024:13 to 2024:15.] None of the insurance companies was able to adjust the purported losses in accordance with the loss adjustment procedures established by the RMA and the FCIC. [Steve Johnson TP, 1918-1919; 1922-1924; 1926-1928; 1931-1932, 1962-1963.]

211. The MPCI policy required the insured plaintiffs to "[l]eave representative samples [check strips] intact for each field of the damaged unit…." The "[r]epresentative samples of the unharvested crop must be at least 10 feet wide and extend the entire length of each field in the unit." Similar to the SMBSC requirements for testing sugar beets, a sample this size was necessary in order to obtain enough beets to determine accurately the existence and extent of damage to the sugar beets. This duty extended to the insured plaintiffs whether they believed they had a probable insured loss or merely damage, whether insured or not, to their crop. No insured plaintiffs left representative strips or samples as required by the policy. [Steve Johnson, TP 1962:22 to 1962:25; R. Haney, TP 1892:18 to 1892:23.] Moreover, by the time SMBSC sent the facsimile to some of the insurance company defendants, a significant portion of the sugar beets already had been processed by SMBSC. Consequently, the insurance company defendants could not determine the existence or extent of any given plaintiff's damage to their sugar beets. [DT Ex. 1 §457.8(14) Insureds' Duties; §457.109(12) Crop Provisions – "Duties in the Event of Damage or Loss;" §457.8(1) definition of "damage".]

212. No adjusters had an opportunity to inspect, nor did they inspect, any freeze damaged beets because of the untimeliness of receipt of a notice of damage or notice of loss. [Virchow Depo. Tr. 9:25 to 10:10; R. Black Depo. Tr. 13:19 to 13:23; M. Vetter Depo. Tr. 17:10 to 17:12; R. Johnston Depo. Tr. 50:19-50:21; M. Johnson Depo. Tr. 32:8 to 32:12; R. Trier, TP 1711:20 to 1712:18.] Thus, the loss adjustment process did not take place, nor could it have occurred. [D. Voy, 1750:13 to 1751:12.]

213. The fourth communication required between an insured and insurance company, after any loss adjustment process has been completed, is the submission by the insured of a separate claim for indemnity. In accordance with Section 14(c) ("Your Duties") of the Basic

Provisions, a claim for indemnity must be submitted "not later than 60 days after the end of the insurance period." This claim for indemnity must include all the information that an insurance company requires to adjust the claim. [DT Ex. 1, see section 14(c).]

214. The MPCI policy provides that if an insured has filed "a claim for any crop year, the documents signed by [the insured] which state the amount of production used to complete the claim for indemnity will be the production report for that year..." Consequently, in addition to verifying the underlying basis for a claim, a validly executed claim for indemnity containing all of the required information is necessary to establish an insured's APH for subsequent crop years. [DT Ex. 1 ¶3(c)(2) (7 C.F.R. 457.8(3)(c)(2).]

215. The dates by which each insured plaintiff would have been required to provide either notice of damage or notice of loss and to submit a claim for indemnity are contained in Attachment 12. In all respects, the last date by which any insured plaintiff could provide a notice of loss was November 13, 2000, and it was November 11 or earlier for all but ten plaintiffs. The last date by which a claim for indemnity could be submitted by any insured plaintiff was January 12, 2001. There is no evidence that any plaintiff submitted a claim for indemnity on or before January 13, 2001. [Final Deloitte Report.]

216. Defendants properly rejected plaintiffs' untimely and insufficient documents claims.

217. In an April 19, 2001 letter, SMBSC calculated what it believed should be the proper claim amount for each plaintiff. Mr. Ritacco sent these calculations to the growers, noting that the growers should be "aware that SMBSC is not insured by crop insurance....Each grower needs to pursue his own claim with his own insurance company. However, Mr. Ritacco admonished the growers not to settle with their respective insurance companies because "the

disaster payments from FSA are based on your insurance claim and you could receive less money" and "your acceptance of the [insurance] payment could eliminate your rights to join in a legal action against the insurance companies." [DX Ex. 12; DX Ex. 13.]

***Examinations Under Oath***

218. Defendants consistently sought to depose all plaintiffs during the proceedings before the Panel. They advised the Panel of their position in a letter dated January 27, 2003.

219. Defendants based their position on a collection of constitutional, statutory, regulatory, and contractual arguments. A key portion of their argument rested on Section 14(d)(2) of the Basic Provisions, which is codified at 7 C.F.R. §457.8. This section entitled "Duties in the Event of Damage or Loss, [Insured's] Duties" states:

> "Upon [the insurance companies'] request, you must: ...(2) Submit to examination under oath.

