Exhibit D1

**IN THE MATTER OF 2000 MINNESOTA SUGAR BEET CROP INSURANCE COVERAGE ARBITRATION**

| | |
|---|---|
| **This document relates to all cases except 01-CV-1637 (Fireman's Fund).** | Defendants' Response to Panel's Provisional Findings of Fact and Order Regarding Disputed Database and Related Issues |

Pursuant to the procedures established by the Panel at the status conference on April 20, 2004, as memorialized in proposed Panel Order No. 11, which incorporates the Panel's rulings at the April 20, 2004 status conference, defendants hereby submit their response to the Panel's Provisional Findings of Fact and the separate Order Regarding Disputed Database and Related Issues, both of which were released on April 6, 2004.

Defendants submit their response subject to and in reliance on the Panel's Order that no party will be deemed to have waived, or to be estopped from raising, any issue or argument that is not raised in opening or reply submissions in any further proceedings before this Panel or any subsequent judicial proceedings, and that no party may argue in any such forums that another party has waived, or is estopped from raising, any issue or argument that was not raised in the submissions. Consequently, the issues raised herein by defendants are not intended to be an exhaustive list of every issue or proposed finding that is objectionable, contrary to the evidence, or which is proposed to be entered in contravention of the Panel's authority.

Certain individual plaintiffs have settled their claims. Information regarding those plaintiffs has not been removed from the database ("Database") compiled by Deloitte & Touche LLP ("Deloitte") from data submitted by plaintiffs, Southern Minnesota Beet Sugar Cooperative ("SMBSC"), and defendants. Once all issues regarding calculations of indemnities have been resolved by the Arbitration Panel, data regarding the settling plaintiffs will be removed from the

Database, a final version of the Database then will be substituted for prior versions, and individual indemnities calculated consistent with the findings issued by the Panel will be calculated.

## SECTION I
### OBJECTIONS APPLICABLE TO ALL PROPOSED FINDINGS

The Panel's Provisional Findings of Fact (hereafter "Provisional Findings" or "PF"), individually and taken as a whole, are not recitations of factual determinations, as mandated by the District Court, but rather a recitation of conclusions of law and a determination of ultimate liability. As such, the Provisional Findings invade the province of the District Court. Moreover, these findings are in direct contravention of the Federal Multiple Peril Crop Insurance ("MPCI") Policy as set forth in the Code of Federal Regulations. As such, these findings and the pre-hearing and hearing procedures leading up to entry of these findings contravene federal law and public policy, and violate Constitutional protections afforded to defendants.

The Provisional Findings are based on the improper attribution of evidence regarding one plaintiff to another, and of one defendant to another. Although defendants agreed that they would not contend that each plaintiff's failure to appear would, in and of itself, constitute a failure of proof, defendants have consistently asserted that each individual plaintiff bore the burden of proof with respect to his/her/its claims against his/her/its insurance company. Defendants consistently have asserted that this matter cannot be treated as a class action, and relied on the Panel's assurances contained in Panel Order No. 7 to that effect. However, the Panel proposes to enter findings that are tantamount to class findings. Consequently, findings relating to "all" plaintiffs or facts attributed to "all" defendants are erroneous in that each plaintiff has not met his/her/its burden of proof as to those factual determinations relating to his/her/its specific insurance company defendant.

Generalized findings of the sort which the Panel proposes to make are inappropriate and objectionable given the failure of at least 294 plaintiffs to testify either in person or by deposition. For example, the Panel proposes to find: "The growers complied with the good farming practice requirements of the policy." (PF 92.) However, other than full depositions of twenty-five "undifferentiated" plaintiffs and of members of SMBSC's Board of Directors and Litigation Committee, the Panel only allowed other depositions on the issue of notice, and then allowed plaintiffs to avoid this discovery by entering into one of several stipulations on notice. (Provisional Findings of Fact at n. 1.) The Panel clearly erred by denying defendants the right to depose each plaintiff. The generalized nature of many proposed findings compounds the error.

The Panel further erred in stating "that plaintiffs did not refuse to have their depositions taken." PF at p.4 n.1. In fact, the vast majority of plaintiffs refused to submit to examination under oath on all issues notwithstanding defendants' repeated requests that they do so.

It is improper for the Panel to make any findings as to what all of the growers knew or did not know, what all of the growers could or could not have known, that all of the growers acted in good faith, that all of the growers complied with all of their duties as insureds, and the like, in light of the refusal of several hundred of these growers to submit to examinations under oath either by deposition or at the evidentiary hearing in this matter.

The Provisional Findings and the improper determination of liability based thereon improperly expand the scope of and coverage under the MPCI policy to insure storage losses and processing profitability.

The Provisional Findings demonstrate that the Panel improperly shifted the burden of proof and the burden of persuasion onto defendants regarding the terms of and compliance with the MPCI policy.

In addition to the foregoing objections, defendants direct the Panel's attention to the following specific fundamental flaws in the Panel's Provisional Findings of Fact.

## SECTION II
## THE "ZERO GROSS DOLLAR VALUE" FINDINGS

Summary Findings 3, 7, 10, and 11 are clearly erroneous. There is a failure of proof for the proposition: "Except for those harvested and processed within 7 days following Monday, October 12, 2000, the gross dollar value of the sugar beets unharvested as of October 9, 2000 was zero." Related Provisional Findings 27, 28, 54, 67, and 246-248 also are clearly erroneous. Defendants collectively refer to these proposed findings as the Zero Gross Dollar Value Findings.

1. The Zero Gross Dollar Value Findings are clearly erroneous because SMBSC achieved with respect to the 2000 crop, according to the Panel, production equivalent to "59% of the expected yield" of 600 million pounds of sugar. (PF 33.)[1] If beets harvested more than seven days following October 12 had a gross dollar value of zero, SMBSC could not have produced 59% of the expected yield, *i.e.* approximately 354 million pounds of sugar.

a. Plaintiffs harvested, and SMBSC processed, "approximately 448,000 tons (19.50% of the crop)… on and after August 23, 2000 but before the onset of the October 6-9, 2000 freeze." (PF 28.)

b. According to Provisional Finding 68, SMBSC processed a further 77,000 tons (3.30% of the crop) following the end of pre-pile harvest through October 19, 2000, (*i.e.*, the seventh day after October 12).

