Exhibit E

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of:

2000 Minnesota Sugar Beet Crop Insurance Coverage,

Case Numbers:

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

- - - - - - - - - - - - - - - - - - - - - - - - - - -

COPY

ARBITRATION HEARING

Volume I, Pages 1-234

September 8, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Dorsey & Whitney, LLP, Attorneys at Law, Suite 1500, 50 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:06 o'clock a.m., September 8, 2003, 2003.)

11:54:35 Q. And do I understand it correctly that as the vice president of agriculture, before that agricultural manager, you were responsible for the crop from planting, growing, et cetera, up until the time it gets into the factory?

11:54:52 A. That is correct.

11:54:52 Q. And you are also talking about tests, are these tests performed in the laboratory?

11:54:59 A. They are laboratory evaluations using the standard polarimetric procedures.

11:55:03 Q. Does Southern Minnesota Beet Sugar Cooperative have a laboratory?

11:55:08 A. We have a laboratory that is utilized during the harvest period to analyze samples taken from grower truckloads to determine net tons, because as the beets come in there is some soil that would adhere to the beet. So the beets are weighed, then washed, dried, and reweighed, and that difference then would become soil tare, that the growers would not be reimbursed. They are only going to be paid for the net tons.

11:55:49 At that point the beet is then sawed and the sawdust, which is call brei, B-R-E-I, would be collected, it would be extracted, the sugar content would be extracted by using aluminum sulfate on a

11:56:08 proportional balance. The aluminum sulfate is a
11:56:12 liquid added to about 26 grams of this brei and the
11:56:18 brei is disintegrated in a high-speed blender, it
11:56:26 frees up all the sugar that's locked into the cells,
11:56:30 and as the sugar content is now released to the
11:56:34 solution, it is then filtered and the filtrate, the
11:56:39 clear solution, would be introduced into a
11:56:47 polariscope, a refractometer, which measures the
11:56:50 percent sugar of that sample.
11:56:52 Q. Is that where you get these percentage of
11:56:56 sucrose readings that we will see in many document?
11:57:01 A. Yes. It is entirely from the polarimeter or
11:57:05 refractometer.
11:57:07 Q. And is that, in a freeze-damaged beet, is that
11:57:11 sucrose reading or sucrose percentage accurate?
11:57:15 A. There are some complicating effects with -- with
11:57:18 freeze-damaged beets because at that point the beet
11:57:23 is looking to recover or repair the damage that has
11:57:28 been caused by the event, and as the cells then are
11:57:33 repairing this damage it starts to break down some of
11:57:38 the stored sucrose internally into smaller
11:57:41 carbohydrates that the plant would then use for
11:57:45 energy to repair this damage, so the sucrose would be
11:57:51 hydrolyzed into the basic six carbon components,
11:57:58 glucose and fructose. The difficulty with the

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of:

2000 Minnesota Sugar Beet Crop Insurance Coverage,

Case Numbers:

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

COPY

- - - - - - - - - - - - - - - - - - - - - - - - - -

ARBITRATION HEARING

Volume II, Pages 235-450

September 9, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Dorsey & Whitney, LLP, Attorneys at Law, Suite 1500, 50 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:01 o'clock a.m., September 9, 2003, 2003.)

10:04:59 Q. Same range?
10:04:59 A. Same range.
10:05:01 Q. Were they as extensive as observed in 2000?
10:05:03 A. Not that I recall.
10:05:05 Q. How did the 2001 crop turn out?
10:05:08 A. The 2001 crop, we were able to process all the beets.
10:05:13 Q. No discards?
10:05:14 A. Not that I recall.
10:05:17 Q. No growers' beets rejected at point of delivery?
10:05:22 A. No.
10:05:24 Q. Were any beets in 2000 rejected at the point of delivery?
10:05:30 A. No. But were they examined? Yes.
10:05:37 Q. Thank you. Again working backwards from where you completed your direct examination, you agreed with Dr. Jaggard's position that the crop should have been rejected as Mr. Eck characterized Dr. Jaggard's opinion?
10:05:59 A. Yes, sir.
10:05:59 Q. Now you don't know whether Mr. Eck has characterized that correctly, do you, or not? Do you know one way or the other? Have you read Dr. Jaggard's report?
10:06:11 A. No, I have not.

