UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re 2000 Sugar Beet Crop Insurance Litigation | No.: 01-CV-1629<br><br>**CONSOLIDATED AND SECOND AMENDED THIRD-PARTY COMPLAINT** |

Defendants Rain and Hail LLC, Agri General Insurance Company, and ACE Property & Casualty Insurance Company (defendants in 01-CV-1629), IGF Insurance Company in liquidation (defendant in 01-CV-1630), Hartford Insurance Company of the Midwest (defendant in 01-CV-1632), American Growers Insurance Company in Rehabilitation (defendant in 01-CV-1633), Great American Insurance Company (defendant in 01-CV-1634), Farm Bureau Mutual Insurance Company (defendant in 01-CV-1635), Farmers Alliance Mutual Insurance Company and The Alliance Insurance Company (defendants in 01-CV-1636), NAU Country Insurance Company, Mountain States Insurance Company, and Ag Force Insurance Services, Inc. (defendants in 02-CV-0985), Fireman's Fund Insurance Company (defendant in 01-CV-1637) and intervenor Rural Community Insurance Services (originally the defendant in remanded 01-CV-1688) (collectively, "third-party plaintiffs"), for their consolidated and second amended third-party claims against third-party defendant Federal Crop Insurance Corporation ("FCIC"), allege and state as follows:

Introductory Matters

1. At all times relevant to plaintiffs' claims against them, third-party plaintiffs and/or their affiliates were approved providers of crop insurance under multiple peril crop insurance

("MPCI") policies authored by the federal government, published as regulations of the United States, and reinsured by the FCIC.

2. Among the insurance products offered by third-party plaintiffs were coverages for losses in production or value of sugar beets ("MPCI Sugar Beet Policy"). This policy consists of two regulations issued by the FCIC, 7 C.F.R. § 457.8 (the "basic provisions") and 7 C.F.R. § 457.109 (the "crop provisions"). The MPCI Sugar Beet Policy also includes any catastrophic risk protection endorsement ("CAT coverage") which a grower may elect in lieu of higher levels of coverage, and the special provisions, which FCIC issues on a county-by-county basis for use (among other matters) in calculating a grower's premium.

3. Plaintiffs sued third-party plaintiffs in 2001 seeking coverage for alleged losses to their sugar beet crops in 2000. In essence, plaintiffs alleged that adverse weather conditions (an insured cause of loss under Section 12(a) of the crop provisions, 7 C.F.R. § 457.109) occurred on October 6 – 10, 2000, when a freeze-thaw cycle rendered all unharvested beets entirely unsuitable for processing.

4. Third-party plaintiffs denied any liability to plaintiffs, asserted affirmative defenses, and demanded arbitration of plaintiffs' claims against them pursuant to the MPCI Sugar Beet Policy. Arbitration took place in accordance with various court orders, including one entered by this Court on September 27, 2002, pursuant to Section 20 of the basic provisions of plaintiffs' MPCI Sugar Beet Policy. Third-party plaintiffs initially asserted, continue to assert, and believe that any liability which they have to plaintiffs should be borne by the FCIC instead of them. The duly constituted Arbitration Panel ultimately found in favor of plaintiffs, and all third-party plaintiffs have discharged their obligations to plaintiffs pursuant to various settlement agreements. Accordingly, third-party plaintiffs have asserted timely indemnification claims against the FCIC for errors and omissions pursuant to 7 U.S.C. § 1508(j)(3).

5. Third-party defendant FCIC is an agency of and within the United States Department of Agriculture ("USDA"), 7 U.S.C. § 1503, and may sue and be sued. 7 U.S.C. § 1506(d).

Jurisdiction and Venue

6. This action arises under the laws of the United States. Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a) and pursuant to 7 U.S.C. § 1506(d).

7. Venue for this third-party claim in the District of Minnesota is proper pursuant to 7 U.S.C. § 1506(d).

8. Prior to instituting this action, third-party plaintiffs invoked Section V.Y. of the Standard Reinsurance Agreement ("SRA") executed by FCIC, which requires them to give notice to the Manager of FCIC of disagreement with any act or omission of the FCIC. That section also mandates the holding of a meeting "in an attempt to resolve the disagreement." Such a meeting was held on March 28, 2001, but resolution of the issues raised by this litigation did not occur. Accordingly, all preliminary steps to seeking judicial review, as required by Section V.Y. of the SRA, have been taken.