220. At the Panel's first meeting with the parties' counsel, a briefing schedule was established to deal with the examination under oath ("EUO") issue. After briefing and oral argument, the Panel deferred consideration of defendants' broad request, but allowed limited deposition discovery by defendants of two groups of plaintiffs. [Panel Order No. 1, ¶ 5.]

221. Following completion of the depositions of plaintiffs allowed by the Panel, defendants renewed the EUO issue with the Panel. After further briefing and argument, the Panel rejected defendants' broad position, but allowed further depositions on one issue only in these cases, notice, and also permitted plaintiffs to avoid any further depositions by making certain stipulations referenced in these findings. [See findings 201-204; Panel Order No. 2.]

222. While defendants' renewed request for full EUO rights was pending before this Panel, defendants also took the EUO issue to RMA in the form of a request for a final agency

determination ("FAD"). They did so on May 9, 2003, in a four-page request. (A copy was attached as Exhibit A to defendants' proposed findings.)

223. Defendants did not advise the Panel or plaintiffs' of their FAD request on the EUO issue. This fact is undisputed. Although plaintiffs have complained that defendants should have advised the Panel and plaintiffs of their FAD request, the applicable regulations did not require it. 7 C.F.R. Chapter IV, part 400, subpart X. Also, one of plaintiffs' expert witnesses, Mr. Ken Ackerman, served as Administrator of RMA when the FAD regulations were promulgated, and he testified that the process of requesting a FAD was not intended to be an adversarial process requiring notice to interested or potentially interested parties. [K. Ackerman, TP 144:2 to 144:23; 144:10 to 144:12.] Moreover, Mr. Ackerman admitted that any party in interest was free to follow this procedure to obtain a FAD, but that plaintiffs chose not to do so. [K. Ackerman, TP 1444:10 to 1444:15.] Finally, the applicable regulations define the information that can and must be provided. Specifically, the requesting party must:

> State that [the request] is being submitted under Section 506(s) of the Federal Crop Insurance Act,
>
> Identify and quote the specific provision of the [Federal Crop Insurance Act] or regulations for which a final agency determination is requested,
>
> State the crop year for which the interpretation is sought,
>
> State the name, address, and telephone number of a contact person associated with the request,
>
> Contain the requestor's detailed interpretation of the regulation,
>
> The requestor must advise FCIC if the request for a final agency determination will be used in a lawsuit or settlement of a claim.

7 C.F.R. § 400.767. Defendants' complied with each of these directives in making their submission. See attached Exhibit A.

224. RMA ultimately issued FAD 0-19 on August 5, 2003, on the EUO issue. Defendants then renewed yet again the EUO issue with the Panel. Notwithstanding the issuance of FAD 0-19 by RMA, the Panel again rejected defendants' position. [Panel Order No. 9.]

***SMBSC's Efforts To Obtain Government Assistance***

225. Starting in early January 2001, SMBSC began advocating its members' position in a variety of efforts seeking assistance from the federal government, as summarized in the following findings.

226. On January 4, 2001, SMBSC wrote the FSA seeking disaster relief. [J. Plathe, TP 1142:11 to 1143:6; PT Ex. 212.] SMBSC revealed to the FSA its knowledge by "late October" that the beets in storage were significantly deteriorating. Specifically, SMBSC represented to the FSA:

> "By late October, the beets in storage were showing significant signs of deterioration with lower than expected juice purities and recovery rates in the factors."
>
> "During November and December it was clear that some beets would have to be discarded because the level of deterioration was so high. Estimates of discards by December 10th were at 150,000 tons. Factory processing was becoming increasingly more difficult as beet quality sank and already poor recovery rates dropped."

[PT Ex 212.]

227. SMBSC's lobbying efforts with the House Agricultural Committee resulted in at least two meetings among certain plaintiffs, SMBSC, and RMA personnel, including Phyllis Honor, who was the Acting Manager of the FCIC and the Acting Administrator of the RMA following Mr. Ackerman's departure, and Ms. Kim Arrigo, a member of USDA's Office of General Counsel. Ms. Arrigo was authorized to testify at the hearing as to the official positions of the RMA, but she was not permitted to provide her personal opinion. [K. Arrigo, TP 1519:14 to 1520:3; 1529:20 to 1531:19; DT Ex. 862.]