[1] Defendants reference the Panel's findings periodically in advocating for a different result than that tentatively contemplated by the Panel. Defendants' use of or reference to a particular Provisional Finding should not be interpreted as the defendants' acquiescence in these findings, and defendants' specifically object to the entry of these Provisional Findings as currently contemplated by the Panel.

c. In view of the foregoing proposed findings, 525,000 tons (22.83% of the crop) either were harvested and processed before or during the freeze or within seven days following resumption of full harvest (accumulated tonnages from a. and b.). This tonnage of beets had an average sugar content of 15.9%, as established by SMBSC Daily Operating Reports. (PT Ex. 8.)

d. The average sugar content for all sixteen counties affected by the freeze was only 15.0%, as can be calculated using individual county percentages listed in the Special Provisions of plaintiffs' MPCI policies. (DT Ex. 1.) The Special Provisions are part of the MPCI policies and establish coverage terms on a county-by-county basis. (PF 7.)

e. Accordingly, it was physically impossible for 22.83% of the crop with an average sugar content of 15.9% to produce 59% of the projected yield, and it is totally infeasible, therefore, to find that all beets harvested on and after October 20, 2000, had zero gross dollar value.

2. The Zero Gross Dollar Value Findings also are clearly erroneous because beets of good quality remained to be processed and were processed on and after October 20, 2000.

a. As late as January 22, 2001, Dr. Widner reported to SMBSC's Board of Directors that approximately 255,000 tons of "good quality beets" remained at Renville, Clara City West, and Murdock, as unequivocally stated in PT Ex. 209.

b. As SMBSC's Daily Operating Reports (PT Ex. 8) establish, between January 22, 2001 (when Dr. Widner reported to the Board) and February 9, 2001 (after which daily production began exhibiting a marked decline), SMBSC's average daily production (in hundred weight of sugar) was 22,268 CWT. This production rate

exceeded the average production rate of 20,654 CWT per day for the period October 13 - 19, 2000, when, according to the Panel, SMBSC had beets suitable for processing.

c. The clearly erroneous nature of the Panel's Zero Gross Dollar Value Findings is also revealed by comparing the average production rate of 20,654 CWT per day for the October 13 - 19 period with late January 2001 production, when sixteen out of seventeen days between January 16 and February 1, 2001, saw average production at 24,120 CWT per day, a level well in excess of the average production for October 13 – 19, when the Panel found that beets were suitable for processing.

d. The production levels of sugar, measured in CWT, from October 20 through November 18, 2000, could not have been achieved (the "77,000 Tons" issue, infra) if all beets processed after October 19 were unsuitable for processing.

3. In short, the Panel received uncontrovertible evidence from plaintiffs demonstrating unequivocally that some beets processed after October 19, 2000, were as suitable for processing as those processed October 13 - 19, 2000, and, therefore, had a value in excess of $-0-. Plaintiffs failed in meeting their burden of proof that all beets processed after the freeze had zero gross dollar value, and the evidence received by the Panel does not permit it to make any such finding.

**SECTION III**
**THE 77,000 TONS ISSUE**

Summary Finding 10 and Provisional Findings 67, 68, and 246-248 are clearly erroneous in that they propose to find that "none of the post-freeze sugar beets were suitable for the manufacture of sugar" except for 77,000 tons processed for seven days after October 12, 2000, which "met the minimal acceptable standard."

1. Based on SMBSC's daily operating reports (PT Ex. 8), there is no factual basis whatsoever for limiting to 77,000 tons the post-freeze harvested tonnage suitable for processing. According to the Panel, SMBSC's processing capacity in 2000 was "11,000 tons of beets per 24 hour day." (PF 33.) Excluding 77,000 tons from the Zero Gross Dollar Value Findings (*e.g.*, Summary Finding 10, PF 67, 68, and 86(a)) presumably is the product of limiting the impact of Dr. Martin's written opinion and testimony (PF 57) to one week of processing and then multiplying 11,000 by seven. As demonstrated below, this limitation is entirely unsupportable.

a. Hundred weight production of sugar was 144,577 CWT for the seven days after October 12, 2000, *i.e.* October 13 – 19.

b. Hundred weight production of sugar was 212,612 CWT for the seven days starting October 20, 2000. Since this production level exceeded the October 13-19 level, beets processed that week had to be suitable for processing into sugar and, therefore, should be added to the 77,000 tons found suitable in Provisional Finding 68.

c. In fact, hundred weight production of sugar by SMBSC was at least equivalent to the October 13 – 19 production for the following seven day periods, as calculated using SMBSC's Daily Operating Reports (PT Ex. 8):

| Period | CWT Production |
|---|---|
| 10/20 –26/00 | 212,612 |
| 10/27 – 11/2/00 | 211,502 |
| 11/3 – 9/00 | 195,753 |
| 11/10 – 16/00 | 188,361 |

d. In reality, SMBSC's daily operating reports show sugar production tracking at three reasonably distinct levels after the October 2000 freeze:

(i) October 13 through November 18, 2000, when average daily production was 27,084 CWT per day;

(ii) November 19, 2000 through February 9, 2001, when average daily production was 19,107 CWT per day; and

(iii) On and after February 10 through March 6, 2001, when average daily production was 9,994 CWT per day.

e. SMBSC's Daily Operating Reports, prepared on a contemporaneous basis and offered in evidence by plaintiffs, negate Provisional Findings 67 and 68 in that they conclusively demonstrate substantial production of sugar after the freeze and no reason whatsoever to distinguish production for the first week following resumption of harvest (October 13 – 19) from production up to and through November 18, 2000.

2. Dr. Martin's actual testimony at the hearing unequivocally shows that there is no scientific, factual, or other basis to limit to only 77,000 tons of post-freeze beets that were suitable for processing.

a. She testified that beets processed for a couple of weeks following a freeze would process normally, assuming they were stored properly. Dr. Jaggard did not disagree with this testimony. (S. Martin, TP 2262:7 to 2262:20; K. Jaggard, TP 2384:16 to 2384:23) Further, the Panel proposes to find that SMBSC piled and maintained stored beets in a proper and professional fashion. (*See, e.g.*, PF 22, 103 and 104-111.)

b. Dr. Martin also testified, after studying the sugar quality and granulation graphs prepared by SMBSC's Mr. Suhr, that the factory experienced deterioration in production of sugar about when she would expect to find it, based on the dates and severity of the freeze, and that this occurred in the late October, early November time

frame in 2000. (S. Martin, TP 2322:18 to 2323:8, 2345:2 to 2345:12.) This testimony by Dr. Martin is consistent with the daily average production of sugar discussed above.