14:54:27 A. Twenty-eight, okay.
14:54:29 Q. And on the 8th back up to 42 and down to 20; correct?
14:54:34 A. Yes.
14:54:34 Q. And the 9th, 49 with a low of 25?
14:54:38 A. Yes.
14:54:38 Q. And then back up to 60 on the 10th?
14:54:41 A. Yes.
14:54:42 Q. A daily freeze-thaw cycle; right?
14:54:45 A. Yes.
14:54:49 Q. Well let's continue on with section 8. What procedures did you implement at the cooperative starting at any point from your employment in 1983 for exercising the option of rejecting beets damaged for some reason other than disease or freezing?
14:55:17 A. Damage would have -- could have meant a mechanical damage where they might have been run over by equipment and disintegrated, something that would have obviously been unfit for storage. On a very rare occasion was there ever a need to look at that as far as rejecting beets.
14:55:50 Q. Was the procedure a visual inspection at the time of delivery?
14:55:53 A. Yes.
14:56:00 Q. What procedures did you develop at the

14:56:02 cooperative for exercising the cooperative's option
14:56:05 of rejecting sugar beets with less than 12 percent
14:56:08 sugar or less than 80 percent purity?
14:56:13 A. As we received the beets, I had a computer
14:56:19 program that would print out any exceptions to the
14:56:25 sugar content less than 12 percent. If it -- a
14:56:32 single sample was 12 percent or less, I looked at the
14:56:36 average, and if the average was greater than 12
14:56:40 percent we did nothing. If it was -- the average was
14:56:45 less than 12 percent, we asked the grower to move to
14:56:48 a different field to allow the sugar content to
14:56:52 improve.
14:56:54 Q. And when you are talking average, you mean for a
14:56:57 given grower within a particular field of that
14:57:03 grower's?
14:57:09 A. Within a given day. All the samples that we
14:57:09 would have taken from the trucks, the weighted
14:57:11 cumulative average on the sugar content, if it was
14:57:13 less than 12 percent, then we asked him to move to a
14:57:17 different field.
14:57:17 Q. In 2000, do you recall asking any grower to move
14:57:20 to a different field because of sugar content below
14:57:22 12 percent?
14:57:23 A. No.
14:57:25 Q. And what about the 80 percent purity portion?

14:57:29 A. We had no indications that the beets were below
14:57:32 80 percent purities.
14:57:34 Q. Okay. What procedures did you establish from
14:57:39 your employment in 1983 through 2000 for implementing
14:57:46 the cooperative's option to reject beets that were
14:57:49 not suitable for manufacture of sugar?
14:57:54 A. This was something that was less specific and it
14:57:59 was difficult to write a procedure on something that
14:58:02 was more general in nature because it was in
14:58:08 someone's opinion, it didn't say we had any way of
14:58:11 determining by measurement or calculation that they
14:58:16 were not suitable for manufacture of sugar. It was
14:58:21 basically relating to the cooperative's opinion.
14:58:26 Q. A subjective judgment versus an objective
14:58:30 judgment?
14:58:30 A. Yes.
14:58:33 MR. OWEN: We are at a good breaking point.
14:58:36 ARBITRATOR FITZGERALD: That's good. I
14:58:37 didn't know when you will come to the end of section
14:58:40 8.
15:21:13 (Recess taken from 2:59 to 3:21 p.m.)
15:21:13 BY MR. OWEN:
15:21:22 Q. Do you still have Defendants' 66, Dr. Widner?
15:21:27 A. Yes.
15:21:27 Q. Let's go to the same page, 3, section 13, title

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of:

2000 Minnesota Sugar Beet Crop Insurance Coverage,

Case Numbers:

COPY

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ARBITRATION HEARING

Volume VI, Pages 1074 - 1337

September 16, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Dorsey & Whitney, LLP, Attorneys at Law, Suite 1500, 50 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:03 o'clock a.m., September 16 , 2003.)

11:00:51 Plaintiffs' 205, and that'll be in one of the plaintiffs binders.

11:01:39 Did, apart from the PIK sugar, the Commodity Credit Corporation transfer sugar to the cooperative for use in compensating its members for losses on the 2000 crop?

11:01:57 A. There was a CCC allocation of sugar, it was 200,000 hundredweight.

11:02:04 Q. Which you then sold, or through your marketing arm sold; is that correct?

11:02:08 A. Yeah.

11:02:09 Q. And then distributed the remaining sums in the same fashion that the FSA payment was distributed, to members based on the numbers of tons of beets they delivered after the cold temperatures of October 6 to 10, 2000?

11:02:30 A. This payment was made a little differently than that. There was -- With FSA there were -- That's part of why I disagree with some of -- of how we're characterizing this. The seven dollars and twenty-seven cents was not common to all people that delivered full harvested beets. Because there was an $80,000 payment limitation, some folks didn't get that. And so those are their rules because it was their payment. It wasn't our payment, it was theirs.