The Federal MPCI Program

9. The federal crop insurance program began in 1938, when Congress passed the original Federal Crop Insurance Act ("FCIA") as part of Great Depression era legislation. For many decades thereafter, FCIC developed all MPCI policy terms and loss adjustment procedures, sold and serviced all MPCI policies, adjusted all claimed losses, and then paid allowed claims. Starting with amendments to the FCIA in 1980 and continuing through 1996, the federal crop insurance program evolved to its present form, which includes the following features:

(a) FCIC still either authors or approves all MPCI policies, but no longer acts as a direct insurer.

(b) Approved insurance providers, such as third-party plaintiffs, sell and service all MPCI policies, are the direct insurers, bear part of the risk of losses thereunder with FCIC, share potential underwriting gains with FCIC, and receive a subsidy from FCIC to cover a portion of their administrative and operating expenses.

(c) FCIC reinsures a portion of any losses sustained and, further, acts in regulatory and supervisory roles.

10. Congress has mandated that the FCIC shall operate the federal crop insurance program in an actuarially sound manner. See 7 U.S.C. §§ 1506(o) and 1508(d)(1).

11. USDA's Risk Management Agency ("RMA") manages the activities and operations of the FCIC. RMA's Administrator serves as the FCIC's Manager. 7 U.S.C. § 6933(c)(2). The FCIC's Manager is its chief executive officer. 7. U.S.C. § 1505(d).

12. The FCIC is authorized to enter into and carry out contracts and agreements. See 7 U.S.C. § 1506(l). This authority includes providing reinsurance for insurers that issue crop insurance policies. See 7 U.S.C. §§ 1508(a) and 1508(k).

13. Approved insurance providers must offer coverage on terms and conditions established by the FCIC, which publishes terms, conditions, endorsements, and special provisions for both CAT and other policies as regulations issued under the FCIA. See 7 U.S.C. § 1508(k)(1).

14. When quoting premiums for coverage, approved insurance providers quote rates determined by the FCIC. See 7 U.S.C. § 1508(d)(1).

15. FCIC reinsures defined portions of the underwriting risks of private insurers. Pursuant to regulations it promulgated in 1987, FCIC executes an SRA with eligible insurance

companies, such as third-party plaintiffs, to reinsure the policies which those companies issue to producers of agricultural commodities. See 7 C.F.R. § 400.164.

The MPCI Sugar Beet Policy

16. The MPCI Sugar Beet Policy offered by third-party plaintiffs and reinsured by the FCIC is a combination of several sets of provisions. Two sets of those provisions are published as regulations of the FCIC and appear in the Code of Federal Regulations. One, referred to as the basic provisions, is set forth at 7 C.F.R. § 457.8 and is denominated as the common crop insurance policy. The other determinative policy language is set forth in the sugar beet crop provisions, referred to as the crop provisions, and published at 7 C.F.R. § 457.109. Although other endorsements or special provisions may exist, the portions of the MPCI Sugar Beet Policy involved herein are found in the published regulations, specifically 7 C.F.R. §§ 457.8 and 457.109.

17. The basic provisions set forth, among other matters of legal significance, the insurance period defining when coverage begins and ends and the respective duties of the insured and insurer in the event of damage or loss. See 7 C.F.R. § 457.8, ¶¶ 11 and 14.

18. The crop provisions for sugar beets, among other matters of legal significance, contain additional definitions, provide greater specificity with respect to the insurance period, define causes of loss, specify additional duties of the insured and insurer in the event of damage or loss, and set forth the methodology for calculating the indemnity payable on the allowed loss claim. See 7 C.F.R. § 457.109, ¶¶ 1, 9, 10, 12, and 13.

19. Based on FCIC's published regulations, the insurance period for the sixteen Minnesota counties involved in this matter ended (for the 2000 crop year) at the earliest of total destruction of the crop, harvest, final adjustment of a loss claim, abandonment of the crop in the field, or November 15, 2000. See 7 C.F.R. §§ 457.8, ¶ 11, and 457.109, ¶ 9. With respect to

sugar beets, the term "harvest" is defined in the regulations as "[t]opping and lifting of sugar beets in the field." 7 C.F.R. § 457.109, ¶ 1.