3. The Panel's position that only 77,000 tons of post-freeze beets were suitable for processing cannot be reconciled with the "Operations Report" authored by SMBSC's Vice-President of Operations, Mark Suhr, and contained in its 2001 Annual Report covering the 2000 crop. (PT Ex. 173/DT Ex. 432[2].) Two passages from page 10 are revealing:

> Unfortunately we experienced a hard freeze in early October and the first impacts were felt in the washing and slicing stations where the raggy tops of the damaged beets fouled all the washing screens and the slicing knives. *After a week* of modifying the two stations and the beet tops drying out *[i.e., about October 19]*, the *processing became normal* for a short window of our season.
>
> During this window, we achieved a daily and weekly slice *record* of 13,855 and 13,094 tons beets sliced/day. Sugar granulation and extraction also was improving, however the beets began showing poor storage and processing characteristics with increasing non-sugars and lowering sugar contents and purities.

(Emphasis added.) According to SMBSC's Daily Operating Reports (PT Ex. 8), the daily slice record occurred on November 3, 2000, and the weekly slice record occurred over the seven days ending November 13, 2000. If Mr. Suhr's statements in PT Ex. 173 and SMBSC's Daily Operating Reports (which plaintiffs introduced in evidence) are to be afforded any credibility, especially the credibility that they deserve, they negate completely the accuracy of the Panel's position that all beets processed after October 19 were worthless. In fact, after the week of October 13 – 19, daily slice, granulation, and extraction improved until mid-November 2000. SMBSC's 2001 Annual Report and its contemporaneously prepared Daily Operating Reports can not be read or interpreted to reach any contrary finding.

---

[2] In some instances, defendants have cross-referenced both the defendants' trial exhibit number and the plaintiffs' trial exhibit number for the Panel's convenience.

4. Provisional Findings 67 and 68 also are clearly erroneous based on the evidence discussed by defendants with respect to the Zero Gross Dollar Value Findings, *supra* at Section II.

**SECTION IV**
**JUICING AND THE NOTICE ISSUE**

Provisional Findings 130 – 139 are clearly erroneous. Among other reasons, piled beets demonstrated much more serious degradation than the hot spots and sink holes discussed by the Panel. As matters of incontrovertible fact, juicing within a month of the end of harvest reveals a notable situation indicating "disastrous" consequences, juicing existed at multiple SMBSC piling stations, and SMBSC had actual knowledge of this juicing. The Panel's disregard of juicing and its significance renders erroneous all of its Provisional Findings regarding plaintiffs' failure to provide timely notice. The Panel erred by not making the following incontrovertible findings on matters material to juicing and the notice issues.

1. Juicing is a sign of advanced deterioration of stored beets. The presence of "juicing" means that elevated respiration rates of beets have caused them to deteriorate to the point that the beets' structure has collapsed so that the once solid beets have begun to liquefy. (J. Widner, TP 211:14 to 211:24).

2. Juicing indicates that a "disaster" is occurring within the storage piles. (R. Fullmer Depo. Tr., 37:1 to 37:12.) Juicing should never occur within days of the end of harvest. If juicing occurs at all, it would only begin toward the end of the processing campaign sometime in January or February at the earliest. (D. Stamer, Depo. Tr. 27:17 to 27:20.) Dr. Widner had never seen juicing in his 32 years of experience as early as it occurred in late October, early November 2000. (J. Widner, TP 414:6 to 414:9.) Generally, the plaintiffs also understood that juicing indicated significant deterioration within the storage piles. (M. Anderson, Depo. Tr. 26:5

to 26:14; J. Bakker, Depo. Tr. 8:10 to 8:17.) Some plaintiffs, namely Harlan Pieper, Philip Pieper, and Scott Tersteeg even saw that juicing was occurring in the piles early in the campaign. (H. Pieper, Depo. Tr. 32:2 to 32:12; P. Pieper, Depo. Tr. 7:15 to 7:19; S. Tersteeg, Depo. Tr. 24:1 to 24:10.)

3. Plaintiffs are experienced beet growers and understand the significance of hot spots, sink holes, and juicing. Those plaintiffs who testified (either in person or by deposition) admitted that they appreciated the significance of such signs of deterioration.

4. As early as October 30, 2000, SMBSC saw abnormal deterioration in the storage piles. The Buffalo Lake site exhibited suspicions of juicing. (PT Ex. 115.)

5. By October 31, 2000, the juicing at Buffalo Lake was confirmed by SMBSC. (DT Ex. 375/PT. Ex. 115.) On November 2, 2000, juicing was reported in the beets piled on October 12 at Clara City West. On November 3, juicing was detected at Bird Island and Renville. On November 4, juice was running at Maynard and Redwood Falls. By November 8, juicing was occurring at Murdock, and two days later, on November 10, 2000, juice was visible at Hector. By November 10, at least eight of the twelve piling stations had reported juicing.

6. Mr. Hofer held a meeting of his agricultural staff on November 9, 2000, and reported the results to Dr. Widner. His e-mail of that date informed Dr. Widner of visible sink holes at six stations and of visible juicing at five stations. (DT Ex. 388/PT Ex. 128.) Mr. Hofer e-mailed Dr. Widner on November 10 to advise him that the November 9 e-mail had failed to report both sink holes and juicing at another station, thus bringing to seven the number of stations with visible sink holes and to six the number with visible juicing. (DT Ex. 389/PT Ex. 129.) The November 10 e-mail also reported that 87,000 tons of deteriorated sugar beets had been identified.

7. SMBSC's inspection reports of piling station conditions actually establish that, as of November 11, 2000, three stations had sink holes (or the equivalent) and nine stations had juicing. (DT Ex. 375/PT. Ex. 115.)

8. Thus, SMBSC's internal records make it indisputable that it had actual knowledge of very severe damage in the storage piles before the last date for timely notice of damage or notice of loss came and went. It also is clear that SMBSC shared some of this knowledge with plaintiffs.