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of:

2000 Minnesota Sugar Beet Crop Insurance Coverage,

Case Numbers:

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

COPY

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ARBITRATION HEARING

Volume VII, Pages 1338 - 1505

September 17, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Dorsey & Whitney, LLP, Attorneys at Law, Suite 1500, 50 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:02 o'clock a.m., September 17, 2003.)

11:03:36 agency generally, to look into the issue. And the
11:03:43 document reviews some of the issues that were raised,
11:03:45 it looked -- it took an initial look at the causes of
11:03:50 loss, it reviewed them and then it looked at how the
11:03:56 -- looked at three particular policy issues that were
11:04:02 raised by them, and presumably these are three issues
11:04:06 which some questions had been raised on and where
11:04:09 there was some uncertainty within the industry and
11:04:11 the public, the farmers, of how to proceed and where
11:04:15 the agency felt it was important to give guidance on
11:04:18 what it's understanding of the rules was.
11:04:20 Q. And what was that -- what were those policy
11:04:22 issues and review that was performed?
11:04:25 A. There are three of them and they are listed on
11:04:28 page 3 of the document. The first is whether the
11:04:30 damage was insurable; in other words, whether the
11:04:33 damage occurred under the terms of the policy. That
11:04:37 is, whether it occurred by -- whether the damage was
11:04:40 caused by an insurable cause during the insurance
11:04:43 period.
11:04:44 Crop insurance applies, it begins on a certain
11:04:47 date and it ends on a certain date, and for damage to
11:04:50 be covered, the cause of the damage must occur during
11:04:53 that -- that period. And so in this case the
11:04:57 question was: Did the cause of loss occur during the

11:36:00 A. Yes.
11:36:11 Q. Let's talk a moment about your legislative
11:36:15 efforts.
11:36:15 A. Uh-huh.
11:36:20 Q. Did you lend assistance to obtaining $4.6
11:36:29 billion worth of sugar that was transferred from the
11:36:32 Commodity Credit Corporation to the cooperative as
11:36:36 part of the appropriations bill enacted in the fall
11:36:42 of 2001?
11:36:44 A. I was not directly involved in that piece of it.
11:36:47 The other counsel that I was working with in the
11:36:50 Washington office had more attachments to the
11:36:53 appropriations committee than I did. My more
11:36:56 significant role was working with -- to develop an
11:37:02 amendment that would be attached either to the
11:37:05 disaster aid bill that was being developed by the
11:37:08 agriculture committee or a more direct appropriation
11:37:14 rider that would be in the form of a special disaster
11:37:17 aid bill for the co-op.
11:37:20 Q. Was the substance of the amendment that you were
11:37:23 drafting one that would have directed the insurance
11:37:26 companies to pay the claims?
11:37:30 A. It would have been a combination. May I ask
11:37:39 counsel a question for a moment? I want to make sure
11:37:41 I'm not --

11:37:47 Q. No, you may not.
11:37:47 A. Okay.
11:37:47 Q. Unless the panel orders you may.
11:37:48 A. The question is, I want to be clear I don't
11:37:51 violate an attorney-counsel -- an attorney-client
11:37:54 issue with the co-op but I -- none of these things
11:38:00 are secret, though.
11:38:02 The amendment that we were working on would have
11:38:05 allowed, would have allowed either USDA to make a
11:38:11 payment either through the disaster program or the
11:38:16 crop insurance program or somehow have an arrangement
11:38:22 where the companies would make -- would pay the
11:38:25 claims with some kind of assurance of reinsurance
11:38:29 from USDA.
11:38:31 Q. Would the level of reinsurance be higher than
11:38:36 the reinsurance that was provided in the standard
11:38:38 reinsurance agreement at the time?
11:38:41 A. There were a number of drafts of legislative
11:38:44 ideas that were floating around at the time, some of
11:38:47 them may have had higher levels, some of them may
11:38:52 not, but there were a number of ideas that we were
11:38:53 trying to come up with at the time. We recognize as
11:38:55 a political matter that for any resolution to fly on
11:39:00 Capitol Hill it would have to be something that was
11:39:03 acceptable to the insurance industry, the insurance

companies as well as to the farmers, as well as to USDA. That was why it never came into place, because there were quite wide differences of views between the three groups. But we recognized that for something to be palatable all around, there would need to be some way to hold the companies harmless or to at least provide them significant reinsurance to pay the claim, if that was the route they were going to go.