20. The FCIC regulations define explicitly when notice of loss or damage must be provided. In accordance with 7 C.F.R. § 457.8, ¶ 14(a), an insured must provide notice of loss "within 72 hours of your initial discovery of damage (but not later than 15 days after the end of the insurance period). . . ." Given the definition of the insurance period set forth in paragraph 19, coverage can end at various times, based on the earliest of the events specified therein. For instance, if sugar beets have been harvested, the absolute latest date for notice of any loss would be fifteen days following the harvest. Similarly, if the calendar date fixed by the crop provisions is utilized to define the end of the insurance period, November 15 would be the relevant date in Minnesota, meaning that notice of loss would have to be given within fifteen days following that date (i.e., during the period November 16 – 30, 2000). Because coverage ends at the earliest of various specified events or dates, including harvest, the latest theoretical date for giving notice of loss in Minnesota is November 30, 2000 (the fifteenth day following November 15). The Arbitration Panel explicitly found that the last day of harvest was October 29, 2000. See Finding 28. (Some plaintiffs actually completed their harvesting prior to October 29, but using that date is appropriate for purposes of illustrating FCIC's errors and omissions.) Therefore, the insurance period ended no later than October 29, 2000, and any notice of loss was required prior to November 13, 2000.

21. The applicable regulations also define an insured producer's duties with respect to permitting appropriate and accurate adjustment of any claimed losses. These duties include leaving "representative samples intact for each field" (which "must be at least ten feet wide and extend the entire length of each field"), allowing removal of samples, providing copies of records, and not taking specified actions (such as destroying unharvested portions of the insured

crop without the consent of the insurer). See 7 C.F.R. §§ 457.8, ¶ 14, and 457.109, ¶ 12(a). The insured producer's duties also include submitting a fully documented claim for loss indemnity "not later than 60 days after the end of the insurance period." 7 C.F.R. § 457.8, ¶ 14(c). Although the insurance period ends at the earliest of any of several specified events, as set forth in paragraph 19, the theoretical latest date for submitting such documentation would have been January 14, 2001 (assuming that the insurance period ended as late as November 13, 2000). Based on the factual finding made by the Arbitration Panel that harvest was completed October 29, 2000, however, the actual latest date for submitting such documentation would have been on or before December 28, 2000. The insured producer, moreover, must comply with 7 C.F.R. § 457.8, ¶ 14(e), which states:

> You must establish the total production or value received for the insured crop on the unit, that any loss of production or value occurred during the insurance period, and that the loss of production or value was directly caused by one or more of the insured causes specified in the Crop Provisions.

Regulations issued by FCIC provide: "No indemnity shall be paid unless the insured complies with all terms and conditions of the contract." 7 C.F.R. § 457.7. Accordingly, permitting untimely notice of and documentation of loss defeats effective implementation of the loss adjustment process and eliminates the insured producer's specific and unambiguous duties under the sugar beet crop insurance policy.

22. The introductory paragraph of the policy specifically informs insureds: "The provisions of the policy are published in the Federal Register and codified in chapter IV of title 7 of the Code of Federal Regulations (CFR) under the Federal Register Act (44 U.S.C. 1501 *et seq.*), and may not be waived or varied in any way by the crop insurance agent or any other agent or employee of FCIC or the company."

FCIC's Errors and Omissions Resulting from Two 2001 Manager's Bulletins

23. After sustaining alleged freeze losses in October 2000, plaintiffs sought FCIC's and RMA's intervention on their behalf when third-party plaintiffs rejected their untimely notices of loss. Despite full knowledge of the occurrence of the freeze event on October 6 – 10, 2000, plaintiffs and their processor, Southern Minnesota Beet Sugar Cooperative ("SMBSC"), generally waited until December15, 2000, to provide notice of loss; the few plaintiffs who gave any form of notice prior to December 15, 2000, did so on an untimely basis under the MPCI Sugar Beet Policy and did not comply with its other loss adjustment requirements. When third-party plaintiffs received these late notices, the entire crop had been harvested and commingled in vast piles at piling stations maintained by SMBSC, and SMBSC actually had processed at least half of plaintiffs' 2000 beet harvest. These conditions rendered it impossible to adjust accurately any individual plaintiff's alleged loss in production, and, coupled with untimely notice of loss, caused denial of coverage.