9. Other information was conveyed that was sufficient to alert plaintiffs to serious deterioration, namely: low granulation rates and the existence of hot spots and sink holes. SMBSC actually informed plaintiffs of deterioration (in the form of hot spots and sink holes) in the 2000 crop in a series of "DTN" messages starting October 8-18 and continuing into November 2000. (DT Ex. 374/PT Ex. 114.) According to a report dated February 14, 2001, by RMA's Regional Compliance Office, this knowledge was sufficient to trigger plaintiffs' notice obligations under their MPCI policies. (DT Ex. 757; *see also* R. Trier, TP 1711:20 to 1712:18; D. Voy, TP 1748:4 to 1750:3.) Also, based on the testimony of Mr. Hofer and certain plaintiffs, it is clear that some, if not all, plaintiffs had actual knowledge before mid-November that there was juicing and that beets were being discarded within days of the end of harvest.

10. In view of the foregoing, Provisional Findings 130 – 139 are incomplete, materially erroneous, and omit any discussion of the clearest evidence that notice of loss or damage could and should have been provided to defendants prior to November 15, 2000. Also, in view of the foregoing, Summary Finding 4 also is clearly erroneous.

## SECTION V
## THE 2000 FREEZE AT SIDNEY, MONTANA

Provisional Finding 127 is clearly erroneous and unsupported by any evidence. The record directly contradicts this finding and each of its subsidiary parts. In fact, as developed below, the Sidney growers experienced more severe weather conditions than did the SMBSC growers, yet the Panel endorses SMBSC's and its growers' lesser efforts to mitigate or avoid the effects of those conditions.

1. The Panel erroneously proposes to find: "The Sidney experience differed from that of Southern Minnesota in that *its freeze was not as deep and lasting,* ..." (PF 127.a.ii.; emphasis added.) National Weather Service data from the Sidney growing area conclusively establishes the utter falsity of this Provisional Finding. (All temperature data below is expressed in degrees Fahrenheit.)

a. According to DT Ex. 424/PT Ex. 164, daily low temperatures at weather stations in the Southern Minnesota area during its early October freeze, by day at five feet above ground, were:

| **Station** | **10/6** | **10/7** | **10/8** | **10/9** | **10/10** |
|---|---|---|---|---|---|
| Hutchinson | 24 | 28 | 20 | 25 | 30 |
| Willmar | 28 | 27 | 22 | 21 | 25 |
| Olivia | 24 | 28 | 15 | 22 | 26 |
| Redwood Falls | 23 | 22 | 16 | 14 | 48 |
| Morris | 26 | 26 | 19 | 21 | 27 |
| Montevideo | 23 | 29 | 13 | 21 | 20 |

b. According to DT Ex. 523, daily low temperatures at weather stations in the Sidney area during its early October freeze, by day at five feet above ground, were:

| **Station** | **10/4** | **10/5** | **10/6** | **10/7** | **10/8** |
|---|---|---|---|---|---|
| Poplar | 20.41 | 16.11 | 12.17 | 8.49 | N/A |
| Terry | 27.91 | 22.16 | 19.72 | 14.27 | 29.63 |
| Glendive | 25.54 | 21.19 | 13.83 | 11.64 | 17.30 |
| Savage | 25.40 | 20.05 | 17.37 | 13.16 | 21.98 |
| Sidney | 23.73 | 18.67 | 16.97 | 11.27 | 24.15 |
| Fairview | 23.58 | 19.92 | 17.65 | 12.66 | 22.32 |
| Trenton | 21.75 | 17.77 | 15.08 | 11.91 | 19.57 |

c. Any comparison of the weather data in DT Ex. 424/PT Ex. 164 and DT Ex. 523 demonstrates that cold temperatures in the Sidney area were, in fact, deeper than and as lasting as cold temperatures in the Southern Minnesota area, including these key incontrovertible facts:

(i) The Sidney area had at least as many nights of subfreezing temperatures as did the Southern Minnesota area.

(ii) The Sidney area had nights with temperatures below 10° F, whereas the Southern Minnesota area had none.

(iii) The Sidney area had more nights below 20° F than did the Southern Minnesota area.

d. Accordingly, the first sentence in Provisional Finding 127.a.ii. is false.

2. The Panel erroneously proposes to find: "The Sidney experience differed from that of Southern Minnesota ..., *nor did it [Sidney] have a freeze-thaw component.*" (PF 127.a.ii.; emphasis added.) National Weather Service data from the two growing areas conclusively establish the falsity of this Provisional Finding.

a. According to DT Ex. 424/PT Ex. 164, daily high temperatures ranged from a low of 39° F to a high of 64° F on the days following low temperatures below 32° F in the Southern Minnesota area. On a daily basis the following high ranges existed in October 2000:

| **Date** | **High Temperature Range** |
| --- | --- |
| 10/6 | 40-48 |
| 10/7 | 39-44 |
| 10/8 | 39-52 |
| 10/9 | 48-63 |
| 10/10 | 59-64 |

b. According to DT Ex. 523, daily high temperatures ranged from a low of 34.45° F to a high of 69.29° F on the days following low temperatures below 32° in the Sidney area. On a daily basis the following high ranges existed in October 2000:

| **Date** | **High Temperature Range** |
| --- | --- |
| 10/4 | 46.52 – 59.75 |
| 10/5 | 34.45 – 41.71 |
| 10/6 | 40.72 – 45.94 |
| 10/7 | 49.41 – 51.99 |
| 10/8 | 64.23 – 69.29 |

c. The Sidney area, therefore, also had a freeze-thaw cycle on a daily basis, and it actually experienced wider freeze-thaw swings, with the day following the last night of the freeze showing all stations markedly above 60° F, unlike the Southern

Minnesota area, where the day following the last night of the freeze reporting stations showed high temperatures ranging between 59° - 63° F. The following facts illustrate that the Sidney area had a more dramatic freeze-thaw cycle than did Southern Minnesota.

(i) Poplar had a low of 12.17° F on October 6 and a high of 50.88° F on October 7.

(ii) Terry had a low of 14.27° F on October 7 and a high of 69.29° F on October 8.