Q. Short of drafting amendments to legislation, did you work on drafting language that could be inserted into any congressional reports that would accompany legislation under consideration in 2001?

A. I drafted a number of documents, a number of memos, I drafted calculations on possible budget scores, I drafted some background pieces that could be put into speeches or statements by members. I don't recall any specific congressional reports in the formal sense but I drafted a number of documents.

Q. Is the representation of the cooperative ongoing?

A. Yes.

Q. So as you sit here today, you concurrently are performing two roles: Co-counsel with Dorsey & Whitney for the cooperative and expert witness for

11:40:39 the plaintiffs?
11:40:42 A. Yes, with this clarification: The efforts to
11:40:46 find a legislative solution or Washington-based
11:40:49 solution to this problem have not been active for at
11:40:53 least a year or two. Basically we gave it our best
11:40:58 shot and came up with what we came up with and since
11:41:02 that time the real focus of this issue has been this
11:41:04 litigation.
11:41:07 My continuing role with the co-op has been
11:41:12 occasionally to answer questions they raise on crop
11:41:15 insurance generally, not so much on this problem
11:41:20 anymore.
11:41:24 Q. Which members of Congress, either senators or
11:41:26 representatives, did you approach seeking a
11:41:28 legislative solution?
11:41:30 A. A number of offices, primarily the Minnesota
11:41:34 delegation. Congressman Mark Kennedy was very
11:41:38 involved in this, Senator Wellstone, Senator Dayton.
11:41:42 Those offices among others.
11:41:44 Q. Did you talk with Hunt Shipman of Senator
11:41:49 Cochrane's office?
11:41:49 A. No, I did not. Hunt Shipman at the time was at
11:41:51 USDA and I was not involved in direct meetings with
11:41:55 USDA.
11:41:55 Q. Did you talk with Jeff Harrison of the House

matter depending on whether -- on which -- on which line of logic you read, you espouse in terms of how you apply the policy.

Q. Is commingling dealt with as a loss adjustment issue in the sugar beet policy?

A. Not directly, although if one applies 13(e) to the situation at hand, essentially the issue becomes irrelevant. Thirteen (e), by saying that the beets delivered to the co-op would be evaluated based on the gross value of those beets; in other words, the value received by the farmer based on their contract, at that point it's not necessary for the grower to know whether there is specific beets that happen to be in the pile of discards or happen to be in the pile of beets processed, because their value is the value that they receive from the co-op. That's the value to them and that's all driven by contract.

Q. Mr. Ackerman, do you know whether commingling is an issue that's dealt with in the Loss Adjustment Manual?

A. I believe it is. Commingling is, in other context, commingling is a significant concern, compliance concern for crop insurance.

Q. If you are working with a production policy -- let me withdraw that.

12:00:18 The sugar beet policy is a production policy?

12:00:20 A. Well sugar beet policy is an amalgam of
12:00:24 different things. It has production elements, 13(e)
12:00:29 is a revenue element. It's based to some extent on
12:00:33 tonnage, it's based to some extent on sugar content
12:00:36 as we saw in the calculations a few minutes ago. It
12:00:40 is substantially a production contract but it has
12:00:43 many elements to it.

12:00:45 Q. When you worked at the USDA as manager of the
12:00:48 FCIC, would you have characterized the sugar beet
12:00:51 policy as a revenue policy?

12:00:53 A. Revenue, when I was at FCIC, the revenue was an
12:00:58 expanding universe. When I first started, revenue
12:01:04 was a term of art that was designed to refer to
12:01:06 certain add-on policies that would give you a certain
12:01:09 -- a boost in your price selection of the price -- if
12:01:13 commodity went up during the course of the growing
12:01:16 season as measured by a futures contract on the
12:01:20 Chicago Board of Trade, that type of thing. I
12:01:22 believe the example was something called MVP, a
12:01:26 private policy produced by one company. Over time,
12:01:31 it took the form of something called crop revenue
12:01:35 coverage, which was an amalgam between production and
12:01:38 revenue where you would get a guaranty based on your
12:01:41 APH, as we talked about before, and a floating price,

so that $40 a ton that we talked about before could change during the year based on trading, again as futures exchange if that applied here.

There were other types of revenue policies towards the end. We had something that was not really a crop insurance policy, the dairy options pilot policy what the FCIC or RMA was subsidizing the direct purchase of dairy options on I believe the New York futures market. Most recently FCIC has approved as a crop insurance policy the livestock risk protection plan, which is the moral equivalent an option.