24. Following plaintiffs' and SMBSC's efforts to obtain relief from the government, RMA, on behalf of FCIC, committed a series of errors and omissions. As explained below, these failings include issuance of Manager's Bulletin MGR-01-010 ("MGR-01-010") on March 2, 2001, and continued through its issuance of Manger's Bulletin MGR-010-010.1 ("MGR-01-010.1") on June 5, 2001.

25. MGR-01-010 was contrary to law and was issued against the advice of RMA program, policy, and loss adjustment specialists, regional office specialists, crop specialists, and third-party plaintiffs and their advisors and representatives. Third-party plaintiffs first identify the legal errors or omissions with respect to MGR-01-010 and then identify its factual errors or omissions.

26. MGR-01-010 amended, waived, or varied terms of the sugar beet policy in a variety of ways. First, MGR-01-010 negated the insured's obligation to give notice of loss within seventy-two hours of any loss or damage despite the explicit obligation to do so under 7 C.F.R. § 457.8, ¶ 14(a)(2). In doing so, MGR-01-010 conceded that notices of losses by sugar beet producers generally were not given "within 72 hours of the freeze, during the harvest periods, or before the end of the insurance period." This negation and concession are material, and the balance of MGR-01-010, therefore, is totally incompatible with the MPCI Sugar Beet Policy, because the insured producer has the burden of establishing that his or her "loss of production or value occurred during the insurance period." See 7 C.F.R. § 457.8, ¶ 14(e). This negation and concession also are material and are totally incompatible with the MPCI Sugar Beet Policy because they demonstrate that the FCIC has expanded coverage for the 2000 sugar beet crop in Minnesota beyond the period when it was in the field in violation of 7 U.S.C. § 1508(a)(2).

27. MGR-01-010 negated the insured's obligation to give notice of loss within fifteen days of termination of the insurance period despite the unambiguous obligation to do so under 7 C.F.R. § 457.8, ¶ 14(a)(2). The Arbitration Panel found that plaintiffs (either "directly or by and through their agents and representatives," which included SMBSC) were aware of the freeze "not later than October 20, 2000." See Finding 143. It is significant that, despite this finding, the Panel relied on MGR-01-010 and found no bar to recovery based on lack of timely notice. See Findings 80 – 85 and Parts XI and XII.

28. MGR-01-010 negated the insured's obligation to leave representative samples of the crop available for inspection in connection with adjustment of losses despite the unmistakable obligation to do so under 7 C.F.R. §§ 457.8, ¶ 14(a)(3), and 457.109, ¶ 12(a). As the Arbitration Panel found, each plaintiff's beets, once delivered, were commingled with other

growers' beets and lost their separate identity. See Finding 13. It also found that plaintiffs generally failed to leave "check strips" or other samples of beets that loss adjusters could inspect. See Finding 139. Thus, MGR-01-010 permitted plaintiffs, and later the Panel, to avoid the legal significance of this obligation imposed under the MPCI Sugar Beet Policy.

29. MGR-01-010 negated the insured's obligation to submit a fully documented claim for indemnification within sixty days after the end of the insurance period despite the clear obligation to do so under 7 C.F.R. § 457.8, ¶ 14(c).

30. MGR-01-010 negated the insured's obligation to establish the total production or value received for the crop, to establish that any loss of production or value occurred during the insurance period, and to establish that any loss was caused by a covered cause of loss despite the explicit obligations to do so under 7 C.F.R. § 457.8, ¶ 14(e).

31. MGR-01-010, as a matter of indisputable fact, contained the following material error: "Those producers whose sugar beets were not processed until after December 1, 2000, could not have discovered and reported the damage or loss by the" policy deadline. This statement's materiality is demonstrated, at least in part, by the Arbitration Panel's citation to and reliance on MGR-01-010. That this statement indisputably is erroneous is evidenced by the review by RMA's Deputy Administrator for Compliance (the "Compliance Review") which MGR-01-010 referenced starting at page 2 and which was dated February 14, 2001, and signed by Mark Huber, Director of RMA's Northern Regional Compliance Office in Eagan, Minnesota.

(a) The Compliance Review explicitly stated: "The processor [i.e., SMBSC] and the insured [plaintiffs] were aware of the early October frost and the possibility of resulting damage. By policy requirements, insureds should have filed their notice of loss at this time so a MPCI loss adjuster could have inspected the sugar beets before they were delivered to the processor."