(iii) Glendive had lows of 13.83° F and 11.64° F on, respectively, October 6 and 7 and highs of 51.14° F and 66.64° F on the next days.

(iv) Savage, Sidney, Fairview, and Trenton experienced freeze-thaw swings similar to those at Glendive on multiple nights.

3. The Panel erroneously proposes to find: "Unlike Southern Minnesota, the [Sidney] freeze *was not followed by abnormally warm temperatures."* (PF 127.a.ii.; emphasis added.)

a. According to DT Ex. 424/PT Ex. 164, the Southern Minnesota area experienced multiple daytime highs in the seventies and eighties, depending on the reporting station, within 3-5 and 10-12 days following its freeze event.

b. According to DT Ex. 522 and DT Ex. 523, the Sidney area also experienced multiple daytime highs in the seventies and eighties, depending on the reporting station, within 1-9 days following its freeze event.

c. According to PT Ex. 302, the Southern Minnesota area experienced abnormally warm temperatures within days of its freeze-event, with some stations (*e.g.*, Willmar and Redwood Falls) reporting record highs.

d. According to DT Ex. 522 and DT Ex. 526, the Sidney area also experienced abnormally warm temperatures with some stations setting record highs in the week ending October 20.

4. The Panel erroneously proposes to find, with respect to Sidney's weather in 2000: "Finally, according to Fullmer, (Sidney) was the beneficiary of 'lady luck' in the form of the timely arrival of lasting cold weather." (PF 127.a.ii.) According to the Weekly Agricultural Reports authored by Mr. Fullmer (DT Ex. 522), harvest ended on Sunday, October 29, as indicated in the report for the week ending November 2. Contrary to the Panel's perception, this contemporaneously authored report demonstrates that "colder temperatures" with "[h]ighs… in the 20's and 30's" would arrive in the next week, *i.e.* the week starting Monday, November 6. The Panel proposes to find that plaintiffs also ended their harvest on October 29. (PF 28.) According to SMBSC's piling station reports (DT Ex. 375/PT Ex. 115), the Southern Minnesota area actually experienced similarly cool temperatures starting the week of November 6; these reports reflect temperatures generally in the mid-twenties starting around November 8, for example: Benson, 26° F on November 9; Bird Island, 30° F on November 8; Buffalo Lake, 28° F on November 10; Clara City East, 24° F on November 8; Hector, 28° F on November 10; Maynard, 24° F on November 8; Milan, 26° on November 9; Murdock, 30° F on November 8; and Redwood Falls, 26° F on November 8, 25° on November 9, 22° F on November 10, and 31° F on November 11. (No temperature information was contained in the piling station reports for the Raymond and Renville stations in this time span.) Exhibits showing official weather data reveal that the Southern Minnesota area actually benefited from the same temperature range (highs "in the 20's and 30's") that Mr. Fullmer predicted for the Sidney area, and which the Panel proposes to find that the Sidney area did experience. (DT Ex. 877; *see also* DT Ex. 375/PT Ex. 115). If

"lady luck" operated in the Sidney area, she presented the same temperature ranges in the Southern Minnesota area.

5. In view of the four foregoing paragraphs, the objective and incontrovertible weather data admitted in evidence negate the Panel's asserted factual grounds for dismissing the experience of the sugar beet growers in the Sidney area. The real facts, and the weather which spawned them, are:

a. The Sidney freeze was deeper and at least as long lasting as the Southern Minnesota freeze.

b. The Sidney freeze had a freeze-thaw component that was comparable to, if not more severe than, the freeze-thaw component found by the Panel to have been experienced in Southern Minnesota.

c. Like Southern Minnesota's experience, the freeze-thaw cycle in the Sidney area was followed by similarly warm temperatures.

d. Like the Sidney area, Southern Minnesota experienced the timely arrival of cooling, cold weather starting in the first full week of November 2000.

Thus, there were no significant differences between the weather components of the SMBSC and Sidney experiences in 2000.

6. The Panel proposes to rely on Mr. Fullmer's testimony regarding "variables that come into this" which make it "hard to predict one way or another what may work and what did not." (PF 127.a.i.) Defendants do not take issue with the accuracy of the Panel's quoting of an excerpt from Mr. Fullmer's testimony. The Panel's failure is deeper and more significant. The essential relevance of the Sidney experience derives from the comparability of the October through early November 2000 weather experienced in the two areas, not from one person's

ability to predict which techniques will or will not work. Both areas experienced nothing deeper than crown frost. In the Sidney area, "cold temperatures froze the beets down to the soil level." (DT Ex. 522.) In the SMBSC area, nothing other than crown frost occurred, as Dr. Widner admitted. (PF 47; S. Martin, TP 2300:23 to 2301:10; J. Widner, TP 366:12 to 367:1 and DT Ex. 538.) As Dr. Martin correctly testified, crown frost can be handled, and it has been handled successfully for years. (S. Martin, TP 2351:4 to 2351:7; *see also* K. Jaggard, TP 2542:16 to 2542:21.) In addition, all of the resources used to deal with the 2000 freeze at Sidney were available to SMBSC, with the exception that it did not have as much ventilated storage. The Panel proposes to find that this difference (the amount and use of ventilation by SMBSC) did not cause the plaintiffs' losses. (PF 124.) Thus, historical experience and the availability of all techniques which the Panel considered pertinent were equally present in the Southern Minnesota and Sidney areas. Management at Sidney, confronted with worse weather, produced a significantly better economic result for its growers -- $37.71 per ton for post-freeze beets for Sidney's growers (R. Fullmer, Depo. Tr. 39:6-39:19) compared to $-0- value for plaintiffs in Summary Finding 10.

7. The Panel has correctly observed that all post-freeze beets were rejected by the processor at Sidney. (PF 127.a.iii.) This is a distinction between Sidney and SMBSC, but it is the classic "distinction without a difference." Rejection was an action by the Sidney processor. It also was a contractual option available to SMBSC, as Section 8 of its Growing Agreement establishes. (DT Ex. 66.) Rejection, further, was an option used by SMBSC and Dr. Widner in the past and since. (D. Cunningham, Depo. Tr. 39:21 to 40:5; S. Melberg, Depo. Tr. 65:7 to 66:18.) The availability and use of the right to reject may differ from processor to processor, but

it does not affect either the growing and harvesting techniques and practices available or the weather conditions framing their use.