It's a long answer but the point is, it's been a moving target, what you would refer to as a revenue policy.

MR. OWEN: Mr. Campeau, would you read back the question I asked the witness.

(Record read.)

BY MR. OWEN:

Q. With the question being repeated, Mr. Ackerman, and despite the evolution, can you tell me how you would have characterized the sugar beet policy before January 20, 2001?

A. I would have characterized it as an APH policy because it's one whose guaranty was based on APH.

12:03:11 The way we used the words at the time, APH was
12:03:15 distinguished from revenue policies, which at that
12:03:18 time included crop revenue coverage, revenue
12:03:22 assurance and a number of others. There were in
12:03:26 addition some hybrids.
12:03:28 Q. In fact, Mr. Ackerman, your two examples under
12:03:31 13(d) and 13(e) for Mr. Heller were both utilized to
12:03:38 determine production to count?
12:03:40 A. They determine production to count based on
12:03:42 sugar content and one had a revenue element in terms
12:03:45 of basing 13(e) on the gross dollar value of the
12:03:49 crop.
12:03:50 Q. Those are both methodologies that lead to 13(b)
12:03:53 under the policy where the formula itself is
12:03:55 contained; is that correct?
12:03:59 A. Thirteen (b) under the policy?
12:04:01 Q. Yeah, B as in boy.
12:04:04 A. I believe there are cross-references between the
12:04:06 two but I would need to look for a moment at the
12:04:10 policy.
12:04:10 Q. Well you can do that in any capacity you want
12:04:15 but we will move on.
12:04:16 A. Okay.
12:04:23 Q. Mr. Ackerman, do you understand that another
12:04:26 issue raised in this matter is whether the growers

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of:

2000 Minnesota Sugar Beet Crop Insurance Coverage,

Case Numbers:

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

COPY

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ARBITRATION HEARING

Volume VIII, Pages 1506-1732

September 23, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Winthrop & Weinstine, P.A., Attorneys at Law, Suite 3500, 225 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:21 o'clock a.m., September 23, 2003.)

ARBITRATORS:

John W. Mooty
Gray Plant Mooty
3400 City Center
33 South Sixth Street
Minneapolis, Minnesota 55402

David F. Fitzgerald
Rider, Bennett, Egan & Arundel
333 South Seventh Street
Suite 2000
Minneapolis, Minnesota 55402

Robert W. Kettering, Jr.
Arthur, Chapman, Kettering, Smetak & Pikala
81 South Ninth Street
500 Young Quinlan Building
Minneapolis, Minnesota 55402

APPEARANCES:

On Behalf of all Plaintiffs, except those suing Fireman's Fund:

George G. Eck
Daniel J. Brown
Theresa M. Bevilacqua
Dorsey & Whitney, LLP
Attorneys at Law
50 South Sixth Street
Suite 1500
Minneapolis, Minnesota 55402

On Behalf of all Plaintiffs suing Fireman's Fund:

Mark P. Hodkinson
Bassford Lockhart Truesdell & Briggs, PA
Attorneys at Law
3550 Multifoods Tower
33 South Sixth Street
Minneapolis, Minnesota 55402

11:22:34 that particular station?

11:22:36 A. I believe that's what the -- if I understand
11:22:39 your question correctly, this does determine, not an
11:22:43 individual basis but a total of all tons that were
11:22:46 delivered to each of these piling stations and the
11:22:49 amount of tons that were discarded from that piling
11:22:52 station.

11:22:52 Q. Mr. Ackerman testified Wednesday regarding the
11:22:54 manner in which calculations would be made, and
11:22:56 without getting into the particulars of his testimony
11:22:59 on that point, can you tell us what the government's
11:23:01 position is as to which provision of the policy would
11:23:05 be utilized to calculate any losses on discarded
11:23:10 tonnage?

11:23:13 MR. ECK: Same objections as we have
11:23:15 discussed.

11:23:16 ARBITRATOR FITZGERALD: Again we are going
11:23:17 to allow the testimony subject to the objection and
11:23:20 we will be looking at it and will have to make some
11:23:24 determinations whether to accept the testimony or
11:23:27 not.