(b) The Compliance Review also found: SMBSC "agriculturalists say that damage in the beet piles was suspected by late October. When leaving the pile at the Bird Island piling station, they recognized this pile was warmer than any pile yet worked on. The east pile at Bird Island had an abnormal amount of sprouting which indicates excessive heating. By November 1st, the pile at Bird Island had been split."

(c) The Compliance Review further found: "By November 2, the pile at Buffalo Lake had already begun juicing. 'Juicing' in a pile represents advanced deterioration of sugar beets. The juice also spreads damage to other beets."

(d) The Compliance Review reported: "Agriculturalists [at SMBSC] said that almost every pile had hot spots and sink holes which indicates deteriorating beets underneath by early November. … In this case, the damage affected the surrounding beets so rapidly that there was no saving them."

The Compliance Review, completed two weeks before MGR-01-010 was issued, plainly negates the factual accuracy of the bulletin.

32. MGR-01-010 also states: "However, since the damage to the sugar beets was not apparent when delivered, damage from the freeze and thaw, an insured cause of loss, may not have been discovered until the sugar beets were processed." This statement, like the one quoted in paragraph 31, is indisputably erroneous, and FCIC knew it to be erroneous and false when the bulletin was issued:

(a) It and RMA had had the Compliance Review in hand for two weeks, and it explicitly negates the validity of this statement, as the factual findings quoted in subparagraphs (a) – (d) of paragraph 31 demonstrate.

(b) The FCIC, moreover, was the defendant in litigation brought by sugar beet growers in the 1980s where, among other matters, an issue was damage to beets subjected to the same sort of freeze-thaw cycle described in MGR-01-010. The Eighth Circuit's decision in that case is significant because it recites:

> An undamaged beet can be stored the entire winter awaiting processing and not suffer deterioration in recoverable sugar content. The freezing and subsequent thawing of an unharvested sugar beet, however, causes damage to the beet's cellular structure and reduces the storability of the beet. The deterioration of freeze-damaged beets occurs gradually; thus, such beets must be processed quickly.

A.W.G. Farms, Inc. v. FCIC, 757 F.2d. 720, 723-24 (8th Cir. 1985) (emphasis added). The District Court noted the inevitability of such damage a year earlier in the same case. A.W.G. Farms, Inc. v. FCIC, 586 F. Supp. 690, 692 (D. Minn. 1984). As a litigant in A.W. G. Farms, FCIC had to have acquired by that time (1984 – 85) actual knowledge that a freeze-thaw cycle inevitably damages a beet, and for the scientific reasons generally described by the Eighth Circuit. That this knowledge existed at least fifteen years before the freeze-thaw cycle in 2000 of which plaintiffs complained conclusively establishes that the fact of damage, although perhaps not its extent, was known or knowable by the plaintiffs and SMBSC as of October 10, 2000, when the freeze-thaw cycle concluded.

In view of the foregoing, there is no factual or scientific basis for the premise of FCIC's late notice analysis in MGR-01-010, and the bulletin is plainly erroneous.

33. In short, the Compliance Review upon which MGR-01-010 purports to rely, as a matter of fact, indisputably demonstrates material factual errors in the bulletin. RMA simply ignored the facts as found by its experienced investigators. MGR-01-010, therefore, was manifestly erroneous in purporting to excuse late notice by plaintiffs.

34. MGR-01-010 established procedures for adjustment of losses not set forth in the regulations embodying the sugar beet policy. In fact, MGR-01-010 actually rendered impossible implementation of the available procedures for determining sugar beet losses. MGR-01-010 also effectively eliminated use of tests of raw sugar content "performed by the processor at the time of delivery." 7 C.F.R. § 457.109, ¶ 13(d). The bulletin, accordingly, encouraged reinsured companies (such as third-party plaintiffs) to contact RMA for assistance in making loss adjustment determinations. FCIC's response to the ensuing requests was its subsequent issuance of MGR-01-010.1 on June 5, 2001. The second bulletin, however, created additional loss adjustment problems, especially since it established loss adjustment procedures inconsistent with the terms of the sugar beet policy.