8. In sum, the factual components of Provisional Finding 127 are erroneous and lack any evidentiary support. The factual bases for defendants' objections to them are incontrovertible. Therefore, the Sidney experience is more than sufficiently similar, and the results achieved there are probative. Accordingly, the Panel further erred by refusing to make the following provisional findings proposed by defendants which relate to the Sidney experience:

a. Unlike SMBSC and its growers, the Sidney area growers altered their normal harvesting, defoliating, and storage practices. Harvest was suspended for seven days rather than the two days SMBSC generally suspended its growers' harvest (three days at Renville and Redwood Falls).

b. The Sidney area growers were not permitted to deliver twenty-four hours a day/seven days a week as were the SMBSC growers. (R. Fullmer, Depo. Tr. 72:8-73:6.) Instead, their piling stations were closed on weekends, and operating hours were reduced from Monday through Friday to reduce the amount of time the beets were in storage before processing, thereby reducing deterioration in the piles. (R. Fullmer, Depo. Tr. 73:16 to 74:7.)

c. Unlike SMBSC's growers who did not properly defoliate their beets, even to the extent required by the grower agreement, the Sidney area growers lowered their scalping knives to remove all of the crown frost damage from the sugar beets. (R. Fullmer, Depo. Tr. 23.8 to 24.4.)

d. Finally, a greater portion of the Sidney beets were stored using passive ventilated storage for the beets.

e. Rather than suffering a processing or storage loss, the Sidney area growers received $37.71 per ton for their post-freeze beets, and they received $38.92 per ton for their pre-freeze beets. (R. Fullmer, Depo. Tr. 39:6 to 39:19.)

## SECTION VI
### SCALPING

The Panel's Provisional Findings regarding scalping (PF 112-120) are clearly erroneous. They do not recognize plaintiffs' failure to follow the scalping practice which the Panel endorses (PF 117 and 118) and do not distinguish between the scalping of healthy beets and wounded beets (PF 113-116 and 119-120). Consequently, the losses found by the Panel could have been avoided by the growers. Accordingly, Summary Findings 8 and 9 also are clearly erroneous.

1. The form of SMBSC Grower Agreement (DT Ex. 66) executed by most plaintiffs provides in Section 8, with respect to scalping, that all beets delivered are to be "properly topped at the base of the bottom leaf..." This farming practice is consistent with Provisional Finding 118.

2. Contrary to Section 8 of the Grower Agreement and PF 118, it appears that SMBSC's growers in 2000 did not scalp to the bottom leaf, instead defoliating without scalping, as Dr. Widner reported to his colleagues at SMBSC on December 11, 2000. (PT Ex. 138; J. Widner 291:12-292:16). This incontrovertible portion of the record means that plaintiffs did not scalp in accordance with the practice found by the Panel to be prudent (PF 118) or with their contract with SMBSC.

3. Although there is no standard industry practice with respect to scalping of healthy beets (K. Jaggard, TP 2387:4 to 2389:25), this does not make PF 114, 115, and 120 true. In fact, industry practice distinguishes between scalping of healthy beets and of wounded beets. (K. Jaggard, TP 2390:1-2390:20.) When beets are healthy, there is no standard practice regarding

scalping. (*Id.* at 2389:22 to 2389:25.) In contrast, when crown frost has wounded beets, the only prudent practice is to scalp more deeply. (*Id.* at 2390:16-2390:20.) Otherwise, damaged beet material needlessly is introduced in the piles.

4. Evidence conclusively demonstrates that more aggressive scalping would have reduced or eliminated the growers' losses, thereby rendering PF 120 clearly erroneous.

a. The Sidney experience demonstrates this, and its growers suffered only a decline from $38.92 per ton (for pre-freeze beets) to $37.71 per ton (for post-freeze beets). (R. Fullmer, Depo. Tr. 39:6 to 39:19.)

b. Dr. Jaggard precisely and persuasively testified regarding the scientific explanation for scalping more deeply beets with crown frost. (K. Jaggard, TP 2384:24 to 2390:20.)

5. Suggesting that deeper scalping causes more decay and increased respiration (PF 116) does not excuse SMBSC and its growers from failing to mitigate storage risks of freeze damaged beets through more aggressive scalping. In fact, SMBSC's and its growers' imprudent conduct in 2000, as well the Panel's endorsement of it, is demonstrated by SMBSC's decision in 2001 to encourage aggressive scalping. (DT Ex. 433/PT Ex. 174 at 9 and 13.) Since SMBSC changed its practices one year after the freeze in question to encourage more aggressive scalping of healthy beets, the Panel clearly erred by failing to find that such scalping was an appropriate loss mitigation practice which should have been followed in 2000.

## SECTION VII
### FINDINGS WHICH ARE UNSUPPORTED/UNSUPPORTABLE BY THE EVIDENCE

The following Provisional Findings lack support in the record.

1. Multiple Provisional Findings improperly utilize the Database as a substitute for disputed underlying core factual determinations regarding compliance with the terms of the

MPCI policy for which each plaintiff bore and bears the burden of proof. For example, the Panel's proposed PF 1. a. purports to rely on the Database to establish that each plaintiff entered into a "Growing Agreement" with SMBSC. Nonetheless, not all plaintiffs introduced evidence of their grower agreements with SMBSC. *See* Defendants' Proposed Provisional Findings ("Defs. Findings") at 23, Attachment 4. Likewise, the Panel's proposed finding in PF 1. c. purports to use the Database to establish the existence of an MPCI policy for *all* plaintiffs. Yet, at least two plaintiffs failed to submit evidence of valid MPCI policies. *See* Defs. Findings at 20 and Appendix D. Moreover, the Panel's reliance on the Database to establish the aggregate amount of premiums paid by plaintiffs (PF 1.f.) (the aggregate value of which is wholly irrelevant to the factual determinations involved in this case) ignores the agreement and stipulation reached between the parties which specifically identifies the uses for which the database is and, more importantly, the purposes for which it is *not* to be used. Terms of Letter Agreement, submitted to Panel on January 27, 2003. The Provisional Findings that rely on the Database as a means for meeting an individual plaintiff's burden of proof on a factual issue are clearly erroneous and not supported by any evidence.