11:23:28 A. Again as I stated earlier, this would have been
11:23:31 still under 13(e) because a determination was based
11:23:34 on the information provided by the processor, is that
11:23:38 the discarded beets did not meet the standards, the

11:23:42 80 and the 12 percent. And so therefore we applied
11:23:47 that, we allowed -- we made that determination based
11:23:49 on their information that none of those beets
11:23:51 qualified and met the minimum standards and so they
11:23:55 were eligible for payment, and that's where we came
11:23:58 up with these factors to prorate that damage out to
11:24:01 the individual farmer.
11:24:05 Q. Was there any extent to which 13(d), D as in
11:24:11 David, would apply in the second bulletin?
11:24:14 A. It could because if the sugar beets did meet the
11:24:18 minimum standards, and that's what number 2 was
11:24:23 intended to address, was determine whether or not
11:24:24 they did meet the minimum standards, then 13(d) would
11:24:27 be the -- under the provision for which they would be
11:24:30 adjusted.
11:24:34 Q. Let's go back and wrap things up for the first
11:24:37 bulletin, Ms. Arrigo, and if you would, please, keep
11:24:41 handy the policy, Defense 1, and the Grower
11:24:47 Agreement, Plaintiffs' 4.350. And let's go to the
11:24:57 second page, the paragraph beginning, quote, "Whether
11:25:04 the sugar beets were damaged," unquote.
11:25:08 A. Yes.
11:25:08 Q. Ms. Arrigo, the last sentence of that paragraph
11:25:15 reads, quote, "Therefore, producers whose sugar beets
11:25:19 failed to meet the minimum standards in the

11:25:21 processing contract at the time of processing may be eligible for an adjustment in accordance with section 13(e)," unquote. Have I read that correctly?

11:25:33 A. Yes, you have, sir.

11:25:34 Q. Are you the author of that sentence?

11:25:36 A. I believe I am, yes, sir.

11:25:41 Q. When you used the term, quote, minimum standards, unquote, what were you referring to?

11:25:47 A. The 80 and 12 percent that was stated in the contract.

11:25:52 Q. In section 8 of the Grower Agreement?

11:25:59 A. That is correct.

11:26:08 Q. Further up the sentence appears, quote, "A reasonable interpretation of this provision is that the appraisal by the processor at the time of processing should apply, not the appraisal at the time of delivery, because freeze and thaw damage that occurred before harvest can manifest itself after delivery according to a USDA sugar beet expert," unquote. Have I read that accurately?

11:26:46 A. Yes, sir.

11:26:46 Q. Are you the author of that sentence?

11:26:47 A. Yes, sir.

11:26:56 Q. Is it the position of the government that it is reasonable to use an appraisal date later than the

11:27:08 time of processing?

11:27:10 A. No.

11:27:11 Q. And is that the reason that the weekly

11:27:14 processing information is included in the second

11:27:18 numbered portion of Manager's Bulletin MGR-01-010.1?

11:27:27 A. That is correct.

11:27:31 Q. Ms. Arrigo, from the position of the RMA, is it

11:27:35 permissible to determine suitability for processing

11:27:43 based on the net value of beets as determined after

11:27:50 the end of the processing campaign?

11:27:53 A. Not in accordance with the terms in the policy,

11:27:57 no. The policy says specifically the manner in which

11:28:00 quality adjustment can be made and it does not

11:28:03 specifically include the net value. I'm sorry, let

11:28:11 me -- I think I misunderstood what your question is.

11:28:14 Q. Okay. We can have it read back.

11:28:14 (Record read.)

11:28:34 A. No. I believe the way the policy reads, it is

11:28:41 the gross dollar value of the damaged beets by the

11:28:47 local market price per pound.

11:28:51 Q. Okay. Let's go to the last page, the action

11:28:56 portion. The last two sentences of the first

11:29:05 paragraph read, quote, "RMA notes that it is solely

11:29:10 the reinsured company's decision with respect to

11:29:13 payment of these claims. RMA does not in any manner

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - - -

FILE COPY

In the Matter of:

2000 Minnesota Sugar Beet Crop Insurance Coverage,

Case Numbers:

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

RECEIVED
OCT 08 2003
CONSTANCE K. WHITE
COPY

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ARBITRATION HEARING

Volume XI, Pages 2107 - 2357

September 29, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Winthrop & Weinstine, P.A., Attorneys at Law, Suite 3500, 225 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:03 o'clock a.m., September 29, 2003.)