35. Issuance of MGR-01-010.1 also constituted an actionable error or omission for the following reasons:

(a) The bulletin did not explicitly declare, or even imply to any reasonable degree of certainty, that losses on beets actually processed should be determined under Section 13(d) of the crop provisions instead of Section 13(e). Section 13(d) presumably sets forth how losses are to be calculated with respect to beets which meet the processor's minimum acceptable standards for processing, whereas Section 13(e) does the same for beets not meeting these standards.

(b) The bulletin did not explain that the sugar content and purity percentages provided in it (or ones more precisely tied to a specific day or to an individual policyholder, if available) were the only objective criteria that third-party plaintiffs permissibly could use in determining suitability for processing of their policyholders' beets.

(c) The bulletin failed to withdraw MGR-01-010, or even to modify its late notice discussion, despite acknowledging that RMA had received copies of electronic

communications proving that plaintiffs had actual knowledge of damage to their beets prior to November 30, 2000.

36. There can be no better evidence that issuance of MGR-01-010 was an error on FCIC's part than RMA's admission, through an authorized agent, on June 20, 2001, that, if the agency had known before March 2, 2001 (when the first bulletin was issued) what it later learned, MGR-01-010 would not have been issued. Third-party plaintiffs also allege that issuance of MGR-01-010.1 constitutes an admission by FCIC and RMA that issuance of MGR-01-010 was an error in that, contrary to its position, timely notice of loss in fact could have been given by plaintiffs.

37. There can be no doubt that MGR-01-010 influenced the fact-finding of the Arbitration Panel, was material to its findings covering the same issues as the bulletin, and substantially contributed to the Panel's ultimately adverse findings against third-party plaintiffs. See, e.g., Findings 81-85.

38. In view of the foregoing, issuance of MGR-01-010 and issuance of MGR-01-010.1 constitute errors of the FCIC, thereby entitling defendants and third-party plaintiffs to indemnification for all payments made to producers in accordance with 7 U.S.C. § 1508(j)(3). The indemnification must include all loss adjustment expenses and other expenses, including attorneys' fees.

FCIC's "Good Farming Practices" Errors and Omissions

39. Plaintiffs' MPCI policies excluded from coverage losses caused by failure to follow recognized good farming practices. This exclusion is required by the FCIA, 7 U.S.C. § 1508(a)(3), and was set forth in Section 12(b) of the basic provisions of each plaintiff's MPCI Sugar Beet Policy.

40. Third-party plaintiffs contended, and submitted substantial competent evidence to the Arbitration Panel to prove, that plaintiffs did not follow good farming practices with respect to their handling of weather conditions (both cold and heat) potentially affecting their 2000 sugar beet crop.

41. The Arbitration Panel rejected third-party plaintiffs' contention that all, or at least significant portions, of plaintiffs' losses were attributable to their failure to follow good farming practices, finding, among various matters, that:

(a) Plaintiffs followed the same practices that they successfully had followed for prior freeze events.

(b) Plaintiffs followed the practices used in the counties where they farmed.

(c) Plaintiffs complied with their contractual obligations to SMBSC.

See Findings 88 – 93 and 127.

42. The Panel could not avoid making these adverse findings due to FCIC's errors and omissions in its definition of and approach to good farming practices with respect to the MPCI Sugar Beet Policy.

43. One of FCIC's fundamental and material errors was its definition of good farming practices in 2000, which specifically stated:

> *Good farming practices.* The cultural practices generally in use in the county for the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, and are those recognized by the Cooperative State Research, Education, and Extension Service as compatible with agronomic and weather conditions in the county.

7 C.F.R. § 457.8 ¶ 1 (2000) (emphasis added). This definition, by having a limited geographic focus, had at least five serious flaws:

(a) It countenanced repetition of undesirable or improper farming practices.

(b) It failed to encourage a "best practices" approach for agricultural production.

(c) It promoted insularity as opposed to receptivity to improvement.

(d) It inhibited innovation in dealing with new or atypical situations.

(e) It allowed beet growers to ignore well established warning signs of actual or probable damage to their beet crops.

Such a limited approach was not, and is not, required by the FCIA. Section 1508(a)(3) thereof neither required nor implied such a geographic limitation on "good farming practices" issues. That a "county" approach was erroneous has been made manifest by FCIC's subsequent amendment of the definition to substitute "area" for "county." 68 Fed. Reg. 37724 (June 25, 2003).