2. Conversely, the Panel has failed to find those facts for which the Database was compiled, namely the applicable insurance coverage *on a unit basis* for each insured plaintiff, including the acres, coverage level percentages, production guarantee, and the applicable county average raw sugar percentages. The Panel's finding contained in PF 1. e. should be modified to reflect these components.

3. The Panel proposes to enter findings concluding that SMBSC's conduct in piling, storing, and processing the beets that the Panel has determined to be damaged was appropriate. *See, e.g.,* PF 22, 103, and 104-111. Notwithstanding that this is a legal conclusion that should

have been left by the Panel to the province of the District Court, the Panel measured SMBSC's standard of care against that which should be done under normal weather conditions. The Panel has failed to differentiate between conduct that would be reasonable in normal conditions, on the one hand, from, on the other hand, conduct that was required to preserve and protect sugar beets during the adverse weather conditions once SMBSC made the determination to accept the sugar beets that had been subjected to the adverse conditions. The evidence is undisputed that cooperatives in similar locales under similar conditions had policies in place that mandated a change in practice and procedure when adverse weather conditions were confronted. (DT Ex. 523; DT Ex. 316; DT Ex. 507; DT Ex. 508; R. Fullmer, Depo. Tr. 18:8 to 19:6; DT Ex. 774).

4. In addition to the foregoing, the following Provisional Findings lack any support in the evidentiary record or otherwise are not supported by the evidence as a whole: PF 22, 30, 34, 48, 49, 54 (as more specifically discussed above in Section II), 56, 58, 59, 60–65, 67, 68 (as more specifically discussed above in Section III), 78, 79, 90, 93, 102, 104 (the Panel has misapplied the concept of the need for ventilation in the context of prudent storage practices of sugar beets subjected to adverse weather conditions), 114, 117, 131, 134, 135, 137, 139, and 239 through 245.

## SECTION VIII
### FINDINGS WARRANTING MODIFICATION BASED UPON THE EVIDENCE PRESENTED

The evidence presented at the hearing requires modification of the following proposed findings.

1. The introductory portion of Provisional Finding 2 should be modified to read, "Defendants are nine private insurance companies and *certain affiliates* that sold MPCI policies to the plaintiffs for the 2000 crop year." This proposed modification recognizes that there are more than nine defendants named by plaintiffs. PF 1.a. should be modified by substituting NAU

Country Insurance Company for Ag Force Insurance Services because NAU is the defendant in that action which executed the applicable SRA and, therefore, is the policy issuing company.

2. Provisional Finding 4 should be modified to insert "or an affiliate of such a company" at the end of the proposed finding. This modification recognizes that some defendants sued by plaintiffs are not SRA holders, but are their affiliates.

3. Provisional Finding 7 should be modified by inserting, after the second sentence, the statement: "Instead of reciting the text of the Basic Provisions or the Sugar Beet Crop Provisions, or excerpts from either, the Panel incorporates by reference the full text of the cited regulations." There is no reason to lengthen the final findings by adding substantial quotations from published materials, but the Panel should make some form of recitation that treats the text of the policy as a fact. Adding the proposed sentence would be the most simple and direct method.

4. The Panel's proposed finding contained in the last sentence of PF 13 should be modified to state, "As a result, *under the terms of the Grower Agreements*, the grower has a pro-rata interest in commingled beets as opposed to an interest in specific beets." (The underlined and italicized words reflect modification). This modification is consistent with the evidence presented, and is necessary to clarify that the prorata interest relates to the growers' agreements with SMBSC, and not with the insurance companies.

5. The Panel's proposed findings in PF 26 and in Section XI, B improperly attribute notices given to some insurance companies to others to which notice was not given in December 2000. For example, the evidence is undisputed that defendants Ag Force Insurance Services Inc, NAU Country Insurance Company, and Mountain States Insurance Company did not receive this notice. (B. Olsen, TP 2052:19 to 2053:2.) Consequently, the Panel's proposed finding should be

modified to reflect that these companies did not receive notice in December 2000. Likewise, the Panel inappropriately attributes any purported notice of the IGF insureds by their agent Terry Hochsprung to the remaining defendants. The Panel's wholesale application of the December purported notice to all defendants results in an inappropriate inference raised in PF 142 h. & i. that the insurance companies were dilatory in responding to the demand, when, in fact, no such demand was received by most of the defendants.

6. The Panel's proposed finding in PF 26 misstates and mischaracterizes the varying reasons provided by each insurance company for denying the plaintiffs' claims. Consequently, the Panel's proposed finding should be modified to reflect the actual reasons stated by each insurance company. (DT Ex. 17-26). Moreover, the Panel has failed to recite those actions which the insurance companies undertook to investigate and attempt to adjust the loss prior to issuing the denial letters. *See* Section X, Omitted Findings. The companies' attempts to adjust the loss were uncontroverted, and, as a result, the Panel should have found them to have been performed.

7. The Panel's proposed finding in PF 36 should be modified to read, "The National Weather Service data is the most reliable data with respect to the relevant time frames and locations *for ambient air temperatures*." This modification is necessary to clarify that the National Weather Service data is reliable for ambient air temperature, and nothing more. The Panel heard substantial testimony concerning the significance of beet root temperatures and ground temperatures. Thus, this clarification is necessary to ensure that this data is used solely as a measurement of ambient air temperatures.

8. The Panel's proposed finding in PF 37 should be modified to read, "Every national weather service recording station for the grower region recorded freezing temperatures

during *some portion of* the nighttime hours of ~~at least~~ October 6, 8 and 9." This modification is consistent with the actual weather data contained in the exhibits submitted at the hearing.

9. The use of the words "significant amounts of time" in PF 38 (rather than relying on the recitation of the actual number of hours as contained in PF 39-45) results in conclusory statements in PF 38. This finding should be eliminated.

10. Notwithstanding the fact that the evidence does not support the Panel's proposed finding in PF 58, if the Panel enters such a finding, it should be modified to reflect that only the *crown* of the sugar beet is exposed if and when the leaves are destroyed.