13:54:51 plants in general, excuse me, not specifically in
13:54:54 sugar beets, and a good deal more is understood now
13:54:58 about the nature of freezing and freeze damage I
13:55:01 believe, but certainly the -- the basic fact that
13:55:04 freezing and thawing can lead to damage in sugar
13:55:08 beets has been known for quite some time.
13:55:10 Q. And is the word "alternate" an important part of
13:55:16 that sentence, alternate freezing and thawing?
13:55:19 A. Yes, I think it is.
13:55:22 Q. And we went through, or actually Mr. Eck did,
13:55:25 how it was cold at night, below 26.6 degrees for some
13:55:29 duration, according to your conversion, and then back
13:55:33 up above freezing the next day?
13:55:35 A. Yes.
13:55:36 Q. And so that would be the thaw. And we can get
13:55:40 to it in some fashion in a little while, but we're
13:55:43 assuming that the ground was still warm at that point
13:55:47 from the summer and early fall temperatures; are we
13:55:50 not?
13:55:50 A. Well we're assuming that the ground is slowly
13:55:52 tracking the changing temperatures --
13:55:54 Q. Okay.
13:55:55 A. -- in the fall.
13:56:02 Q. Was the danger of the alternate -- excuse me, of
13:56:04 the alternative freezing and thawing cycles something

13:56:07 that was understood at the time of either of the beet
13:56:10 sugar foundation conferences, '73 or '75?
13:56:14 A. I don't know whether anyone had actively looked
13:56:16 at it at that time. I don't really recall the
13:56:18 contents of all the numerous reports in here, but I
13:56:21 suspect it was known at that time.
13:56:32 Q. And then, continuing on with your letter, you
13:56:39 discuss physiology of beets on the next two pa -- the
13:56:44 first page and also on the second page, and then what
13:56:51 I'd like to do is direct your attention to the first
13:57:00 full paragraph on page 2 and the last two sentences.
13:57:07 The first of those two first: "If such beets can be
13:57:10 processed promptly (within a few days, preferably, or
13:57:14 a week or two when held under good conditions) they
13:57:17 process essentially normally."
13:57:19 A. Yes.
13:57:20 Q. And by that did you mean that the beets that are
13:57:26 harvested within the first couple of weeks after the
13:57:30 freeze will process and make good sugar?
13:57:34 A. One would expect so.
13:57:37 Q. Okay. And then they gradually become very
13:57:45 difficult or almost improce -- almost impossible to
13:57:49 process economically.
13:57:52 A. Yes. Of course there's a time factor implicit
13:57:55 in that kind of statement, and there's where all the

16:11:53 Q. Do you still have your opinion letter, or your
16:11:57 -- yes, your opinion letter of October -- January 26
16:12:03 handy?
16:12:04 A. Just -- I do, but just one moment here.
16:12:09 Q. Certainly.
16:12:11 A. Okay.
16:12:21 Q. With what you've described in the fifth point
16:12:23 here, and you want -- take a moment just to refresh
16:12:28 yourself.
16:12:29 A. Thank you.
16:12:34 Q. Is --
16:12:34 Is it really reasonable to expect improvement in
16:12:43 extraction rate and the other measures that were used
16:12:46 based on the description you've given in the fifth
16:12:51 paragraph of your opinion?
16:12:53 A. Well they weren't basing expected improvement on
16:12:56 what I said in the fifth paragraph of course, the
16:12:58 factory people were basing their expected improvement
16:13:01 on years of experience with harvests, some of which,
16:13:06 we have heard, included frost and heal periods, and
16:13:11 they had no reason not to believe at that time that
16:13:14 the beets would not heal and would not process
16:13:18 acceptably.
16:13:19 Q. Okay. Well let's go back to the first page, and
16:13:21 I'll do it just summarizing by memory but we can

16:13:25 check, and that's where you describe the alternate
16:13:27 freeze-thaw cycle as the worst possible situation.
16:13:29 A. Yes.
16:13:30 Q. And that's been something that's been understood
16:13:32 since the time of the 1973 and 1975 beet sugar
16:13:36 foundation conferences.
16:13:37 A. Quite some time.
16:13:38 Q. Yeah, quite some time.
16:13:42 With that level of understanding is it, in your
16:13:46 judgment, reasonable to believe that the situation's
16:13:48 going to turn around with what you're seeing in
16:13:50 mid-October as declining extraction rates?
16:13:53 A. I think based on the fact that they examined the
16:13:55 beets apparently very carefully, from what I heard
16:13:58 during my attendance at various testimonies, they
16:14:02 examined the beets very carefully, the
16:14:05 agriculturalists in the field, at the factory, when
16:14:08 they saw beets that to their visual test, the
16:14:11 standard test used throughout the sugar beet industry
16:14:14 in this country, visual examination, you'll find it
16:14:17 listed in place after place after place in the
16:14:20 literature, that the only -- the best way of
16:14:24 examining for healing in a frost-damaged beet is
16:14:28 visual examination. They did that, they saw what
16:14:31 they saw, they made their decision to process on that

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - - -

FILE COPY

In the Matter of:

2000 Minnesota Sugar Beet Crop Insurance Coverage,

Case Numbers:

01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

RECEIVED
OCT 0 8 2003
CONSTANCE K. WHITE
COPY

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ARBITRATION HEARING

Volume XII, Pages 2358-2546

September 30, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Winthrop & Weinstine, P.A., Attorneys at Law, Suite 3500, 225 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:04 o'clock a.m., September 30, 2003.)