44. Even assuming a "county" or "area" approach could be appropriate for determining good farming practices for some crops, it was and is inappropriate for insuring sugar beets. Only sugar beets grown under a sugar beet processor contract are eligible to be insured. 7 C.F.R. § 457.109, ¶ 7(a)(3). Such contracts specify planting, cultivation, harvesting, and delivery practices of beet growers, as FCIC either knew or should have known when it promulgated the MPCI Sugar Beet Policy. The processor, in accordance with its form contract with beet growers, moreover, determines those beets which can and cannot be processed, and the crop provisions recognize this right and obligation of the processor. Id., ¶¶ 13(d) and 13(e). The FCIC's use of a "county" approach for determining good farming practices in 2000 was particularly erroneous for the following reasons applicable to MPCI coverage for sugar beets:

(a) Beet processors then were (and remain) multi-county and/or multi-state operators. For instance, SMBSC had member growers in at least sixteen Minnesota counties, and one of its competitors (American Crystal Sugar Company) operated in

multiple counties in both Minnesota and North Dakota. Thus, whatever a single processor required or permitted would constitute ipso facto the farming practices for an entire county (and generally for many counties) even if such practices were outdated, harmful, or inappropriate for dealing with specific agronomic or weather conditions.

(b) Given the unique role of processors, both in specifying the agricultural practices to be used in bringing a crop to maturity and harvest and in determining the suitability of harvested beets for processing, a standard encompassing the most widely accepted agricultural practices nationally, if not internationally, was (and remains) essential for determining good farming practices for sugar beets.

FCIC's Loss Determinations Errors and Omissions

45. As promulgated by FCIC, the MPCI Sugar Beet Policy has a section for determining the extent of an insured loss. Section 13, the relevant provision, provides the potentially applicable formulas. 7 C.F.R. § 457.109, ¶ 13.

46. A critical issue contested by plaintiffs and third-party plaintiffs, and ultimately resolved by the Arbitration Panel against third-party plaintiffs, was whether any freeze damage losses sustained by plaintiffs were to be measured under Section 13(d) or Section 13(e) of the crop provisions.

(a) Because substantially all beets harvested by plaintiffs in 2000 actually were processed by SMBSC and turned into sugar and co-products, third-party plaintiffs advocated that any freeze damage to processed beets had to be determined under Section 13(d), and that, if Section 13(e) applied at all, it only was to be used to measure losses with respect to discarded beets.

(b) Plaintiffs, in contrast, advocated that all beets harvested after the freeze event were unsuitable for processing, thereby making Section 13(e) applicable to all post-freeze beets.

47. RMA allowed an authorized representative to testify before the Arbitration Panel on the scope and meaning of various policy terms, including the applicability of Sections 13(d) and 13(e) to determine the dollar amounts of losses sustained. This representative testified that Section 13(e) could not be used to measure the amount of loss with respect to beets actually processed. Instead, the amount of any loss with respect to processed beets had to be determined under Section 13(d), and Section 13(e) only could apply to rejected or discarded beets, according to this representative.

48. The Arbitration Panel rejected third-party plaintiffs' positions with respect to Sections 13(d) and 13(e) and did not accept the supporting testimony of RMA's authorized representative. See Findings, Part VIII. The Panel, therefore, ordered indemnity payments to be calculated under Section 13(e), as reflected in Attachment A to its findings. Id., ¶ 86.

49. The policy language was (and remains) insufficient to support the processed vs. unprocessed beets dichotomy advocated by third-party plaintiffs and posited at the hearing by RMA's authorized representative. The inadequacy of and defects in the policy's actual text, allowing the Arbitration Panel to make an award under Section 13(e), constitute another error or omission by FCIC. This is a particularly egregious one because prior litigation against FCIC gave it sufficient notice and adequate time to address the potential significance of this issue.

FCIC's "Commingling" Errors and Omissions

50. MPCI policies of the type at issue in this matter require individualized, rather than collective, loss determinations. Even if an entire area sustains the same adverse and insured

weather condition, the existence and amount of loss must be determined on an individualized policyholder-by-policyholder basis.

51. The crop provisions do not make commingled production ineligible for payment of an insurance indemnity if an insured producer has commingled his own production. Instead, they specify how such commingled production is treated for loss adjustment purposes. 7 C.F.R. § 457.109, ¶ 13(a)(2).