11. The Panel proposes to accept the proffered evidence of the practices of the Risk Management Agency and the Federal Crop Insurance Corporation, particularly those relating to Manager's bulletins, for the periods involving the 2000 sugar beet crop issues based upon the testimony of Mr. Ken Ackerman. The Panel bases its reliance on an incorrect factual determination made by it, *i.e.* that Mr. Ackerman was the Chief Executive Officer of those agencies during "the relevant period of time." Mr. Ackerman was not Chief Executive Officer during the time in which the RMA and the FCIC issued the bulletins in question (MGR-01-010 and MGR-01-010.1). Mr. Ackerman resigned from his position on January 20, 2001. In fact, Mr. Ackerman was adverse to the RMA and FCIC during the relevant periods relating to these bulletins, when he was hired by the plaintiffs as a highly paid expert specifically to lobby for legislative relief for the growers. He also acted as co-counsel with plaintiffs' counsel. Nonetheless, to the extent the Panel relies on Mr. Ackerman's testimony for issues relating to the bulletins at issue in this case, the Panel should recognize that Mr. Ackerman was not employed by the FCIC or the RMA when these bulletins were issued. Nor, did Mr. Ackerman have any hand in the drafting of these bulletins or investigation leading up to their issuance.

12. The Panel proposes to enter a "factual" finding that the "providers" of the MPCI polices contemplated commingling at the time the policies were issued. (PF 78.) Notwithstanding the legal conclusions subsumed in such a finding, the plaintiffs have offered no evidence that the *insurance company defendants* contemplated that their coverage obligations extended to commingled beets. There is no probative evidence that insurance providers contemplated commingling when plaintiffs' MPCI policies were issued. Such a finding is directly contrary to the express terms of the insurance contract which terminates coverage at the earliest of harvest or November 15. (DT Ex. 1, Section 9, Sugar Beet Crop Provisions, Section 11, Basic Provisions). In addition, the growers' ownership of their beets ceased at delivery, when titled vested in SMBSC pursuant to Section 13 of the Grower Agreement (DT Ex. 66), and the existence of such an agreement is required for there to be coverage, as Section 7(a)(3) of the sugar beet crop provisions (DT Ex. 1) makes clear. Commingling of beets could only have occurred following harvest and, therefore, after coverage terminated. Moreover, absolutely no evidence was offered that the defendants anticipated that coverage extended to losses when one company's insured's production could not be distinguished from another company's insured's production because of the commingling.

13. The Panel's proposed findings at PF 83 and 84 are incomplete recitations of the full contents of MGR-01-010 and result in the excerpts being taken out of context. Moreover, because the Panel finds MGR-010-010 applicable due to its purported validity in interpreting the policy and the regulations under which it is issued, then application of its supplement, MGR-01-010.1, is mandated. Consequently, assuming arguendo liability and coverage under the policy, MGR-01-010.1 must be applied to any indemnity calculations, contrary to the findings contained

in the Panel's proposed "findings" under Summary Finding 11 and PF 86 and its subsidiary parts.

14. The Panel's proposed finding in PF 143 attributes knowledge of the freeze to the defendants by October 20, 2000, without a corresponding finding applicable to plaintiffs. If defendants had knowledge of the freeze, certainly plaintiffs did as well. A similar finding applicable to plaintiffs is warranted.

15. The Panel's proposed findings contained in PF 234-238 suggest a required level of compliance with the Loss Adjustment Manual ("LAM") which it, in fact, does not require. The Panel correctly found in PF 234 that the Loss Adjustment Manual is merely a guide to assist in the adjustment of losses – if those losses can be accurately adjusted. However, the remaining findings imply that the defendants were obligated to invoke the late notice procedures permitted by the FCIC in the Loss Adjustment Manual. This inference is not supported by the explicit terms of the manual or by law. Moreover, there has been no evidence submitted that the defendants did not comply with all adjustment procedures required by the FCIC and RMA. In fact, the evidence is to the contrary, and the defendants took all required action necessary under the terms of the policies and FCIC's requirements. Consequently, should the Panel enter findings regarding the LAM, those findings must reflect the permissive nature of the LAM provisions. PF 235 should be modified to read, "The LAM in effect for the crop year 2000 contains a delayed notice of loss provision, *which describes a procedure by which an insurance company may (but is not required to) adjust a loss notwithstanding untimely notice*." Moreover, PF 238 should be modified to read, "No defendant insurer followed the *optional* procedures set forth in the LAM with respect to a delayed notice."

## SECTION IX
## "FINDINGS" WHICH ARE, IN REALITY, CONCLUSIONS OF LAW

The following Provisional Findings are conclusions of law and, therefore, beyond the scope of Paragraph 2 of the Engagement Letter of March 20, 2003, which recites that the Panel has no authority to make conclusions of law, as well as Chief Judge Rosenbaum's order referring this matter to the Panel and the Basic Provisions of the MPCI Policy: Summary Findings 1-11 and Provisional Findings 1-11, 19, 27, 24, 34, 38, 48, 49, 56, 60, 64, 65, 66, 67, 68, 69, 74, 75, 78, 79, 85, 86 and its subparts, 87, 88 – 129 (in which the Panel purports to describe "affirmative defenses" and, as a result, inappropriately places the burden of proof on defendants to establish each of these issues; not only is this an inappropriate legal conclusion, it is a fatal misapplication of the law and the MPCI policy, under which each plaintiff must separately establish compliance with each term of the policy, including establishing that the loss was directly caused by one or more of the insured causes of loss specified in the Crop Provisions),[3] 88, 89, 90, 92, 94, 96 (to the extent it characterizes conduct as "prudent"), 102, 103, 107, 109 (to the extent it characterizes the conduct of SMBSC), 111, 113, 118, 120, 121 (which also misstates the defendants' contention regarding the impact of the warm weather), 122, 123, 124, 126, 128 (which also is irrelevant to any determination required to be made by the Panel), 129, 131, 134, 135, 136, 138, 139, 213-217 218-245, and 246-248.

## SECTION X
### OMITTED FINDINGS

In addition to the omitted findings discussed in the foregoing sections, the following findings should be made based on undisputed evidence of these facts.

[3] *See* 7 C.F.R. § 457.8, Basic Provisions, ¶ 14(e) ("Your Duties"). These duties encompass proving that the claimed loss did not result from failure to follow good farming practices, mismanagement, or intervening causes of loss. *Royalty v. Federal Crop Ins. Corp.*, 618 F. Supp. 650, 652 (W.D. Ky. 1985).