11:51:54 damage and then measured the consequences of that and
11:52:03 found that they would process normally. That example
11:52:05 was from work done in the Netherlands where they
11:52:13 severely frosted beets and then stored them for
11:52:19 periods after the thaw and the beets that harvested,
11:52:24 that processed normally or where they couldn't detect
11:52:29 any adverse of effects were ones that were stored at
11:52:31 4 degrees centigrade for two weeks. Yeah.
11:52:39 Q. And 4 degrees centigrade --
11:52:41 A. Sorry. I should say where they stored them more
11:52:43 than 4 degrees centigrade, which in that case it was
11:52:47 10. They noticed quite serious deterioration. I
11:52:51 don't know of any other case where there hasn't been
11:52:53 an adverse effect of trying to process frozen
11:52:57 material, material that had frozen.
11:52:59 Q. Is that study a basis for the view that Dr.
11:53:02 Martin expressed, and I believe you also may have
11:53:04 expressed, that freeze-damaged beets can be processed
11:53:08 essentially normally for up to two weeks?
11:53:12 A. That's part of that assessment, yes. You can go
11:53:19 quite a while after the freeze damage on that site,
11:53:22 two weeks, before you can detect the detriment, the
11:53:30 changes that would be detrimental to the process.
11:53:33 Q. Is the scalping method that you depicted on the
11:53:37 right your effort to demonstrate the deep scalping

ARBITRATION PROCEEDING

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of:
2000 Minnesota Sugar Beet Crop Insurance Coverage,
Case Numbers:
01-CV-1629 (JMR/FLN)
01-CV-1630
01-CV-1632
01-CV-1633
01-CV-1634
01-CV-1635
01-CV-1636
01-CV-1637
01-CV-2242
02-CV-0985

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ARBITRATION HEARING

Volume VI, Pages 1074 - 1337

September 16, 2003

(The following is the transcript of the arbitration hearing held in the above-entitled matters, before Arbitrators John W. Mooty, David F. Fitzgerald and Robert W. Kettering, at the offices of Dorsey & Whitney, LLP, Attorneys at Law, Suite 1500, 50 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:03 o'clock a.m., September 16 , 2003.)

date, and -- and that's why we generate a positive payment for the nonfrozen beets. And also as I indicated yesterday, the expenses out -- I mean it -- the expenses outstripped the revenue components by three dollars and four cents so, you know, I think -- I guess I thought we covered that pretty well yesterday.
Q. I thought my question was just to capture, in one place, that you included all expenses you could associate with those beets. Is that correct?
A. Correct.
Q. Did that include fixed costs that were going to continue on whether those beets were good beets or bad beets; some allocation for fixed costs?
A. Fixed costs were allocated to all beets --
Q. Okay.
A. -- regardless of whether they were prefreeze or postfreeze.
Q. Did the expenses that you allocated to those beets include any fines or penalties paid to the State of Minnesota or any of its agencies for environmental compliance issues that the cooperative encountered through the disposal of beets?
A. I believe that there would have been some expenses in that regard, and they would have been

applied to the postfreeze beets.
Q. So any fines or penalties imposed on the cooperative are also a component in calculating the negative three dollars and three cents per ton.
A. Yes.
Q. Okay. Mr. Plathe, we're going to talk as the last document this morning about Plaintiffs' Exhibit 212. Take a moment and read it to yourself. I'll have a few questions, Mr. Plathe.
A. I'm all set.
Q. Okay. Mr. Plathe, is Plaintiffs' Exhibit 212 a copy of a letter that you sent to Tracy Beckman, the Minnesota director for the Farm Service Agency, on January 4, 2001?
A. Yes, it is.
Q. Did you try to make that letter as accurate as you could?
A. I probably tried to make it as pleading as I could, given our situation.
Q. The second paragraph includes this sentence, quote, by late October the beets in storage were showing significant signs of deterioration with lower than expected juice purities and recovery rates in the factory, period, unquote. Have I read that accurately?