52. The crop provisions do not contemplate payment of insurance indemnities when an insured's beets have been delivered to the processor and then commingled with beets produced by other growers. There are multiple legal and program integrity reasons to preclude payment of insurance indemnities when insured producers have delivered their beets to their processor who, in turn, has commingled them.

(a) Payment of indemnities on beets in such situations would expand coverage to permit insurance for beets to extend beyond the period during which they were in the field in violation of 7 U.S.C. § 1508(a)(2).

(b) Payment in such circumstances defeats the individualized approach to loss determinations required by the MPCI Sugar Beet Policy and all similar policies.

(c) Payment in such circumstances risks paying an indemnity for losses caused, in whole or in part, by events subsequent to harvest, at which point the insurance period conclusively ends for sugar beets.

53. MGR-01-010 affirmatively recognized that the beets in question had been commingled following harvest. Nevertheless, the bulletin was issued. Third-party plaintiffs understand that commingling was not allowed to defeat any recovery by plaintiffs due to RMA's perception that A.W.G. Farms, cited above in paragraph 32, allows losses on commingled beets to be compensated under the MPCI Sugar Beet Policy. This understanding is based on the

testimony of the same RMA representative referenced in paragraph 47. Reliance on A.W.G. Farms for this purpose was inappropriate.

(a) The decision in A.W.G. Farms did not construe the policy at issue in this matter. That case was the subject of court opinions in 1984 and 1985. The policy at issue in this matter, however, was first issued on November 19, 1996. 61 Fed. Reg. 58775 (1996).

(b) A.W.G. Farms did not address the relevance of 7 U.S.C. § 1508(a)(2), nor did RMA in either of the applicable bulletins.

Therefore, relying on A.W.G. Farms to permit recovery of commingled production was an error.

54. FCIC has committed a more basic error or omission, however, because it has failed to revise MPCI sugar beet coverage to preclude payment of insurance indemnities on beets commingled after harvest without any loss adjustment prior to delivery (or, alternatively, making absolute and unequivocal the requirement to maintain representative samples for subsequent inspection). Assuming that A.W.G. Farms was decided correctly under the policy language then in effect, FCIC's errors and omissions encompass failing to revise the policy to preclude such a result under the current policy language. As noted, the MPCI Sugar Beet Policy at issue in this matter first was issued November 19, 1996. Thus, FCIC then had an opportunity to address this aspect of A.W.G. Farms, particularly since FCIC had litigated and lost that case. The MPCI Sugar Beet Policy was then amended twice between its 1996 issuance and 2000: on December 2 and 10, 1997, 62 Fed. Reg. 63633 and 65167 (1997). FCIC used neither additional opportunity to correct the policy interpretation resulting from A.W.G. Farms and exploited by plaintiffs against third-party plaintiffs.

55. Accordingly, FCIC's handling of the commingling issue has damaged third-party plaintiffs.

56. In view of the allegations set forth in paragraphs 1 – 55, third-party plaintiffs have sustained compensable losses due to FCIC's errors or omissions.

WHEREFORE, third-party plaintiffs demand judgment against the FCIC, as follows:

(a) Indemnification for any and all liability to plaintiffs;

(b) Reimbursement of all attorneys' fees, costs, and other expenses of this action; and

(c) Such further and additional relief as the Court deems just and equitable.

Dated: August ___, 2005

By: s/Thomas H. Boyd
Thomas H. Boyd, #200517
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street
Suite 3500
Minneapolis, MN 55402-4629
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
tboyd@winthrop.com

and

P. John Owen (KS Bar #11835; MO Bar #22523)
NATIONAL CROP INSURANCE SERVICES, INC.
8900 Indian Creek Parkway, Suite 600
Overland Park, Kansas 66210
Telephone: (913) 685-2767
Facsimile: (913) 685-3080
johno@ag-risk.com

Attorneys for All Defendants and
Third-Party Plaintiffs

By: s/Michael J. Davenport by Thomas H. Boyd
Michael J. Davenport
Rain and Hail Insurance Services, Inc.
9200 Northpark Drive, Suite 300
Johnston, IA 50131-3006
Telephone: (515) 559-1000
Facsimile: (515) 559-1001

Attorneys for Defendants and Third-Party Plaintiffs Rain and Hail LLC, Agri General Insurance Company and ACE Property and Casualty Company

2318623v2